# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN MILLER,

                    PETITIONER,

    vs.

THERESA DELBALSO,
Superintendent SCI Mahanoy,
SETH WILLIAMS,
Philadelphia District Attorney, and
KATHLEEN KANE,
Pennsylvania Attorney General

                    RESPONDENTS.

CIVIL ACTION No. 2:12-cv-00742-AB

**MEMORANDUM OF LAW IN SUPPORT OF SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## TABLE OF CONTENTS

**Page**

I.    Introduction ...................................................................................................... 4

II.   Statement of Facts and Procedural History ...................................................... 6

      A.    Initial Police Investigation ..................................................................... 6

      B.    Mr. Miller's Preliminary Hearing and Trial .......................................... 9

      C.    Mr. Miller's PCRA Petitions and New Evidence Discovered After Trial ........... 10

            1.    First PCRA Petition, Leading to First Federal Habeas Petition ............... 10

            2.    Second PCRA Petition ............................................................. 12

            3.    Third and Fourth PCRA Petitions, Leading to This Habeas Petition ....... 13

III.  Argument ...................................................................................................... 21

      A.    Mr. Miller's Petition Meets the Procedural Requirements. .................. 23

            1.    Mr. Miller Exhausted his State Court Remedies. ..................... 23

            2.    This Petition Is Timely ............................................................. 25

                  a.    The Newly Discovered Evidence of Michael Arnold And
                        Mark Manigault Was Timely Filed in Mr. Miller's
                        February 13, 2012 Petition For Writ Of Habeas Corpus. ............. 25

                  b.    The Newly Discovered Evidence of Jack Williams Was
                        Timely Filed in Mr. Miller's February 21, 2013 Petition
                        For Writ Of Habeas Corpus. ......................................................... 28

      B.    There Can be No Procedural Default Where Mr. Miller Presents New
            Facts Supporting His Actual Innocence. ............................................... 29

      C.    Mr. Miller Was Deprived of His Fourteenth Amendment Right to
            Demonstrate His Innocence With Newly Discovered Evidence as The
            Process Afforded to Him Was Fundamentally Inadequate. .................. 30

            1.    Mr. Miller's New Facts Supporting His Innocence Were Not
                  Considered Because They Pertained to His Ultimate Defense
                  Theory. .................................................................................... 33

            2.    Mr. Miller's Diligence Cannot be Condemned Through The
                  "Clarity of Hindsight." ............................................................ 35

      D.    Mr. Miller Was Deprived of his Due Process Rights Because the
            Commonwealth Failed to Disclose Exculpatory Evidence that Would
            Have Undermined the Credibility of the Key Witness Against Mr. Miller
            at Trial. ................................................................................................... 37

            1.    This Court Should Exercise Independent Judgment on Mr. Miller's
                  *Due Process* Claims. ................................................................ 37

2.   Mr. Miller Was Denied Due Process Because the Commonwealth Failed to Disclose Material Impeachment Evidence. ............................... 38

a.   The Suppressed Jack Williams and Manigault Evidence was Favorable to Mr. Miller. .......................................................... 39

b.   The Commonwealth Withheld Evidence from Jack Williams and Mark Manigault. ....................................................... 42

c.   The Evidence was Material............................................................ 44

E.   This Court Must Order a New Trial so That a Jury May Find Mr. Miller's Actual Innocence. ................................................................................................... 48

IV.   Conclusion ................................................................................................................................. 52

#37346889 v5

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007)......................................................................52

*Appel v. Horn*, 250 F.3d 203, 2010 (3d Cir. 2001)............................................................24,32, 39

*Betts v. McKune*, No. 11-3097-SAC, 2013 WL 3328747, at *8 (D. Kan. July 2, 2013)...............27

*Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986)..............................................................46

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................... passim

*Breakiron v. Horn*, 2008 U.S. Dist. LEXIS 87013, at *6 (W.D. Pa. Oct. 27, 2008), *aff'd
in part, rev'd in part on other grounds*, 642 F.3d 126 (3d Cir. 2011).....................................49

*Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) .................................................40, 41, 43, 45

*Bridges v. Beard*, 941 F. Supp. 2d 584, 596 (E.D. Pa. 2013) .................................24, 32, 39, 46, 47

*Commonwealth v. Medina*, 92 A.3d 1210, 1217-1218 (Pa. Super. Ct. 2014) .............................27

*Commonwealth v. Miller*, No. 3269 EDA 2011 (Pa. Super. Ct. July 24, 2012)..........21, 35, 37, 39

*Commonwealth v. Miller*, No. 3563 EDA 2014 (Pa. Super. Ct. December 18, 2015) .......... passim

*Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010)......................................................37

*Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981) ..........................................32

*In re Davis*, 557 U.S. 952, 952 (2009)..........................................................................................52

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*
557 U.S. 52, 68 (2009).................................................................................32, 33, 34, 38, 51

*Herrera v. Collins*, 506 U.S. 390, 401 (1993) ..................................................................50, 51, 52

*Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010)......................................................................30

*House v. Bell*, 547 U.S. 518, 536 (2006) ........................................................................30, 31, 51

*Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013)...........................................................................40

*Kyles v. Whitley*, 514 U.S. 419, 437 (1995)...........................................................40, 43, 45, 46, 48

*Lambert v. Beard*, 633 F.3d 126 (3d Cir. 2011) ...........................................................................49

*Lambert v. Blackwell*, 387 F.3d 210, 232 (3d Cir. 2004) .........................................................25, 49

*Lee v. Glunt*, 667 F.3d 397, 403 n.5 (3d Cir. 2012)........................................................................52

*Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ..................................................................46

*Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. Pa. 2000)...............................................................30

*McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013)...............................................................30, 52

*Medina v. California*, 505 U.S. 437, 446, 448 (1992) ...............................................................33, 38

*Munchinski v. Wilson*, 807 F. Supp. 2d 242, 275 (W.D. Pa 2011) ....................................40, 45, 46

*O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) .......................................................................25

*Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) ..........................................................................26

*Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) ...............................................................26, 27

*Schlup v. Delo*, 513 U.S. 298, 327 (1995) ...............................................................30, 31, 51, 52

*Shoats v. Horn*, 213 F. 3d 140, 143 (3d Cir. 2000).......................................................................32

*Sistrunk v. Rozum*, 674 F.3d 181, 188-89 (3d Cir. 2002) ..............................................................26

*Smith v. Cain*, 132 S. Ct. 627, 630 (2012) ..............................................................................45, 47

*State v. Garner*, 523 S.E.2d 689, 699 (N.C. Ct. App. 1999) ........................................................27

*United States v. Agurs*, 427 U.S. 97, 107 (1976) .....................................................................40, 45

*United States v. Bagley*, 473 U.S. 667, 676 (1985) .....................................................40, 41, 43, 46

*United States v. Battles*, 2012 U.S. Dist. LEXIS 3185, at *17 (E.D. Pa. Jan. 10, 2012)...............49

*United States v. Walker*, 657 F.3d 160, 185 (3d Cir. 2011)............................................................49

*Wetzel v. Lambert*, 132 S.Ct. 1195, 1197 (2012)...........................................................................49

*Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005).......................................................................26

*Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009)..............................................................40, 43, 45

*Wyatt v. State*, 71 So. 3d 86, 100 (Fla. 2011) ...............................................................................27

**STATUTES**

*42 Pa. C.S. § 9542* ...................................................................................................................5, 25

*42 Pa.C.S. § 9545(b)* ...................................................................................................32, 33, 34, 37

*28 U.S.C. § 2244(d)* .............................................................................................................24, 26

*28 U.S.C. § 2254* .................................................................................................22, 23, 24, 31, 32

## I.     Introduction

Since his conviction for murder in 1998 on the basis of the testimony of two people—neither of whom ever claimed to witness the murder and both of whom have repeatedly recanted their statements—and notwithstanding the complete absence of any physical evidence whatsoever, John Miller remains in prison.   Meanwhile, David Williams, one of the two witnesses against Mr. Miller, has repeatedly confessed to committing the crime for which Mr. Miller is incarcerated.  In a fittingly cruel twist of fate, it was the unsworn statements of David Williams to police detectives that led to Mr. Miller's arrest and conviction in the first place.  Yet, on the same day David Williams told detectives Mr. Miller had confessed to Anthony Mullen's murder, he also told them another man, Jack Williams, had confessed to a different murder—all in an effort to gain leniency for himself.  Even though David Williams' claim about Jack Williams' confession was easily disprovable, and the Commonwealth likely knew it was false because David Williams was not called as a witness at Jack Williams' trial, the Commonwealth withheld this evidence from Mr. Miller.  Making matters worse, the Commonwealth also withheld evidence that David Williams told police that another individual, Mark Manigault, could provide information supporting David Williams' claim that Mr. Miller murdered Mr. Mullen.  The police interviewed Mr. Manigault and learned that, in fact, David Williams' statement was not true and Mr. Manigault knew nothing about the Mullen murder.  By withholding the information demonstrating the falsity of David Williams' statements, the Commonwealth withheld two key pieces of evidence that could have been used to impeach their star witness, unquestionably *Brady* material that the Commonwealth had an affirmative obligation to disclose.  Further, because Mr. Miller was not informed about Mr. Manigault, he had no opportunity to discover that David Williams had admitted to Mr. Manigault that he

falsely accused Mr. Miller. The Commonwealth's failure to disclose this exculpatory evidence constitutes an independent deprivation of Mr. Miller's due process rights.

The house of cards upon which the Commonwealth's case was built has now completely collapsed. Nonetheless, Mr. Miller remains incarcerated because the Pennsylvania courts unconstitutionally construed the Pennsylvania Post Conviction Relief Act (the "PCRA") such that it has been impossible for Mr. Miller to obtain relief.

In enacting the PCRA, the Pennsylvania Legislature sought to "provide[] for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa. C.S. § 9542. For the past eighteen years, John Miller has diligently sought to use the procedures set forth in the PCRA to obtain collateral relief from the conviction of a crime that he did not commit. As construed by Pennsylvania courts, however, the PCRA procedures have been applied against Mr. Miller as a roadblock as opposed to the avenue to justice they were intended to provide. Specifically, the PCRA, as applied to Mr. Miller, violates his Fourteenth Amendment right to due process because Pennsylvania courts have improperly construed: (1) the definition of a new "fact" in the PCRA, by substituting the word "theory" and consequently holding that Mr. Miller's discovery of new "facts" are untimely because they relate to a previously presented "theory"; and (2) the PCRA's requirement that a petitioner exercise "due diligence" to overcome a time-bar in a manner that is impossible to meet without the "clarity of hindsight." *Id.* at § 9545(b)(ii). Because the application of the PCRA to Mr. Miller's claims is fundamentally inadequate to vindicate the substantive right it is intended to provide, Mr. Miller has been unconstitutionally deprived of his right to due process under the Fourteenth Amendment to the United States Constitution. Moreover, because the newly discovered evidence proving Mr. Miller's innocence makes it more likely than not that no

reasonable juror could have found Mr. Miller guilty beyond a reasonable doubt, the Pennsylvania courts' refusal to consider this evidence on procedural grounds does not, and cannot, foreclose consideration of the evidence by this Court. The Pennsylvania courts' refusal to consider the merits of Mr. Miller's claims permits this Court to exercise its independent judgment in evaluating their merits without deference to any conclusion by the state courts.

Finally, while Mr. Miller seeks relief for the specific violations of his constitutional rights discussed above, he also respectfully requests that this Honorable Court recognize that the continued incarceration of any actually innocent individual is not only a freestanding constitutional violation but an act so antithetical to our fundamental rights and values as to be intolerable. Mr. Miller has exhausted the remedies afforded to him under state law. He now comes before this Honorable Court so that justice can finally be achieved.

## II.    Statement of Facts and Procedural History

Throughout his incarceration, Mr. Miller has continued to gather evidence of his actual innocence. He presented this evidence to the state court in four separate PCRA petitions, all of which were denied and unsuccessfully appealed. Each petition for relief was supported by new facts that Mr. Miller could not have discovered earlier through due diligence. Mr. Miller now submits this Second Amended Petition for a Writ of Habeas Corpus.

### A.    Initial Police Investigation

On the night of October 8, 1996, Anthony Mullen was shot and killed while working as a parking lot attendant near 30th Street Station in Philadelphia. (Ex. A, Trial Tr. Day 1, 28:9-14, Sept. 24, 1998.) He suffered a single gunshot wound to the chest. (Ex. B, Mullen Autopsy Report.) The autopsy showed that Mr. Mullen was intoxicated at the time of his death, and that the bullet hit him directly in the heart, killing him nearly instantly. (*Id.*)

Mr. Mullen's body was found lying outside his van, where he often spent his shifts. (Ex. A at 28:6-8; 30:4-14; 54:2-8.) Under his body, police found Mr. Mullen's .25 caliber gun, which he was known to carry for self-defense. (*Id.* at 59:20-25; 60:1-17; Ex. C, Statement of Leon Hughes, 2, October 10, 1996.) Mr. Mullen had fired three shots from his gun before it jammed. (Ex. A at 59:16-61:8.) Police recovered those three spent .25 caliber casings on the opposite side of the van, spread over a distance of more than 15 feet. (*Id.* at 57:21-22; 58:15-18; Ex. D, 10/9/96 Police CSI report at 2.) Next to Mr. Mullen's body, police found a single 9mm casing, presumably from the bullet that killed him. (Ex. A at 56:7-10.) Since Mr. Mullen died nearly instantly, he likely fired his own weapon first, before being hit by the single 9mm shot.

Police found no fingerprints at the scene. (*Id.* at 65:19-22.) The only blood and DNA at the scene came from the victim. Police never recovered the murder weapon and they were unable to find any eyewitnesses. Police had no suspects and the case went cold.

Then, over four months later, on February 27, 1997, David Williams was arrested for armed robbery. (*Id.* at 72:23-73:13.) After his arrest, David Williams asked to meet with detectives to volunteer information about a cold case homicide. (Ex. E, Investigation Interview R. of David Williams re: J. Miller, 2, Mar. 4, 1997.)

David Williams then gave a statement to detectives implicating Mr. Miller in the Mullen murder. (*Id.*) David Williams knew Mr. Miller from the neighborhood. (Ex. A at 71:21-24.) He told police that Mr. Miller spontaneously came to his house one night in October 1996 and confessed to killing Mr. Mullen in a robbery gone bad. (Ex. E, Investigation Interview R. of David Williams re: J. Miller, 3, Mar. 4, 1997.) He claimed that Mr. Miller's confession was so detailed that, notwithstanding the fact that the police found no fingerprints or blood at the scene,

Mr. Miller even showed him a cut on his finger where Mr. Mullen slammed a door on it in self-defense. (*Id.*) David Williams then stated that Mr. Miller got the murder weapon from a neighborhood teenager named Mike Arnold. (Ex. A at 85:12-16.) David Williams has never repeated this story since; to the contrary, he has consistently recanted and admitted to fabricating Mr. Miller's alleged confession in order to receive a lighter sentence for his own pending charges. (*Id.* at 85:5-7; 102:21-103:25.)

On June 23, 1997, detectives interviewed Mr. Arnold to corroborate David Williams' statement about the gun. (Ex. F, Investigation Interview R. of Michael Arnold, 1-4, June 23, 1997.) Mr. Arnold grew up in the same neighborhood as Mr. Miller and David Williams, and had known them both for many years. (*Id.*) Mr. Arnold was 17 years old at the time, and was interviewed at his school outside the presence of his parents. (*Id.* at 1.) Rather than asking whether Mr. Arnold had any knowledge of the murder, detectives instead began the interview by telling Mr. Arnold the story that David Williams had spun: "we interviewed a guy who told us that you gave a gun to 'Little' [Mr. Miller] [and] 'Little' shot [and] killed Anthony Mullen."[1] (*Id.*) Mr. Arnold agreed with the story detectives fed to him, saying he gave Mr. Miller a gun in late August 1996. (*Id.* at 3.) Specifically, Mr. Arnold told police that he got a gun from his home in late August 1996 when neighborhood kids were fighting. (*Id.*) Mr. Arnold said he tossed the gun to the ground when the police arrived and then saw Mr. Miller pick it up. (*Id.*) But, Mr. Arnold also stated that he had never heard about Mr. Miller committing murder. (*Id.* at 4.)

On June 25, 1997, Mr. Miller was arrested and charged with Mr. Mullen's murder and related counts.

---

[1] "Little" was Mr. Miller's nickname in the neighborhood.

### B.    Mr. Miller's Preliminary Hearing and Trial

On October 30, 1997, at Mr. Miller's preliminary hearing, David Williams recanted his statement implicating Mr. Miller: "It [the statement] depicts what I said, but it ain't what happened." (Ex. G, Prelim. Hr'g Tr. 10, Oct. 30, 1997.) David Williams said there were several reasons he had lied to detectives about Mr. Miller. First, David Williams said he felt physically threatened by the detectives who "used body language" to convey the message "that I either cooperate or I get dealt with." (*Id.* at 21.) Second, he testified that "at the time me and [Mr. Miller] wasn't getting along too good" because "I stole something from him and he was looking for me for it." (*Id.* at 14.) Finally, David Williams was "in that predicament" on his own robbery charges, "and they [the detectives] told me they wanted some information, so why not use him [Mr. Miller] as a scapegoat. . ." to try and get leniency. (*Id.* at 14, 21-22.) David Williams then specifically recanted the two key elements of his statement implicating Mr. Miller, admitting he made up: (1) Mr. Miller's "confession" about the murder, and (2) the story about Mr. Miller getting a gun from Mr. Arnold. (*Id.* at 17-22.)

Nevertheless, the prosecution pushed ahead. Sometime between two days and one week prior to Mr. Miller's trial, David Williams again recanted his statement implicating Mr. Miller, this time to the prosecutor assigned to Mr. Miller's case. (Ex. H, Hr'g Tr. 23:24-24:15, July 30, 2003.) David Williams was offered leniency with his own robbery sentence if he would just stick to his statement implicating Mr. Miller, but he said that "it wasn't right and [he] was recanting [his] statement." (*Id.*)

Mr. Miller's trial took place in late September 1998 before the Honorable John J. Poserina, Jr. of the Philadelphia County Court of Common Pleas and a jury. Mr. Miller was represented by Leon Williams, Esquire. There were only three days of testimony. The prosecution called David Williams to testify, but he again denied that Mr. Miller had confessed

to him. (Ex. A at 73:21-76:15; 93:1-6.)  Mr. Arnold also testified and was largely consistent with the statement he gave to police.  Importantly however, Mr. Arnold testified that the gun he saw Mr. Miller pick up "didn't work." (*Id.* at 161:22-24.)  In addition, Mr. Arnold testified he had no idea regarding the caliber of the gun. (*Id.* at 161:25-162:5.)

No physical evidence placed Mr. Miller at the scene of the crime.  The only evidence presented against Mr. Miller was David Williams' unsworn statement to detectives, by that time twice recanted, and Mr. Arnold's statement to detectives (which he now admits was entirely false).  The gun that Mr. Arnold supposedly gave to Mr. Miller, and which Mr. Arnold testified did not even work, has never been found or connected to the murder.  The defense argued that Mr. Miller was innocent of the crime.

Despite the complete lack of any physical evidence and the recantation of the prosecution's star witness, the jury convicted Mr. Miller.  Judge Poserina imposed a mandatory life without parole sentence.

Mr. Miller appealed and the Pennsylvania Superior Court affirmed his conviction on December 29, 2000.

### C.  Mr. Miller's PCRA Petitions and New Evidence Discovered After Trial

#### 1.  First PCRA Petition, Leading to First Federal Habeas Petition

Based on new evidence in statements from Clinton Bailey and Terry Scruggs, Mr. Miller filed a PCRA petition on January 28, 2002, and amended it on February 25, 2002.  Judge Poserina dismissed the petition in October 2002, finding that Mr. Bailey and Mr. Scruggs were not credible. (Exhibit I, Hr'g Tr. 11:4-9; 13:12-22, Oct. 29, 2002.)  On November 26, 2002, Mr. Miller appealed the dismissal to the Superior Court.

Around the same time in the fall of 2002, David Williams sent a letter to Mr. Miller's mother, Velma Miller, *confessing to murdering Mullen.* (Ex. J, Letter from David

Williams to Velma Miller, Fall 2002.)  In the letter, David Williams stated that he approached Mr. Mullen on the night in question to get money.  (*Id.*)  Mr. Mullen appeared intoxicated and yelled "I'm not giving you nothing." (*Id.*)  Mr. Mullen then fired his gun at David Williams two or three times.  (*Id.*)  Startled, David Williams fired a single shot from his 9mm at Mr. Mullen and ran away.  (*Id.*)  He emphasized to Mrs. Miller that "Your son had no knowledge of this crime [sic] he wasn't even there.  I lied on him because I was afraid at the time." (*Id.*)  David Williams concluded by asking for Mrs. Miller's forgiveness and stating that he was trying to change his life and clear his conscience.  (*Id.*)

The description of the murder provided by David Williams in his letter to Mrs. Miller was entirely consistent with the physical evidence recovered at the scene and the autopsy report, including: (1) the multiple shots fired by Mr. Mullen; (2) the single 9mm casing; and (3) Mr. Mullen's intoxicated state.

On March 27, 2003, David Williams signed an affidavit authenticating his letter to Mrs. Miller.  (Ex. K, Williams Aff., 1, March 27, 2003.)  His affidavit again exonerated Mr. Miller, and added that David Williams was freely confessing to the crime: "I'm receiving nothing of material gain, on the contrary I may easily receive many years in prison.  Hopefully it will release the weight of my heart." (*Id.* at 2.)

On April 16, 2003, Mr. Miller filed an Application for Remand with the Superior Court requesting another evidentiary hearing on the basis of David Williams' confession.

On April 22, 2003, Judge Poserina denied Mr. Miller's request for a supplemental opinion in light of David Williams' confession.

On May 21, 2003, the Superior Court granted Mr. Miller's request for another evidentiary hearing.

The hearing was held on July 30, 2003, and Judge Poserina again presided.

At the hearing, David Williams waived his Fifth Amendment rights and again confessed to shooting Mr. Mullen. During cross-examination, the prosecutor asked David Williams if he was willing to suffer death by "hanging" as punishment for Mr. Mullen's murder. (Ex. H, Hr'g Tr. July 30, 2003 at 42:1-4.) After an objection, Judge Poserina clarified "[t]he question really was whether or not this witness, knowing that he's implicating himself, is willing to sacrifice his life on earth." (*Id.* at 42:21 - 42:24.) After these comments by the prosecutor and the trial judge, David Williams incorrectly described Mr. Mullen's race and clothing. (*Id.* at 49:4 - 49:7.) After David Williams finished, Judge Poserina stated "I'll testify right now that I believe he was lying under oath just now, and in my opinion he's not believable" and referred the case back to the Superior Court. (*Id.* at 65:11-18.)

On October 22, 2004, the Superior Court denied Mr. Miller's request for post-conviction relief.

On October 6, 2005, Mr. Miller filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. On January 30, 2007, the Honorable Bruce W. Kauffman denied and dismissed the petition without a hearing. Judge Kauffman ruled that no certificate of appealability should issue. On February 20, 2007, Mr. Miller filed a notice of appeal. On July 27, 2007, the Honorable Morton I. Greenberg denied Mr. Miller's request for a certificate of appealability. On October 23, 2007, Mr. Miller filed a petition for writ of certiorari to the U.S. Supreme Court, which was denied on February 19, 2008. Burton Rose, Esq., represented Mr. Miller through this petition and these appeals.

## 2.    Second PCRA Petition

On October 23, 2007, Mr. Miller filed a second PCRA petition, this time *pro se*, after discovering new evidence on August 24, 2007, during an encounter with fellow inmate

Andre Monroe.   Judge Poserina again presided, and on October 17, 2008 he dismissed this petition as untimely.   There was no appeal.

### 3.   Third and Fourth PCRA Petitions, Leading to This Habeas Petition

On April 19, 2011, Mr. Miller filed a third PCRA petition, *pro se*, after discovering two crucial pieces of new evidence (the "Third PCRA Petition").   The Honorable Sheila Woods-Skipper presided over proceedings on this petition.

The first piece of new evidence was a letter from David Williams to Mr. Miller's mother, dated March 19, 2011, declaring that he shot Mr. Mullen and apologizing that he panicked at the 2003 PCRA hearing.   (Ex. L, Letter from David Williams to Velma Miller, March 19, 2011.)

The second piece of new evidence was Mr. Arnold's recantation, which was first discovered "the last week of February between the 22-28" of 2011.   (Ex. M, Aff. of Mary Wilt, 1, April 1, 2011; Ex. N, Aff. of Michael Arnold, May 24, 2011.)   Mr. Arnold now admits that his previous statement and testimony against Mr. Miller were entirely false.   (*Id.*)   When detectives questioned him at his school, he was scared and felt pressured, so he just adopted the story detectives told him – that he gave Mr. Miller a gun.   (Ex. M, Aff. of Mary Wilt, 1, April 1, 2011.)   He also had a vendetta against Mr. Miller because they were rivals, so framing Mr. Miller was a convenient way to eliminate competition.   (Ex. N, Aff. of Michael Arnold, May 24, 2011.)   On June 6, 2011, Mr. Miller amended this Third PCRA Petition to incorporate an affidavit from Arnold attesting to these events.

On July 18, 2011, the PCRA court filed a notice of intent to dismiss Mr. Miller's Third PCRA Petition as untimely.

On August 4, 2011, Mr. Miller filed an objection to the trial court's notice of intent to dismiss, asserting a valid exception to the timeliness requirement.   Mr. Miller intended

this filing to serve also as a further amended Third PCRA Petition. On August 5, 2011, the Pennsylvania Innocence Project entered an appearance on behalf of Mr. Miller.

On September 7, 2011, staff members from the Pennsylvania Innocence Project located Mr. Manigault, who David Williams falsely told police had knowledge of Mr. Miller's involvement in the Mullen murder, and spoke with him on a street corner in his neighborhood. (Ex. O, Cert. of Shaina Tyler Re: Mark Manigault, 5.) On September 22, 2011, they conducted a follow-up interview on the same street corner. (*Id.* at 5-6.) During that interview, Mr. Manigault signed a certification describing new evidence that discredited David Williams' original unsworn statement about Mr. Miller and corroborated David Williams' confession that David Williams murdered Mr. Mullen. (*Id.*)

Mr. Manigault said that in February of 1997, he and David Williams were arrested for armed robbery and were in a police holding cell together. (Ex. P, Cert. of Mark Manigault, 1, Sept. 22, 2011; Ex. O, Cert. of Shaina Tyler Re: Mark Manigault, 4-5.) There, David Williams told Mr. Manigault that David Williams "was going to do 'whatever it took' to get out of there" and that David Williams was going to "pin a homicide that he (David) had done on somebody else." (Ex. P, Cert. of Mark Manigault at 1.)

When David Williams then implicated Mr. Miller to detectives, he apparently added that Mr. Manigault had been present for the murder or knew something about the murder and could, in exchange for a favorable robbery sentence of his own, provide additional information to help police. (*Id.*) The police questioned Mr. Manigault about the homicide, but Mr. Manigault did not know anything about it, because he was incarcerated on the night in question. (*Id.*) The fact that David Williams falsely stated that Mr. Manigault could corroborate his story, which undermines the credibility of his story, was not disclosed to Mr. Miller.

On October 4, 2011, Pepper Hamilton LLP entered an appearance as co-counsel on behalf of Mr. Miller.

On November 3, 2011, counsel for Mr. Miller filed a further amended Third PCRA Petition on his behalf, based on the newly discovered evidence Mr. Manigault provided.

On November 18, 2011, Judge Woods-Skipper dismissed the Third PCRA Petition as untimely.

On November 28, 2011, Mr. Miller's counsel filed a motion for reconsideration and a further amended PCRA petition addressing the alleged deficiencies Judge Woods-Skipper identified. On December 13, 2011, Judge Woods-Skipper denied the motion for reconsideration. Mr. Miller appealed to the Superior Court of Pennsylvania on December 15, 2011.

On January 24, 2012, while his state court appeal was still pending and within one year of discovering the new evidence on which his Third PCRA Petition was based, Mr. Miller filed an application in the Third Circuit Court of Appeals seeking permission to file a second petition for a writ of habeas corpus based on the discovery of new evidence of actual innocence. On February 8, 2012, the Third Circuit granted Mr. Miller's application. Mr. Miller filed his habeas petition in this Court on February 13, 2012.

On March 1, 2012, Mr. Miller's attorneys interviewed Jack Williams, who said that David Williams gave a statement to police implicating Jack Williams in a murder. Jack Williams also said that David Williams admitted he falsely accused Mr. Miller. (Ex. W, Cert. of Shaina Tyler Re: Jack Williams, March 1, 2012). On March 9, 2012, Mr. Miller filed an application for remand with the Superior Court of Pennsylvania requesting remand for an evidentiary hearing regarding the new evidence concerning Jack Williams. On March 28, 2012, Mr. Miller's application for remand was denied. On April 27, 2012, Mr. Miller's attorneys

conducted a telephone interview with David Williams. (Ex. Q, Cert. of Shaina Tyler Re: David Williams, 3.) During that interview, David Williams spoke about prior statements he made to detectives about Jack Williams. (*Id.* at 3-4.) On the day he implicated Mr. Miller in the Mullen murder, David Williams also implicated Jack Williams in another, unrelated murder. (*Id.*) David Williams told the police that Jack Williams confessed to him during a phone conversation that he murdered someone in a dispute involving a car. (*Id.* at 4.)

David Williams fabricated the story implicating Jack Williams in hopes of reducing his own sentence. (*Id.* at 3-4.) David Williams also explained that he fabricated the story in that specific manner because he believed that police would: (1) investigate and find that he was in prison at the time of the supposed phone call from Jack Williams, (2) look up the prison phone logs and see no such call, and (3) ultimately determine that David Williams' statement against Jack Williams was untrue. (*Id.* at 4.) In reality, David Williams' only knowledge about Jack Williams came from "friends in the neighborhood," not a phone call from Jack Williams himself. (*Id.*)

Ultimately, the Commonwealth did not call David Williams to testify at Jack Williams' trial. (*Id.* at 5.)

David Williams later admitted to Jack Williams that he fabricated the telephone confession story. (*Id.* at 4.)

On April 27, 2012, Mr. Miller's attorneys conducted a follow-up telephone interview with Jack Williams. (Ex. R, Cert. of Shaina Tyler Re: Jack Williams, 5). During that interview, Jack Williams provided information about the evidence offered by the Commonwealth against him at trial. Jack Williams also provided information about statements made by David Williams that were not offered at trial. (*Id.*) Specifically, Jack Williams said, among other

things, that in July 1997, following his conviction, he spoke with David Williams at Curran-Fromhold Correctional Facility, where both were incarcerated. (*Id.* at 5-6.) The two discussed David Williams' statements against Jack Williams. (*Id.*) David Williams explained that he made up the statement against Jack Williams to lessen his own sentence. (*Id.*) Jack Williams and David Williams also discussed David Williams' statement against Mr. Miller. (*Id.*) During that conversation, David Williams told Jack Williams that he gave false information to the police about Jack Williams *and* Mr. Miller to reduce his own sentence. (*Id.*)

After this telephone interview, Jack Williams sent Mr. Miller's attorneys copies of the discovery documents he received in connection with his case. (Ex. S, Selected Page of Materials received from J. Williams on June 1, 2012, Investigation Interview Record of David Williams re: J. Williams, Mar. 4, 1997). The discovery records indicated that, among other things, David Williams gave at least two statements to police on the night he was arrested: (1) a statement that Jack Williams confessed to him about the murder of Paul Jones, and (2) only ninety minutes later, a statement that Mr. Miller confessed to him about the murder of Mr. Mullen. (*Id.*; Ex. E, Investigation Interview R. of David Williams re: J. Miller, Mar. 4, 1997.) Neither Mr. Miller nor his trial counsel, Mr. Leon Williams, at any stage prior to or during trial of this case, was ever aware that David Williams provided police with (false) information implicating Jack Williams in the Jones murder. (Exhibit V, Aff. of Leon Williams, Sept. 14, 2012 ¶ 5.)

During this time, Mr. Miller's attorneys also obtained newly discovered evidence from Mr. Arnold. On March 18, 2012, Mr. Arnold signed a written confession about his role in providing a false statement used to convict Mr. Miller of the murder of Mr. Mullen. (Ex. T, Cert. of Michael Arnold.) Pennsylvania Innocence Project staff members previously attempted to

interview Mr. Arnold on July 19, 2011, but Mr. Arnold refused to make any written statements at that time. (Ex. U, Cert. of Shaina Tyler re: Michael Arnold, 3.) Mr. Arnold's written confession contains a number of new relevant facts.

First, Mr. Arnold explained that in June 1997, Detectives Bova and Coogan interviewed him at Carson Valley School. (Ex. T, Cert. of Michael Arnold, 2.) Upon arrival, the detectives informed Mr. Arnold that David Williams had implicated Mr. Arnold in Mr. Mullen's murder. (*Id.*) Specifically, the detectives showed Mr. Arnold a statement by David Williams in which David Williams alleged that Mr. Miller had confessed to committing the murder with a gun he received from Mr. Arnold. (*Id.*) The detectives also told Mr. Arnold that David Williams was willing to testify against him if he did not cooperate with the investigation. (*Id.*)

Second, Mr. Arnold confirmed that he never gave Mr. Miller a gun. (*Id.*) However, based on the detectives' statements, Mr. Arnold feared that David Williams would testify that he had given Mr. Miller the gun used in Mr. Mullen's murder. (*Id.*) With that information, Mr. Arnold decided to craft a lie designed to eliminate his alleged involvement in the Mullen murder. (*Id.*) Mr. Arnold led the detectives to believe that he had a gun which he discarded during a police raid. (*Id.*) In order to further extricate himself from culpability, Mr. Arnold told the detectives that he later heard from a third party that Mr. Miller had picked up the gun. (*Id.*) He made up this story so he would not be blamed for giving Mr. Miller a gun, even if David Williams later testified that Mr. Miller had received the gun from Mr. Arnold. (*Id.*)

Third, Mr. Arnold confirmed that he thought he was giving the police only enough information that would allow him to extricate himself from any culpability in the murder. (*Id.*) His intention was to send the police on a "dead lead" via a completely fabricated and unverifiable story. (*Id.*)

Fourth, Mr. Arnold stated that despite his expectation that his fabricated, unverified story would eliminate him from having any further involvement in the case, Mr. Arnold was asked to testify against Mr. Miller. (*Id.*) At the trial, Mr. Arnold repeated the same false story to avoid any potential perjury charges being brought against him. (*Id.* at 3.)

Fifth, Mr. Arnold revealed that following the trial, he consulted with attorneys who advised him not to come forward with the truth because of the potential for perjury charges. (*Id.*)

Sixth and finally, Mr. Arnold is now a gainfully employed car salesman, long removed from the neighborhood where he, Mr. Miller, and David Williams grew up. Mr. Arnold now wishes "to set the record straight" that his statements to the police and at Mr. Miller's trial were entirely fabricated. (*Id.*) Mr. Miller did not receive a gun from Mr. Arnold. (*Id.* at 2.)

On July 24, 2012, the Superior Court of Pennsylvania denied Mr. Miller's appeal. The Superior Court ruled that Mr. Miller's petition was time-barred because (1) the Manigault evidence was not a "new fact" but was merely a "new source of [the] previously known fact" that David Williams killed Mr. Mullen, and (2) Mr. Miller did not demonstrate due diligence in obtaining the information regarding Mr. Manigault. The Superior Court's "due diligence" ruling was made even though Mr. Miller could not compel David Williams to provide information about Mr. Manigault that Mr. Miller did not know existed and Mr. Miller was incarcerated throughout this time period. The Superior Court declined to rule on whether the Commonwealth's withholding of the Manigault evidence constituted a constitutional violation under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. (Ex. X, *Commonwealth v. Miller*, No. 3269 EDA 2011 (Pa. Super. Ct. July 24, 2012)).

-19-

On September 20, 2012, Mr. Miller's attorneys filed a Fourth PCRA Petition based on newly discovered evidence concerning Jack Williams and Mr. Arnold. The Honorable Genece E. Brinkley presided over proceeding on this petition.

On February 21, 2013, while his Fourth PCRA Petition remained pending in state court, Mr. Miller filed a motion for leave to amend the habeas petition in order to include the new evidence that Mr. Miller acquired in April 2012. On March 20, 2013, this Court granted the motion and permitted the amendment. On November 20, 2014, Judge Brinkley denied Mr. Miller's Fourth PCRA Petition without an evidentiary hearing.

On April 28, 2015, Mr. Miller appealed to the Superior Court of Pennsylvania.

On December 18, 2015, the Superior Court denied Mr. Miller's appeal. Similar to its July 24, 2012 ruling, the Superior Court ruled that the fourth PCRA Petition was time-barred because (1) the new evidence regarding Jack Williams was not a "new fact" but was instead a "new source of a previously known fact", and (2) Mr. Miller did not exercise due diligence in obtaining this new evidence. Again, the Superior Court declined to rule whether the Commonwealth violated Mr. Miller's due process rights by failing to disclose *Brady* material, albeit this time regarding the Commonwealth's failure to disclose the Jack Williams evidence. (Ex. Z, *Commonwealth v. Miller*, No. 3563 EDA 2014 (Pa. Super. Ct. December 18, 2015)). The Superior Court also declined to rule on Mr. Miller's freestanding, constitutionally-based actual innocence claim.

The Honorable President Judge Emeritus John T. Bender issued a concurring and dissenting opinion in which he contested both of the majority's above-described conclusions. In addressing the majority opinion's interpretation of a "new fact," Judge Bender wrote that "[t]he Majority conflates or confuses a new fact - David's false accusation regarding Jack - with the

defense theory that David falsely implicated [Mr. Miller] in the murder of Mullen. Even if one construes that defense theory as a fact, it is patently not the same fact as David's false statement regarding a different person and a different murder." (Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, *5 (*Concurring and Dissenting*)). In addressing Mr. Miller's due diligence, Judge Bender wrote that the majority's conclusion that Mr. Miller could have obtained the information earlier was "little more than speculation" and an evidentiary hearing was required before such a conclusion could be drawn. (*Id.* at *6.)

   Mr. Miller has exhausted his state court remedies. On March 2, 2016, Mr. Miller filed a motion seeking leave to further amend his habeas petition and attaching a second amended petition and the accompanying memorandum of law, which is now before this Court.

## III. Argument

   This Court has jurisdiction to grant Mr. Miller's habeas petition challenging his continued incarceration pursuant to Pennsylvania law, where Mr. Miller is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Mr. Miller's continued incarceration is unconstitutional because: (1) the Pennsylvania courts deprived Mr. Miller of his Fourteenth Amendment due process right by establishing a right to demonstrate innocence with newly discovered evidence in the PCRA and then depriving Mr. Miller of that right through a fundamentally inadequate process; (2) the Commonwealth deprived Mr. Miller of his right to due process, articulated in *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose material impeachment evidence that would have undermined the credibility of the key witness against Mr. Miller at trial; and (3) the continued incarceration of an actually innocent man cannot stand under the United States Constitution.

In support of the foregoing, Mr. Miller respectfully presents the following facts supporting his actual innocence that the Pennsylvania courts have prevented him from putting forth to challenge his conviction:

> (1) Michael Arnold did not give John Miller a gun;
>
> (2) Michael Arnold was intimidated by police detectives into corroborating David Williams' statement about John Miller;
>
> (3) Mark Manigault had independent knowledge of David Williams' role in Anthony Mullen's murder;
>
> (4) Mark Manigault provided independent evidence that David Williams had lied to police about details of his statement implicating John Miller in Anthony Mullen's murder;
>
> (5) based on Mark Manigault's statements, the Commonwealth knew that at least portions of David Williams' statement implicating John Miller were false, but withheld that evidence from John Miller;
>
> (6) David Williams falsely implicated another person, Jack Williams, in another murder less than two hours before he told a story implicating John Miller in Anthony Mullen's murder;
>
> (7) David Williams falsely told police that both Jack Williams and John Miller confessed to David Williams that each had committed murders; and
>
> (8) the Commonwealth knew that David Williams provided a false statement about Jack Williams right before he gave a statement about John Miller but withheld that evidence from John Miller.

Critically, facts numbered three through eight above were known to the Commonwealth but withheld from Mr. Miller at the time of his trial.

In general, habeas relief is reserved to circumstances that have been adjudicated on the merits and resulted in an "unreasonable application of clearly established Federal Law" or an "unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1)-(2). However, where the state court did not rule on the merits of a claim despite the

claim being presented, "[t]he habeas court may make an independent judgment of the petitioner's claims, without deference to the decision of the state courts." *Bridges v. Beard*, 941 F. Supp. 2d 584, 596 (E.D. Pa. 2013) (*citing Appel v. Horn*, 250 F.3d 203, 2010 (3d Cir. 2001)). Pennsylvania courts have failed to address the merits of Mr. Miller's constitutional claims so this Court should exercise its independent judgment in reviewing these claims.

Additionally, there is no procedural bar that prevents this Court's adjudication of the merits of this petition. First, Mr. Miller has satisfied the procedural requirements for filing this petition. Second, there can be no bar based on the state's procedural findings because it is those procedures, as applied to Mr. Miller, that have deprived him of his due process rights to prove his actual innocence.

Mr. Miller therefore respectfully requests that this Court grant Mr. Miller a new trial so that he may present evidence that supports his actual innocence, including evidence the Commonwealth withheld during his initial trial. And, if Mr. Miller is not retried within one hundred and twenty days of the order granting a new trial, Mr. Miller respectfully requests that he be released from prison. Alternatively, Mr. Miller respectfully requests an evidentiary hearing on his claims of actual innocence and the violations of his due process rights so that he may demonstrate to this Court the new evidence justifying the grant of this petition.

A.    **Mr. Miller's Petition Meets the Procedural Requirements.**

A petition for a writ of habeas corpus must meet the procedural thresholds of exhaustion and timeliness before it can be considered on the merits. 28 U.S.C. § 2254(b)(1); 28 U.S.C. § 2244(d)(1). Mr. Miller has satisfied both requirements.

1.    **Mr. Miller Exhausted His State Court Remedies.**

To bring a successful habeas petition, a petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). There is no

exhaustion where a petitioner has remedies available in state courts or if he still has the right to raise the questions presented under state law. 28 U.S.C. § 2254(c). However, "state prisoners do not have to invoke extraordinary remedies when those remedies are alternatives to the standard review process and where the state courts have not provided relief through those remedies in the past." *Lambert v. Blackwell*, 387 F.3d 210, 232 (3d Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999)).

        Mr. Miller has exhausted his state court remedies. Mr. Miller asserted his claims under the PCRA, through his Third and Fourth PCRA Petitions, which encompasses all the claims Mr. Miller makes here:

> [t]his subchapter provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief...[t]he action established in this subchapter shall be the sole means of obtaining collateral relief and encompasses all other common law and statutory remedies for the same purpose that exist when this subchapter takes effect, including habeas corpus and coram nobis.

42 Pa. C.S. § 9542. The PCRA Court denied those petitions. The Superior Court also denied Mr. Miller's appeals—affirming the PCRA court's dismissal of Mr. Miller's Third PCRA Petition on July 24, 2012, and, most recently, affirming the PCRA court's dismissal of Mr. Miller's Fourth PCRA Petition on December 18, 2015.

        Mr. Miller elects to file the present Second Amended Habeas Petition rather than pursue any further action in state court by way of a petition for allocatur to the Pennsylvania Supreme Court, which is not required to satisfy exhaustion. *Lambert*, 387 F.3d at 233 (holding that "a state prisoner need not petition the Pennsylvania Supreme Court for allocatur in order to exhaust state court remedies and seek habeas relief in federal court"); s*ee also In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, Judicial Administration Docket No. 1, 218, 233-34 (Pa. May 9, 2000).

-24-

### 2.    This Petition Is Timely.

To satisfy timeliness based upon newly-discovered evidence of innocence, a habeas petition must be filed within one year from the date on which the factual predicate of a claim could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1). To avoid a time bar, petitioners may file "protective" petitions in federal court and ask the court to stay and abey the federal habeas proceedings until exhaustion of state remedies occurs. *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005).

Mr. Miller's claims in this petition are based upon the newly discovered statements made by Mr. Arnold and Mr. Manigault, which Mr. Miller timely filed in his original petition with this Court on February 13, 2012, and the newly discovered statements of Jack Williams, which Mr. Miller timely filed in his Amended Petition with this Court on February 21, 2013.

### a.    The Newly Discovered Evidence of Michael Arnold And Mark Manigault Was Timely Filed in Mr. Miller's February 13, 2012 Petition For Writ of Habeas Corpus.

Mr. Miller's February 13, 2012 habeas petition was filed within one year of his discovery of new evidence from Mr. Arnold and Mr. Manigault, on February 22, 2011 and July 18, 2011, respectively. 28 U.S.C. § 2244(d)(1)(D). Mr. Miller could not have discovered this evidence before that date. "Evidence becomes 'known' on 'the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of reasonable diligence.'" *Sistrunk v. Rozum*, 674 F.3d 181, 188-89 (3d Cir. 2002) (quoting 28 U.S.C. § 2244(d)(1)(D)). The Third Circuit has also defined reasonable diligence in this context as "'reasonable diligence in the circumstances'" and has noted that the standard is context-specific. *Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005) (quoting *Schlueter v. Varner*, 384

F.3d 69, 74 (3d Cir. 2004)). Critically, due diligence does *not* require "the maximum feasible diligence ...." *Schlueter*, 384 F.3d at 74 (internal quotation marks omitted).

Before February 22, 2011, Mr. Miller did not know the circumstances of how police detectives secured Mr. Arnold's false statement and could not establish that Mr. Arnold was lying when he told police that Mr. Miller confessed to committing the murder with a gun he received from Mr. Arnold. That changed on February 22, 2011, when Mr. Arnold admitted to Mary Wilt that his previous statement and testimony against Mr. Miller were false and that Mr. Arnold never gave Mr. Miller a gun. (Ex. Y, Aff. of Mary Wilt, 1, April 1, 2011; Ex. N, Aff. of Michael Arnold, May 24, 2011.) Prior to that date, Mr. Arnold elected to withhold this information to avoid perjury charges. (Ex. T, Cert. of Michael Arnold, 3.) Mr. Miller does not now and has never had any influence or control over Mr. Arnold and not even the utmost, let alone reasonable under the circumstances, diligence could have revealed what only Mr. Arnold knew to be true.[2] Only Mr. Arnold could make the decision to come forward to provide Mr. Miller with the facts that he needed to prove his innocence. Moreover, although Mr. Miller diligently pursued Mr. Arnold, he refused to come forward with a sworn statement that he did not give a gun to Mr. Miller until May 24, 2011.

The earliest date on which Mr. Miller could have discovered Mr. Manigault's evidence was on July 18, 2011. Prior to that date, Mr. Miller did not even know of Mr. Manigault's existence let alone his relevance to Mr. Miller's case. On July 18, 2011, staff

---

[2] Case law from federal and state courts recognize the unique nature of recantations. *See, e.g.*, *Commonwealth v. Medina*, 92 A.3d 1210, 1217-1218 (Pa. Super. Ct. 2014) (affirming the PCRA court's holding that recantation could not have been discovered earlier by PCRA petitioner); *Betts v. McKune*, No. 11-3097-SAC, 2013 WL 3328747, at *8 (D. Kan. July 2, 2013) (rejecting state's argument that recantation was not newly discovered evidence because "it is clear that until Carter recanted his testimony after trial, the defendant could not have known about the recanted testimony"); *Wyatt v. State*, 71 So. 3d 86, 100 (Fla. 2011) (noting that "witness's recantation, which did not exist at the time of trial, constituted newly discovered evidence"); *State v. Garner*, 523 S.E.2d 689, 699 (N.C. Ct. App. 1999) (noting that "there is a difference between recanted testimony and [other] newly discovered evidence" because "[r]ecanted testimony is not evidence which existed at the time of trial").

members from the Pennsylvania Innocence Project spoke with David Williams, who, for the first time, gave a written confession identifying Mr. Manigault and stating that he may have told Mr. Manigault that he committed the Mullen murder. On September 7, 2011, staff members from the Pennsylvania Innocence Project located Mr. Manigault and spoke with him on a street corner in his neighborhood. (Ex. O, Cert. of Shaina Tyler Re: Mark Manigault, 3). Mr. Manigault provided certain information regarding David Williams' involvement in the murder of Mr. Mullen but refused to provide a signed certification of such information. (*Id.* at 3-4.) On September 22, 2011, the Pennsylvania Innocence Project conducted a follow-up interview on the same street corner. There, Mr. Manigault signed a certification describing new evidence that discredited David Williams' statements to the police and corroborated David Williams' confession to the Mullen murder. (Ex. P, Cert. of Mark Manigault, 1, Sept. 22, 2011.) Specifically, Mr. Manigault revealed that the police questioned him about the Mullen murder but he did not know anything about it because he was incarcerated at the time of the homicide. (*Id.*) Further, Mr. Manigault revealed that David Williams told Mr. Manigault that David Williams was going to "pin a homicide that he (David) had done on somebody else." (*Id.*) Up until that point, no one involved in the Mullen investigation or Mr. Miller's trial or subsequent appeals ever revealed that, at the time of the Mullen murder, detectives had interviewed Mr. Manigault about the murder and that certain statements given by Mr. Manigault during that interview directly contradicted parts of David Williams' statement. Had the Commonwealth revealed this information to Mr. Miller or his representatives at any time over the last twenty years, Mr. Miller or his representatives could have contacted Mr. Manigault sooner and used his signed certification to establish Mr. Miller's innocence. To preserve the timeliness of his habeas petition, Mr. Miller filed a protective petition on February 13, 2012 with this new evidence from

Mr. Arnold and Mr. Manigault, which this Court held in abeyance until the exhaustion of Mr. Miller's state court remedies.

>    **b.    The Newly Discovered Evidence of Jack Williams Was Timely Filed in Mr. Miller's February 21, 2013 Petition For Writ Of Habeas Corpus.**

Mr. Miller filed an amended habeas petition with this Court on February 21, 2013, within one year of discovering evidence pertaining to Jack Williams on March 1, 2012.  On March 1, 2012, Mr. Miller learned that, on the same day that David Williams gave a false story implicating Mr. Miller in Mr. Mullen's murder using a fabricated confession story, he told a similar story about a man named Jack Williams.  Both stories were offered by David Williams to lessen the consequences of his own robbery charges and, in the case of Jack Williams, one can surmise that the Commonwealth's prosecutors were able to discredit the story such that David Williams was never called to testify at Jack Williams' trial.  (Ex. W, Cert. of Shaina Tyler Re: Jack Williams, 3-4.)  Until March 1, 2012, despite continued and diligent efforts to establish his innocence for more than a decade, Mr. Miller had no way of knowing that David Williams falsely implicated Jack Williams in another, unrelated murder on the same day that he implicated Mr. Miller in the Mullen murder.  To preserve the timeliness of his habeas petition based on new evidence, Mr. Miller filed a protective amended petition on February 21, 2013 with this new evidence, which this Court held in abeyance until the exhaustion of Mr. Miller's state court remedies.

As the procedural requirements of timeliness and exhaustion have been satisfied, this Court may consider the merits of Mr. Miller's petition.

**B.    There Can be No Procedural Default Where Mr. Miller Presents New Facts Supporting His Actual Innocence.**

Typically, a district court may not grant a habeas petition where a state court has found that petitioner's claims are barred by the state court's procedural rules. *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. Pa. 2000). These claims are deemed forfeited and "may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." *House v. Bell*, 547 U.S. 518, 536 (2006). There is, however, an exception to this rule for miscarriages of justice because "the principles of comity and finality . . . must yield to the imperative of correcting a fundamentally unjust incarceration." *Id.* (quotation omitted). In this class of cases, a litigant may use evidence of his "actual innocence" to excuse claims that would otherwise be procedurally defaulted. *See Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (citations omitted); *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). This is known as a "gateway" case, in which a court first analyzes whether a litigant's procedural default should be excused to allow him to present his constitutional claim. *Id.*

A litigant may use "actual innocence" as a gateway to asserting defaulted claims if he can "establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). The *Schlup* standard requires a federal court to determine how reasonable jurors would have responded to the new, more complete record. *Id.* at 538. The petitioner must present new, reliable evidence that was not presented at trial. *Houck*, 625 F.3d at 93. This standard does not require "absolute certainty" of innocence because it is merely a gateway to raising an otherwise barred constitutional claim. *House*, 547 U.S. at 538. A petitioner need only demonstrate a substantial doubt about his guilt to justify a review on the merits of the constitutional claims. *Id.*

In Mr. Miller's case, as in *Schlup*, even if his actual innocence claim does not, on its own, entitle him to relief, the newly-discovered evidence serves as a gateway through which his due process claims can be heard by this Court. Mr. Miller was convicted of murdering Mr. Mullen based solely on the now recanted statements David Williams and Mr. Arnold gave to detectives. David Williams recanted immediately, and has actually been confessing to the crime for more than a decade – providing new information over the years. Michael Arnold also eventually recanted. Additional new evidence independent of those recantations, namely statements from both Mark Manigault and Jack Williams, seriously undermines any weight that a reasonable juror might have assigned to David Williams' initial statement to police.

The new evidence makes clear that David Williams' implication of Mr. Miller in the Mullen murder was just one in a series of knowing lies told within hours of each other to police detectives to lessen his own sentence. With this new evidence, "'it is more likely than not that no reasonable juror would have found [Mr. Miller] guilty beyond a reasonable doubt.'" *House*, 625 F.3d at 536-37 (quoting *Schlup*, 513 U.S. at 327). Thus, this Court should excuse any procedural default based upon the denial of Mr. Miller's PCRA petitions as untimely under the *Schlup* actual innocence gateway, and consider his due process claims on the merits. Mr. Miller requests an evidentiary hearing in order to demonstrate that he meets this standard.

### C.   Mr. Miller Was Deprived of His Fourteenth Amendment Right to Demonstrate His Innocence With Newly Discovered Evidence as The Process Afforded to Him Was Fundamentally Inadequate.

A writ of habeas corpus provides redress where a petitioner is incarcerated "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) A habeas court may not grant relief on any claim adjudicated on the merits by the state courts unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C. § 2254(d). However, this Court should review Mr. Miller's claim without deference to the state courts' rulings because, other than a dissenting opinion in Mr. Miller's favor, the Pennsylvania courts have ignored this claim. *See Bridges*, 941 F. Supp. 2d at 596 ("[t]he habeas court may make an independent judgment of the petitioner's claims, without deference to the decision of the state courts.") (*citing Appel v. Horn*, 250 F. 3d 203, 2010 (3d Cir. 2001)).

The Fourteenth Amendment requires that no state "deprive any person of life, liberty, or property, without due process of law." *U.S. Const. Amend. XIV*, § 1. A petitioner is deprived of a liberty interest when the process to vindicate this interest falls short of the constitutional requirements. *Shoats v. Horn*, 213 F. 3d 140, 143 (3d Cir. 2000). Pennsylvania, through the PCRA, provides a specific liberty interest to those convicted to "demonstrat[e] [their] innocence with new evidence...." *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009); 42 Pa.C.S. § 9545(b)(1)(ii). Pennsylvania courts are not permitted, after creating this liberty interest, to then deprive a person of the necessary process to realize it. *Osborne*, 557 U.S. at 68 ("This 'state-created right can . . . beget yet other rights to procedures essential to the realization of the parental right.'") (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981) (internal quotations omitted)).

To challenge the procedures afforded, a petitioner must show that the state's process was "fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. A process to recognize a liberty interest is fundamentally inadequate where it "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)).

In the PCRA, Pennsylvania sets forth the process to demonstrate innocence with newly-discovered evidence post-conviction. The PCRA requires filing a petition with newly-discovered evidence within one year of a judgment becoming final, but allows petitioners to file petitions after this point if

> the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence.

42 Pa.C.S. § 9545(b)(ii). Should a petitioner discover such new evidence, he must, within sixty (60) days of that discovery, file a PCRA petition. *Id.* at § 9545(b)(2).

As applied to Mr. Miller, the Pennsylvania Superior Court's interpretation of the PCRA process has barred Mr. Miller's access to his liberty interest in proving his innocence with newly-discovered evidence and will do so in perpetuity if not addressed by this Court. Mr. Miller's conviction rested entirely on evidence originating from a single source—David Williams. There was no physical or direct evidence of any kind tying Mr. Miller to Anthony Mullen's murder: no gun, no fingerprints, no forensics, and no eye-witnesses. (Ex. A at 56:7-10; 65:19-20, 23-25.) All connections to Mr. Miller were created by a single statement from David Williams—that Mr. Miller confessed to the crime and named Mike Arnold as the source of the murder weapon. (Ex. E, Investigation Interview R. of David Williams, 3, Mar. 4, 1997; Ex. A at 85:12-16.) Mike Arnold, a teenager confronted at his school by detectives with David Williams' statement, then gave a statement agreeing that he had given a gun to Mr. Miller, approximately two months before the murder. (Ex. F, Investigation Interview R. of Michael Arnold, 1-4, June 23, 1997.)

Given the nature of the evidence used to convict him, it is hardly surprising that Mr. Miller's efforts to gain his freedom have focused on what deprived him of it in the first place. But as applied by Pennsylvania courts, the PCRA, as explained below, provides no

-32-

realistic avenue by which Mr. Miller can obtain the relief the statute was enacted to provide: freedom from wrongful incarceration. While federal courts must give deference to a state's procedures, this deference ends where those procedures "transgress[] any recognized principle of fundamental fairness in operation" and are "fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 68-69.

The process afforded Mr. Miller has been and remains fundamentally inadequate to vindicate his rights because of (1) the Pennsylvania Superior Court's insistence that Mr. Miller present novel defense *theories* in order to obtain relief rather than newly-discovered *evidence*, and (2) the Pennsylvania Superior Court's failure to separate the benefit of hindsight from any possible diligence that Mr. Miller could have reasonably employed to discover new evidence.

        **1.**       **Mr. Miller's New Facts Supporting His Innocence Were Not Considered Because They Pertained to His Ultimate Defense Theory.**

The PCRA statute does not allow for a petition supporting actual innocence to be submitted more than one year following a conviction becoming final *unless* new evidence is found. 42 Pa.C.S. § 9545(b)(ii). Mr. Miller presented critical new *facts* in support of his innocence to the Pennsylvania Superior Court, none of which were considered:

      (1) Michael Arnold did not give John Miller a gun;

      (2) Michael Arnold was intimidated by police detectives into corroborating David Williams' statement about John Miller;

      (3) Mark Manigault had independent knowledge of David Williams' role in Anthony Mullen's murder;

      (4) Mark Manigault provided independent evidence that David Williams had lied to police about details of his statement implicating John Miller in Anthony Mullen's murder;

      (5) based on Mark Manigault's statements, the Commonwealth knew that at least portions of David Williams statement implicating John Miller were false, but withheld that evidence from John Miller;

(6) David Williams falsely implicated another person, Jack Williams, in another murder less than two hours before he told a story implicating John Miller in Mullen's murder;

(7) David Williams falsely told police that both Jack Williams and John Miller confessed to David Williams that each had committed murders; and

(8) the Commonwealth knew that David Williams provided a false statement about Jack Williams right before he gave a statement about John Miller but withheld that evidence from John Miller.

All of these facts are new. But, the Superior Court determined these facts were not new because, these new facts went to the "overarching claim" or "ultimate fact" that David Williams lied to police about Mr. Miller's role in Anthony Mullen's murder. (Ex. Z, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 12-14 (Pa. Super. Ct. December 18, 2015); Ex. X, *Commonwealth v. Miller*, No. 3269 EDA 2011.) This determination by the Superior Court conflates the new *facts* that were discovered by Mr. Miller with the defense *theory* that David Williams lied. Under the Superior Court's analysis, Mr. Miller can never successfully present new evidence, no matter how conclusively that new evidence proves Mr. Miller's innocence, because any new evidence ultimately supports the defense theory that David Williams lied. Indeed, if Mr. Miller discovered a long-lost video showing David Williams committing the murder, the Superior Court, by its own reasoning, would nevertheless dismiss his PCRA petition as untimely because it would merely be Mr. Miller's "latest means to discredit David's statement implicating him in Mullen's murder." (Ex. Z, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 14.)

As stated by the Honorable President Judge Emeritus John T. Bender, in his opinion concurring with and dissenting from the majority of the Pennsylvania Superior Court, which denied Mr. Miller's fourth PCRA Petition: "The Majority *conflates or confuses a new fact*—David's false accusation regarding Jack—*with the defense theory* that David falsely

implicated Appellant in the Murder." (Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014,

*5 (*Dissenting*) (emphasis added). Judge Bender cautioned:

> I believe, however, that this *over-generalization puts our interpretation and application of the "newly discovered fact" exception on a slippery slope towards oblivion.* One might also construe Appellant's 'non-guilt' as the "ultimate fact" and, thus, render any new evidence challenging that ultimate fact as merely 'new sources of a previously known fact.' Thus, while we should endeavor to not permit trivial modifications of previously known facts to trigger the "newly discovered fact" exception of the PCRA's time-bar, *we must also avoid over-generalizing so as to effectively preclude any new evidence from meeting the exception.* Instantly, I believe *the Majority treads too deeply in the latter camp.*

(*Id.* at n.4 (emphasis added).)  Mr. Miller presented new facts that should have been considered

by the Pennsylvania courts.  As currently construed by Pennsylvania courts, a prisoner who

discovers evidence that may exculpate him has sixty days to uncover—from the confines of

prison and without the power of subpoena—every single fact that supports that theory or forever

be barred from presenting them to a court for consideration.  Because such a limitation

"transgresses any recognized principle of fundamental fairness in operation," the Pennsylvania

Superior Court's interpretation of a 'newly discovered fact' unconstitutionally barred Mr.

Miller's access to the state-created liberty rights established in the PCRA.

### 2.   Mr. Miller's Diligence Cannot be Condemned Through The "Clarity of Hindsight."

For a petitioner to file a PCRA petition based on new evidence after the one-year

post-conviction period, the evidence he presents must not have been discoverable by him earlier

through reasonable diligence. 42 Pa.C.S. § 9545(b)(ii).  The requirement is facially reasonable.

But, as interpreted by the Pennsylvania Superior Court and applied to Mr. Miller, it has

unreasonably prohibited Mr. Miller from demonstrating adequate diligence (and would do so in

perpetuity).  The Pennsylvania Superior Court's standard for Mr. Miller's diligence has been a

simple one: Did Mr. Miller know the proponent or subject of the evidence since childhood? If the answer is yes, then the Superior Court's answer to Mr. Miller has always been: you should have asked sooner or you should have known to ask a different question; you were not reasonably diligent, and you cannot present this evidence now. (Ex. Z, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 6; Ex. X, *Commonwealth v. Miller*, No. 3269 EDA 2011, at 17). Judge Bender, in his dissenting opinion, explained why refusing Mr. Miller the chance to have his evidence considered based on such a standard was wrong under Pennsylvania law and the facts of Mr. Miller's case:

> Due diligence analysis must be "fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing that the [party] has put forth a reasonable effort."
>
> It is only through the *clarity of hindsight* that one can conceive of simple, pertinent questions which might have extracted the new fact from David at an earlier time. If one already knows the answer sought, then the appropriate question(s) to elicit the answer easily come to mind. However, when the fact—or even the nature of that fact—is not known beforehand, then the pertinent questions are not so "easily obtained." Moreover, whether David would have answered honestly at a prior time is unknown . . . Indeed, for all we know, David may have failed to answer the most direct and on-point questions likely to elicit the pertinent information long before this newly discovered information ultimately came to light.

(Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, *6-8 (*Concurring and Dissenting Mem. by J. Bender*) (quoting *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010).

A requirement of diligence beyond a petitioner's ability and determined only by the "clarity of hindsight" would foreclose any petitioner's ability to present new evidence. Mr. Miller is incarcerated. In prison, his access to the individuals and evidence needed to prove his innocence has been minimal. Not even superhuman diligence by Mr. Miller could overcome (1) David Williams' exclusive control of information and, as discussed *infra*, (2) the

*Commonwealth's* withholding of facts critical to Mr. Miller's defense. But, with the benefit of legal representation, years, and thousands upon thousands of dollars to chase down leads, find (including through engaging the services of a retired FBI agent) and question (including by former federal prosecutors) witnesses, Mr. Miller has uncovered the evidence needed to prove his actual innocence.

Pennsylvania cannot create a substantive right for people convicted of crimes to prove their innocence through newly-discovered evidence where the process to realize this right, at least as applied by the Pennsylvania courts, forecloses any chance of doing so. If no piece of evidence is new so long as it challenges the original statement made by David Williams and no pursuit is diligent enough when it is about the original actors in Mr. Miller's conviction, Mr. Miller's wrongful incarceration will endure without the merits of his claim ever receiving meaningful consideration from a court of law. Such procedures therefore "transgress[] any recognized principle of fundamental fairness in operation" because they will always foreclose the very right to which they are intended to grant access. *Osborne*, 557 U.S. at 69 (citing *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). Mr. Miller has therefore been deprived of his Fourteenth Amendment due process rights, a deprivation that will continue without the intervention of this Court.

     **D.**    **Mr. Miller Was Deprived of His Due Process Rights Because The Commonwealth Failed to Disclose Exculpatory Evidence That Would Have Undermined The Credibility of The Key Witness Against Mr. Miller at Trial.**

         **1.**    **This Court Should Exercise Independent Judgment on Mr. Miller's *Due Process* Claims.**

Pennsylvania courts failed to address Mr. Miller's claim that his due process rights, as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963), were violated. Therefore, this

Court should use its independent judgment to evaluate the claim. *See Bridges*, 941 F. Supp. 2d at 596 (citing *Appel*, 250 F.3d at 2010).

Mr. Miller presented his *Brady* claims, as detailed below, to the state court on multiple occasions. The state court expressly acknowledged that Mr. Miller had asserted *Brady* claims and expressly declined to rule on those claims. On July 24, 2012, in denying the appeal of Mr. Miller's Third PCRA Petition, the Pennsylvania Superior Court noted that "we do not reach the question of whether Manigault's police interview was exculpatory in nature and, thus, *Brady* material." (Ex. X, *Commonwealth v. Miller*, No. 3269 EDA 2011, at 22 n.1.) Similarly, on December 18, 2015, in denying the appeal of Mr. Miller's Fourth PCRA Petition, the Pennsylvania Superior Court stated that "we need not address the merits of the alleged *Brady* violation," referring to Mr. Miller's claim that the Commonwealth failed to disclose that David Williams gave a statement to police falsely implicating Jack Williams in a separate murder at the same time that David Williams falsely accused Mr. Miller. (Ex. Z, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 18.)

Therefore, this Court should exercise its independent judgment in reviewing Mr. Miller's claims that his constitutional right to due process was violated because the Commonwealth withheld material exculpatory evidence.

### 2.   Mr. Miller Was Denied Due Process Because The Commonwealth Failed to Disclose Material Impeachment Evidence.

Under the Due Process Clause of the Fourteenth Amendment, prosecutors must disclose exculpatory evidence to the accused. *Brady*, 373 U.S. at 87. So must police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). The duty to disclose exculpatory evidence applies even if the accused has not requested it. *United States v. Agurs*, 427 U.S. 97, 107 (1976). And the duty encompasses both direct and

impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013). Failure to fulfill this duty is a due process violation. *Brady*, 373 U.S. at 87.

To properly present a *Brady* claim, Mr. Miller must demonstrate that: (1) the evidence is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was withheld by the prosecution; and (3) the defendant was prejudiced because the evidence was material. *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011). "Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). "The 'materiality' of suppressed evidence must be determined collectively, and not item-by-item." *Munchinski v. Wilson*, 807 F. Supp. 2d 242, 275 (W.D. Pa 2011) (*aff'd on other grounds*, 694 F.3d 308 (3d Cir. 2012)) (citing *Kyles*, 514 U.S. at 436). "Confidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction." *Id.* at 275-76 (internal quotation omitted).

In this case, the prosecution knowingly withheld evidence that was unmistakably material and favorable to Mr. Miller.

###### a. The Suppressed Jack Williams and Manigault Evidence Was Favorable to Mr. Miller.

The suppressed evidence was favorable to Mr. Miller, thus satisfying the first prong of *Breakiron*. Evidence is favorable to the accused and subject to mandatory disclosure even where it does not reflect directly upon the culpability of the defendant. *See Bagley*, 473 U.S. at 676 (finding that impeachment evidence as well as exculpatory evidence falls within the *Brady* rule).

Here, the suppressed Jack Williams and Manigault evidence is favorable to Mr. Miller. The only direct evidence presented against Mr. Miller at trial was David Williams' statement to detectives on March 4, 1997, following his arrest for robbery, that Mr. Miller confessed to David Williams that he killed Mr. Mullen. The only other evidence presented at trial that implicated Mr. Miller was testimony from Mr. Arnold that he observed Mr. Miller pick up an inoperable gun from the street approximately two months before the shooting.

Within hours on the same day that David Williams gave the statement to detectives implicating Mr. Miller, David Williams also gave a very similar statement implicating Jack Williams in a different murder. Now, however, David Williams admits that he fabricated both statements in hopes of getting a lenient sentence for the robbery charges he faced. David Williams also now explains that the evidence he provided against Jack Williams could easily be disproven through prison telephone records. That the Commonwealth did not call him as a witness in Jack Williams' murder trial further demonstrates that the police knew that his accusations against others were false.

David Williams also told another tale when he spoke to detectives that day that the police knew was false. He told the detectives that Mr. Manigault had information about Mr. Miller's role in the Mullen murder. Police detectives then spoke with Mr. Manigault to try to corroborate that information. But Mr. Manigault told detectives that he knew nothing about Mr. Mullen's murder because he was incarcerated at the time. This contradiction should have immediately alerted detectives that David Williams was lying about the Mullen homicide, among other things. At the very least, Mr. Miller was constitutionally entitled to know this information so that a jury could consider it in evaluating the credibility of David Williams' original statement.

David Williams' statement became the prosecution's key piece of evidence in Mr. Miller's trial because it was the only evidence that connected Mr. Miller to the crime. At the time of Mr. Miller's trial, David Williams had already recanted his statement to police implicating Mr. Miller. Nevertheless, the Commonwealth's case against Mr. Miller depended on the jury believing David Williams' original statement implicating Mr. Miller over his recantation. Evidence that David Williams gave the police irrefutably false information about Jack Williams and Mr. Manigault (which directly related to his accusation against Mr. Miller) on the same day he gave the original statement against Mr. Miller would have provided a forceful method of impeaching David Williams' statement. Specifically, this new information reveals that David Williams was willing to say just about anything, including demonstrably and incontestably false information, in an attempt to reduce his sentence.

As Judge Bender wrote in his opinion concurring and dissenting with the majority of the Superior Court that denied Mr. Miller's appeal of his Fourth PCRA Petition,

> David's [Williams] statement regarding Jack [Williams] was given to the police on the same day that David implicated Appellant for the murder of Mullen and, thus, it tends to corroborate David's and Arnold's recantations.
>
> Appellant believes, *reasonably*, that if the jury was aware that David has falsely implicated another person in an unrelated murder within hours of implicating Appellant, they would have been more inclined to believe David's recantation and disbelieve his initial statement to police.

(Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 2-3 (*dissenting*) (emphasis added)).

In sum, had the Commonwealth not suppressed the record of David Williams' false statement against Jack Williams and the record of Mr. Manigault's interrogation which undermines the credibility of David Williams' entire statement against Mr. Miller, those records could have been used to further cross-examine and impeach David Williams at Mr. Miller's trial

and to provide the jury a more fulsome understanding of the veracity, or lack thereof, of David Williams' statements to police that day. Such cross-examination would support David Williams' recantation and testimony that he fabricated Mr. Miller's alleged confession as part of his overall attempt to convince the police to give him a lenient sentence. Therefore, under *Bagley*, the Jack Williams and Manigault evidence is favorable to Mr. Miller.

> **b.** **The Commonwealth Withheld Evidence From Jack Williams and Mark Manigault.**

The Jack Williams and Mark Manigault evidence was in the possession of the Commonwealth and the Commonwealth withheld it, thus satisfying the second prong of the *Breakiron* test. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (finding that evidence in the possession of police investigators is possessed by the government for purposes of evaluating a *Brady* claim); *see also Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). The Commonwealth had an affirmative duty to disclose the evidence to Mr. Miller. *Kyles*, 514 U.S. at 432. The Commonwealth withheld the evidence, knowing that it possessed and had a duty to disclose this material evidence.

David Williams made a statement to police implicating Jack Williams in the murder of Paul Jones just ninety minutes before he made a very similar statement implicating Mr. Miller in the Mullen murder. Detectives recorded a summary of the statement on an "Investigation Interview Record," a standard form used by the Philadelphia Police Department Homicide Division. (Ex. S, Selected Pages of Materials received from J. Williams on June 1, 2012, Investigation Interview Record of David Williams, 1, Mar. 4, 1997.)[3] The Commonwealth

---

[3] Mr. Miller's attorneys obtained this Record from Jack Williams on June 1, 2012 as part of the discovery materials related to his conviction for the Jones murder.

had the Investigation Interview Record and had a duty to disclose it to Mr. Miller. The Commonwealth did not do so.

By David Williams' own admission, the statement against Jack Williams (1) was a lie, (2) could easily be verified as a lie by accessing the prison's phone logs, and (3) was made to lessen David Williams' own sentence. The Commonwealth may have confirmed the falsity of David Williams' statement against Jack Williams, because it did not call David Williams to testify at Jack Williams' trial. (*See* Ex. Q, Cert. of Shaina Tyler Re: David Williams at 4-5). Neither Mr. Miller nor his trial counsel, Mr. Leon Williams, at any stage prior to or during trial of this case, was ever aware that David Williams provided police with (false) information implicating Jack Williams in the Jones murder. (Ex. V, Aff. of Leon Williams, September 14, 2012 , ¶ 5.)

Indeed, Mr. Leon Williams signed an affidavit stating at no time prior to or during Mr. Miller's trial was he ever aware that David Williams, in addition to giving a statement to police indicating that Mr. Miller was responsible for the Mullen murder, also gave a statement to police implicating Jack Williams in the Jones murder. (*Id.*) Had Mr. Leon Williams known that David Williams also gave a statement to police implicating Jack Williams in a murder, he would have considered this in formulating and implementing Mr. Miller's defense at trial. (*Id.* at ¶ 6.) Further, the evidence regarding David Williams' accusation against Jack Williams could have been used as impeachment evidence in the cross-examination of David Williams at trial.

Making matters worse, the Commonwealth also withheld information about Mr. Manigault's interrogation. Police detectives questioned Mr. Manigault about the Mullen homicide before Mr. Miller's trial. Detectives would have likewise recorded a summary of Mr. Manigault's interrogation on an "Investigation Interview Record." But the Commonwealth

never told Mr. Miller or his trial counsel about the interrogation or any record thereof. (Ex. BB, Aff. of Leon Williams, October 26, 2011, ¶ 5.) (stating that he was never told of Manigault's identity or that Philadelphia police officers or detectives had questioned Manigault in connection with Mullen's murder). Because prosecutors failed to do so, all information, documents, or other materials regarding Mr. Manigault were withheld.

### c.    The Evidence Was Material

The Jack Williams and Manigault evidence was material and the Commonwealth's failure to disclose the evidence prejudiced Mr. Miller, satisfying the third prong of the *Breakiron* test.

"Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "The 'materiality' of suppressed evidence must be determined collectively, and not item-by-item." *Munchinski*, 807 F. Supp. 2d at 275; *see also United States v. Agurs*, 427 U.S. 97, 112-13 (1976) ("[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.")

Courts must also consider the impact of the withheld evidence on pre-trial decisions by defense counsel while preparing for trial, in addition to decisions made at trial.

*Bagley*, 473 U.S. at 683.  The defense in a criminal case is entitled to disclosure of information that would call into question the thoroughness or good faith of the police investigation, or police knowledge of information that contradicts their selected witnesses or theory of guilt.  *See Kyles*, 514 U.S. at 446 (citing with approval, *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing the possible *Brady* violation.") and *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial under *Brady* where withheld evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case")).

Here, the testimony of David Williams was the key evidence in the case against Mr. Miller.  "[T]he pivotal factor in the . . . trial was the credibility of the prosecution's chief witness."  *Bridges*, 941 F. Supp. 2d at 607 (internal quotation omitted).  "Confidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction."  *Munchinski*, 807 F. Supp. 2d at 275-76 (internal quotation omitted).  "[U]ndisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration."  *Johnson*, 705 F.3d at 129.

Evidence that undermined the credibility of David Williams (such as the fact that he implicated another person in another murder within ninety minutes of pointing the finger at Mr. Miller) was therefore material to Mr. Miller's defense.  Additionally, the documents could have led Mr. Miller's counsel to other witnesses, such as Jack Williams and Mr. Manigault, who could have provided independent evidence regarding the falsity of David Williams' statements.  *See Bridges*, 941 F. Supp. at 608.  In particular, if Mr. Miller had been given the information

regarding Mr. Manigault, he could have interviewed Mr. Manigault and learned that David Williams admitted to Mr. Manigault that David Williams had falsely accused Mr. Miller to gain leniency for himself, serving as an independent piece of evidence from a third party corroborating David Williams' recantation and undermining his initial statement to police.

The Supreme Court addressed the *Brady* materiality analysis in *Smith v. Cain*, 132 S. Ct. 627 (2012). There, petitioner John Smith was convicted of murder. *Id.* at 639. "[T]he *only* evidence linking Smith to the crime" was the testimony of an eye witness, Mr. Boatner. *Id.* at 630 (emphasis in original). But when detectives were first investigating the murder, Mr. Boatner had made several statements to them contradicting his claim that Mr. Smith was the gunman. *Id.* at 629. The lead detective noted these contradictions in his file, but that file was never turned over to Mr. Smith until he requested it in post-conviction litigation. *Id.* The Court found that "Boatner's undisclosed statements were plainly material" for *Brady* purposes. *Id.* at 630. The Court rejected the state's speculation about how the jury *could* have reconciled the inconsistencies created by the undisclosed evidence. *Id.* Speculation was not enough because the Court had "no confidence" that the jury *would* have accepted the state's arguments. *Id.*

If the Commonwealth disclosed the exculpatory Jack Williams and Manigault evidence, there is a reasonable probability that Mr. Miller's trial would have turned out differently. The Commonwealth's case at trial required the jury to believe David Williams' lone statement to police detectives implicating Mr. Miller rather than his recantations of that statement. David Williams' false statement to police implicating Jack Williams in a murder casts reasonable doubt upon the validity of David Williams' statement against Mr. Miller. So does David Williams' disproven claim that Mr. Manigault had information about Mr. Miller's role in the Mullen murder.

Since David Williams' statement was the sole evidence connecting Mr. Miller to the homicide, evidence that David Williams told police at least two other obvious lies at almost the same time, coupled with his multiple recantations of his statement against Mr. Miller, would have created a reasonable doubt in the minds of jurors concerning Mr. Miller's guilt. Considering the totality of the evidence presented as required by *Kyles*, had (1) David Williams' withheld statement against Jack Williams and (2) Mr. Manigault's withheld statement disproving David Williams' statement been presented to the jury, "[d]isclosure. . .would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441 (noting the district court's statement that "'the essence of the State's case' was the testimony of eyewitnesses"). This is the "touchstone" of materiality, i.e., a "reasonable probability" of a different result. *Id.* at 434.

Indeed, the *only* member of the Pennsylvania Superior Court to ever address the merits of Mr. Miller's *Brady* claims concluded that the withheld evidence would have "reasonably" caused the jury to reach a contrary conclusion as to the credibility of David Williams' original statement. (Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 2-3 (Bender, J., *dissenting*) (emphasis added)) ("Appellant believes, *reasonably*, that if the jury was aware that David has falsely implicated another person in an unrelated murder within hours of implicating Appellant, *they would have been more inclined to believe David's recantation and disbelieve his initial statement to police.*" (emphasis added).) Here, the key evidence against Mr. Miller was a police statement made by David Williams implicating Mr. Miller, given while David Williams was trying to secure a lighter sentence for himself. David Williams' statement against Mr. Miller was one in a series of statements David Williams made against various people in an attempt to convince police to give him a lesser sentence. David Williams recanted his

statement even before Mr. Miller's preliminary hearing, and has been confessing to the murder for more than a decade. David Williams has nothing to gain by confessing and is well-aware that he is risking a life sentence or even the death penalty. Additionally, David Williams' statement against Mr. Miller could have been impeached with evidence of his similarly untrue statements about Jack Williams and Mr. Manigault. This is precisely the type of impeachment evidence that can be used to demonstrate a key witness's "bias, motive, and self-interest" and significantly weaken the Commonwealth's case. *Breakiron v. Horn*, 2008 U.S. Dist. LEXIS 87013, at *6 (W.D. Pa. Oct. 27, 2008), *aff'd in part, rev'd in part on other grounds*, 642 F.3d 126 (3d Cir. 2011).[4]

Given the obvious importance of the David Williams, Jack Williams and Manigault evidence to Mr. Miller's defense, the prosecution would have known that the evidence was material and favorable to Mr. Miller. Yet they knowingly withheld it. Mr. Miller is entitled to a new trial on this basis alone.

**E.    This Court Must Order a New Trial so That a Jury May Find Mr. Miller's Actual Innocence.**

Even if this Court finds that there was no already recognized substantive constitutional violation in Mr. Miller's trial or appeal, he is still entitled to have a new trial so that a jury may find his actual innocence. Though the Supreme Court has not yet explicitly recognized a right against the wrongful incarceration of an innocent person, it has hinted at such

---

[4] While *Lambert v. Beard*, which Mr. Miller relied on in his previous Petition has since been overturned, it was overturned for reasons that are distinct from the Petitioner's and does not diminish the strength of Mr. Miller's argument. *See Wetzel v. Lambert*, 132 S.Ct. 1195, 1197 (2012) overturning *Lambert v. Beard*, 633 F.3d 126 (3d Cir. 2011) (overturning *Lambert* because the suppressed evidence was not material and favorable to the petitioner as it was "an ambiguously worded notation"). While the ambiguity of the unique evidence in *Lambert* caused it to be overturned, the proposition that undisclosed evidence is material and favorable if it would have provided a "*different* avenue of impeachment," for which Mr. Miller cited *Lambert*, still stands. *See United States v. Battles*, 2012 U.S. Dist. LEXIS 3185, at *17 (E.D. Pa. Jan. 10, 2012) (quoting *United States v. Walker*, 657 F.3d 160, 185 (3d Cir. 2011)).

a right given a sufficiently convincing set of facts.  Mr. Miller's case presents such convincing facts.

The existence of a freestanding claim of actual innocence was first raised before the Supreme Court in *Herrera v. Collins*, 506 U.S. 390, 401 (1993).  There, the Supreme Court took the first step in outlining what such claim would look like by evaluating the merits of the petitioner's claim.  *Id.* at 417.  After review, the Supreme Court chose to reserve the issue until it was presented with a case with a more compelling set of facts – one that met the "extraordinarily high threshold" required.  *Id.*  Although the Supreme Court declined to definitively announce a right to actual innocence, it signaled such a right could exist.  *Id.*  Five Justices indicated that, had *Herrera* presented sufficiently compelling facts, they would have recognized the freestanding innocence claim.  *Id.* at 419-20 (O'Connor and Kennedy, J.J., *concurring*) (recognizing that "the execution of a legally and factually innocent person would be a constitutionally intolerable event"); *Id.* at 430 (Blackmun, Stevens, and Souter, J.J., *dissenting*) ("Nothing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent."); *Id.* at 433-34 ("What respondent and the United States fail to recognize is that the legitimacy of punishment is inextricably intertwined with guilt.").

The Supreme Court has further indicated that freestanding innocence claims are cognizable in the habeas context by clearly delineating between "gateway" and "freestanding" actual innocence claims.  *Schlup*, 513 U.S. at 314-16.  "Gateway" actual innocence claims are procedural (i.e. mechanisms through which to present otherwise barred constitutional claims).  *Id.* at 314.  Freestanding actual innocence claims are substantive (*i.e.* innocence claims unaccompanied by an underlying constitutional violation at trial).  *Id.*  Further distinguishing the

types of claims are the evidentiary hurdles. Freestanding innocence claims require a much higher standard of review: evidence of innocence that would make the execution or continued incarceration of a petitioner "constitutionally intolerable." *Id.* at 316. In line with Supreme Court jurisprudence, the Third Circuit has also acknowledged the distinction between "gateway" and freestanding innocence claims. *See Wright v. Superintendent Somerset SCI*, 601 App'x 115, 119 (3d Cir. 2015) (distinguishing between "actual innocence as a gateway" and a "freestanding claim of actual innocence").

The Supreme Court again declined to rule on whether freestanding innocence claims are cognizable because the facts presented did not meet the "extraordinarily high threshold" required. *House v. Bell*, 547 U.S. 518, 555 (2006). Given that the Supreme Court has declined opportunities "to resolve this issue," *id.*, at the very least, the possibility of a cognizable freestanding innocence claim remains an open question. *See Herrera*, 506 U.S. at 417 (noting that "[w]e may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief"); *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 71 (2009) (acknowledging that "[w]hether a such a federal right exists [to be released from incarceration upon proof of actual innocence] is an open question" and that the Court has "struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (noting that the Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence). Indeed, in 2009, the Supreme Court remanded a habeas petition and ordered an evidentiary hearing to determine

actual innocence. *In re Davis*, 557 U.S. 952, 952 (2009) ("The District Court should receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence.").

Absent explicit guidance from the Supreme Court, the Third Circuit has recognized that a free standing claim of actual innocence may be possible, though the threshold has not yet been met. *See Wright*, 601 Fed. App'x at 120 (considering the merits of petitioner's free standing actual innocence claim before concluding that that case at bar did not satisfy the "*Schlup* gateway standard, much less the 'extraordinarily high' standard required by *Herrera*"); *Lee v. Glunt*, 667 F.3d 397, 403 n.5 (3d Cir. 2012) (declining to analyze petitioner's free standing actual innocence claim but acknowledging the possibility of such a claim); *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007) (analyzing the merits of a free standing actual innocence claim before concluding that the case did not meet the heightened *Herrera* standard).

Mr. Miller's case, however, presents sufficient facts to meet the "extraordinarily high" standard required by *Herrera*. The *only* evidence used to establish his guilt at trial was the now-recanted and undermined testimony of David Williams and Mr. Arnold. Without a scintilla of incriminating evidence against Mr. Miller, this case presents the Court with the ideal opportunity to definitively recognize that the Constitution does not accept the imprisonment of a person who is factually innocent. Thus, Mr. Miller respectfully requests that this Court find his imprisonment "constitutionally intolerable" and grant Mr. Miller a new trial so that he may present evidence that supports his actual innocence. And, if Mr. Miller is not retried within one hundred and twenty days of the order granting a new trial, Mr. Miller respectfully requests that he be released from prison. Alternatively, Mr. Miller respectfully requests an evidentiary

hearing on his claims of actual innocence and the violations of his due process rights so that he may demonstrate to this Court the new evidence justifying the grant of this petition.

## IV.    Conclusion

For all of the foregoing reasons, Mr. Miller respectfully requests that this Court grant his Petition for Writ of Habeas Corpus.

Dated:  March 2, 2016

Respectfully submitted,

Thomas M. Gallagher, Esq.
(No. 55984)
James T. Giles, Esq.
(No. 4425)
Hannah Dowd McPhelin, Esq.
(No. 93118)
Noah S. Robbins, Esq.
(No. 206803)
Yulia Weisberg, Esq.
(No. 806854)
Christen Tuttle, Esq.
(No. 206925)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000

Marissa Boyers Bluestine, Esq.
(No. 75973)
Nilam A. Sanghvi, Esq.
(No. 209989)
THE PENNSYLVANIA INNOCENCE PROJECT
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
215.204.4255

*Attorneys for Petitioner John Miller*