# EXHIBIT A

9/24/98

2

```
 1              I N D E X

 2

 3           OPENING STATEMENTS

 4    By Mr. Fisher:  3

 5    By Mr. Williams:  15

 6         —  —  —

 7         COMMONWEALTH'S EVIDENCE

 8    WITNESS          DIRECT   CROSS   REDIRECT   RECROSS

 9    LEON HUGHES        25      31
      OFF. GILLIN.       39      44
10    OFF. VINCENT       46      65
      DAVID WILLIAMS     71      96       97
11    DET. PIREE        105     131      147       152
      MICHAEL ARNOLD    158     170      174       175
12    DR. MC DONALD
      (Voir Dire)       177
13                      179     184    191,194   193,194

14         —  —  —

15            E X H I B I T S

16    NUMBER           DESCRIPTION              PAGE

17    C-1 to 12         Photographs              29
      C-13              Document                 37
18    C-14              Document                 48
      C-15              Diagram                  48
19    C-16              Item                     51
      C-17              Item                     51
20    C-18              Document                 77
      C-19              Document                100
21    C-20              Photograph              129
      C-21              Photograph              129
22    C-22              Photograph              147
      C-23              Photograph              147
23    C-24              Document                163
      C-25              Document                179

24         —  —  —

25
```

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

LEON HUGHES - DIRECT

28

1    booth, one entrance, one exit -- two entrances.

2         Q.   And where did Anthony work?

3         A.   He worked in the booth -- well, his -- the

4    location is the booth and that's where the cashier

5    is at.

6         Q.   Do you know whether or not he would work

7    in the booth or in his car or what?

8         A.   He hung out in his van pretty much.

9         Q.   And did you have an opportunity to go back

10   there that evening at that location?

11        A.   I had to go back there.  I guess I got

12   back there around quarter after 12:00.  I got a

13   phone call around 12 o'clock that the attendant had

14   been shot and killed.

15        Q.   And you went back?

16        A.   Yes.

17        Q.   And what did you see when you went back?

18        A.   Pretty much a lot of cops.  I got there.

19   I parked.  They asked -- told me to look over

20   there.  He was laying on the ground.  They said is

21   that your attendant.  I said, yeah.  That was pretty

22   much it.

23             MR. FISHER:  Could we mark these 1

24        through 12?

25             (Photographs were marked for

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

LEON HUGHES - DIRECT

30

1    Q.   Now, do you see anything else in there

2   that's familiar?

3    A.   Tony's van.

4    Q.   Now, could you please hold the picture --

5   with your permission, Your Honor -- could you please

6   hold the picture up and show us where the booth is

7   where the money is kept and, two, where Mr. Mullen

8   would park his van and sometimes be in it?

9    A.   All right.  The cashier booth or the

10  cashier register is inside the booth.  That's where

11  he's supposed to be at.  This is his van right here

12  and he pretty much worked out of his van.  He pretty

13  much hung in the van until somebody came up to leave

14  and then he would go into the booth.

15   Q.   Now, when you got back that evening -- you

16  can put them down now please -- when you got back

17  that evening, Mr. Hughes, or actually it was that

18  morning, the next morning which would have been the

19  9th, early morning hours, did you check your

20  register?

21   A.   Yes.

22   Q.   Was anything missing out of the register?

23   A.   No.

24   Q.   By the way, was the booth opened or

25  locked?

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

54

1    strike that.

2              Where was Mr. Mullen's body located?

3         A.   It was located right here next to the

4    first vehicle parked in the second -- in the second

5    row.

6         Q.   And how far was that from the van?

7         A.   It was approximately maybe twenty feet,

8    approximately twenty feet.

9         Q.   And is that shown in any of the pictures

10   that I gave you that I gave back to you, 1, 2, 3, 4

11   or 5 where the van was and where Mr. Mullen's body

12   was located in relationship to it?

13        A.   Yes.

14        Q.   What photographs show the door open on the

15   van?

16        A.   C-1, C-3, C-4 and C-9.

17              MR. FISHER:   Judge, I'd like to

18        publish 1, 2, 3, 4 and 9 at this point.

19              THE COURT:   Any problem?

20              MR. FISHER:   May I confer with

21        counsel just for one second?   (Pause).

22              MR. WILLIAMS:   Side bar.

23              THE COURT:   Let me see the pictures

24        first.

25              MR. FISHER:   There's no problem with

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

56

1     Q.  Is that a no or a yes. Was it near where

2  the crime scene?

3     A.  Not the immediate area, no.

4     Q.  Now, the evidence that you collected in

5  the crime scene area, what evidence specifically did

6  you collect?

7     A.  Item number 1 was a 9mm. luger fired

8  cartridge casing.

9     Q.  Where was that?

10     A.  It was located right here next to the van.

11     Q.  When you say right there, are you talking

12  about --

13     A.  The blue dot.

14     Q.  Point to it specifically.

15     A.  The blue dot.

16     Q.  And that was 9mm. --

17     A.  That's correct.

18     Q.  -- cartridge case?  Do you have that?

19     A.  Yes, I do.

20     Q.  May we see that?

21        Now, could you show it -- you showed

22  us on the diagram where that is where you identified

23  it as the blue dot, and on your chart it indicates

24  CCI 9mm. luger; is that correct?

25     A.  That's correct.

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

57

1        Q.   Right here?

2        A.   That's correct, right there.

3    (Indicating).

4        Q.   Do you have a picture that corresponds

5    with that, that area, where you found the 9mm.

6    cartridge case?

7        A.   Yes, photograph C-9.

8        Q.   Now, photograph C-9, you have a marker on

9    it; that is correct?

10       A.   That's correct.

11       Q.   And you've pointed to the marker?

12       A.   That's correct.

13       Q.   And that's right next to a vehicle with

14   the door open; is that correct?

15       A.   That's correct, the van.

16       Q.   Which vehicle is that?

17       A.   The van.

18       Q.   That's the van.

19            What else did you collect and where

20   did you collect it?

21       A.   Items number 2, 3 and 4, which are the red

22   dots, were .25 caliber fired cartridge casings.

23       Q.   Okay.  And where does that show up on your

24   legend, .25 caliber?

25       A.   Right here.   (Indicating).

OFF. VINCENT - DIRECT

58

1      Q.   Go ahead.

2      A.   Item number 5.

3      Q.   No, just the .25 caliber now.  Their

4  location you got those from, do you have those with

5  you?

6      A.   Yes.

7      Q.   May we see those?  Now, where did you --

8  again, where did you get those casings?

9      A.   These were recovered where the red dots

10  are located, numbers 2, 3 and 4.

11     Q.   Again, do you have a picture that depicts

12  that and what photograph is that, same one you used

13  before, right?

14     A.   Photograph number C-9.

15     Q.   And show us on there where those three

16  items came from.

17     A.   Would have been 2, 3 and 4 on the other

18  side of the vehicle.

19     Q.   Were there any other fired cartridge cases

20  that you had?

21     A.   No.

22          MR. FISHER:  Judge, can I demonstrate

23          at this point to the jury in some fashion

24          the 9mm. casing and the three .25 caliber

25          casings?

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

59

1   THE COURT:  If he has them.

2   MR. FISHER:  Yeah, he does, Judge.

3   He just testified to them.  If I could

4   have them shown separately, I would

5   appreciate it.

6   Judge, could I make a suggestion?

7   Can he just come out of the jury box,

8   stand down here and hold them up and show

9   the difference?

10   THE COURT:  Sure.

11   MR. WILLIAMS:  May I, Your Honor?

12   THE COURT:  Sure.

13  BY MR. FISHER:

14   Q.   Bring the one 9mm. that you found next to

15  the door, hold that up, Michael, please.

16   A.   (Witness complies with the request.)

17   This is one of the three .25

18  calibers.

19   Q.   Thank you very much.

20   What other evidence did you collect?

21   A.   Item number 5, which was located at this

22  green dot underneath the victim, was a .25 caliber

23  semiautomatic pistol.

24   Q.   Now, you said that was underneath the

25  victim's body?

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

60

1    A.   Partially, yes.

2    Q.   Now, would you show us that?

3    A.   (Indicating).

4    Q.   What exhibit number is that?

5    A.   C-17.

6    Q.   It's part of C-17; is that correct?

7    A.   Yes.

8    Q.   C-17 is a brown bag with several items

9  inside; is that correct?  It's a brown envelope?

10   A.   Yes.

11   Q.   And that's one of the items inside.

12             Was the gun loaded or unloaded?

13   A.   It was loaded.

14   Q.   And how was it loaded?

15   A.   There was one round in the chamber that

16  was jammed in the chamber and there was four rounds

17  in the magazine.

18   Q.   And do you have those?

19   A.   Yes, I do.  This is the four rounds that

20  were in the magazine.

21   Q.   And show us the magazine.  That's the

22  magazine that you're holding in your hand had a

23  little black item --

24   A.   That's correct.

25   Q.   And they are the four rounds in front.

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

OFF. VINCENT - DIRECT

61

1      A.   And this is the round that was jammed

2  inside the gun, itself.

3      Q.   How do you know it was jammed?

4      A.   I couldn't get it out.  I actually had to

5  submit the gun.

6      Q.   To firearms?

7      A.   Yeah, with a big red label saying that the

8  gun was still loaded, to use with caution, yes.

9      Q.   Do you have a picture that shows where

10  that gun, the loaded gun, the .25 caliber that had

11  five rounds in it, right, five live rounds?

12      A.   That's correct.

13      Q.   Where that was found?  Along with the

14  body?

15      A.   You can barely see the marker in C-9, but

16  it's the only one that shows.

17           MR. FISHER:  Judge, is it okay if he

18           gets out of the jury box and comes over?

19           THE COURT:  Absolutely.

20           MR. FISHER:  Just point to it.

21           (Witness complies with the request.)

22           THE WITNESS:  Number 5 is located

23           right next to the -- you can see the top

24           of the marker.  Number 5 is the gun.

25  BY MR. FISHER:

OFF. VINCENT - DIRECT/CROSS

65

1      A.   Yes.

2      Q.   Were there any bullet holes in the glass

3  or the window?

4      A.   Not that I noticed.

5           MR. FISHER:   Thank you.   I don't have

6           any other questions.

7                    -   -   -

8                CROSS EXAMINATION

9  BY MR. WILLIAMS:

10     Q.   Officer Vincent.

11     A.   Good morning, sir.

12     Q.   Good morning.

13           Aside from collecting evidence, did

14  you get into any analysis of the evidence?

15     A.   No, sir.

16     Q.   Were you involved at all in

17  fingerprinting?

18     A.   Yes.

19     Q.   Did you find any fingerprints?

20     A.   No, sir.

21     Q.   Except for the victim's, right?

22     A.   I didn't find any fingerprints.

23     Q.   Do you know if the .25 automatic was

24  fingerprinted?

25     A.   No, it was not.

DAVID WILLIAMS - DIRECT

1           THE COURT:  Thank you.

2           (Witness excused.)

3           THE CRIER:  State your full name.

4           MR. WILLIAMS:  David Williams.

5           THE CRIER:  Spell your last name for

6       the record.

7           MR. WILLIAMS:  W-I-L-L-I-A-M-S.

8           (Whereupon, the witness was duly

9       sworn.)

10          MR. FISHER:  May I proceed, Judge?

11                     --  --  --

12                DIRECT EXAMINATION

13   BY MR. FISHER:

14       Q.   Good afternoon, Mr. Williams.

15       A.   Good afternoon.

16       Q.   Mr. Williams, do you know the defendant in

17   this case --

18       A.   Yes.

19       Q.   -- Mr. Miller?

20       A.   Yes.

21       Q.   And how long do you know him?

22       A.   About all my life almost.

23       Q.   Grow up in the same neighborhood?

24       A.   Yes.

25       Q.   I'm sorry.  You have to answer otherwise

DAVID WILLIAMS - DIRECT

72

1  she won't -- grow up in the same block or just in

2  the same neighborhood?

3      A.   Same neighborhood.

4      Q.   And how old are you, Mr. Williams?

5      A.   Twenty.

6      Q.   So he's a couple years older than you; is

7  that correct?

8      A.   Yes.

9      Q.   Do you know Michael Arnold?

10     A.   Yes.

11     Q.   How long have you known him?

12     A.   Maybe '92.

13     Q.   And how do you know him?

14     A.   Live around the corner.

15     Q.   He lives around the corner from you?

16     A.   Yes.

17     Q.   Again from the neighborhood; is that

18  correct?

19     A.   Yes.

20     Q.   And Mr. Arnold is a little bit younger

21  than you; is that correct?

22     A.   Yes.  Yes.

23     Q.   Incidentally, you have what appears to be

24  prison clothes on; is that correct?

25     A.   Yes.

DAVID WILLIAMS - DIRECT

73

1      Q.    Okay.  Well, everybody doesn't know that.

2      A.    Yes.

3      Q.    And you're in prison now?

4      A.    Yes.

5      Q.    Where?

6      A.    Somerset State Penitentiary.

7      Q.    And for how long?

8      A.    Eight to sixteen years.

9      Q.    And you're doing time for a bunch of

10  robberies, basically?

11     A.    Six.

12     Q.    I would say that was a bunch, at least.

13     A.    Yeah.

14     Q.    Mr. Williams, do you recall when you were

15  arrested for those robberies?

16     A.    Yeah.

17     Q.    Do you recall who arrested you?

18     A.    No.

19     Q.    Was it a big, black detective?

20     A.    (Witness nods head.)

21     Q.    Do you recall back in sometime in October

22  of '96 talking to the defendant, Mr. Miller, about a

23  robbery that occurred at 30th Street Station?

24     A.    That conversation never happened.

25     Q.    What do you mean it never happened?

DAVID WILLIAMS - DIRECT

74

1    A.    I can't explain it no better than that.

2  It never happened.  I told you that last time.

3    Q.    Are you telling that you don't recall such

4  a conversation or what?

5    A.    I'm saying it never happened.

6    Q.    Well, do you recall telling the police

7  that you talked to Mr. Miller back in October of

8  1996 about a robbery that occurred at -- am I

9  keeping you up here?

10    A.    No.

11    Q.    Are you okay?

12    A.    It's cold.

13    Q.    Okay.  Let me start the question all over

14  again, please.

15                Do you recall talking to the police,

16  Philadelphia Police, that is, that is Detective

17  Sharkey.  You know him, right?

18    A.  , Yes.

19    Q.    And Detective Piree of Homicide and giving

20  a statement to the effect that you talked to the

21  defendant about a robbery and murder that occurred

22  in October over at 30th Street?

23    A.    And I told you that it was coerced.

24    Q.    I'm just asking you, do you recall talking

25  to the police about them?

DAVID WILLIAMS - DIRECT

75

1      A.    I remember them beating -- yeah, I
2   remember them, yeah, taking that statement.
3      Q.    Now, let me get this straight.  You
4   remember giving the statement?
5      A.    Yes.
6      Q.    Is that correct?
7      A.    Yes.
8      Q.    And what you're telling us, everybody in
9   here, including the jury, that the cops had beat
10  this statement out of you; is that correct?
11     A.    No, they didn't get a chance to physically
12  beat me.  They was doing it in subtle ways.
13     Q.    What do you mean?
14     A.    You know, banging a table, you know, the
15  threats and everything else.
16     Q.    And so because they were intimidating you
17  -- I'm sorry, strike that.
18          Because they were intimidating you,
19  you gave a statement; is that correct?  Is that what
20  you're telling us?  I just want to get that part of
21  it clear.
22     A.    I was led.  The statement was led.  It was
23  -- it was food-fitting.  It was fed to me.
24     Q.    Mr. Williams, I know sometimes I have a
25  problem expressing myself.  If you don't understand

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

DAVID WILLIAMS - DIRECT

76

1    one of my questions, tell the Judge.  Tell me.  I'll

2    rephrase it.  If you do understand it, answer the

3    question, okay?

4              Okay, we all right with that then you

5    can say anything else you want, okay, Mr. Williams?

6    I'll treat you with respect.

7              Do you understand what I'm saying?

8         A.   Yeah, I ain't got no choice but to

9    understand.

10        Q.   Now, my question was, Mr. Williams, are

11   you telling us that the police intimidated you into

12   giving a statement?

13        A.   Yes.

14        Q.   About that conversation?

15        A.   Yes.

16        Q.   Okay.  Now, the guy that took the

17   statement or the guy who arrested you, which guys

18   intimidated you?

19        A.   It was about four of them in the room.

20        Q.   About four detectives, police officers?

21        A.   Detectives.

22        Q.   Detectives.

23              Where did this happen, Homicide?

24        A.   8th and Race.

25              MR. FISHER:  8th and Race.

DAVID WILLIAMS - DIRECT

85

1    twenty minutes ago.

2         Q.   Well, you didn't tell me about this.  I'm

3    asking you about each and every question.

4         A.   No, you playing word games.

5         Q.   You said the detective made this up; is

6    that correct?

7         A.   Yes.

8         Q.   Question --- next question is on Page 4,

9    question at the top of the page.

10             Do you see it?

11        A.   Um-hum.

12        Q.   Question:  Did Little, in parentheses

13   Johnny Miller, III, close parentheses, say he,

14   Little, where he got the gun?

15             Your answer:  He said he got the gun,

16   9mm., from Michael Arnold.

17             Do you remember that question and did

18   you give that answer?

19        A.   I did not give any answers, maybe, you

20   know, you keep asking question after question.  I

21   keep telling you I did not answer them questions,

22   no.

23        Q.   You're saying --

24        A.   No.

25        Q.   -- that the detective made that up?  It's

DAVID WILLIAMS - DIRECT

93

1    Q.   In regards to the rest of the statement,
2  are you telling this jury that the detective made
3  that up?
4    A.   Yes.  I don't know if he got it from
5  somebody else.  I don't know if he made it up.  What
6  I'm saying, it didn't come from me.
7    Q.   At no point did you tell him any of this?
8    A.   No.
9    Q.   Well, what were you telling the jury about
10 the detectives coercing you?  What was all that
11 about?
12   A.   I don't -- I don't think they would
13 understand if you got --
14   Q.   Tell them.  Try.
15   A.   If they asking you questions about
16 somebody else and they got you in there and they
17 playing these games that they have where one of them
18 would leave and act like he your friend and then
19 three more come in, and he act like he's saving you
20 from the other three, and you don't sign your name
21 on anything.
22   Q.   Well, let me get this straight.
23          Are you saying that the statement,
24 itself, the detectives made that up, but what they
25 coerced you into doing was signing your name and

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

DAVID WILLIAMS - REDIRECT

102

1   another question.  Did I say that?

2                The next question, my question to

3   you, yes.  Your answer, yes.

4                You said it, that's what you're

5   saying now, but it's true, but is it true?  No.  My

6   answer that I gave in my statement, is it true, but

7   I said it, that's what you're saying.

8                And question, are you saying today

9   that it is true?

10                Answer:  Yes, I am.

11                Question:  And you are saying today

12   that the reason that you gave it to the detective is

13   that detective threatened to beat you?

14                Your answer:  And other reasons.

15                My next question:  Well, didn't you

16   say, though, that the reason you gave it is that he

17   said he was going to beat you when you were afraid

18   and he was going to beat you.

19                Your answer:  And there are other

20   reasons, other reasons that you gave the statement.

21                Question:  Well, what are the other

22   reasons that you gave the statement?

23                Answer:  First of all, at the time me

24   and Little wasn't getting along too good.  I stole

25   something from him and he was looking for me for it,

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

DAVID WILLIAMS - REDIRECT

103

1    so plus I'm in that predicament and they told me

2    they wanted some information, so why not use him as

3    a scapegoat?

4                    Question:  Let me --

5                    THE COURT:  Hold it.  Hold it.  If

6            you're going to read the notes, no, it's

7            an improper form of question.

8                    MR. FISHER:  You're right, Judge.

9            Judge, I agree.  I'll ask the question.

10           I'm done with that question and answer.

11           Let me ask the question, Judge.

12   BY MR. FISHER:

13       Q.   Question:  Do you remember those questions

14   and answers at the preliminary hearing?

15       A.   I remember coming to the preliminary

16   hearing, but these exact questions, I mean, I'm sure

17   they were asked, but do I remember them?  No.

18       Q.   Well, the answer that you gave at the

19   preliminary hearing, do you remember saying that you

20   made this statement up and told Jeff everything and

21   the reason you made it up is that you wanted to put

22   something on the defendant because he stole a beeper

23   from you.

24                    Do you remember that?

25       A.   Yeah.

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

MICHAEL ARNOLD - DIRECT

161

1        A.   I threw it on the ground.

2        Q.   Why did you throw it on the ground?

3        A.   I seen police coming down the block.

4        Q.   You saw police coming.  And what happened

5   to the gun when you threw it on the ground?

6        A.   It was picked up.

7        Q.   Who picked the gun up?

8        A.   Little.

9        Q.   The jury may not know who Little is.  Who

10   is Little?

11        A.   (Indicating).  He's right here.

12        Q.   You mean Mr. John Miller, III?

13        A.   Yes.

14        Q.   That's who Little is?

15        A.   Yes.

16        Q.   You guys on the street know him as Little;

17   is that right?

18        A.   Yes.

19        Q.   Why do you call him Little, because he's

20   so big?

21        A.   Just the name he got, that's all.

22        Q.   After he picked the gun up, what happened?

23        A.   I just asked was he going to keep it?  He

24   said yeah.  I told him it didn't work.  No problem.

25        Q.   What kind of gun was it?

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

MICHAEL ARNOLD - DIRECT

162

1    A.    I don't know.  I don't have the slightest
2    idea.

3    Q.    Pardon me?

4    A.    From the description of it, I don't know.
5    It's like a .380 or a .38.

6    Q.    And did you ever talk to him again about
7    the gun?

8    A.    Like one time.

9    Q.    Was that in October of 1996?

10   A.    Early October, like late September.

11   Q.    And where did you see him when you talked
12   to him in October or September of '96?

13   A.    Street corner.

14   Q.    And what was said, said by you, said by
15   him?

16   A.    You still got that gun?  He said yeah.

17   Q.    He said yeah?

18   A.    Yes.

19   Q.    Did he tell you where it was?

20   A.    No.

21   Q.    Now, do you remember talking to the police
22   about this case?

23   A.    Yes.

24   Q.    Do you remember speaking to the police on
25   June the 23rd, 1997 about this case?

ROBIN LEUZZI, RPR
OFFICIAL COURT REPORTER

# EXHIBIT B



**City of Philadelphia**
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila. PA  19104
REPORT OF AUTOPSY

| M.E. CASE NO. | |
|---|---|
| 96-4290 | |
| DATE OF DEATH | |
| 09 Oct 96 | |

| DECEDENT'S NAME | AGE | RACE | SEX | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| Anthony G. Mullen | 49 | Black | Male | 5'6" | 193 lb |

| PRONOUNCED DEAD BY | AT | DATE | TIME |
|---|---|---|---|
| David Quain | 3051 J.F.K. BOULEVARD Philadelphia, PA | 09 Oct 96 | 1:05am |

| ID WITNESS NAME | ADDRESS | RELATION |
|---|---|---|
| PATRICIA MULLEN | 2119 W. Indiana Ave Philadelphia, PA  19132 | Wife |

| ID WITNESS NAME (#2) | ADDRESS | RELATION |
|---|---|---|
| THEODORE LEBKS | 2119 W. Indiana Ave Philadelphia, PA  19132 | Son |

Alias:  October 9  1996 Unidentified

PATHOLOGIC FINDINGS:

I.    PERFORATING GUNSHOT WOUND OF LEFT CHEST

NO STIPPLE, SOOT OR GUNPOWDER SURROUNDING WOUND
EXIT RIGHT CHEST
DIRECTION:  RIGHTWARD, SLIGHTLY BACKWARD
PROJECTILE: NO PROJECTILE IS RECOVERED

CAUSE OF DEATH:

GUNSHOT WOUND OF CHEST

MANNER OF DEATH: HOMICIDE

Susan Klingler DO.
Forensic Fellow
20 Nov 96

Greg McDonald, DO
ASSISTANT MEDICAL EXAMINER
20 Nov 96

| M.E. CASE NO. |
| 96-4290 |
| NAME |
| Anthony |
| G. |
| Mullen |

Page. 2

City of Philadelphia
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila. PA 19104
REPORT OF AUTOPSY

## INTRODUCTION

The body is identified by Medical Examiner's tag with the decedent's name on it.

Clothing accompanies the body and consists of a red jacket with a "5-Star" parking logo on the left front. Just below the logo is a three part skip defect corresponding to the entrance wound. There is bullet wipe around the most lateral defect. There are blood-stained defects also on the right side as well as the right sleeve corresponding to exit wounds. A gray powdery substance is around the left chest defect as well as scattered across the front of the jacket. This substance is suspicious for gunpowder and is recovered on tape and submitted to crime lab for analysis.

A red quilt vest contains defects in the right and left front corresponding to respective entrance and exit wounds.

A white polo shirt with the "5-star" logo contains a defect in the left upper chest area corresponding to the entrance wound and a right lateral defect corresponding to the exit wound.

A pair of dark color pants with a brown belt, white jockey shorts, white socks, white athletic shoes, and a black cap accompany the body.

BODY:

The body is that of a well-nourished, well-developed Black male with passing rigor and no fixed livor. The subject has short black-gray hair and a well-trimmed goatee and mustache. The eyes are brown. The teeth are natural lower and upper, in good condition with a partial lower plate. The extremities are symmetrical. The penis is circumcised.

## IDENTIFYING MARKS AND SCARS

There is a 1/8 inch rounded scar on the left lateral temple, a 1/2 inch hyperpigmented scar on the right anterior shoulder, a hyperpigmented "BIRTH MARK" on the left abdomen, a 1/2 inch rounded scar on the left knee; and a 2 by 1/4 inch scar on the left forearm.

City of Philadelphia
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila. PA 19104
REPORT OF AUTOPSY

M.E. CASE NO.
96-4290

NAME
Anthony
G.
Mullen

Page 3

Narrative Description: (continued)

EVIDENCE OF INJURY AND CAUSE OF DEATH

GUNSHOT WOUND OF CHEST

ENTRANCE:  On the chest centered 17 inches beneath the top of
the head and 5 inches left of the anterior midline is a 1/4 inch
rounded defect with a 1/4 inch marginal abrasion.  There is no
stipple, soot or gunpowder surrounding the wound.

PATH:  A hemorrhagic wound track proceeds through the skin, soft
tissues, and muscle of the left chest entering the left pleural
cavity between the 5th and 6th ribs, proceeding through the left
anterior pericardium, through the right ventricle severing the
right coronary artery and producing concussive tears of the base
of the aorta, proceeding through the superior vena cava, through
and through the right lung, and passing out of the lateral right
chest through the 6th intercostal space, through the muscles,
soft tissues and skin, leaving an exit wound centered 17 inches
beneath the top of the head and 10 inches right of the anterior
midline on the lateral surface of the chest.  This is a 1/4 inch
easily re-approximated defect with a 1 inch circumferential
bruise.

DIRECTION: Rightward, slightly backward

PROJECTILE:  No projectile is recovered.

ASSOCIATED INJURIES

There is 2000 ml of blood clot in the right pleural cavity and
250 ml of blood in the left pleural cavity.

INTERNAL EXAMINATION

The body is opened with the usual Y-shaped incision.  There is
no evidence of disease identified on examination of the bony
skeleton.  All organs are present and in their usual anatomic
position and are normal except for evidence of injury.

HEART:

The heart weighs 370 grams.  The pericardial surfaces are smooth

City of Philadelphia
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila, PA  19104
REPORT OF AUTOPSY

M.E.CASE NO.
96-4290
NAME
Anthony
G.
Mullen
Page  4

Narrative Description: (continued)

and glistening.  The anatomy of the heart and associated
vasculature is normal except for evidence of injury.  The
coronary arteries are normal in distribution.  The right
coronary artery is involved in the wound path.  The left
anterior descending contains 40 percent occlusion by
atherosclerotic calcific plaque.  The heart valves are
anatomically normal in appearance, size and shape.  The
ventricle walls are of the normal thickness.  The myocardium is
normal in color and consistency.  The right lung weighs 489
grams, and the left lung weighs 376 grams.  The right bronchus
contains blood.  Cut sections of the lungs show no evidence of
tumor or abnormality other than that of injury previously
described.

NECK ORGANS:

The neck is dissected.  There are no hemorrhages in the soft
tissues of the strap muscle.  There are no hemorrhages in the
paravertebral musculature.  The cervical spine is free of trauma
and natural disease.  The tongue is removed and sectioned and is
unremarkable.  The hyoid bone is intact and free of injury.
Postmortem fracture is present.  The larynx, pharynx, trachea,
esophagus, vocal cords and thyroid gland are not remarkable.

ABDOMINAL AND PELVIC ORGANS:

The liver weighs 1493 grams.  The capsule is smooth and
glistening.  The liver is examined in multiple sections.  The
parenchyma is brown in color and homogeneous in consistency.  The
gallbladder contains an estimated 5 cc's of thick bile.  There
are no stones present.

The spleen weighs 82 grams.  Cut sections demonstrate a normal
red pulp and normal follicle pattern.

The pancreas weighs 109 grams.  It is pale tan in color, firm in
consistency, and has the usual lobular pattern.

The adrenal glands are identified in the fatty tissues above the
kidneys, they are normal in size and shape.

The right kidney weighs 193 grams, and the left kidney weighs

City of Philadelphia
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila. PA 19104
REPORT OF AUTOPSY

M.E.CASE NO.
96-4290

NAME
Anthony
G.
Mullen

Page. 5

Narrative Description: (continued)

213 grams.  The kidneys are both pale in color.  The renal capsules are thin and strip easily.  The kidneys are normal in shape with the usual well-defined cortex and medulla.  The renal arteries show early atherosclerotic calcific plaque at the take off from the aorta.  The veins and ureters are normal in size. The urinary bladder contains 50 ml of clear yellow fluid.  The mucosa is normal tan and glistening.  The prostate is normal in size and is composed of firm tan tissue without nodularity.  The testes are in the scrotum and are normal in size.

The stomach contains 3 ml of pink material.  The mucosa is tan, glistening and normal.  The large and small intestines and appendix are in their usual anatomic locations.  The surfaces are smooth and glistening.  There is no evidence of gross abnormality.

The aorta shows evidence of the injury described above.  In addition, the proximal ascending aorta shows moderate amount of calcific atherosclerotic plaque as does the distal aorta at the bifurcation of the iliac arteries.

The brain weighs 1172 grams.  The scalp is reflected, and there is no injury noted.  The skull is examined after removal of an intact unremarkable dura, and there are no fractures identified. There are no hemorrhages in the subdural or epidural spaces. The hemispheres are symmetrical.  The surface and the basal vasculature is intact.  There are no significant abnormalities. Cut sections of the cerebral hemispheres, pons, midbrain, medulla and cerebellum fail to demonstrate any gross abnormality.

X-RAYS TAKEN

FLUOROSCOPY : NO FOREIGN BODY/METAL FRAGMENTS

AB

City of Philadelphia
OFFICE of the MEDICAL EXAMINER
321 University Avenue, Phila. PA 19104
REPORT OF AUTOPSY

H.E. CASE NO.
96-4290

NAME
Anthony
G.
Mullen

Page 6

Autopsy Started:    09 Oct 96    9:00am

Susan Klingler DO
Forensic Fellow
20 Nov 96

Greg McDonald, DO
ASSISTANT MEDICAL EXAMINER
20 Nov 96.

(End of Report)

# EXHIBIT C

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H92-305 |
|---|---|---|
| | | INTERVIEWER Cooper |

| NAME Leon Hughes | AGE 30 | RACE w/m | DOB 12-10-65 |
|---|---|---|---|

| ADDRESS 15-1 Daly St | APARTMENT NO. |
|---|---|

NAME OF EMPLOYMENT/SCHOOL

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT |
|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS | PHONE NO. |
|---|---|

| PLACE OF INTERVIEW D-23   3051 JFK Blvd | DATE 10-10-96 | TIME 08 11 PM |
|---|---|---|

| BROUGHT IN BY | DATE | TIME |
|---|---|---|

WE ARE QUESTIONING YOU CONCERNING
The shooting death of Anthony Mullen

| WARNINGS GIVEN BY | DATE | TIME |
|---|---|---|

ANSWERS

(1)  (2)  (3)  (4)  (5)  (6)  (7)

Q. Did Anthony Mullen work for you?

A. Yes

Q. Was Anthony Lots on 10-8-96?

A. Yes  He was due in at 11 PM

Q. Was it unusual that Anthony was late?

A. Yes, First time in about almost 2 yrs.

Q. What happened on 10-8-96?

A. at about 10:45 PM, Anthony called up the
Booth and spoke to Alyx. I just happened
to be there. I was closing out the shift.
Tony said he was not going to come in
at all. I then handed me the phone but
Anthony hung up. At 11:05 PM 10-8-96
he called Booth, I picked up the phone.

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|

REVIEWED BY   8. Leon Huber

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|------|------|----------|
| Leon Hughes | 2 | H96-325 |

A. Cont... - I asked him if he had wanted not to
show. He said yes. I told him he had to
come into work right now on turn his uniform
in. I asked if he had a personal problem. He
said yes. I told him if he was not going to
show there would be no problem if he called 1 to
2 hrs prior to the shift. I Left. At 11:30 pm
I called the booth and spoke to Anthony.
He was mad but he was not panicing. He
said if everything was alright. I was then
paged at 12:00 am of told of the Homicide.
I checked the call register and nothing was
to report.

Q. Did you recieved other information?

A. yes; a Postal worker named Dee - called
MB - and Left me her phone #. She said
she was on the Lot and heard about 5
shots. Her Phone # is

Q. Did Anthony have a drinking problem?

A. yes, he drank in the booth.

Q. Was he ever Late?

A. no never he was alway 15-20 mins early.

Q. Was Anthony ever Robbed before?

A. yes, he even had his gun back then but
did not use it even though his leg was
broken during the robbery.

# EXHIBIT D

**MOBILE CRIME DETECTION SERVICE REPORT**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**
LABORATORY DIVISION

MOBILE LAB. NO.
ML#96-1199

| OFFENSE OR INCIDENT | | CODE | C.C. NO. | | DATE OF REPORT |
|---|---|---|---|---|---|
| HOMICIDE | | | 96-16-34931 | | WEDNESDAY, 10/9/96 |

| COMPLAINANT | AGE | RACE | SEX | ADDRESS |
|---|---|---|---|---|
| MULLEN, Anthony | 49 | B | M | 2119 WEST INDIANA AVENUE |

| PLACE OF OCCURRENCE | ☐ INSIDE | ☐ OUTSIDE XX | DATE AND TIME OF OCCURRENCE |
|---|---|---|---|
| 3051 J.F.K. BLVD | | | 10/8/96 @ 11:32PM |

| NOTIFIED BY | UNIT | DATE AND TIME NOTIFIED | TIME ARRIVAL SCENE | TIME DEPARTURE SCENE |
|---|---|---|---|---|
| DET. WILLIAM COOGAN, #9098HM | | 10/9/96 @ 12:25AM | 12:35AM | 2:25AM |

| INVESTIGATOR ASSIGNED AT SCENE | UNIT | TECHNICIAN ASSIGNED | TECHNICIAN ASSISTED |
|---|---|---|---|
| ☐ Yes   ☐ No   DET. W. COOGAN, #9098HM | | P/O MICHAEL J. VINCENT, #3783 | CES WILLIAM WHITEHOUSE |

| LOCATION OF SERVICES | ☐ INSIDE | ☐ OUTSIDE XX | WEATHER CONDITIONS |
|---|---|---|---|
| 3051 J.F.K. BLVD | | | CLEAR/COOL SURFACE-WET LIGHTING-GOOD |

| PHOTOGRAPHS | TOTAL TAKEN | NUMBER TO BE PRINTED | | TOTAL PRINTED | |
|---|---|---|---|---|---|
| ☐ 1 Yes  ☐ 2 No XX | 24 | 4 X 5 | 8 X 10 | 4 X 5 | 8 X 10 |

**DISTRIBUTION OF PHOTOGRAPHS**

| SIZE | DATE DELD. | UNIT | RECD. BY | UNIT | RECD. BY | UNIT | RECD. BY |
|---|---|---|---|---|---|---|---|
| 4" X 5" | | | | | | | |
| 8" X 10" | | | | | | | |

| SKETCH MADE | ☐ Yes | ☐ No   ROUGH | DATE COMPLETED |
|---|---|---|---|

| LATENT PRINTS | RESULTS | IDENTIFIABLE | TYPE |
|---|---|---|---|
| ☐ 1 Examination   ☐ 2 No Examination | ☐ 1 Pos.   ☐ 2 Neg. | ☐ 1 Yes   ☐ 2 No | ☐ 1 Finger   ☐ 2 Palm   ☐ 3 Other |

**SUMMARY OF SERVICES AND EVIDENCE** *(Para. A — Summary, Para. B — Evidence, include Property Receipt Numbers)*

A. DIRECTION OF SERVICES:

  a. At approximately 12:35am, Wednesday, 10/9/96, P/O Michael J. VINCENT, #3783 and CES William WHITEHOUSE, Crime Lab, met with Detectives William COOGAN, #9098, and Richard BOVA, #9228, Homicide Division, at 3051 J.F.K. Blvd, and after conferring with them the following services were preformed.

  b. Police Officer Michael J. VINCENT, #3783, Crime Lab, Three Squad, assigned Crime Scene Technician.

B. PHOTOGRAPHS:

  a. The following photographs were taken by the assigned technician using a NIKON, N5005, 35MM, LENS: 28-70, FLASH: Electronic, FILM: TMY 135-24, BLACK & WHITE, SPEED: 400;

  1. VIEW LOOKING NORTH, SHOWING THE VICTIMS VAN AND THE ENTRANCE TO THE PARKING LOT

  2. VIEW LOOKING EAST, SHOWING THE VICTIMS VAN AND THE VICTIMS POSITION

  3. VIEW LOOKING SOUTH, SHOWING THE VICTIM AND THE ENTRANCE TO THE PARKING LOT

  4. VIEW LOOKING SOUTHWEST, SHOWING THE ENTRANCE TO THE TO THE PARKING LOT

  5. VIEW LOOKING NORTHWEST, SHOWING THE ENTRANCE TO THE PARKING LOT

  6. VIEW LOOKING EAST, SHOWING THE POSITION OF THE VICTIM

  7. VIEW LOOKING NORTH, SHOWING THE POSITION OF THE VICTIM

  8. VIEW LOOKING SOUTH, SHOWING THE POSITION OF THE VICTIM

  9. VIEW LOOKING NORTH, SHOWING BALLISTIC EVIDENCE #1 - #4

  10 VIEW LOOKING NORTH, SHOWING BALLISTIC EVIDENCE #3 - #5

  11 VIEW LOOKING EAST, SHOWING THE INTERIOR OF THE CASHIER BOOTH

  12 VIEW LOOKING WEST, SHOWING THE INTERIOR OF THE VICTIMS VAN

| DISTRIBUTION OF REPORTS | | | | DATE FORWARDED |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | |
| TECHNICIAN ASSIGNED | UNIT SUPERVISOR | | UNIT COMMANDER | |
| P/O MICHAEL J. VINCENT #3783 171930 | SGT. R. CORSINO, #8826, #191466 | | LT. FRANKLIN FRY, #370, 133784 | |

75-365 (Rev. 5/65)

| YR | DIV Y. OF OCCUR. | DC NO. (2-7) | INITIAL (49) | | DISTRICT (8-9) | SECTOR (10) |
|---|---|---|---|---|---|---|
| 96 | 16 | 16 34931 | ☐ Class. Change | | 16TH DIST | |
| | | | ☒ Status Change | | | |
| PREVIOUS CLASSIFICATION | | CODE | SUPPLEMENTAL (52) | DIST./UNIT PREPARING | CODE (11-12) | REPORT DATE |
| | | | Confirmation (51) | MCDU | | 10/9/96 |
| | | | ☐ Additional Info. | | | |
| | | 51 Sheet.  2 of 2 | ☐ Court Disposition | | | |
| CLASSIFICATION | | cobg (14-17) | PLACE OF OCCURRENCE (18-34) | J.A.D. INVESTIGATIONS (35) | | |
| HOMICIDE | | | 3051 J.F.K. BLVD | 1. ☐ Male   2. ☐ Female   3. ☐ Adult Offenders   Juvenile Offenders | | |

| COMPLAINANT (Use firm name) (36-52) | AGE (30-51) | RACE (92) | SEX (61) | ADDRESS | PHONE |
|---|---|---|---|---|---|
| | | A-(Asian, Indian or Alask. Native) B-(Black) U-(Unknown) W-(White) | 1. ☐ M  2. ☐ F | | |

| TYPE OF PREMISES (53-55) | DATE AND TIME REPORTED | REPORTED BY | | ADDRESS | |
|---|---|---|---|---|---|

| DATE OF OCCURRENCE (56-61) | DAY CODE (62) | TIME (63-65) | FOUNDED (66) | STATUS | 1. ☐ Active   3. ☐ Arrest - cleared   2. ☐ Inactive - not cleared   4. ☐ Exceptionally cleared | UNIT |
|---|---|---|---|---|---|---|
| | | | ☐ Yes  ☐ No | | | |

| STOLEN PROPERTY (68) | 1. ☐ Currency, Bonds, etc. | 4. ☐ Jewelry, Precious Metals | 7. ☐ Autos  A. ☐ Furs | PROPERTY VALUE (69-73) | RECOVERED VALUE (74-78) | INSURED | OCCURRENCE (79) |
|---|---|---|---|---|---|---|---|
| | 2. ☐ T.V., Radio, Stereo | 5. ☐ Household Items (Furniture, Washers) | 8. ☐ Clothing B. ☐ Misc. | $ | $ | ☐ Yes | ☐ Inside |
| | 3. ☐ Office Equipment | 6. ☐ Consumer Items (Liquor, Cigarettes, etc.) | 9. ☐ Firearms C. ☐ Live St. | | | ☐ No | ☐ Out |

ML#96-1199   (CONTINUED)

C. PHYSICAL EVIDENCE:

    a. The following physical evidence was collected and packaged by the assigned technician on 10/9/96;

    PROPERTY RECEIPT #2059967 issued for the following physical evidence which was submitted to the Firearms Identification Unit for further analysis;

    1. ONE "CCI 9MM LUGER" F.C.C...30'9" N OF THE N CURB OF J.F.K...8'6" W OF THE W P/L OF THE CASHIER BOOTH

    2. ONE "R P 25 AUTO" F.C.C...44'1" N OF THE N CURB OF J.F.K...9'8" W OF THE W P/L OF THE CASHIER BOOTH

    3. ONE "R P 25 AUTO" F.C.C...55'10" N OF THE N CURB OF J.F.K...8'10" W OF THE W P/L OF THE CASHIER BOOTH

    4. ONE "R P 25 AUTO" F.C.C...61'5" N OF THE N CURB OF J.F.K...20'3" W OF THE W P/L OF THE CASHIER BOOTH

    5. ONE SUNDANCE IND. CAL. 25 AUTO, MODEL A-25, SERIAL #032363, LOADED WITH ONE IN THE CHAMBER, FOUR IN THE MAGAZINE, 63'8" N OF THE N CURB OF J.F.K...15'8" WEST OF THE WEST P/L OF THE CASHIER BOOTH

    6. ONE PIECE OF LEAD FRAGMENT AND ONE PIECE OF COPPER FRAGMENT...RECOVERED FROM THE REAR OF A RED, CHEV. CAVALIER, S/W, PA LICENSE #AGE-9206

    PROPERTY RECEIPT #2059968 issued for the following physical evidence which was submitted to the Evidence Custodian for storage;

    1. One (1) baseball type hat, black with a red brim, with a logo "No Fear Dangerous Gear Sports" 276' West of the West P/L of the cashier booth, 35' south of the north P/L of the Parking Lot

D. LATENT EXAMINATION:

    a. Conducted by the assigned technician, using the dusting method, on the cash register, which did not reveal any identifiable latent print impressions.

E. DIAGRAM:

    a. Measurements were taken and a rough sketch of the crime scene was prepared, a scaled diagram was completed from the rough sketch. (See attached)

F. REMARKS:

    a. No further services conducted at this time.
    b. *** Laboratory User Fee $755.00 ***

| INVESTIGATOR (Type and Sign Name) | SERGEANT | LIEUTENANT |
|---|---|---|
| P/O MICHAEL J. VINCENT #3783 171996 | SGT. E. CORSINO, #8826, #194466 | LT. FRANKLIN FRY, #370, 133704 |

75-49 (Rev. 8/87)

STAFF SERVICES DIVISION

# EXHIBIT E

INVESTIGATION INTERVIEW RECORD

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. 17-96-325

INTERVIEW NO. M1285 638

NAME Davis James Williams

AGE 19

RACE B/M

DOB 4-11-78

ADDRESS 5573 Beaumont Ave

APARTMENT NO.

PHONE NO.

NAME OF EMPLOYMENT/SCHOOL Univirsity vo

SOC. SEC. NO. 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

ADDRESS OF EMPLOYMENT/SCHOOL

DEPARTMENT

PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS

PHONE NO.

PLACE OF INTERVIEW Homicide Division

DATE 3-4-97   TIME 3:45 AM

BROUGHT IN BY Sgt Leny Noodiff + Det Jame Pisse - CFCF

DATE

TIME

WE ARE QUESTIONING YOU CONCERNING Shooting Death of Anthony Mulled in 10-8-96 Parking lot 7051 JFK Blvd

WARNINGS GIVEN BY

DATE

TIME

ANSWERS

(1)   (2)   (3)   (4)   (5)   (6)   (7)

Q  Dave, Do you own any other knives or weapons

A  reference of BABY James.

Q  Are you presently under the influence of
Drug — Alcohol or Medication.

A  No

Q  Can you read + write the English language

A  Yes

RECORD  ☐ Yes  ☐ No   CHECKED BY

REVIEWED BY   David J Williams

75-483 (Rev. 7/82)

INVESTIGATION - INTERVIEW - RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME David J. Williams   PAGE 2   CASE NO.

Q   Where & How far did you go in School.

A   Clarion University, I--left after the 2nd Semester. It is located in Western Pa.

Q   Did you know a male named Anthony Matlow

A   No-

Q   Do you have some information about the Murder of a parking lot attendent who was shot & killed - in the 3000 Block of J.F. Kennedy Blvd near 30' St. Railroad Station.

A   Yea. I told Det Starkey (Mike Starkey) from SWDD that I had some information about this man getting shot & killed in a parking lot Robbery in October. He talkes to me a little about it and he said he would call the detectives at the Homicide Division who Worked on the case & he would have the Homicide Detective talk to me.

David J Williams

INVESTIGATION — INTERVIEW — RECORD          CITY OF PHILADELPHIA
CONTINUATION SHEET                          POLICE DEPARTMENT

NAME  David J Williams                PAGE  3      CASE NO.

Q    What information D. You Have about
     this Shooting.

A    A couple of days after it happens
     I was out at 52 + Beaumont and
     I was talking to Johnny Miller - he
     U - A - LLL conducting witnesses interview

     He told me Don't say nothing to
     nobody but the guy who got locked up
     the Pinkley lot Robbery I killed the
     guy Because he couldn't give up the
     money. I told him (little) that
     I heard about it on the news
     TV + papers - He said he did
     it. Said he shot the guy and
     only got a few dollars - little told
     me the guy couldn't give it up
     and then he shot him.

     Little ( Henry Miller III ) even
     showed me his cut finger + said that
     when He was Trying to Rob the guy
     the guy closes a Door on his Hand +
     cut his finger - He had a cut + scar.

                     David J Williams

INVESTIGATION – INTERVIEW – RECORD
CONTINUATION SHEET
CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME David James Williams
PAGE 4
CASE NO.

Q  Did "Little" (Johnny Miller "LL") say where he, Little, got the gun

A  He said he got the gun 9MM from Mike Arnold.

Q  Did Little say what he did with the gun.

A  No – He told me he had gotten ris of the gun – He said he Busted the gun up & threw it away

Q  Did he say where.

A  Not to me.

Q  Do you know if he told anyone else about the robbery & shooting

A  No except for Mike Arnold. I know he told Mike he shot the guy during the stickup and he got ris of the gun.

David J Williams

INVESTIGATION—INTERVIEW—RECORD

CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: David S. Williams     PAGE 5     CASE NO.

Q   Did "Little" (John Miller III) say
how much money He got from the
Robbery & Shooting.

A   No — Just a few Dollars

Q   Did "Little" say if He did the
Robbery with anyone else.

A   He Didn't Say

Q   Did Little say How he got To &
from the Robbery

A   Not To DJW ME.

Q   Did ya talk to Mike About the
Robbery & Shooting that Little Did.

A   After Little had Told me About the
Shakeup & Shooting I later Saw Mike.
I asked Mike (Arnold) about Him loaning
a gun to Little (Johnny Miller III) Mike
told me. He loaned Little a gun to Do
a Stickup & that Little Shot Somebody with

David S. Williams

75-483A

# EXHIBIT F

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. 96-325 |
|---|---|---|
| | | INTERVIEWER BOVA / COOSAN |

**NAME** m. MICHAEL ARNOLD   **AGE** 17   **RACE** B/M   **DOB** 9/28/79

**ADDRESS** 1419 Bethlehem Pke   **APARTMENT NO.** 19031

**NAME OF EMPLOYMENT/SCHOOL** Montgomery Co.   **SOC. SEC. NO.** 560 55 1553

**ADDRESS OF EMPLOYMENT/SCHOOL** CARSON VALLEY School   **DEPARTMENT**   **PHONE NO.**

**DATES OF PLANNED VACATIONS** SAME

**DATES OF PLANNED BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE** CAROLIN Butts

**ADDRESS** 5941 Belmont TERR.   **PHONE**

**PLACE OF INTERVIEW** CARSON VALLEY School   MONDAY   **DATE** 6/23/97   **TIME** 12:30 PM

**BROUGHT IN BY**   **DATE**   **TIME**

**WE ARE QUESTIONING YOU CONCERNING** The shooting death of Anthony Mullen

**WARNINGS GIVEN BY** On 10/8/96 At 30th + JFK   **DATE**   **TIME**

**ANSWERS** (1)   (2)   (3)   (4)   (5)   (6)   (7)

Q- Michael, present for this interview
is your Therapist Oscar Page (
Det Coogan and myself, Det Bova.
We interviewed a guy who told us
That you gave a gun to "Little"
+ "Little" shot + killed Anthony Mullen
in a hold-up at 3051 JFK Blvd
on 10/8/96.

What we want to Know, Do you Know
a "Little" ( JOHN MILLER II )

A- Yes.

**RECORD**   **CHECKED BY**

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Michael Arnold          PAGE 2    CASE NO. H96-325

Q- How long have you known "Little?"

A- Since I was small, about 5 years

Q- I'm showing you a photo (PPN 782-625) Is this the same "Little" that you know?

A- Yes

Q- Does he still look the same?

A- Yes.

Q- In October, last year, 10/8/96, Did you see "Little?"

A- Yes.

Q- Where did you see him at?

A- On the corner of 56th + Florence sts.

Q- Was there any conversation between you + "Little?"

A- Yes. I asked him where my gun gun lins at + he told me that he had it. He said that "he has the gun."

Michael Arnold

75-483A

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Michael Arnold

PAGE: 3

CASE NO.: H96-325

Q— What fabric gun was it?
A— A .380, I think of maybe a 9mm.

Q— Describe it?
A— Silver color, it was an automatic.

Q— When did "little" get the gun from you?
A— Late August of 1996.

Q— How did "little" know that you had a gun?
A— The young boys were fighting. Kids from other neighborhoods were coming around fighting. One of the older brothers asked me if I had a gun in the house. I said I did. I told him it wasn't loaded. I got the gun + the cops came by + I put the gun down on the ground + "little" picked the gun up + said he would hold it.

Michael Arnold

| INVESTIGATION  INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| CONTINUATION SHEET | | POLICE DEPARTMENT | |
| NAME Michael Arnold | | PAGE 4 | CASE NO. 1196-325 |

Q— Did you hear about "Little" doing a
murder in October of 1996?

A — No.

Q— Do you know Davis William AKA
"BABY JAMES?" (PPN 769-487)

A — Yes

Q— How Long have you known
BABY JAMES?

A — Since Elementary School

Q— Did "BABY JAMES" ever tell you THAT
"Little" Did A MURDER IN OCTOBER
OF 1996?

A — No.

Q How Long have you Been here AT
CARSON Valley School?

A Since 10/22/96.

Q— CAN You READ, WRITE + understand English?

A — Yes.

# EXHIBIT G

IN THE MUNICIPAL COURT OF PHILADELPHIA

ROOM 306 CRIMINAL JUSTICE CENTER

COMMONWEALTH             : CHARGES:  ROBBERY, THEFT RSP,
                                   MURDER, PIC, VUFA 6106, 6108,

V.

JOHN BILLER                : M.C. 97-06-3400

PHILADELPHIA, PENNSYLVANIA

OCTOBER 30, 1997

BEFORE:

HONORABLE FRANCIS P. COSGROVE, JUDGE

APPEARANCES:

         WILLIAM FISHER, ESQUIRE
         ASSISTANT DISTRICT ATTORNEY
         FOR THE COMMONWEALTH

         CHARLES MIRARCHI, III, ESQUIRE
         FOR THE DEFENDANT

         KARL SCHWARTZ, ESQUIRE
         ASSISTANT VOLUNTARY DEFENDER
         FOR WITNESS ARNOLD

REPORTED BY:      CATHERINE A. DUMOFF, OFFICIAL COURT
                       REPORETR

34

Williams -Direct

Q        Well, take a look at the statement and tell
us whether or not that statement accurately depicts
what you said to Jeff Piree?

A        It depicts what I said, but it ain't what
happened.

Q        Well, didn't you tell Detective Jeff Piree
that -- didn't Jeff Piree rather tell you that he was
asking you about the shooting death of Anthony Mullen
on 10/8/96, in the parking lot of 3051 JFK Boulevard;
is that correct?

A        Did he ask me about it?

Q        Yes, that is what he told you that he wanted
to talk to you about; didn't he?

A        Yes.

Q        And didn't he ask you whether or not you
could read and write the English language?

A        Yes.

Q        And you told him yes, did you not?

A        Yes, I did.

Q        And didn't he ask you whether or not you knew
Mr. Mullen?

A        I never knew.

Williams -Direct

beat you when you were afraid that he was going to beat
you?

A        And other reasons.

Q        Well, what are your other reasons?

A        First of all, at the time me and Little wasn't
getting along too good.        I stole something from him
and he was looking for me for it, so, plus, I'm in
that predicament, and they told me they wanted some
information, so why not use him as a scapegoat?

Q        Let me get this straight.
                You stole something from
Little?

A        Yes.

Q        What was it that you stole from Little?

A        It was a beeper.

Q        When did you steal that from Little?

A        I cannot remember the date.

Q        Well, give us an approximation.

A        Early October.

Q        Of 1996?

A        I would believe so.

all he placed his hand cutting me after I took the
beeper and I slammed his --

Q        You slammed your door on his finger?

A        Yes.

         I knew that is why I said I
knew his hand was messed up.

Q        Did you tell Detective Piree threaten you
when you said that he told you that he killed the guy,
when he didn't give the money up?

A        I told him, when he threatened me, didn't have
to threaten me more than once.

Q        Next question.

         Did Little (Johnny Miller,
III) say where he, Little, got the gun?

         Answer.  He said he got the
gun, 9mm from Mike Arnold.

         Did you tell that to Piree,
didn't you?

         Answer.  Yes, I did.

         Question.  That part is true?

         Answer. Well, Mike Arnold
bought the gun from somebody who also be with us,

Williams —Direct

and everybody was getting the gun from Mike Arnold, that
is just why I said it, he got the gun from Mike Arnold.

Q        That part is true?

A        No.

         I said he got the gun from
Mike Arnold. He didn't. I didn't know if he did after-
wards, but anyone could get a gun off of Mike Arnold.

Q        Did Little say what he did with the gun?

         He told me he had gotten rid
of the gun. He said he broke the gun up and threw it
away.

         You told that to Piree, did
you not?

A        Yes, but Little never told me he had the gun.

         That is all a story, just
saying the same thing over and over, and I just keep
asking the same thing.

Q        You said also there were two reasons, several
reasons why you lied about it, one, you were afraid
you were being threatened, and another one was that
you were in a jam yourself; is that correct?

A        Yes.

Williams -Direct                    19

Q        Did the police offer you anything?

A        They they did, they didn't write it down.

Q        Jeff Piree was telling you he was going to
try to help you out?

A        Something to that nature.

                    MR. FISHER: Judge, I don't
            have any other questions.

                    THE COURT:  All right.

                    MR. FISHER: I have disclosed
            the statement of this witness to
            Mr. Mirarchi, and I am about to
            disclose his prior criminal history,
            the extract.

                    Thank you, Your Honor.  Cross-
            examine.


                    CROSS-EXAMINATION


BY MR. MIRARCHI:

Q        Good afternoon, Mr. Williams.

A        Good afternoon, sir.

Q        Just so I understand this, you gave a statement

Williams -. Cross.

to the Detective, Piree, about six months after this
person Anthony Mullen was shot; is that correct?

A        Yes.

Q      . And you don't have any personal knowledge of
how Mr. Mullen was shot, is that correct?

A·        Not at all. ·

Q.        Okay.

And before you know this de-
fendant next to me as John Miller, is that right?

A        Yes. .

Q      . And John Miller never told you that he had
anything to do with the shooting of Anthony Mullen, is
that correct?

A        No, he did not.

Q    .    Okay.

And at the time that you were
mad at Mr. Miller, you saw that as an opportunity to
try to get something with regard to your own situation;
is that right?

A        Yes.

Q    .    And you are sorry you did that?

·A .        Yes.

Williams - Cross                    21

Q       Now, have you gone to trial on your case yet
or anything like that?

A       Yes, I have.

Q       And did the police intercede or the detectives
intercede on your behalf?

A       No, but I had a good judge. I still made out
pretty good.

Q       So, you didn't have any agreement with the
District Attorney's Office, any written agreement that
you would testify against Mr. Miller; is that correct?

A       Not at all.

Q       And you said that the reason that you told
Detective Piree the story is because he threatened
you?

A       It wasn't like a blatant threat, but it was,
he used body language and other things of things to
let me know that either I cooperate or I get dealt
with.

Q       Did he first bring up the name Johnny Miller
to you, or did you bring it up to him?

A       He brought it up to me.

Q       Then did he ask you, if you help us get this

GY

Williams -Cross

person; then we'll do something for you?

A        Yes.

Q        And if you don't help us get this person, then I'll do something else to you, that is the impression that you got?

A        Yes, basically.

Q        So, as it stands now, Mr. Miller who is seated next to me never told you anything with regard to the shooting death or any incident concerning Anthony Mullen; is that right?

A        Never.

MR. MIRARCHI: I don't have any further questions.

REDIRECT EXAMINATION

BY MR. FISHER:

Q        In regard to the statement, you read the whole statement, did you not?

A        When I signed it?

Q        Yes.

A        I signed every page.

# EXHIBIT H

1

```
1              IN THE COURT OF COMMON PLEAS

2         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

3                  CRIMINAL TRIAL DIVISION

4                       - - - - - -

5   COMMONWEALTH              :  OCTOBER TERM, 1997

6            vs.              :

7   JOHN MILLER              :  NO. 1030
                                - - - - - -

8

9                    July 30, 2003
                        - - - - - -

10

11                 Courtroom 1002 City Hall
                  Philadelphia, Pennsylvania

12                      - - - - - -

13  BEFORE:  HONORABLE JOHN J. POSERINA, JR., J.

14                      - - - - - -

15  APPEARANCES:

16         HUGH COLIHAN, ESQ.
           Assistant District Attorney
17         For the Commonwealth

18         SUSAN BURT, ESQ.
           Counsel for Defendant

19         GREGORY PAGANO, ESQ.
           Counsel for the Witness

20

21

22

23                      - - - - - -

24         TESTIMONY OF DAVID WILLIAMS
                        - - - - - -
```

95a

23.

Williams - direct

1    but I figured if they put it together that the

2    guns were sold in the same lot, so that if they

3    ever tracked it down, it was a believable story.

4    Q.    And how did you know Michael Arnold bought a

5    gun at the same time?  Were you together?

6    A.    Yes, we both bought them at the same time.

7    Q.    Do you remember what kind of gun he bought?

8    A.    He bought a Bryco.

9    Q.    Do you know what caliber?

10   A.    .9 millimeter.

11   Q.    So it was not a .380 or a .38.

12   A.    No.   The Bryco .380s, the person that was

13   selling them didn't sell them until a little later

14   on, I guess as he got the lot or the batch, he

15   sold them as he got them.

16   Q.    Now, did you discuss with Michael Arnold

17   what you told the police?

18   A.    No.   I haven't seen Michael Arnold since

19   I've been arrested, or heard from Michael Arnold.

20   Q.    Did you ever tell Michael Arnold about your

21   involvement with the Five Star robbery, Five Star

22   murder?

23   A.    No.

24   Q.    After you gave this information to the

117a

24

Williams - direct

1  police, did you make an effort, did you contact

2  Piree or anybody else to say I want to take back

3  my statement?

4  A.    Bill Fisher, who was the DA, I let him

5  know.   The detectives took me over before the

6  trial, they took me over to the DA office,

7  actually walked me over in handcuffs on the

8  streets to the DA office and sat me down and they

9  offered me leniency, and I told them that it

10  wasn't right and I was recanting my statement,

11  before the trial.

12  Q:    Do you remember when that was?

13  A.    A couple days before the trial, a few --

14  anywhere between two days to a week before the

15  trial.  And they had Detective Sharkey and his

16  partner, who I said I had a little rapport with,

17  they even had them come and talk to me, and they

18  sat me down in there and he asked me, he said --

19  basically what he said didn't make any sense:   I

20  was already sentenced to 8 to 16 years to the

21  state, and he said that if I went along with my

22  statement and tried to convict John Miller, that

23  he will have no problem with the parole board

24  paroling me after five years, which was

1189

65

1   Your Honor.  I don't know whether or not the

2   Superior Court will remand it for your findings

3   and conclusions as to the testimony of this man,

4   but because he testified that he shot a white man

5   in a green jacket and it turns out the deceased is

6   a black man in a red jacket and he could not

7   otherwise describe the man that he shot --

8              THE COURT:  Nor the building.

9              MR. COLIHAN:  -- I think it's

10  incredible.

11             THE COURT:  I think he's incredible

12  also, so if you want me to make findings of fact

13  and conclusions of law I'll testify right now that

14  I believe he was lying under oath just now, and in

15  my opinion he's not believable.  And because of

16  that I find that the matter should be referred

17  back up to the Superior Court with these notes of

18  testimony.

19             MR. COLIHAN:  All right.  Your

20  Honor, it would not be necessary for me then to

21  elaborate the record with testimony from crime

22  scene police, the medical examiner and how the

23  body was received in the medical examiner's

24  office.

159a

# EXHIBIT I

1

```
 1                IN THE COURT OF COMMON PLEAS

 2         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

 3                  CRIMINAL TRIAL DIVISION

 4                      - - - - - -

 5   COMMONWEALTH            : OCTOBER TERM, 1997
                             :
 6            vs.            :
                             :
 7   JOHN MILLER            : NO. 1030

 8                      - - - - - -

 9                   October 29, 2002

10                      - - - - - -

11                   Courtroom 1002
                   Criminal Justice Center
12                 Philadelphia, Pennsylvania

13                      - - - - - -

14   BEFORE:  HONORABLE JOHN J. POSERINA, JR., J.

15                      - - - - - -

16   APPEARANCES:

17           HUGH COLIHAN, ESQ.
             Assistant District Attorney
18           For the Commonwealth

19           SUSAN BURT, ESQ.
             Counsel for the Defendant

20

21

22                      - - - - - -

23        FINDINGS OF FACT AND CONCLUSIONS OF LAW

24                      - - - - - -

25                      - - - - - -
```

71a

1          THE COURT:  When recanted testimony

2    comes in, it has to be received with extreme

3    caution, and that's what I have done in this

4    case.  I have reexamined the testimony, and I find

5    that frankly I don't believe any of them, Mr.

6    Williams, Mr. Bailey or Mr. Scruggs, so for my

7    position here, and of course I expect an appeal, I

8    am going to deny the PCRA petition as being

9    without merit.

10          Now I am going to read Findings of

11   Fact and Conclusions of Law, and make sure that it

12   fits within the scope of this case so that I'm

13   accurate.  If there's any objection, just let me

14   know and we'll change it.

15          The facts of the case are that on

16   October 8, 1996, a 49-year-old Anthony Mellons was

17   shot and killed while he was working at the

18   Amtrack 30th Street Station in Philadelphia.  The

19   attempt was to rob him.

20          On September 28, 1998, I presided

21   over a trial in which a jury convicted the

22   defendant of second degree murder, robbery and

23   possessing an instrument of crime.  That case was

24   appealed to the Superior Court and the Superior

25   Court of Pennsylvania denied the appeal.

81a

13

1   what Williams would say at the time of the PCRA

2   hearing.

3           The Commonwealth quoted a case of

4   Commonwealth versus Bracero, B-R-A-C-E-R-O, and

5   incidentally defense relied on that case also, and

6   in that case three witnesses who would testify

7   that a third person admitted committing a crime

8   actually committed the crime, and that trial court

9   in that case rejected the offer.  The Supreme

10  Court of Pennsylvania agreed.  The citation is 528

11  A.2d 936, a 1987 case.

12          In summary, then, the testimony of

13  Scruggs and Bailey in this case are just taken as

14  not being credible and therefore they're not the

15  basis for any findings of fact.

16          The supporting underlying factors in

17  this case were that all of these three, Williams,

18  Scruggs and Bailey, all claimed to be extremely

19  close friends and it was unbelievable to me that

20  such close friends would be absolutely ignorant of

21  petitioner's arrest for almost five years until

22  they came forward and each gave a statement.

23          So to me it was an issue of

24  credibility, and I just did not believe the

25  witnesses that were presented.  I therefore

# EXHIBIT J

D - 1

Dear Mrs. Miller,

Mrs. Miller, I've been living a lie for many a years, and now that I found God, I'm making a valiant effort to change my life for the better. And by doing so I went to clear my conscience. On the night of the incident 10/9/96 I went to 5 star Parking lot to collect my money that was owed to ~~Anthony~~ me by Anthony. He used to buy drugs off me, and one day I gave him some on credit. So when I went to collect my money he pulled out a gun on me. ~~I think~~ ~~I think~~ he was ~~way~~ high or drunk, but he said "I'm not ~~giving~~ you nothing and he shot at me, twice or three times. I returned fire with my black 9mm. I was scared that he was going to kill me. I only shot once and ran to my black regal. Mrs. Miller if you can find it in your heart to forgive me and tell your sons lawyer to talk to me, that would be good because I can't live with this on my conscience. Your son had no knowledge of this crime he wasn't even there. I lied on him because I was afraid at the time. Please forgive me and many ➔

God bargin us all.

Sincerely
David J. Williams
David J. Williams

# EXHIBIT K

To Whom It May Concern:

I have been shown a copy of a letter I first wrote on _Between Oct & Nov_ (date) and sent to John Miller's mother. I have signed this copy shown to me today by _Travis Ganley_ I wish to state that prior to writing this letter I never told the information to anyone. Not to John Miller, not to his mother, not to anyone connected to this case in any way, or anyone else for that matter.

I have been paid no fees or any other thing of value in exchange for writing the letter.
I have not been threatened into writing and sending this letter.
I have not been approached by John Miller or his family or his lawyer asking me to send that letter.
I have been made no promises, and make this statement of my own free will.
I am not under the affects of any medication,
I have completed _(education) College drop out_ and consider myself to be of sound mind, and I can read and write the English language.

I have placed my initials at the end of each line in this affidavit to affirm that I have read, reviewed, and agree with my original undated 2 page letter which begins with:

"Dear Mrs. Miller, I've been living a lie for many a years." _DJW_

And contains the information: "Your son had no knowledge of this crime he wasn't even there. I lied on him because I was afraid at the time." _DJW_

And ends with: "God forgive us all." _DJW_

I swear and affirm on my oath that the contents of the letter are true and correct. So help me God.

_David J. Williams_                          _3/27/03_
David Williams                                    Date


_Travis Ganley_                          Date _3/27/03_
Witnessed by

3/27/03

To whom it may concern:

I David Williams is the originator, and creator of the letter I wrote to the mother of John Miller. I want it know that I haven't shared this information with anyone. I'm receiving nothing of material gain, on the contrary I may easily receive many years in prison. Hopefully it will release the weight of my heart. I am not under any medication but have finished school before dropping out of college I find myself mentally competent. All the contents in the letter addressed to Mrs. Miller was written by me and I will swear and affirm my oath.

— David J. Williams

Travis Gordon 3/27/03

EXHIBIT B

# EXHIBIT L

March, 19th, 2011        Williams

Dear Mrs. Miller,

Mrs. Miller, I'm sorry about what happened at the hearing back in "03" I panicked when it was said in so many words that I couldn't get self-defense case this was the only reason why I said that Mr. Mullen owed me money for drugs. Other people thought the same, but the truth of the matter is I was trying to rob him. Mrs. Miller, robbing people is what I did, and that night I was in high on cocaine I went on a robbing spree. Stores, bars and drug dealers are my favorite. And I always wanted to rob a parking lot didn't matter which one, for some reason I thought around so th of. Would be my big payoff right near the train station I was so high that night I pulled up 10 feet away got out and seen a man in a red jacket by a van right near the entrance. I then demanded money. he reached in the same van pulled out a gun and shot twice. I fired and left with nothing. Now I'm aware of the consequences. I was wrong and want to make it right. Me and Little aren't friends, at all!! I lied on him because of several reasons. Please Mrs. Miller forgive and pray for me, please have someone talk with me.

                    Sincerely
                    David T. Williams
                    David T. Williams

Inmate Name: Daniel T. Williams DC# DG8432
Housing Unit: DA
SCI Forest
PO Box 945
Marienville, PA 16239

INMATE MAIL
PA DEPT OF
CORRECTIONS

neopost
03/25/2011
US POSTAGE
$00.44⁰
ZIP 16239
041L12201801

Sent 3-23-11

received 3-23-11

Mrs. Miller
1426 S. 56th Street
Philra, PA 19143

Inmate Mail Dept. of Corrections
1 91 43247 32

# EXHIBIT M

Mary Wilt                                April 1, 2011
905 Lower Creek Road
Milroy, PA 17063
717-667-1486

Affidavit for John Miller

RE: Mary Wilt conversation with Mike Arnold

I spoke to Mike Arnold regarding his testimony in the John Miller case. To the best of my recollection, it was the last week of February between the 22-28. He told me the following:

① He was questioned by two men at his high school. He didn't know what they were talking about. He felt pressured, was scared, and just went along and agreed with them to get them to finish up and leave. Specifically, he stated that he didn't know ledge about any fight, didn't know anything about a gun, and he didn't know about the incident John Miller was accused of it all.

② The men appeared at his school and gave him a supeona to come to the court trial the next day. He didn't understand why he was there. The statements they made to him in court were not what he remembered. His testimony was false.

                        Mary L. Wilt

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Clarence L. Scheibe Jr., Notary Public
Armagh Twp., Mifflin County
My Commission Expires Dec. 1, 2011
Member, Pennsylvania Association of Notaries

APR 01

USPS

Mary Wilt
905 LowerCreek Rd.
Milroy, PA 17063

Att. Charlotte
Whitmire

RE: John Miller

PA Innocence Project
1719 North Broad St.
Philadelphia, PA
19122

19122356002

# EXHIBIT N

Affidavit

I, Michael Arnold have spoken with Ms. Mary Wilts on February 22-28 concerning John Miller's case and I've stated the following. I've lied at John Miller's trial back in September 1998. My testimony was that in the summer of 1996 there was a fight on 56th and Florence. I, Michael Arnold went in the house to get a gun in order to bluff the guys fighting but the police showed up and I threw the gun on the ground and John Miller picked it up.

The truth is a fight never existed on 56th and Florence in the summer of 1996, the police never showed up and John Miller never pick up my gun because I never owned a gun. My reason for lying is because John Miller and myself were old drug competitors and I, Michael Arnold wanted John Miller out the way. I'm not being threaten to make this statement nor have I been promise anything, my coming forward is because my conscious is bothering me.

Sincerely,

*Michael Arnold*

Michael Arnold
5/24/11

Sworn and Subscribed this 24th day of May 2011 by Michael Arnold.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Marjorie E. Donohue, Notary Public
Haverford Twp., Delaware County
My Commission Expires Aug. 18, 2012
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

# EXHIBIT O

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :
Respondent                       :
                                 :
                                 :
                                 :
          v.                     :        CP-51-CR-1010301-1997
                                 :
                                 :
JOHN MILLER                      :
Petitioner                       :

CERTIFICATION OF WITNESS IN SUPPORT OF PETITION FOR POST-
CONVICTION RELIEF UNDER 42 Pa. C.S. § 9543

1

## PRELIMINARY STATEMENT

Petitioner, John Miller, through counsel, respectfully submits this *Certificate of Witness In Support of Patition for Post-Conviction Relief Under 42 Pa. C.S. § 9543.*

Petitioner adopts and incorporates herein as if fully stated the factual and legal averments contained in the *Petition* (filed on November 28, 2011).

Petitioner reserves the right to amend this *Certification* upon further investigation.

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA       :
Respondent                         :
                                   :
                                   :
          v.                       :       CP-51-CR-1010301-1997
                                   :
                                   :
JOHN MILLER                        :
Petitioner                         :

CERTIFICATION OF WITNESS PURSUANT TO 42 Pa. C.S. § 9545(d)(1)

Pursuant to 42 Pa. C.S. § 9545(d)(1), Petitioner herein submits the following certification

of witness in support of his *Petition for Post-Conviction Relief.*

1. I am an investigator employed by the Pennsylvania Innocence Project.

2. On July 18, 2011, staff attorney, Charlotte Whitmore, and I interviewed David J.

   Williams (inmate number DG-9437) at State Correctional Institute Forest regarding the

   homicide at the 30th Street Amtrak Station.  Mr. Williams told us that he may have told

   his prior co-defendant, Mark Manigault, about committing the murder at the 30th Street

   Amtrak Station.  Mr. Williams could not recall if he did or did not tell Mr. Manigault

   about the homicide.

3. On July 20, 2011, staff members from the Pennsylvania Innocence Project went to the

   residence located at 5404 Delancey Street, Philadelphia, PA 19143 to attempt to

   interview Mr. Manigault.  This address was listed as the most current address for Mr.

   Manigault in a LexisNexis database.  Nobody was home at the residence so we left a

   business card on the front door.

4. On August 18, 2011, Ms. Whitmore and I went to the same residence located at 5404

3

Delancey Street, Philadelphia, PA 19143 in an attempt to interview Mr. Manigault. Once again, nobody was home and we left a business card on the front door.

5.   As we walked away, I saw two older women sitting on a front porch across the street. I approached the women and asked them if they know if Mr. Manigault lived at 5404 Delancey Street, Philadelphia, PA. One of the women told me she did not know where he lived but I may be able to find him down the street with a group of people.

6.   Ms. Whitmore and I walked westbound on Delancey Street in the direction the woman suggested. Approximately halfway down the block, I saw a younger female sitting on the porch and a male standing in the doorway of a house. I approached the woman and asked her if she knew Mr. Manigault. She said she did not know him but she would pass a message onto him. I gave the woman my business card and asked her to tell him to call me.

7.   As Ms. Whitmore and I walked away from the house and down the street, I heard a male saying "hey" behind me. Ms. Whitmore and I stopped walking and walked toward the male. He identified himself as Mark Manigault.

8.   I asked him if he was the Mr. Manigault who was a co-defendant with David Williams. He said he was and asked, "What did David Williams do this time?" We informed him that Mr. Williams had confessed to a murder at the 30th Street Amtrak parking lot and had given written permission to his friends, family and prior attorneys to speak to us regarding their knowledge of the homicide. We showed Mr. Manigault Mr. Williams' written permission and asked if he had any knowledge about the homicide or if Mr. Williams had ever confessed to him.

9.   Mr. Manigault refused to talk to us unless he heard from Mr. Williams directly. He gave

4

us his address and phone number and told us to have Mr. Williams write to him or call

him directly.

10. On August 24, 2011, Ms. Whitmore and I spoke to Mr. Williams over the phone.  With

Mr. Williams' permission, we recorded a statement from him allowing Mr. Manigault to

speak with us regarding the 30th Street Amtrak parking lot homicide.

11. On September 7, 2011, Ms. Whitmore and I met with Mr. Manigault at the intersection of

54th Street and Spruce Street in Philadelphia, PA and played him the recorded statement

from Mr. Williams.  Mr. Manigault told us that he was arrested with Mr. Williams for a

robbery case.  While they were in a holding cell at 55th Street and Pine Street, Mr.

Williams told him that he was going to blame a murder he committed on someone else.

Mr. Williams said that he was going to get out of jail by pinning it on someone.  Mr.

Manigault could not remember Mr. Williams' exact words.

12. Mr. Manigault also told us that the police at the station questioned him about the

homicide.  Through that questioning, Mr. Manigault learned that the homicide was at the

30th Street Amtrak station.  Mr. Manigault did not know anything about the murder

because he was incarcerated when it happened.  Mr. Manigault believed that the police

questioned him about it because Mr. Williams told the police that Mr. Manigault knew

something.  Mr. Manigault did not know anything about the murder except that Mr.

Williams said he was putting the blame on someone else in order to help himself.

13. Mr. Manigault refused to sign a certification that day without receiving permission

directly from Mr. Williams.

14. On September 22, 2011, Mrs. Whitmore and I met with Mr. Manigault at the intersection

of 54th Street and Spruce Street again.  Mr. Manigault spoke to Mr. Williams over the

5

phone and then agreed to sign a certification detailing the above information.

Respectfully submitted,

Shaina A. Tyler/Staff Investigator
The Pennsylvania Innocence Project
  at Temple University Beasley School of Law
1719 N. Broad Street
Philadelphia, PA  19122
215-204-4255

6

# EXHIBIT P

COMMONWEALTH OF PENNSYLVANIA, PHILADELPHIA

CERTIFICATION OF Mark Manigault

I, Mark Manigault, being of full legal age, and being duly sworn according to law do hereby state the following is true and correct to the best of my knowledge, information and belief:

When David Williams and I got locked up for robbing a bar in 1997 we were in a holding cell together at 55th and Pine. David said that he was going to do "whatever it took" to get out of there. He said he was going to "pin a homicide that he (David) had done on somebody else." I think David told the police that I was there for the homicide so that I could help myself out too. The police interrogated me for a while about the homicide but I didn't know anything about it because I was incarcerated when the homicide occurred. I think the cops said that a gas station attendant or something like that was killed at 30th Street Station. I was recently incarcerated with John Miller at Mahanoy and he asked me if I knew anything about this but I said I.

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

_Mark Manigault_
Name

_9-22-11_
Date

Date of Birth: _45-71_
Address: _~~_
_5417 Spruce St Phila, Pa 19143_

_Shaina Seivers,_
Witness
_Investigator_

_9/22/11_
Date

COMMONWEALTH OF PENNSYLVANIA, PHILADELPHIA

CERTIFICATION OF Mark Manigault

I, Mark Manigault, being of full legal age, and being duly sworn according to law do hereby state the following is true and correct to the best of my knowledge, information and belief:

didn't know anything. Now I have agreed to make this statement because I spoke to David Williams and he gave me his permission. No one threatened me or promised me anything to get me to make this statement.

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

_mark Manigault_
Name

_9-22-11_
Date

Date of Birth: 4-5-78
Address: ~~_____~~
5417 Spruce ST Phila, Pa. 19139

_Shaina Seivers_
Witness
Investigator

_9/22/11_
Date

1

# EXHIBIT Q

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :
Respondent                     :
                               :
                               :
                               :
              v.               :         CP-51-CR-1010301-1997
                               :
                               :
JOHN MILLER                    :
Petitioner                     :

CERTIFICATION OF WITNESS IN SUPPORT OF PETITION FOR POST-
CONVICTION RELIEF UNDER 42 Pa.C.S. § 9543

1

## PRELIMINARY STATEMENT

Petitioner, John Miller, through counsel, respectfully submits this *Certificate of Witness In Support of Petition for Post-Conviction Relief Under 42 Pa. C.S. § 9543*.

Petitioner adopts and incorporates herein as if fully stated the factual and legal averments contained in the *Petition* (filed on September 20, 2012).

Petitioner reserves the right to amend this *Certification* upon further investigation.

2

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :
Respondent                                             :
                                                            :
                                                            :
                                                            :
            v.                                             :            CP-51-CR-1010301-1997
                                                            :
                                                            :
JOHN MILLER                                         :
Petitioner                                             :

### CERTIFICATION OF WITNESS PURSUANT TO 42 Pa. C.S. § 9545(d)(1)

Pursuant to 42 Pa. C.S. § 9545(d)(1), Petitioner herein submits the following certification

of witness in support of his *Petition for Post-Conviction Relief*. **David Williams, Date of Birth:**

**January 11, 1978, Address: SCI Forest.**

1.   I am the Staff Investigator employed by the Pennsylvania Innocence Project.

2.   On April 27, 2012, staff attorney, Charlotte Whitmore, and I interviewed David Williams

      ("D. Williams") by telephone.  Attorneys from Pepper Hamilton LLP were also present

      on the call.  We identified ourselves as staff members of the Pennsylvania Innocence

      Project and told D. Williams that we wanted to speak to him about statements he made to

      police implicating others in crimes in connection with his 1997 robbery arrest.

3.   D. Williams told us that on the day and time that he spoke with Detective Piree about

      Miller, he also gave Det. Piree information about other crimes in hopes of reducing his

      own sentence.  He gave information about robberies that he committed with his co-

      defendant, Mark Manigault.  In addition to confessing to robberies that he committed, D.

      Williams also confessed to committing a robbery that he did not actually commit.  He

      also provided information about a murder committed by Jack Williams ("J. Williams") –

3

information that he also explained to us that he fabricated.

4. D. Williams told Det. Piree about a robbery that he and Manigault committed on "a dude and a girl in Wynnefield." D. Williams said that this robbery never occurred and he made up the story. Again, D. Williams explained that these statements were provided to reduce his own sentence. D. Williams figured that the more information he gave the police, the more time they would take off of his sentence.

5. D. Williams told the police that J. Williams confessed to a murder over the phone. D. Williams explained that he made up the phone story knowing it could easily be disproved by looking at the phone records as he was in prison at the time the call would have been made. D. Williams signed a statement implicating J. Williams in that murder.

6. Before D. Williams spoke with Det. Piree, he had heard from friends in the neighborhood that J. Williams bought a car from someone who later reported it stolen. Based on the dispute over the car, D. Williams made up the story about J. Williams committing the murder.

7. D. Williams stated that he spoke with J. Williams when they were both incarcerated at Curran-Fromhold Correctional Facility in May or June 1997. J. Williams approached D. Williams about the statements D. Williams made against J. Williams regarding the murder conviction that J. Williams is currently serving a life sentence for. D. Williams explained that he made up the statements and his story could easily be disproved by examining the prison phone records. At the time he allegedly made the call to J. Williams, D. Williams was in prison. D. Williams' alleged phone conversation would have been recorded, and it would have been easy to prove that his statement was not true

4.

since the conversation never occurred.  D. Williams did not ultimately testify against J.

Williams.

Respectfully submitted,

Shaina A. Tyler, Staff Investigator
The Pennsylvania Innocence Project
at Temple University Beasley School of Law
1719 N. Broad Street
Philadelphia, PA  19122
215-204-4255

# EXHIBIT R

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| Respondent | : | |
| | : | |
| | : | |
| | : | |
| v. | : | CP-51-CR-1010301-1997 |
| | : | |
| | : | |
| JOHN MILLER | : | |
| Petitioner | : | |

### CERTIFICATION OF WITNESS IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF UNDER 42 Pa.C.S. § 9543

1

### PRELIMINARY STATEMENT

Petitioner, John Miller, through counsel, respectfully submits this *Certificate of Witness In Support of Petition for Post-Conviction Relief Under 42 Pa. C.S. § 9543.*

Petitioner adopts and incorporates herein as if fully stated the factual and legal averments contained in the *Petition* (filed on September 20, 2012).

Petitioner reserves the right to amend this *Certification* upon further investigation.

2

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
Respondent :
                         :
                         :
                         :
          v.               :      CP-51-CR-1010301-1997
                         :
                         :
JOHN MILLER :
Petitioner :

### CERTIFICATION OF WITNESS PURSUANT TO 42 Pa. C.S. § 9545(d)(1)

Pursuant to 42 Pa. C.S. § 9545(d)(1), Petitioner herein submits the following certification

of witness in support of his *Petition for Post-Conviction Relief*.  Jack Williams ("J. Williams"),

Date of Birth: **February 11, 1978, Address: SCI Albion.**

1. I am the Staff Investigator employed by the Pennsylvania Innocence Project.

2. On December 19, 2011, attorneys from Pepper Hamilton LLP interviewed David

     Williams ("D. Williams").  D. Williams informed them that J. Williams was present

     when D. Williams sold the gun that D. Williams used in the Mullen murder to Dwayne

     at the Chinese store.

3. In February 2012, I spoke with Counselor Randall at SCI Albion to set up a phone call

     with inmate J. Williams (inmate #: DQ1200)

4. On March 1, 2012, I interviewed J. Williams by telephone.  I identified myself as the

     staff investigator of the Pennsylvania Innocence Project and explained to him that I was

     investigating the case that John Miller ("Miller") is presently incarcerated for.

5. J. Williams told me that he was arrested in March 1997 for a murder.  He is currently

     serving time for that murder.  The "discovery packet" that J. Williams received from his

attorney about a month after he was arrested included statements from D. Williams,
Mike White and Randolph Dwayne Wright implicating him in the murder. The dates on
the statements were December 1996 and January 1997.

6. J. Williams also told me that he was at Curran-Fromhold Correctional Facility in June
1997, he saw D. Williams. They were on the same cell block together. D. Williams
was incarcerated for robbery charges. J. Williams confronted D. Williams about J.
Williams' case. J. Williams' cell mate, Barry, was present during this confrontation. J.
Williams did not recall Barry's last name. J. Williams asked D. Williams why D.
Williams made a statement against J. Williams about J. Williams killing someone. D.
Williams told J. Williams that D. Williams just agreed with whatever the cops said. D.
Williams told J. Williams that D. Williams also pinned J. Williams' murder case on
Mike White. J. Williams thought that D. Williams gave information to the police so he
could help his own pending robbery charges. D. Williams never testified against J.
Williams.

7. After J. Williams and D. Williams discussed J. Williams' case, they talked about people
in their neighborhood. Then, they talked about Miller's case. D. Williams told J.
Williams that D. Williams tried to rob someone and ended up killing him. J. Williams
cannot remember details about the conversation but recalled that D. Williams bragged
about the shooting and pinning it on John Miller. D. Williams told J. Williams that after
the murder, D. Williams went to get high and "look for women."

8. D. Williams also told J. Williams that the gun D. Williams used for the murder that D.
Williams pinned on Miller was sold to Randolph Dwayne Wright. J. Williams did not
know how much it was sold for or what Wright did with the gun. Wright is now

4

deceased but has a brother who lived on Litchfield Street in Philadelphia, PA. D. Williams also told J. Williams that D. Williams gave up all the information he knew about the murder that Miller was convicted of to get less time for his pending robbery case. J. Williams could not give me any more details on Miller's current case.

9. On April 27, 2012, staff attorney, Charlotte Whitmore, and I interviewed J. Williams by telephone again. Attorneys from Pepper Hamilton LLP were also present during the call. We identified ourselves as staff members of the Pennsylvania Innocence Project and told J. Williams that we wanted to speak to him further about statements D. Williams made implicating J. Williams in the murder for which J. Williams is presently incarcerated.

10. J. Williams told us that he is presently serving time for a murder committed in May or June of 1996. J. Williams explained that several people testified against him. The people who testified or provided statements against him were Keith Edwards, Randolph Dwayne Wright, Michael Irving and D. Williams. J. Williams explained that Keith Edwards and Randolph Dwayne Wright both testified against him at his murder trial. Michael Irving, according to J. Williams, was a federal informant and never testified. J. Williams explained that D. Williams gave a statement, but never testified. The statement that D. Williams provided stated that D. Williams placed a phone call from prison to a friend of J. Williams and J. Williams was at that friend's house at the time of the call and J. Williams confessed to the murder to D. Williams over the phone. J. Williams stated that this call never happened.

11. When J. Williams spoke with D. Williams at Curran-Fromhold Correctional Facility, D. Williams said that D. Williams made statements against both J. Williams and Miller

to lessen his own sentence.  J. Williams knew that D. Williams had sold a gun to someone that was used in a murder.  He knew that the "gun had a body on it."

11. Additionally, J. Williams recalled that his cell mate from Curren-Fromhold Correctional Facility's name was Barry Speech who was 21 years old in 1997 and incarcerated for a murder.

12. J. Williams informed us that he still has copies of his discovery, including the police statements made by D. Williams against J. Williams.  He agreed to send us a copy of his discovery.

13. On June 1, 2012 we received copies of the police statements from J. Williams.

Respectfully submitted,

Shaina A. Tyler, Staff Investigator
The Pennsylvania Innocence Project
at Temple University Beasley School of Law
1719 N. Broad Street
Philadelphia, PA  19122
215-204-4255

6

# EXHIBIT S

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H 96 - 233 |
|---|---|---|---|
| | | | INTERVIEWER McDERMOTT #9005 |

| NAME DAVID WILLIAMS | | AGE 19 | RACE B | DOB 1-11-78 |
|---|---|---|---|---|

**ADDRESS** 5543 BEAUMONT ST.    APARTMENT NO.

| NAME OF EMPLOYMENT/SCHOOL UNEMPLOYED | | SOC. SEC. NO. 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 |
|---|---|---|

**ADDRESS OF EMPLOYMENT/SCHOOL**    DEPARTMENT    PHONE NO.

**DATES OF PLANNED VACATIONS**

**DATES OF PLANNED BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE** KIRBY WILLIAMS (FATHER)

**ADDRESS** 609 LOCUST ST. WILLIAMSPORT, PA.

| PLACE OF INTERVIEW INSIDE OF HOMICIDE DIVISION | DATE 3-4-97 | TIME 2 15 PM |
|---|---|---|
| BROUGHT IN BY DET. PIREE | DATE 3-4-97 | TIME 11 00 AM |

**WE ARE QUESTIONING YOU CONCERNING** SHOOTING DEATH OF PAUL JONES ON 7-13-96

| WARNINGS GIVEN BY | DATE | TIME AM PM |
|---|---|---|

**ANSWERS**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. DAVID, DO YOU UNDERSTAND THAT WE ARE INVESTIGATING THE SHOOTING DEATH OF A PAUL JONES THAT OCCURRED ON 7-13-96 OUTSIDE AT 56TH & BEAMONT STREETS?

A. YES,

Q. ARE YOU UNDER THE INFLUENCE OF EITHER DRUGS OR ALCOHOL?

A. NO,

Q. DO YOU READ, WRITE AND UNDERSTAND ENGLISH?

A. YES, I WENT TO COLLEGE FOR ALMOST A YEAR.

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|
| REVIEWED BY | |

David Williams

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME: DAVID WILLIAMS 19 B/M    PAGE: 2    CASE NO.: H96-233

Q. PLEASE GO ON IN YOUR OWN WORDS AND TELL ME ABOUT ANY KNOWLEDGE THAT YOU MAY HAVE OF THIS SHOOTING?

A. I KNOW THAT JACK WILLIAMS DID IT, HE TOLD ME IN HIS OWN WORDS THAT HE SHOT THE BOY. THE FIRST TIME HE TALKED ABOUT IT, HE TOLD ME OVER THE PHONE, THIS WAS THE ONLY TIME HE TOLD ME ABOUT IT, BECAUSE HE WAS IN JAIL. JACK CALLED ME FROM JAIL, AND HE TOLD ME THAT HE WAS IN FOR A STOLEN CAR. I THOUGHT THAT HE WAS LOCKED UP FOR THIS MURDER, BECAUSE JESSE BOOKER AND KEITH EDWARDS BOTH TOLD ME THAT JACK HAD KILLED THE WHITE BOY. THE TIME THAT JACK CALLED ME, I WAS AT JESSE'S HOUSE IN WEST OAK LANE. WHEN HE CALLED. WHEN JACK CALLED, HE TALKED TO JESSE FIRST, AND THEN I GOT ON THE PHONE. I ASKED JACK WHAT HE DID, AND HE SAID THAT HE SHOT THE GUY OVER THE STOLEN CAR THAT HE WAS LOCKED UP FOR, AND THAT THE WHITE GUY "GOT WHAT HE WAS LOOKING FOR". I ASKED HIM IF HE WAS IN FOR THE MURDER, AND HE TOLD ME NO JUST THE CAR CASE. ON A BENCH WARRANT.

75-483A

J.J.W.    David Williams

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME
DAVID WILLIAMS 19 B/M    PAGE 3    CASE NO. H 96-233

Q. IS THIS THE FIRST TIME THAT YOU HEARD ABOUT PAUL JONES BEING KILLED AT 56TH AND BEAUMONT STS.?

A. NO, I FIRST FOUND OUT ABOUT IT THE SAME MORNING, MY BROTHER, MONTE JOE, TOLD ME. HE JUST TOLD ME THAT SOMEBODY GOT KILLED. MY UNCLE, DAVID JOE, TOLD ME THAT HE HAD WALKED DOWN ON BEAMONT ST. BEFORE IT HAPPENED, AND JACK WAS THE ~~ONLY ONE~~ OUT THERE. THERE WAS ALOT OF TALK ABOUT WHAT HAPPENED, EVERBODY WAS SAYING THAT JACK DID IT. I TALKED TO JESSE BOOKER A COUPLE OF DAYS AFTER IT HAPPENED, AND HE TOLD ME THAT HE WASN'T THERE, BUT THAT JACK KILLED THE BOY OVER THE CAR THE BOY HAD REPORTED STOLEN. THE WHITE BOY SOLD THE CAR TO JACK, AND THEN REPORTED IT STOLEN, AND GOT JACK LOCKED UP FOR IT. JACK WORKED AT 56TH & BEAMONT SELLING CRACK, DIME BAGS, JESSE AND KEITH EDWARDS RAN THE CORNER, AND JACK WORKED FOR THEM. JESSE WAS LAUGHING ABOUT WHAT JACK DID TO THE BOY.

D.J.W.    David Williams

75-483A

**INVESTIGATION INTERVIEW RECORD**
CONTINUATION SHEET

CITY OF PHILADELPHIA

POLICE DEPARTMENT

| NAME DAVID WILLIAMS 19 B/m | PAGE 4 | CASE NO. H96-233 |
|---|---|---|

Q. DID KEITH EDWARDS TELL YOU ABOUT THIS SHOOTING?

A. YEA, A COUPLE OF DAYS LATER. I WAS ON A HOME PASS FROM ABRAXAS WHEN HE TOLD ME. I WAS OUT ON BEAMONT ST, AND KEITH TOLD ME THAT JACK SHOT THE GUY. I ASKED HIM WHY, AND KEITH LAUGHED, AND HE TOLD ME THAT THE GUY DESERVED IT, BECAUSE THE SAME GUY SOLD KEITH A CAR AND THEN TOOK IT BACK, THE GUY STOLE IT BACK. KEITH TOLD ME THAT JACK USED HIS GUN TO SHOOT THE GUY.

Q. DID ANYONE ELSE TELL YOU ABOUT THIS MURDER?

A. YEA, "POPPY" DID. HIS REAL NAME IS EUGENE PATTERSON, & "POPPY" TOLD ME THAT JACK CALLED HIS HOUSE AND TOLD HIM THAT HE DID IT, AND THAT JACK WANTED HIM TO PUT UP HIS $500.00 BAIL IN CASE THE POLICE FOUND OUT THAT HE SHOT THE BOY. "POPPY" DIDN'T WANT TO BAIL HIM OUT, AND EITHER DID JESSE OR KEITH.

Q. WAS ANYONE ELSE PRESENT DURING THESE CONVERSATIONS?

A. YEA, DWAYNE WRIGHT ALSO TOLD ME THAT JACK DID IT. FROM THE WAY HE WAS

75-483A

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA | |
|---|---|---|
| **CONTINUATION SHEET** | POLICE  DEPARTMENT | |

NAME

DAVID WILLIAMS 19 B/M

PAGE 5

CASE NO. H 96-233

TALKING, I THOUGHT THAT HE WAS THERE
WHEN JACK SHOT THE GUY. DWAYNE WAS
ALWAYS OUT THERE SELLING WITH JACK, THEY
WERE PARTNERS, AND THEY BOTH SOLD DRUGS
FOR JESSE AND KEITH AT THAT TIME

Q. WHEN JACK WILLIAMS CALLED JESSE BOOKER
FROM PRISON, WHAT ADDRESS WERE YOU AT
WITH JESSE ?

A. I WAS HOME FROM ABRAXAS ON A HOME
PASS, AND HE DROVE ME UP THERE, I
THINK THAT IT'S JESSE'S AUNT'S HOUSE.
I'M NOT SURE OF THE ADDRESS, BUT THE
PHONE NUMBER IS                    JESSE'S
MOTHER'S NUMBER IS                  I ALREADY
KNEW ABOUT WHAT JACK DID TO THE BOY,
SO I WASN'T SURPRISED WHEN HE TOLD ME
THAT HE DID IT OVER THE PHONE.

Q. HOW WELL DO YOU KNOW THESE PEOPLE YOU ARE
TALKING ABOUT ?

A. REAL GOOD, I GREW UP WITH ALL OF THEM.
I KNOW DWAYNE AND JACK SINCE LIKE
2ND GRADE. I WOULD HAVE BEEN OUT THERE
WHEN IT HAPPENED IF I WASN'T LOCKED UP.

W.T.W.   David Williams

75-483A

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME DAVID WILLIAMS 19 B/M | PAGE 6 | CASE NO. H 96-233 |

Q. I AM GOING TO SHOW YOU SEVERAL PHOTOS. PLEASE TELL ME IF YOU RECOGNIZE ANYONE?
1 SHOWN PPN/ 721 744, KEITH EDWARDS.
A. YEA, THAT'S KEITH EDWARDS.
SHOWN PPN/ 818107 JESSE BOOKER.
A. YEA, THAT'S JESSE BOOKER.
SHOWN PPN/ 823839, GREG TAYLOR.
A. THAT'S JACK WILLIAMS.
SHOWN PPN/ 757 749, RANDOLPH WRIGHT.
A. YEA, THAT'S DWAYNE WRIGHT.

Q. IS THERE ANYTHING ELSE THAT YOU CAN ADD TO AID OUR INVESTIGATION?
A. NO, JUST WHAT JACK TOLD ME HE DID

Q. HAS ANYONE PROMISED YOU ANYTHING FOR YOUR COOPERATION?
A. NO.

Dt. John M. Damott #9005

D.J.W.   David Williams

75-483A

# EXHIBIT T

## COMMONWEALTH OF PENNSYLVANIA, PHILADELPHIA

### CERTIFICATION OF MICHAEL ARNOLD

I, Michael Arnold, being of full legal age, and being duly sworn according to law do hereby state the following is true and correct to the best of my knowledge, information and belief:

I met John "Little" Miller and David "Baby James" Williams when I was in fifth grade and they were in junior high school. We were neighborhood friends but we were never really close friends. If we were outside together we would do things like ride bikes, play football and play basketball but we didn't have a lot in common. Miller didn't hang in our neighborhood too often. Rather, he hung out with a group about three blocks away. Williams was never around. Little and Baby James were older than me. They would hang out to make money while most of my friends and I were still in school. Baby James would always get in trouble. He could barely take care of himself. I hung out with his brother, Monte.

I have been arrested two times. The first time I was arrested was when I was a sophomore in Bartram High School when I was stopped with drugs in my pocket. After my arrest on drug possession charges I was sent to Flourtown on some sort of diversion program where I spent my junior year of high school. I was at Flourtown in June 1997 when the police came to interview me about the Mullen murder. I was arrested once more right after I got out of high school. On that occasion, I was driving a car with two passengers. I was pulled over and one of the passengers had marijuana in his jacket on the back seat. The cops found the marijuana but let two of the passengers go home. One was a young kid who was released and the other was a relative of a cop from the neighborhood. Only my friend and I were arrested. The charges for this arrest were pending during the Miller trial. I don't remember what happened to these charges but I think they were dismissed.

I do not remember if I was offered a deal if I cooperated with police in the Miller case but the charges just disappeared. I do remember, however, that I went to go visit a public defender, named Schwartz, who may have told me that he could see from my record that I cooperated with the police.

No one threatened me or promised me anything to get me to make this statement.                    1

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

_Michael Arnold_
Name                                              _3/18/12_
                                                  Date
Date of Birth: _9/28/79_
Address: _437 W. Schoolhouse La_
_PHILADELPHIA PA 19144_

_John C. Narvaez_                                 _3/18/12_
Witness                                           Date

## COMMONWEALTH OF PENNSYLVANIA, PHILADELPHIA

### CERTIFICATION OF MICHAEL ARNOLD

I, Michael Arnold, being of full legal age, and being duly sworn according to law do hereby state the following is true and correct to the best of my knowledge, information and belief:

The police came to interview me about the Mullen murder in June 1997. I did not know anything about the case before the cops came. My school counselor, Oscar Page, was supposed to be there to help me but he was not very helpful. The cops came to my school and told me they were investigating Miller in a murder. They showed me a statement from Williams. I read over the statement about the case and how Williams said Miller confessed to committing the crime. At the end of Williams' statement I saw that Miller apparently told Williams that he got the gun from me. The cops told me that Williams was willing to testify against me if I didn't cooperate.

I made up the story about the gun and the fight on Florence Avenue because I wanted to do whatever I could do to get the police and Williams off my back and I thought it would be funny to send the cops on a "dead lead." I told them that there was a fight and that I threw the gun in the bushes and that I later heard that Miller had picked up the gun. I never said Miller told me he had the gun. Unless you know how we thought, you wouldn't understand why I said what I said. I wanted to send the police on a wild goose chase. People got killed all the time in our neighborhood. Baby James put me in the mix of a murder investigation and I had to get myself out of it. All I was trying to do was remove myself from the situation and distance myself from the gun. If Miller did it then he did it but he didn't get it from me. I didn't care about the connection to the gun. All I cared about was that I wasn't the one who put it in his hands. I did not give Miller or Williams a gun. I didn't think my story would go anywhere because the cops wouldn't be able to verify it because I made it up.

I never thought the police were going to make me sign the statement. I asked Oscar Page if I had to sign it and he told me that he would sign it as well. I signed it but didn't read through it. Some of the information in the statement is inaccurate. I never said the gun was a 9mm. Rather, I said it was a .380. I didn't know I was going to have to testify at Miller's trial. About a year later, the cops took me out of my classroom and told me I had to testify the next day.

No one threatened me or promised me anything to get me to make this statement.     2

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

Name: Michael Arnold     Date: 3/28/12

Date of Birth: 9/28/1979

Address: 437 W. Schoolhouse ln Philadelphia Pa 19144

Witness: John C. Navary     Date: 3/18/12

## COMMONWEALTH OF PENNSYLVANIA, PHILADELPHIA

### CERTIFICATION OF MICHAEL ARNOLD

I, Michael Arnold, being of full legal age, and being duly sworn according to law do hereby state the following is true and correct to the best of my knowledge, information and belief:

Before I was set to testify, I was in a room with two cops who told me Williams said I threatened him for snitching on me. I never threatened Williams. The only time I spoke to Williams after his arrest was when I was hanging out at Williams' grandmother's house with his brother Monte. Williams called the house and I picked up the phone. On the phone Williams laughed and said, "Your boy Little is up here." I didn't say anything to Williams on the phone about Miller and gave the phone to Monte. I never threatened David Williams and I never talked to anyone about Miller's case.

Before the hearing, the cops showed me my statement from the interview in June 1997. I didn't want to get in trouble for lying so I repeated the same story under oath and mostly confirmed what I said to the police in 1997. I felt pressured to stick with my original story. After the trial, I consulted with attorneys who advised me not to come forward with the truth because I could be faced with potential perjury charges. I'm coming forward now to set the record straight about my previous statements and the fact that I was not involved in the Mullen murder in any way. I did not make this statement earlier because I was advised by lawyers not to and was worried about being involved at all and possible perjury charges.

No one threatened me or promised me anything to get me to make this statement.                    3

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

_Michael Arnold_
Name                                                        Date   _3/18/12_

Date of Birth: _9/28/1929_

Address: _437 W. Schoolhouse ln_
_Philadelphia PA  19144_

_John C. Nahay_
Witness                                                     Date   _3/18/12_

# EXHIBIT U

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :
Respondent                         :
                                      :
                                      :
            v.                   :     CP-51-CR-1010301-1997
                                        :
                                      :
JOHN MILLER                        :
Petitioner                         :

**CERTIFICATION OF WITNESS IN SUPPORT OF PETITION FOR POST-
CONVICTION RELIEF UNDER 42 Pa.C.S. § 9543**

1

## PRELIMINARY STATEMENT

Petitioner, John Miller, through counsel, respectfully submits this *Certificate of Witness In Support of Petition for Post-Conviction Relief Under 42 Pa. C.S. § 9543.*

Petitioner adopts and incorporates herein as if fully stated the factual and legal averments contained in the *Petition* (filed on September 20, 2012).

Petitioner reserves the right to amend this *Certification* upon further investigation.

2

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :
Respondent                     :
                               :
                               :
                               :
              v.               :        CP-51-CR-1010301-1997
                               :
                               :
JOHN MILLER                    :
Petitioner.                    :

### CERTIFICATION OF WITNESS PURSUANT TO 42 Pa. C.S. § 9545(d)(1)

Pursuant to 42 Pa. C.S. § 9545(d)(1), Petitioner herein submits the following certification of witness in support of his *Petition for Post-Conviction Relief*. **Mike Arnold, Date of Birth: April 28, 1979, Address: 437 West School House Lane, Apartment A12, Philadelphia, PA 19144.**

1.  I am the Staff Investigator employed by the Pennsylvania Innocence Project.

2.  On July 19, 2011, staff attorney, Charlotte Whitmore, and I attempted to interview Mike Arnold ("Arnold") at the Pennsylvania Innocence Project's Office.  We identified ourselves as staff members of the Pennsylvania Innocence Project and told Arnold that we wanted to speak to him about John Miller's ("Miller") case.

3.  Arnold told us that he lied to the police when they questioned him about Miller.  Arnold would not specify what portions of his statement he lied about or what portions were true.

4.  When we asked Arnold about the gun used in the murder, he refused to continue the interview and stated that he would not talk to us further or sign a statement without speaking to a lawyer first.

5. We asked Arnold to contact us again after speaking to a lawyer.  He never contacted us again.

Respectfully submitted,

Shaina A. Tyler, Staff Investigator
The Pennsylvania Innocence Project
at Temple University Beasley School of Law
1719 N. Broad Street
Philadelphia, PA  19122
215-204-4255

4

# EXHIBIT V

## AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA       :
                                   :       ss
COUNTY OF PHILADELPHIA             :

I, LEON WILLIAMS, being duly sworn according to law, state that:

1. I am an adult individual maintaining a work address at 327 S. 13th Street, Philadelphia, PA 19107.

2. My date of birth is August 7, 1948.

3. I am an attorney licensed by the Commonwealth of Pennsylvania and in good standing.

4. I represented John Miller in his criminal trial in September 1998 for the homicide of Anthony Mullen and related charges.

5. At no time prior to or during Mr. Miller's trial was I ever aware of Jack Williams' identity or that David Williams told Philadelphia police officers or detectives that Jack Williams committed a murder around the same time that he told them that John Miller murdered Anthony Mullen, and at no time did I ever receive any information, documents or other materials regarding Jack Williams.

6. If I had known Jack Williams' identity and that David Williams made statements against Jack Williams around the same time that he made statements against Mr. Miller, I would have considered this information and documentation in formulating and implementing my defense of Mr. Miller prior to and during his trial.

7.   The facts set forth in this affidavit are true and correct to the best of my knowledge, information and belief.

_Leon q. Will_

Leon Williams

Sworn to and Subscribed
Before me this _14th_ day of
September, 2012.

_Sandra Hendrick_

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SANDRA HENDRICK, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 14, 2015

-2-

# EXHIBIT W

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :
Respondent                                       :
                                                       :
                                                       :
                                                       :
                    v.                              :        CP-51-CR-1010301-1997
                                                       :
                                                       :
JOHN MILLER                                  :
Petitioner                                        :


**CERTIFICATION OF WITNESS IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF UNDER 42 Pa.C.S. § 9543**

## PRELIMINARY STATEMENT

Petitioner, John Miller, through counsel, respectfully submits this *Certificate of Witness In Support of Petition for Post-Conviction Relief Under 42 Pa. C.S. § 9543.*

Petitioner adopts and incorporates herein as if fully stated the factual and legal averments contained in the *Petition* (filed on September 20, 2012).

Petitioner reserves the right to amend this *Certification* upon further investigation.

2

IN THE PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
Respondent :
 :
 :
 :
v. : CP-51-CR-1010301-1997
 :
 :
JOHN MILLER :
Petitioner :

## CERTIFICATION OF WITNESS PURSUANT TO 42 Pa. C.S. § 9545(d)(1)

Pursuant to 42 Pa. C.S. § 9545(d)(1), Petitioner herein submits the following certification of witness in support of his *Petition for Post-Conviction Relief*. **Jack Williams ("J. Williams"), Date of Birth: February 11, 1978, Address: SCI Albion.**

1. I am the Staff Investigator employed by the Pennsylvania Innocence Project.

2. On December 19, 2011, attorneys from Pepper Hamilton LLP interviewed David Williams ("D. Williams"). D. Williams informed them that J. Williams was present when D. Williams sold the gun that D. Williams used in the Mullen murder to Dwayne at the Chinese store.

3. In February 2012, I spoke with Counselor Randall at SCI Albion to set up a phone call with inmate J. Williams (inmate #: DQ1200)

4. On March 1, 2012, I interviewed J. Williams by telephone. I identified myself as the staff investigator of the Pennsylvania Innocence Project and explained to him that I was investigating the case that John Miller ("Miller") is presently incarcerated for.

5. J. Williams told me that he was arrested in March 1997 for a murder. He is currently serving time for that murder. The "discovery packet" that J. Williams received from his

3

attorney about a month after he was arrested included statements from D. Williams, Mike White and Randolph Dwayne Wright implicating him in the murder. The dates on the statements were December 1996 and January 1997.

6. J. Williams also told me that he was at Curran-Fromhold Correctional Facility in June 1997, he saw D. Williams. They were on the same cell block together. D. Williams was incarcerated for robbery charges. J. Williams confronted D. Williams about J. Williams' case. J. Williams' cell mate, Barry, was present during this confrontation. J. Williams did not recall Barry's last name. J. Williams asked D. Williams why D. Williams made a statement against J. Williams about J. Williams killing someone. D. Williams told J. Williams that D. Williams just agreed with whatever the cops said. D. Williams told J. Williams that D. Williams also pinned J. Williams' murder case on Mike White. J. Williams thought that D. Williams gave information to the police so he could help his own pending robbery charges. D. Williams never testified against J. Williams.

7. After J. Williams and D. Williams discussed J. Williams' case, they talked about people in their neighborhood. Then, they talked about Miller's case. D. Williams told J. Williams that D. Williams tried to rob someone and ended up killing him. J. Williams cannot remember details about the conversation but recalled that D. Williams bragged about the shooting and pinning it on John Miller. D. Williams told J. Williams that after the murder, D. Williams went to get high and "look for women."

8. D. Williams also told J. Williams that the gun D. Williams used for the murder that D. Williams pinned on Miller was sold to Randolph Dwayne Wright. J. Williams did not know how much it was sold for or what Wright did with the gun. Wright is now

deceased but has a brother who lived on Litchfield Street in Philadelphia, PA. D. Williams also told J. Williams that D. Williams gave up all the information he knew about the murder that Miller was convicted of to get less time for his pending robbery case. J. Williams could not give me any more details on Miller's current case.

9. On April 27, 2012, staff attorney, Charlotte Whitmore, and I interviewed J. Williams by telephone again. Attorneys from Pepper Hamilton LLP were also present during the call. We identified ourselves as staff members of the Pennsylvania Innocence Project and told J. Williams that we wanted to speak to him further about statements D. Williams made implicating J. Williams in the murder for which J. Williams is presently incarcerated.

10. J. Williams told us that he is presently serving time for a murder committed in May or June of 1996. J. Williams explained that several people testified against him. The people who testified or provided statements against him were Keith Edwards, Randolph Dwayne Wright, Michael Irving and D. Williams. J. Williams explained that Keith Edwards and Randolph Dwayne Wright both testified against him at his murder trial. Michael Irving, according to J. Williams, was a federal informant and never testified. J. Williams explained that D. Williams gave a statement, but never testified. The statement that D. Williams provided stated that D. Williams placed a phone call from prison to a friend of J. Williams and J. Williams was at that friend's house at the time of the call and J. Williams confessed to the murder to D. Williams over the phone. J. Williams stated that this call never happened.

11. When J. Williams spoke with D. Williams at Curran-Fromhold Correctional Facility, D. Williams said that D. Williams made statements against both J. Williams and Miller

to lessen his own sentence.  J. Williams knew that D. Williams had sold a gun to someone that was used in a murder.  He knew that the "gun had a body on it."

11. Additionally, J. Williams recalled that his cell mate from Curren-Fromhold Correctional Facility's name was Barry Speech who was 21 years old in 1997 and incarcerated for a murder.

12.  J. Williams informed us that he still has copies of his discovery, including the police statements made by D. Williams against J. Williams.  He agreed to send us a copy of his discovery.

13. On June 1, 2012 we received copies of the police statements from J. Williams.

Respectfully submitted,

Shaina A. Tyler, Staff Investigator
The Pennsylvania Innocence Project
at Temple University Beasley School of Law
1719 N. Broad Street
Philadelphia, PA  19122
215-204-4255

6

# EXHIBIT X

J-S33027-12

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN MILLER | |
| Appellant | No. 3269 EDA 2011 |

Appeal from the PCRA Order November 18, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1010301-1997

BEFORE:  BOWES, J., LAZARUS, J., and WECHT, J.

MEMORANDUM BY LAZARUS, J.                    **FILED JULY 24, 2012**

John Miller appeals from the order dismissing his untimely serial petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541, *et seq*. After careful review, we affirm.

On September 29, 1998, a jury found Miller guilty of the murder[1] of Anthony Mullen.  Mullen was shot while on duty as a night attendant at a parking lot adjacent to Philadelphia's 30th Street Station ("30th Street").  No witnesses to the shooting came forward.  However, five months after Mullen was killed, David Williams informed the police that his neighbor, Miller, had told him that he (Miller) had committed the crime.  Williams also told police

---

[1] Miller was convicted of second-degree murder under 18 Pa.C.S.A. § 2502(b), as well as robbery, 18 Pa.C.S.A. § 3701, and possessing instruments of crime ("PIC"), 18 Pa.C.S.A. § 907.

J-S33027-12

that Miller told him he had obtained a 9mm handgun from another neighbor of theirs, Michael Arnold, and had thrown it away after the shooting. Williams stated that he had confirmed the story of the gun with Arnold. Police interviewed Arnold, who confirmed that Miller had taken the gun, which he described as a silver automatic .380 or 9mm.

On June 25, 1997, Miller was arrested and charged with Mullen's murder based on the statements of Williams and Arnold. However, at Miller's preliminary hearing on October 30, 1997, Williams recanted his statement, claiming that he had incriminated Miller because they were not getting along at the time. Subsequently, at Miller's trial, Williams again recanted, this time stating that he had never given any information to the police and that they had fabricated his statement. Williams' recantation was refuted by the testimony of two police officers. Arnold also testified at trial, confirming his previous story that Miller had borrowed his gun, but adding – for the first time – that the gun did not work and that he had no idea of the gun's caliber.

Upon conviction, Miller was sentenced to a mandatory term of life imprisonment[2] on December 15, 1998. His judgment of sentence was affirmed by this Court on December 29, 2000 and he did not file a petition for allowance of appeal. Williams filed his first *pro se* PCRA petition on May

_____

[2] Under 18 Pa.C.S.A. § 1102(b), the court imposed a mandatory life sentence. Miller received no further penalty on his robbery and PIC charges.

J-S33027-12

15, 2001.  Susan Burt-Collins, Esquire, was appointed as counsel and filed an amended petition in which she raised the issue of after-discovered exculpatory evidence in the form of statements from two individuals, Clinton Bailey and Terry Shaw, both of whom implicated Williams, rather than Miller, in Mullen's murder.[3]  Specifically, Shaw claimed that, on the night of the shooting, Williams came to his house sometime after midnight and asked Shaw to help him dispose of the weapon, which Shaw identified as either a .380 or 9mm black handgun.  Shaw stated that Williams told him he had attempted to rob someone or get money owed to him (Shaw could not remember which) at 30th Street and the other person shot at him, so Williams shot back and hit him.  Shaw claims he declined to help Williams, stating that he did not want to get involved.  Clinton Bailey also submitted a statement saying that Williams came to his house at approximately 1:00 a.m. on a night "definitely right at the time of the shooting of the parking lot attendant" and asked him to help dispose of a gun, saying he "did something around 30[th] [S]treet and he needed to get rid" of it.   Clinton Bailey Statement, 1/7/02.  Bailey stated that he declined to assist Williams because he did not want to jeopardize his family's safety.

After a bifurcated hearing at which Bailey and Shaw testified, the court dismissed Miller's PCRA petition in open court on October 29, 2002,

---

[3] Miller learned of these two men's stories when he was incarcerated with them at SCI Mahanoy.

J-S33027-12

concluding that the testimony presented by Bailey and Shaw was "totally unbelievable."   PCRA Court Opinion, 3/3/03, at 5.   Miller filed a notice of appeal on November 26, 2002 and a court-ordered statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) on January 8, 2003. Attached to Miller's Rule 1925(b) statement was a copy of a letter from Williams to Miller's mother, in which Williams confesses to having killed Mullen himself and falsely implicated Miller.   Miller indicated in his Rule 1925(b) statement that he intended to obtain a proper affidavit from Williams and request that the Superior Court remand his case to the PCRA court for additional proceedings relating to Williams' confession.  He did so, and this Court remanded the matter to the PCRA court for another evidentiary hearing.

A hearing was held on July 30, 2003, at which time Williams testified that he shot Mullen, whom he described to be a white male wearing a green jacket.  Mullen was, in fact, a black male and had been wearing a red jacket on the night he was gunned down.  At the conclusion of Williams' testimony, the PCRA court made a finding that Williams was "lying under oath" and was "not believable."   N.T. PCRA Hearing, 7/30/03, at 65.   The record was subsequently returned to this Court.

On appeal, Miller argued that he was entitled to a new trial based upon the testimony offered by Bailey, Shaw and Williams.  By memorandum decision filed on October 22, 2004, we affirmed the order of the PCRA court,

- 4 -

J-S33027-12

finding that its credibility determinations were supported by the record.  Our Supreme Court subsequently denied Miller's petition for allowance of appeal.

On October 23, 2007, Miller filed another *pro se* PCRA petition.  This time, Miller invoked the "after-discovered evidence" exception to the time-bar under 42 Pa.C.S.A. § 9545(b), submitting an affidavit from Andre Monroe, who claimed to have witnessed Williams shoot Mullen at the 30th Street Station parking lot.[4]  Without holding a hearing, the PCRA court dismissed Miller's petition as untimely by order dated October 17, 2008.

Miller filed his next *pro se* PCRA petition April 19, 2011.  Attached to the petition was another written statement from Williams to Miller's mother in which Williams admitted to misidentifying Mullen as white during the prior PCRA proceeding because he "panicked when it was said in so many words that [Williams] couldn't get a self-defense case[.]"  Williams Letter to Mrs. Miller, 3/19/11.  Also attached to the petition was a written statement by Mary L. Wilt, detailing a conversation she had with Michael Arnold in which he recanted the statement he had given to the police about Miller borrowing his gun.  In actuality, Arnold claimed, he did not know anything about the entire situation and "went along and agreed with [the police] to get them to finish up and leave."  Mary Wilt Statement, 4/1/11.

---

[4] Monroe conveyed this information to Miller when they ran into each other while imprisoned at SCI-Mahanoy.

- 5 -

J-S33027-12

On June 6, 2011, Miller filed an "Amended Petition (pursuant to P[a]. R.Crim.P[.] 905(D), 902(A)(15) & U.S. [Constitution] 6th Amendment[']s 'Compulsory Process Clause')." To this "Amended Petition," Miller attached an affidavit from Michael Arnold in which Arnold claims that he lied at Miller's trial when he said that Miller picked up his gun after a fight at 56th and Florence in the summer of 1996. In fact, Arnold claims that he never owned a gun and he only told the story to police because he and Miller were drug competitors and he "wanted John Miller out the way." Michael Arnold Affidavit, 5/24/11.

On July 18, 2011, the PCRA court issued a notice pursuant to Pa.R.Crim.P. 907, informing Miller that his petition was untimely and failed to invoke a valid exception to the PCRA time bar. On August 4, 2011, Miller filed objections to the Rule 907 notice, in which he asserted that he had satisfied the exception under 42 Pa.C.S.A. § 9545(b)(1)(ii) by presenting newly-discovered facts. The next day, August 5, 2011, newly-retained *pro bono* counsel entered their appearance and filed a "Petition For Extension of Time to File Amended Petition For Post-Conviction Relief Pursuant to [Pa.R.Crim.P.] 905." The PCRA court never acted on this petition.

Nevertheless, on November 3, 2011, *pro bono* counsel filed a "Third Amended Petition For Post-Conviction Relief." In this petition, Miller asserts newly-discovered evidence in the form of a statement from Mark Manigault, who claimed that, while sharing a cell with Williams, he was told by Williams that Williams "was going to do 'whatever it took' to get out of [jail]" and

J-S33027-12

intended to "pin a homicide that [Williams] had done on somebody else." Certification of Mark Manigault, 9/22/11. Manigault also told Miller that Williams had told police that Manigault had been present for Mullen's murder so that Manigault could use that "information" as leverage to help himself in his own then-pending criminal case.   Miller also alleged that, during their initial investigation of Mullen's murder, police had questioned Manigault, but Manigault had told them he did not know anything about the murder because he had been incarcerated at the time.   Miller claims that the police were required to disclose to him this "exculpatory evidence" prior to trial. He claims that, had he been aware of Manigault at the time, he would have discovered that Williams had lied to the police about Manigault being at the scene of Mullen's murder and, consequently, he would have been able to argue that other parts of Williams' story were also false.  Miller claims this would have changed the outcome of his trial.

On November 18, 2011, the PCRA court issued a Memorandum and Order dismissing Miller's petition.[5]  In its memorandum, the court found that:  (1) the letter from David Williams recanting his prior incriminating statements is not "newly-discovered evidence," as Williams' recantation was previously litigated; (2) Miller did not demonstrate due diligence in obtaining

---

[5] The PCRA court acknowledged that Miller had filed his original petition on April 19, 2011, but had amended it on June 6, 2011 and again on November 3, 2011.   The court also acknowledged Miller's "objections to dismissal notice," which he filed on August 4, 2011.

J-S33027-12

the affidavit from Mark Manigault, nor did he show that he presented the evidence within 60 days of discovering it; and (3) Mike Arnold's recantation is not "newly-discovered" because he had previously recanted in similar fashion at Miller's preliminary hearing.   Accordingly, the court entered an order denying Miller relief.

Thereafter, on November 28, 2011, *pro bono* counsel filed a "Fourth Amended Petition For Post-Conviction Relief," in which Miller sought to "address [the] deficiencies" cited by the PCRA court in its dismissal memorandum.  Counsel also filed a "Motion For Reconsideration of Dismissal of Third Amended Petition . . ., to File an Amended PCRA Petition, and For Extension of Time in Which to File a Further Amended PCRA Petition."  In the motion for reconsideration, Miller alleged that the PCRA court erred by:  (1) dismissing his third amended petition without issuing a Rule 907 notice of intent to dismiss or ordering amendment to allow Miller to "cure any defects," Motion For Reconsideration, 11/28/11, at 2; (2) finding that Miller failed to demonstrate when he became aware of Manigault's evidence; (3) finding that Miller failed to exercise due diligence in locating Manigault; and (4) finding that Arnold's latest recantation is substantially similar to his previous recantation.

The PCRA court denied Miller's motion for reconsideration by order dated December 13, 2011.  Miller filed a notice of appeal of the November

J-S33027-12

18, 2011 order on December 15, 2011.  The PCRA court did not order him to file a Rule 1925(b) statement.

On appeal, Miller asserts the following claims for our review:[6]

1.    Whether the trial court erred in dismissing [Miller's] PCRA Petition as untimely?

2.    Whether the trial court erred in failing to hold an evidentiary hearing to allow [Miller] to demonstrate the court's jurisdiction and to establish his claim?

3.    Whether the trial court erred in failing to issue a notice of intent to dismiss [Miller's] amended PCRA Petition as required by Pa.R.Crim.P. 907 or to order amendment of the PCRA Petition to cure any defects as required by Pa.R.Crim.P. 905?

4.    Whether the trial court erred in denying a reasonable extension of time request?

Brief of Appellant, at 4.

We begin by noting that our standard of review from the grant or denial of post-conviction relief is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error.  ***Commonwealth v. Ousley***, 21 A.3d 1238, 1242 (Pa.

---

[6] Miller also raised a claim as to whether the trial court erred in failing to address his claim of governmental interference for failure to disclose the existence of exculpatory evidence.  Our disposition of this claim is incorporated into our discussion of Miller's general claim that the court erred in finding his petition to be untimely.

J-S33027-12

Super. 2011) (citation omitted).   We will not disturb findings that are supported by the record. *Id.* Moreover, our Supreme Court has stated:

> [I]n reviewing claims for relief in a second or subsequent collateral attack on a conviction and judgment of sentence, the request will not be entertained unless a strong prima facie showing is demonstrated that a miscarriage of justice occurred.  An appellant makes such a prima facie case only if he demonstrates that either the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes charged.

*Commonwealth v. Fahy*, 737 A.2d 214, 223 (Pa. 1999) (citations and quotation omitted).

Generally, a petition for PCRA relief, including a second or subsequent petition, must be filed within one year of the date the petitioner's judgment becomes final.  *See* 42 Pa.C.S.A. § 9545(b)(3); *see also Commonwealth v. Alcorn*, 703 A.2d 1054 (Pa. Super. 1997).   There are, however, three exceptions to the time requirement, set forth at 42 Pa.C.S.A. § 9545(b)(1). Where the petition alleges, and the petitioner proves, that an exception to the time for filing the petition is met, the petition will be considered timely. These exceptions include:   (1) interference by government officials in the presentation of the claim; (2) after-discovered facts or evidence; and (3) an after-recognized constitutional right.   *See Commonwealth v. Gamboa-Taylor*, 753 A.2d 780, 783 (Pa. 2000).  However, a PCRA petition invoking one of these exceptions must "be filed within 60 days of the date the claims

J-S33027-12

could have been presented." *Id.*; *see also* 42 Pa.C.S.A. § 9545(b)(2).  A petitioner fails to satisfy the 60-day requirement of section 9545(b) if he fails to explain why, with the exercise of due diligence, the claim could not have been filed earlier. *Commonwealth v. Marshall*, 947 A.2d 714, 720 (Pa. 2008) (citation omitted).  The timeliness requirements of the PCRA are jurisdictional in nature and, accordingly, a PCRA court cannot hear untimely petitions. *Commonwealth v. Robinson*, 837 A.2d 1157 (Pa. 2003).

Here, Miller's judgment of sentence became final on January 29, 2001, thirty days after it was affirmed by this Court and the time to file a petition for allowance of appeal expired.   **See** 42 Pa.C.S.A. § 9545(b)(3). Accordingly, Miller had one year from that date, or until January 29, 2002, to file a timely PCRA petition.  Miller filed the first in the instant series of petitions and amendments on April 19, 2011, nearly ten years after his judgment of sentence became final.  As such, his petition is untimely unless he pleads and proves one of the exceptions to the time bar under section 9545(b).

Here, Miller first claims that the PCRA court erred in dismissing his petition as untimely, having found that he failed to prove any of the exceptions to the time bar.  Miller has presented numerous pieces of evidence which he claims satisfy the "after-discovered evidence" and/or "governmental interference" exceptions to the time bar.  We will address each piece of evidence in turn.  However, we begin by addressing a

- 11 -

J-S33027-12

procedural issue raised by the Commonwealth.  On August 5, 2011, Miller's

newly-retained counsel filed a motion to extend time to file an amended

PCRA petition under Pa.R.Crim.P. 905.  Rule 905 provides, in relevant part:

> (A)   The judge may grant leave to amend or
> withdraw a petition for post-conviction collateral
> relief at any time.   Amendment shall be freely
> allowed to achieve substantial justice.

Pa.R.Crim.P. 905(A).  Rule 905 does not explicitly distinguish between initial

and serial petitions.  ***Commonwealth v. Porter***, 35 A.3d 4, 12 (Pa. Super.

2012).

The    PCRA    court    never    acted    on    Miller's    motion    to    amend.

Nevertheless, Miller, through counsel, filed a "Third Amended Petition" on

November 3, 2011.[7]  The Commonwealth argues that these "unauthorized

attempted amendment[s]" submitted without leave of court subsequent to

Miller's April 19, 2011 *pro se* petition are a nullity and, thus, the claims

raised in those filings are invalid.  Brief of Appellee, at 20.  We disagree.

Our Supreme Court has previously stated that amendments under Rule

905 are not "self-authorizing," *i.e.* a petitioner may not simply amend a

petition with a supplemental pleading.   *Porter*, 35 A.3d at 17.   Rather, as

set forth in the rule, amendment is permitted only by direction or leave of

---

[7] Miller also filed a *pro se* amended petition on June 6, 2011.  He did not
seek leave of court to file that amendment.

J-S33027-12

the PCRA court. *Id.* at 18.  However, such leave should be "freely allowed to achieve substantial justice."  Pa.R.Crim.P. 905(A).

Here, although the PCRA never explicitly granted Miller leave to amend his petition, the court nevertheless acknowledged Miller's amendments and, indeed, ruled on the substance of the claims raised therein.  In its November 18, 2011 memorandum, the court notes as follows:

> This [c]ourt hereby dismisses the instant Post Conviction Relief Act Petition filed on April 18 [sic], 2011[1], for the reasons set forth below. . . .
>
> > [1] This represents the original filing date, as an **amended petition** was filed *pro se* on June 6, 2011, Objections to Dismissal Notice filed *pro se* on August 4, 2011, and a third **amended petition** filed by counsel on November 3, 2011.

Trial Court Opinion, 11/18/11, at 1 and n.1 (emphasis added).  The PCRA court went on to address not only the claims raised in Miller's April 19, 2011 *pro se* petition, but also those raised in his *pro se* June 6, 2011 "Amended Petition" and the "Third Amended Petition" filed by counsel on November 3, 2011.  Accordingly, we conclude that the PCRA court implicitly authorized Miller's amendments and we will address their substance herein.

Miller first claims that the trial court erred in finding that the certified statement given by Manigault did not constitute previously unknown facts because "[t]he existence of Mr. Manigault was known by Mr. Williams . . . and no explanation is given for why this information was not found through due diligence by [Miller] through Mr. Williams."  Trial Court Opinion,

- 13 -

J-S33027-12

11/18/11, at 4.  Miller counters that he could not have forced Williams to reveal information that Miller did not even know Williams possessed, i.e. Manigault's name and story.  Miller claims that he presented his claim to the PCRA court within 60 days of discovering Manigault's existence and, thus, has satisfied the requirements of section 9545(b).

The Commonwealth claims that Manigault's statement – that Williams was going to pin the murder on someone else – was not new information because Williams, himself, stated this on several occasions.   Thus, Manigault's statement is not a "newly-discovered fact" as contemplated in 42 Pa.C.S.A. § 9545(b)(1)(ii) and the time bar is not overcome.[8]   **See Commonwealth v. Johnson**, 863 A.2d 423 (Pa. 2004) (PCRA time bar not excused by new source of already known fact).  We agree.

---

[8] Citing **Commonweath v. Small**, 980 A.2d 549 (Pa. 2009), the Commonwealth also claims Manigault's statement was inadmissible hearsay.  In **Small**, a PCRA petitioner sought an exception to the time bar based upon an exculpatory statement in which another individual essentially implicated himself in Small's crime to a third party.  This statement could have been admissible as a statement against penal interests; however, Small failed to make that argument on appeal.  Accordingly, the Court denied Small relief.  **Small**, 980 A.2d at 577 ("Small does not argue any hearsay exception applies to allow the admission of Tucker's statement.  Small's claim fails in this regard.").  Conversely, in the case at bar, Miller argues that Manigault's statement is admissible as a statement against penal interests pursuant to Pa.R.E. 804(b)(3).   Thus, the Commonwealth's reliance on **Small** is misplaced.

- 14 -

J-S33027-12

In *Commonwealth v. Marshall*, 947 A.2d 714 (Pa. 2008), the Supreme Court synthesized several section 9545(b)(1)(ii) related cases as follows:

> Exception (b)(1)(ii) "requires petitioner to allege and prove that there were 'facts' that were 'unknown' to him" and that he could not have ascertained those facts by the exercise of "due diligence." *Commonwealth v. Bennett*, 593 Pa. 382, 930 A.2d 1264, 1270-72 (2007) (emphasis added). The focus of the exception is "on [the] newly discovered facts, not on a newly discovered or newly willing source for previously known facts." [*Johnson*, 863 A.2d at 427]. In *Johnson*, this Court rejected the petitioner's argument that a witness's subsequent admission of alleged facts brought a claim within the scope of exception (b)(1)(ii) even though the facts had been available to the petitioner beforehand. Relying on *Johnson*, this Court more recently held that an affidavit alleging perjury did not bring a petitioner's claim of fabricated testimony within the scope of exception (b)(1)(ii) because the only "new" aspect of the claim was that a new witness had come forward to testify regarding the previously raised claim. [*Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1267 (Pa. 2008)]. Specifically, we held that the fact that the petitioner "discovered yet another conduit for the same claim of perjury does not transform his latest source into evidence falling within the ambit of [Section] 9545(b)(1)(ii)." *Id.* at 1269.

*Marshall*, 947 A.2d at 720.

Similarly, in this case, the "fact" that Williams falsely accused Miller of Mullen's murder was known to Miller long before Manigault "came forward" with his claim that Williams confided in him in prison. As far back as Miller's preliminary hearing in October 1997, Williams admitted to falsely accusing

- 15 -

J-S33027-12

Miller of the crime.   Moreover, to the extent that Manigault's statement implicates Williams in the crime, Williams began implicating himself in Mullen's murder as far back as 2002, when he confessed in a letter to Miller's mother.   Accordingly, Manigault is nothing more than a "newly willing source for previously known facts." *Marshall*, *supra*.

Next, Miller asserts that the trial court erred in finding that Arnold's May 24, 2011 recantation did not satisfy the previously unknown facts exception to the time bar because "Arnold has recanted in a substantially similar fashion previously to make this evidence cumulative in nature." Trial Court Opinion, 11/18/11, at 4.   When Arnold first spoke to police, he told them that he gave Miller a working gun.   Subsequently, at trial, Arnold testified that the gun Miller had taken did not work.   Now, Arnold claims that his entire story was fabricated and that he never owned a gun.   Miller argues that Arnold's various recantations are not, in fact, substantially similar.

In response, the Commonwealth argues that, when Arnold first altered his original statement at Miller's trial, he was fully cross-examined, yet did not alter his story.   Moreover, the Commonwealth asserts, a recantation such as Arnold's is "hardly the kind of 'new fact' envisioned by" the PCRA. Brief of Appellee, at 15.   Finally, the Commonwealth argues that Miller did not demonstrate that Arnold's recantation could not have been obtained earlier with the exercise of due diligence, asserting that "[i]f he managed to

- 16 -

J-S33027-12

locate and interview Arnold – his childhood friend – in February 2011, he could have done so twenty-five [sic] years earlier." *Id.* at 16.

With regard to recanted testimony, we have previously stated:

> While [the appellate courts have] often acknowledged the limitations inherent in recantation testimony, we have not foreclosed the possibility that, in some instances, such testimony may be believed by the factfinder and thus form a basis for relief.   For this to occur, however, the testimony must be such that it could not have been obtained at the time of trial by reasonable diligence; must not be merely corroborative or cumulative; cannot be directed solely to impeachment; and must be such that it would likely compel a different outcome of the trial.   In addition, an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion.

*Commonwealth v. Markel*, 953 A.2d 544, 561 (Pa. Super. 2008) (citation and quotation omitted).

Here, we cannot say that the outcome of trial would have been different had the jury heard Arnold's current version of his story.   In the version of the story Arnold told at trial, Miller took an inoperable gun from him.   In Arnold's current version of the story, Miller took no gun from him at all.   In either case, Arnold's testimony would only have demonstrated to the jury that Miller could not have used a gun obtained from Arnold to shoot Mullen.   It does not, however, lead inexorably to the conclusion that Miller did not shoot Mullen.   Rather, it means that Miller would have had to have obtained a gun from a source other than Arnold.   As Arnold's testimony

- 17 -

J-S33027-12

would not likely compel a different outcome of the trial, this claim is meritless. ***See Markel***, ***supra***.

Next, Miller claims that the trial court erred in finding that Williams' July 2011 confession "did not satisfy the previously unknown facts exception because Williams has confessed many times before."  Brief of Appellant, at 20.  The court also noted that another confession of Williams had been the basis for a previous PCRA petition, which was ultimately dismissed by the PCRA court and affirmed on appeal.  Miller asserts that "Williams' latest, most detailed confession, corroborated by Manigault's evidence and Arnold's recantation, provides a fuller factual picture that exonerates [Miller] in a way that Williams' previous confessions, standing alone, never could."  Brief of Appellant, at 21.  Miller also claims that Williams' "most recent confession contains new, previously unknown details, and is factually distinct from Williams' prior confession." ***Id.*** at 22.

The Commonwealth argues that Williams' July 2011 "serial confession" was not new evidence, as he had previously confessed in 2002, 2003 and again in March 2011.  Moreover, Williams admitted in 2004 that he had lied at Miller's 2003 PCRA hearing.  Accordingly, the Commonwealth claims, Williams' latest confession was "just more of the same already thoroughly discredited and rejected evidence."  Brief of Appellee, at 19.  We agree.

As noted by both the PCRA court and the Commonwealth in its brief, Williams' July 2011 confession is merely one in a string of confessions dating

back to 2002. Although his most recent story contains some new details, the crux of the story – that Williams, and not Miller, killed Mullen – remains the same. Were we to grant Miller relief based solely upon the additional details included in this latest version of Williams' tale, we would open the floodgates to myriad new claims based on slightly altered versions of previously known facts. This would result in the filing of innumerably more untimely petitions. Moreover, it is indisputable that Williams has previously lied to the court regarding various aspects of his story and the court made a determination that Williams was not credible. Indeed, Williams has never told the same story twice; each version of his story is different, from his signed statement through his most recent retelling in July 2011.[9] As such,

---

[9] On March 4, 1997, Williams signed a statement that Miller had confessed to him that he murdered Mullen in a botched robbery attempt. Thereafter, at Miller's October 30, 1997 preliminary hearing, Williams testified that his signed statement had accurately reflected what he had told police, but not what actually happened. Subsequently, at trial, Williams testified that the detectives had actually made up "ninety percent" of his statement themselves. N.T. Trial, 9/24/98, at 86. Then, in an undated letter written to Miller's mother sometime in the fall of 2002 and submitted to the PCRA court on January 3, 2003, Williams confessed to having killed Mullen *himself* and stated that Miller had no knowledge of the crime. Williams stated that the shooting occurred when he went to the parking lot to collect drug money owed to him by Mullen. At a subsequent PCRA hearing in July 2003, Williams again confessed to Mullen's murder and testified, under oath, that Mullen was a white male wearing a green jacket. In fact, Mullen was a black male wearing a red jacket. Finally, on March 19, 2011, Williams sent another letter to Miller's mother in which he again confessed to murdering Mullen and also: (1) admitted to having lied in court at Miller's July 2003 PCRA hearing and (2) stated that the shooting occurred when he attempted *(Footnote Continued Next Page)*

J-S33027-12

we cannot say that the PCRA court committed a clear abuse of discretion when it denied Miller relief based upon Williams' latest confession/recantation. **Markel**, **supra**.

Next, Miller claims that the trial court erred in not addressing the merits of his claim that the Commonwealth failed to inform him of the existence of allegedly exculpatory evidence, in the form of a statement given to police by Manigault, in violation of **Brady v. Maryland**, 373 U.S. 83 (1963) and **U.S. v. Bagley**, 473 U.S. 667 (1985).  Specifically, Miller claims that during an interview with police during the course of the original murder investigation, Manigault denied knowing anything about Mullen's murder. Miller claims Manigault's denial

> directly contradicted the statement Williams apparently gave [that Manigault was at the scene of the crime] and should have alerted detectives that Williams was lying about [Miller's] involvement in the homicide.  The [r]ecord of Manigault's interrogation is either exculpatory evidence or evidence that could have been used to cross-examine Williams and to corroborate his testimony at trial that he fabricated [Miller's] alleged confession.

Third Amended Petition for Post-Conviction Relief, 11/3/11, at ¶ 89.

**Brady** requires disclosure by the prosecution "of evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

*(Footnote Continued)* ──────────────

to rob Mullen, not when he was collecting a drug debt as he had previously stated.

- 20 -

J-S33027-12

prosecution." *Brady*, 373 U.S. at 87.   Subsequently, in *Bagley*, the Supreme Court held that the rule in *Brady* also applies to impeachment evidence, where the reliability of a given witness may be determinative of guilt or innocence. *See also Commonwealth v. Mitchell*, 839 A.2d 202, 216 (Pa. 2003) ("A violation of *Brady* occurs when the Commonwealth suppresses material evidence, favorable to the accused, and there is a reasonable probability [that] if the evidence had been disclosed the outcome of the trial would have been different.")

"Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove that the failure to previously raise these claims was the result of interference by government officials, and that the information could not have been obtained earlier with the exercise of due diligence." *Commonwealth v. Hawkins*, 953 A.2d 1248, 1253 (Pa. 2008).  Here, Miller became aware of Manigault's status as a possible exculpatory witness on July 18, 2011, when Williams spoke to Project Innocence staff members and told them that he may have confessed to Manigault while imprisoned together for robbery.  However, Williams has been known to Miller since prior to his trial – indeed, since childhood.  Moreover, Williams has been actively cooperating with Miller's efforts to exonerate himself since at least 2003.  Certainly, through the exercise of due diligence, Miller could have obtained information regarding

J-S33027-12

Manigault from Williams prior to 2011.[10]  As Miller failed to demonstrate due diligence in obtaining Manigault's statement, **see id.**, his governmental interference claim must fail.  Moreover, because this claim is meritless, Miller suffered no prejudice as a result of the PCRA court's failure to address it in its opinion.[11]

Finally, Miller claims that the trial court erred in failing to issue a Rule 907 notice of intent to dismiss before formally denying his PCRA petition(s) or to order amendment pursuant to Pa.R.Crim.P. 905.[12]  Specifically, the PCRA court issued a Rule 907 notice, in response to a *pro se* petition and amended petition filed by Miller, on July 18, 2011, indicating that Miller's petition would be dismissed as untimely.  Thereafter, Miller filed objections to the dismissal of his petition, and newly-retained counsel filed an additional amended petition, without leave of court.  Finally, on November 18, 2011, the PCRA court issued a memorandum and order dismissing

---

[10] Miller or his counsel need only have inquired of Williams:  "Is there anyone else to whom you confessed to shooting Mullen?"

[11] Because Miller did not demonstrate due diligence, we do not reach the question of whether Manigault's police interview was exculpatory in nature and, thus, **Brady** material.

[12] Miller's Rule 905 claim is patently meritless.  Although the PCRA court never formally authorized him to amend his petition, the court clearly considered the claims raised in both his *pro se* and counseled amended petitions and found them to be meritless.  Moreover, the court was under no obligation to authorize *further* amendments to allow Miller to, once again, attempt to raise yet more claims.

J-S33027-12

Miller's petition, in which it addressed the issues raised in Miller's amended petitions despite not having granted leave of court to file them. Because the PCRA court did not issue another Rule 907 order before dismissing Miller's petition(s), Miller argues that the order should be vacated. We disagree.

Our Supreme Court has previously declined the grant relief where an untimely PCRA petition was dismissed without the issuance of a notice of intent to dismiss. In ***Commonwealth v. Pursell***, 749 A.2d 911 (Pa. 2000), the appellant had filed a second, untimely PCRA petition in which he raised, *inter alia*, the after-discovered evidence and governmental interference exceptions to the time bar. The Court concluded that appellant's claims were all meritless and, as a result, his petition was properly dismissed as untimely. The Court then noted:

> We recognize the merit in Appellant's first claim that the trial court failed to comply with Pa.R.Crim.P. 1509[13] when it dismissed Appellant's petition without the requisite notice in advance. While we do not condone the trial court's error in this regard, we

---

[13] Rule 1509 is the predecessor to current Rule 909 and addresses the procedures applicable to the disposition of PCRA proceedings in which the defendant has been sentenced to death. The relevant portion of Rule 1509 is identical to that section of Rule 907 at issue here, which provides as follows: "If the judge is satisfied from [his or her] review [of the PCRA petition] that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal." Pa.R.Crim.P. 907(1).

J-S33027-12

> will not provide Appellant with relief on this issue as our independent review has determined that Appellant failed to invoke the jurisdiction of the trial court by failing to plead and prove the applicability of the timeliness exceptions contained in 42 Pa.C.S. § 9545(b)(1)(i) – (iii).

*Pursell*, 749 A.2d at 917 n.7.

Assuming, *arguendo*, that Miller was entitled to another notice of intent to dismiss following his unauthorized amendments, we conclude that the Supreme Court's rationale in *Pursell* is applicable here.   Miller filed untimely, serial petitions in which he failed to plead and prove the applicability of any of the exceptions to the time bar.   Accordingly, any error on the part of the PCRA court in failing to comply with Rule 907 was harmless.   *See also Commonwealth v. Davis*, 916 A.2d 1206, 1208 (Pa. Super. 2007) (where PCRA petition was untimely, PCRA court's failure to provide Rule 907 notice does not entitle petitioner to relief).

Order affirmed.

Judgment Entered.

Prothonotary

Date: 7/24/2012

- 24 -

# EXHIBIT Y

#1

"C"

Mary Wilt
905 Lower Creek Road
Milroy, PA 17063
717-667-1488

April 1, 2011

<u>Affidavit</u> for John Miller

RE: Mary Wilt conversation with Mike Arnold.

I spoke to Mike Arnold regarding his testimony in the John Miller case. To the best of my recollection, it was the last week of February between the 22-28. He told me the following:

① He was questioned by two men at his high school. He didn't know what they were talking about. He felt pressured, was scared, and just went along and agreed with them to get them to finish up and leave. Specifically, he stated that he didn't knowledge about any fight, didn't know anything about a gun, and he didn't know about the incident John Miller was accused of at all.

② The men appeared at his school and gave him a Supoena to come to the court trial the next day. He didn't understand why he was there. The statements they made to him in court were not what he remembered. His testimony was false.

Mary L. Wilt

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Clarence L. Scheffel Jr., Notary Public
Armagh Twp., Mifflin County
My Commission Expires Dec. 1, 2011
Member, Pennsylvania Association of Notaries

4/1/11

# EXHIBIT Z

J-S68038-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOHN MILLER | |
| Appellant | No. 3563 EDA 2014 |

Appeal from the PCRA Order November 13, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1010301-1997

BEFORE:  BENDER, P.J.E., DONOHUE, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                **FILED December 18, 2015**

Appellant, John Miller, appeals from the November 13, 2014 order dismissing, as untimely, his fourth petition for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we affirm.

The PCRA court set forth the facts and procedural history of this case as follows.

> On October 8, 1996, the decedent Anthony Mullen ("Mullen") was shot and killed in a parking lot adjacent to 30th Street Station [in Philadelphia].  The police recovered a 9 mm cartridge casing next to Mullen's body, as well as three .25-caliber cartridge casings on the opposite side of Mullen's automobile.  Furthermore, the police recovered a .25-caliber firearm underneath Mullen's body, with one round jammed in the chamber and four rounds in the magazine.  No other firearm was recovered from the scene.

J-S68038-15

On February 27, 1997, the police arrested David Williams ([David]) for robbery. On February 28, 1997, [David] was interviewed by Detective Michael Sharkey ("Sharkey"). During the interview, [David], a neighbor and lifelong acquaintance of [Appellant], told Sharkey that [Appellant] was responsible for Mullen's murder. On March 4, 1997, [David] was interviewed by Detective Jeffrey Piree ("Piree") of the Homicide Unit. During the interview, [David] stated that [Appellant] confessed to him that he killed Mullen during a robbery attempt. [David] further stated that [Appellant] told him he had obtained the murder weapon from a neighbor, Michael Arnold ("Arnold") and then threw the gun away after the murder. [David] stated that he then confirmed this information with Arnold and Arnold told him that [Appellant] confessed to him as well.

On June 23, 1997, Detective Richard Bova ("Bova") interviewed Arnold. During the interview, Arnold confirmed that [Appellant] had taken a gun from him in August 1996. Arnold stated that he retrieved the gun from his home after a fight erupted on the street outside[.] Arnold further stated that he then discarded the gun when the police arrived on the scene, and he saw [Appellant] pick the gun up. Arnold stated that the gun was either a silver automatic .380-caliber pistol or a 9 mm pistol. Arnold further stated that he spoke with [Appellant] on October 8, 1996, and [Appellant] confirmed at that time that he still possessed the gun.

On June 25, 1997, [Appellant] was arrested and charged with murder, robbery and related offenses. On October 30, 1997, during a preliminary hearing, [David] recanted the statement he had given to police. [David] claimed that, while the statement accurately reflected what he told the police, he had lied to the police because he and [Appellant] were not getting along at the time. From September 24, 1998 to September 29, 1998, a jury trial was held before the Honorable Judge John Poserina. At trial, [David] again recanted the statement he had given to police. [David] testified

J-S68038-15

that he did not give any information to the police and they had fabricated his statement. During their testimony, Sharkey and Piree refuted [David's] recantation. Furthermore, Arnold testified that [Appellant] had taken his gun, but stated that the gun did not work and he was unaware of its caliber. On September 29, 1998, the jury found [Appellant] guilty of second-degree murder, robbery and possession of an instrument of crime (PIC). On December 15, 1998, [Appellant] was sentenced to life imprisonment on the murder charge.

[Appellant] appealed the judgment of sentence to the Superior Court, which affirmed the sentence on December 15, 2000. [*Commonwealth v. Miller*, 769 A.2d 1207 (Pa. Super. 2000) (unpublished memorandum).] [Appellant] did not file a Petition for Allowance of Appeal with the Pennsylvania Supreme Court. On May 15, 2001, [Appellant] filed his first PCRA petition, alleging after-discovered evidence on the basis of statements by Clinton Bailey ("Bailey") and Terry Scruggs ("Scruggs") which implicated [David] in Mullen's murder. On August 5, 2002 and August 8, 2002, the PCRA court held an evidentiary hearing and received testimony from Bailey and Scruggs. On October 29, 2002, the PCRA court dismissed [Appellant's] petition after concluding that the testimony of Bailey and Scruggs was unbelievable.

On November 26, 2002, [Appellant] filed a Notice of Appeal to the Superior Court. On January 8, 2003, [Appellant] filed a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b) and attached to it a copy of a letter from [David] to [Appellant's] mother. In the letter, [David] claimed that he killed Mullen and falsely implicated [Appellant]. On April 16, 2003, [Appellant] filed an Application for Remand with the Superior Court for an evidentiary hearing regarding the letter. On May 21, 2003, the Superior Court granted [Appellant's] request for an evidentiary hearing, which was held on July 30, 2003. [David] testified at the hearing that he shot and killed Mullen in self-defense. [David] further

J-S68038-15

testified that he had known Mullen for several months prior to the murder, and had shot him while he was trying to recover money that he had loaned to Mullen a few days prior to the shooting. [David] also testified that the police had accurately recorded what he told them in his statement, but that he had lied to them. However, [David] testified incorrectly that Mullen was a short white male who was wearing a green jacket on the night of the shooting, and incorrectly identified the location of the shooting as occurring inside the parking garage adjacent to the station. In reality, Mullen was a tall, heavy-set, African-American male who was wearing a red jacket on the night of the shooting, and the shooting occurred near Mullen's van in an open air parking lot farther away from the station. At the conclusion of the hearing, the PCRA court stated that it believed [David] was lying under oath. The PCRA court then referred the case back to [the] Superior Court. On that same day, [David] was arrested for perjury based on the testimony he gave at the hearing. On February 26, 2004, [David] pled guilty to perjury and was sentenced to 1 to 3 years['] incarceration plus 4 years['] probation. On October 22, 2004, the Superior Court affirmed the PCRA court's dismissal of [Appellant's] petition. [***Commonwealth v. Miller***, 864 A.2d 581 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1198 (Pa. 2005).] On April 26, 2005, the Supreme Court of Pennsylvania denied [Appellant's] Petition for Allowance of Appeal. [***Id.***]

On October 6, 2005, [Appellant] filed a petition for *habeas corpus* in the United States District Court for the Eastern District of Pennsylvania. On January 30, 2007, the Honorable Judge Bruce Kauffman dismissed [Appellant's] petition without a hearing and ruled that no Certificate of Appealability should issue. On February 20, 2007, [Appellant] filed a Notice of Appeal and Application for Certificate of Appealability to the United States Court of Appeals for the Third Circuit. On July 27, 2007, the Honorable Judge Morton Greenberg denied [Appellant's] request for a Certificate of Appealability. On October 23, 2007, [Appellant] filed

- 4 -

a Petition for a Writ of Certiorari to the United States Supreme Court, which denied [Appellant's] petition on February 19, 2008. [*Miller v. Beard*, 552 U.S. 1205 (2008).]

On October 23, 2007, [Appellant] filed his second petition for relief pursuant to the PCRA. [Appellant] submitted with his petition an affidavit from fellow inmate Andre Monroe, who claimed to have witnessed [David] shoot and kill Mullen. On October 17, 2008, the PCRA court dismissed [Appellant's] petition without a hearing as untimely. [Appellant did not file a notice of appeal to the Superior Court.]

On April 19, 2011, [Appellant] filed a third petition for relief pursuant to the PCRA. [Appellant] attached to his petition another letter from [David] to his mother, in which [David] again declared that he killed Mullen and claimed that he incorrectly identified Mullen as a white male due to panic while on the witness stand. On June 6, 2011, [Appellant] amended his petition to include an affidavit from Arnold, in which Arnold recanted his pretrial statement to police and his testimony at trial. On July 18, 2011, the PCRA court sent [Appellant] a [Pennsylvania Rule of Criminal Procedure] 907 notice, indicating that his petition would be dismissed as untimely. On August 4, 2011, [Appellant] filed a response to the [Rule] 907 notice.

On August 5, 2011, new counsel entered an appearance on behalf of [Appellant]. On November 3, 2011, defense counsel filed an amended petition, alleging after-discovered evidence and governmental interference as exceptions to the time-bar. Defense counsel attached to the amended petition a statement from Mark Manigault ("Manigault"). In the statement, Manigault claimed that he shared a cell with [David] in February 1997 and [David] told him that he was going to pin a murder that he committed on someone else in order to get out of jail. Manigault further claimed that he was interviewed by police about Mullen's murder, but told the police that

- 5 -

J-S68038-15

he knew nothing.  Defense counsel argued that the police failed to disclose this alleged evidence to [Appellant] prior to trial and that it would have changed the outcome of [Appellant's] trial.  On November 18, 2011, the PCRA court dismissed [Appellant's] petition as untimely.  On November 28, 2011, defense counsel filed a motion for reconsideration.  On December 13, 2011, the PCRA court denied [Appellant's] motion.  On December 15, 2011, [Appellant] filed a Notice of Appeal to the Superior Court.  On February 13, 2012, [Appellant] filed a second petition for *habeas corpus* in federal court.  [That petition remains pending in the United States District Court for the Eastern District of Pennsylvania.]  On March 9, 2012, [Appellant] filed an Application for Remand with the Superior Court for an evidentiary hearing regarding evidence which is now the subject of his current PCRA petition.  On March 28, 2012, the Superior Court denied [Appellant's] Application for Remand.  On July 24, 2012, the Superior Court affirmed the denial of [Appellant's] PCRA petition.  [***Commonwealth v. Miller***, 55 A.3d 145 (Pa. Super. 2012) (unpublished memorandum).  Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.]

On September 20, 2012, [Appellant] filed a fourth petition for relief pursuant to the PCRA, invoking the after-discovered evidence and governmental interference exceptions to the time-bar.  In the instant petition, [Appellant] alleges that, on the same day [David] gave his statement to the police implicating [Appellant] in Mullen's murder, [David] also gave a statement to the police which implicated Jack Williams ("Jack") in an unrelated murder.  [Appellant] claims that [David] fabricated this statement to the police as well, and later told Jack that he purposefully included false information in the statement.  [Appellant] further claims that [David] fabricated the statement against [Appellant] as well as the statement against Jack in order to receive leniency on his own pending charges.  Jack was subsequently found guilty of first-degree murder

- 6 -

J-S68038-15

at trial. Four witnesses testified for the Commonwealth at Jack's trial, although [David] was not called to testify. [Appellant] alleges that he first learned about this other statement [David] gave during a phone call between defense counsel and [David] on April 27, 2012. [Appellant] argues that the Commonwealth failed to disclose to the defense that [David] had given an allegedly false statement to the police concerning a separate homicide on the same day that he gave his statement to police implicating [Appellant] in Mullen's murder. [Appellant] further argues that, had the jury known about this second statement, the outcome at trial would have been different. Furthermore, [Appellant] claims that Arnold again recanted the statement he gave to police and the testimony he gave at trial.

On September 4, 2013, the Commonwealth filed a motion to dismiss [Appellant's] PCRA petition. On October 11, 2013, [Appellant] filed a response to the Commonwealth's motion to dismiss. On October 17, 2014, [the PCRA court] sent [Appellant] a notice pursuant to Rule 907, indicating that his petition would be dismissed because the issues raised in the petition were without merit. [Appellant] did not file a response to the [Rule] 907 notice. On November 13, 2014, after independent review of [Appellant's] *pro se* petition, defense counsel's amended petition, the Commonwealth's motion to dismiss, and [Appellant's] response to the Commonwealth's motion to dismiss, [the PCRA court] dismissed the petition based upon a lack of merit. On November 21, 2014, [Appellant], through counsel, filed a Notice of Appeal to the Superior Court.[1]

PCRA Court Opinion, 1/30/15, at 1-7 (footnote omitted).

---

[1] The PCRA court did not direct Appellant to file a Pennsylvania Rule of Appellate Procedure 1925(b) statement of matters complained of on appeal. The PCRA court authored a Rule 1925(a) opinion on January 30, 2015.

- 7 -

J-S68038-15

On appeal, Appellant presents the four following issues for our review, which we have reordered for purposes of our discussion.

> 1.   Whether the PCRA court erred in dismissing Mr. Miller's PCRA [p]etition as untimely.
>
> [2].   Whether the PCRA court erred in finding that [Appellant's] claim that governmental interference in the form of failure to disclose the existence of exculpatory evidence was not a denial of due process under the Pennsylvania Constitution and the United States Constitution as construed by the United States Supreme Court in **Brady v. Maryland**, 373 U.S. 83 (1963) and **Commonwealth v. Watkins**, 108 A.3d 692 (Pa. 2014).
>
> [3].   Whether the PCRA court erred in failing to hold an evidentiary hearing to allow [Appellant] to demonstrate the court's jurisdiction and to establish his claim.
>
> 4.   Whether the PCRA court erred in denying [Appellant's] freestanding claim of actual innocence pursuant to the Pennsylvania and United States Constitutions.

Appellant's Brief at 4.

We begin by noting our well-settled standard of review.  "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Fears**, 86 A.3d 795, 803 (Pa. 2014) (internal quotation marks and citation omitted).  "The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level."  **Commonwealth v. Spotz**, 84 A.3d 294, 311 (Pa. 2014) (citation omitted).  "It is well-settled

- 8 -

J-S68038-15

that a PCRA court's credibility determinations are binding upon an appellate court so long as they are supported by the record." ***Commonwealth v. Robinson***, 82 A.3d 998, 1013 (Pa. 2013) (citation omitted).  However, this Court reviews the PCRA court's legal conclusions *de novo*. ***Commonwealth v. Rigg***, 84 A.3d 1080, 1084 (Pa. Super. 2014) (citation omitted).

As Appellant's first and second issues on appeal both raise exceptions to the PCRA time-bar, we address them together.  Therein, Appellant contends that the PCRA court erred in dismissing his petition as untimely. The timeliness of Appellant's PCRA petition implicates the jurisdiction of this Court and the PCRA court.  ***Commonwealth v. Davis***, 86 A.3d 883, 887 (Pa. Super. 2014) (citation omitted).  Pennsylvania law is clear that when "a PCRA petition is untimely, neither this Court nor the trial court has jurisdiction over the petition." ***Commonwealth v. Seskey***, 86 A.3d 237, 241 (Pa. Super. 2014) (citation omitted), *appeal denied*, 101 A.3d 103 (Pa. 2014).  The "period for filing a PCRA petition is not subject to the doctrine of equitable tolling; instead, the time for filing a PCRA petition can be extended only if the PCRA permits it to be extended[.]" ***Commonwealth v. Ali***, 86 A.3d 173, 177 (Pa. 2014) (internal quotation marks and citation omitted), *cert. denied*, ***Ali v. Pennsylvania***, 135 S. Ct. 707 (2014).  This is to "accord finality to the collateral review process." ***Commonwealth v. Watts***, 23 A.3d 980, 983 (Pa. 2011) (citation omitted).  "However, an untimely petition may be received when the petition alleges, and the petitioner proves, that

- 9 -

J-S68038-15

any of the three limited exceptions to the time for filing the petition, set forth at 42 Pa.C.S.A. § 9545(b)(1)(i), (ii), and (iii), are met." **Commonwealth v. Lawson**, 90 A.3d 1, 5 (Pa. Super. 2014) (citation omitted). Section 9545 sets forth the three exceptions to the PCRA time-bar as follows.

### § 9545. Jurisdiction and proceedings

...

(b) Time for filing petition.—

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

- 10 -

J-S68038-15

...

42 Pa.C.S.A. § 9545(b)(1).  A PCRA petition invoking one of these time-bar exceptions must "be filed within 60 days of the date the claim could have been presented."  *Id.* § 9545(b)(2).  "A petitioner fails to satisfy the 60-day requirement of Section 9545(b) if he or she fails to explain why, with the exercise of due diligence, the claim could not have been filed earlier." *Commonwealth v. Marshall*, 947 A.2d 714, 720 (Pa. 2008).

Herein, Appellant was sentenced on December 15, 1998.  This Court affirmed his judgment of sentence on December 29, 2000, and Appellant did not file a petition for *allocator* with our Supreme Court.  As a result, Appellant's judgment of sentence became final on January 29, 2001, when the time for Appellant to file such a petition expired.[2]  *See id.* § 9545(b)(3) (stating, "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review[]"); Pa.R.A.P. 1113 (declaring an appeal to our Supreme Court must be filed within 30 days of an order of this Court).   Accordingly, Appellant had until January 29, 2002 to file a timely PCRA petition.  *See* 42

---

[2] We note that the 30th day following this Court's decision fell on Sunday, January 28, 2001. As such, the last day Appellant could have filed a petition for *allocator* was Monday, January 29, 2001.  *See* 1 Pa.C.S.A. § 1908 (providing that when the last day of a calculated period of time falls on a Saturday or Sunday, such days shall be omitted from the computation).

Pa.C.S.A. § 9545(b)(1) (providing that a PCRA petition must be filed within one year of the judgment of sentence becoming final to be considered timely).    Therefore, Appellant's current petition, his fourth, filed on September 20, 2012, was facially untimely. *See id.*

Appellant argues, however, that the PCRA court erred in dismissing his petition because the "newly discovered fact" and the "governmental interference" exceptions to the time-bar enumerated in Section 9545 apply in this case. Appellant's Brief at 22. We will discuss each exception in turn.

Appellant's PCRA petition raised two facts that he claimed were newly discovered. *Id.* at 23. First, like his prior PCRA petition, Appellant again presented his overarching claim that David's initial statement to police implicating Appellant was false. The "newly discovered fact" Appellant relied on in his latest PCRA petition to discredit David was that David gave a separate statement to police, implicating Jack in an unrelated homicide case, hours before David provided the statement accusing Appellant of Mullen's homicide. *Id.* at 23-24. According to Appellant, David later told Jack that he had made a false statement inculpating Jack in exchange for leniency in his robbery case. *Id.* at 24. Appellant argues that this constituted a newly discovered fact that he could not have previously discovered through due diligence, which meets the exception to the time-bar in Section 9545(b)(1)(ii). Moreover, Appellant's PCRA petition pled a second allegedly newly discovered fact, which was that Arnold supplied a supplemental

- 12 -

J-S68038-15

recantation in greater detail than the repudiation that was one of the grounds for Appellant's prior PCRA petition. *Id.* at 29-31. For the following reasons, we conclude that neither of the ultimate facts that Appellant asserted meets the time-bar exception because they were not newly discovered.

Our Supreme Court has explained that the newly discovered fact exception in Section 9545(b)(1)(ii) "requires petitioner to allege and prove that there were 'facts' that were 'unknown' to him" and that he could not have ascertained those facts by the exercise of "due diligence." *Commonwealth v. Bennett*, 930 A.2d 1264, 1270-1272 (Pa. 2007). A PCRA petitioner cannot meet this exception by introducing a new source of a previously known fact. *Marshall*, *supra*.

Herein, Appellant's PCRA petition pled new sources of two previously known facts.[3] First, Appellant attempted to show, yet again, that David falsely accused him of Mullen's murder. He sought to do so in this PCRA

_____

[3] Appellant claimed he discovered both sources while the appeal of his third PCRA petition was pending with this Court. Specifically, on March 18, 2012, Arnold signed a written certification admitting that he falsely accused Appellant of taking Arnold's discarded handgun. Appellant's Brief at 29. Moreover, on April 27, 2012, David disclosed to Appellant's counsel that he made the false statement implicating Jack. *Id.* at 28. Then, on June 1, 2012, Appellant's counsel obtained Jack's discovery packet. *Id.* Thereafter, on July 27, 2012, this Court decided Appellant's appeal of his third PCRA petition, affirming the PCRA court's dismissal of the petition. On September 20, 2012, Appellant filed the instant PCRA petition, his fourth, which was within 60 days of this Court's decision. Appellant claims this satisfies the 60-day requirement of Section 9545(b)(2). *Id.* at 29.

J-S68038-15

petition by introducing a new source in the form of David's allegedly false statement to police accusing Jack of a separate homicide while David was in custody on robbery charges. David's statement accusing Jack, however, is simply Appellant's latest means to discredit David's statement implicating him in Mullen's murder. Appellant has known the ultimate fact that David falsely accused Appellant of Mullen's homicide since his preliminary hearing in October 1997. A prior panel of this Court, in affirming the dismissal of Appellant's third PCRA petition, detailed David's various recantations of his statement as follows.

> On March 4, 1997, [David] signed a statement that [Appellant] had confessed to him that he murdered Mullen in a botched robbery attempt. Thereafter, at [Appellant's] October 30, 1997 preliminary hearing, [David] testified that his signed statement had accurately reflected what he had told police, but not what actually happened. Subsequently, at trial, [David] testified that the detectives had actually made up "ninety percent" of his statement themselves. Then, in an undated letter written to [Appellant's] mother sometime in the fall of 2002 and submitted to the PCRA court on January 3, 2003, [David] confessed to having killed Mullen *himself* and stated that [Appellant] had no knowledge of the crime. [David] stated that the shooting occurred when he went to the parking lot to collect drug money owed to him by Mullen. At a subsequent PCRA hearing in July 2003, [David] again confessed to Mullen's murder and testified, under oath, that Mullen was a white male wearing a green jacket. In fact, Mullen was a black male wearing a red jacket. Finally, on March 19, 2011, [David] sent another letter to [Appellant's] mother in which he again confessed to murdering Mullen and also: (1) admitted to having lied in court at [Appellant's] July 2003 PCRA hearing and (2) stated that the shooting

- 14 -

J-S68038-15

> occurred when he attempted to rob Mullen, not when
> he was collecting a drug debt as he had previously
> stated.

*Commonwealth v. Miller*, 55 A.3d 145 (Pa. Super. 2012) (unpublished

memorandum at 19 n.9) (citation omitted; emphasis in original).

Based on the foregoing, we conclude Appellant previously knew the

"fact" that David falsely accused Appellant of Mullen's murder and David's

statement implicating Jack is merely a new source of that previously known

fact, which does not satisfy the time-bar. *See Marshall*, *supra*.

Accordingly, the PCRA court did not abuse its discretion or err as a matter of

law in dismissing Appellant's petition as untimely. *See Fears*, *supra*.

Similarly, Appellant asserts that Arnold's latest, most detailed

recantation is a newly discovered fact capable of overcoming the time-bar.

Appellant's Brief at 29 (stating Arnold's latest recantation "describes Arnold's

motivations to provide false information against [Appellant]"). Arnold,

however, recanted his initial statement to police both at Appellant's trial and

in a 2011 statement. In the 2011 statement to Appellant's counsel, Arnold

claimed that he fabricated his original statement to police to eliminate

Appellant as his competitor in the local drug trafficking market. The 2011

statement was one of the grounds that Appellant cited in his third PCRA

petition. Here, because Arnold's third and most recent recantation is merely

a more detailed version of a fact previously known to Appellant, and litigated

in Appellant's third PCRA, it cannot overcome the time-bar. *See Marshall*,

- 15 -

J-S68038-15

*supra*.  Accordingly, the PCRA court did not abuse its discretion or commit an error of law by concluding Appellant did not plead or prove the newly discovered fact exception to the PCRA time-bar.  *See Fears*, *supra*.

Alternatively, in an attempt to invoke the governmental interference exception to the time-bar at Section 9545(b)(1)(i), Appellant contends that the Commonwealth was aware of David's false statement implicating Jack, but did not disclose it to him in discovery in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  Appellant's Brief at 35.

Our Supreme Court has explained the interaction between *Brady* and the governmental interference exception to the PCRA time-bar as follows.

> Although a *Brady* violation might fall within the "governmental interference" exception, § 9545(b)(1)(i) nonetheless requires a petitioner to plead and prove: (1) the failure to previously raise the claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence.  The merits of a *Brady* claim need not be addressed until it is established that the instant petition was timely filed.

*Commonwealth v. Williams*, 105 A.3d 1234, 1240 (Pa. 2014) (citations omitted), *cert. granted*, *Williams v. Pennsylvania*, 136 S. Ct. 28 (2015).  Accordingly, we must determine whether the Commonwealth interfered with Appellant's ability to raise the claim that David's statement was false and whether Appellant could have uncovered David's statement about Jack through due diligence.  *Id.*

- 16 -

J-S68038-15

In concluding Appellant did not exercise due diligence, the PCRA court reasoned as follows.

> [A]s the Superior Court noted in its prior dismissal of [Appellant's] third PCRA petition, [Appellant] had known [David] since childhood and [David] had been actively cooperating with [Appellant's] efforts to exonerate himself since at least 2003. In holding that [Appellant] had not exercised due diligence in obtaining Manigault's statement, the Superior Court stated that [Appellant] could have simply asked [David] if he confessed to anyone else about shooting Mullen. Likewise, here, [Appellant] or [] counsel earlier could have obtained information about the other statement [David] gave by asking [David] an equally simple question as to what occurred while he was in police custody on the day he gave the statement. Certainly, the circumstances under which a witness gives a statement while in police custody are commonly inquired into by defense counsel in order to determine a possible basis to impeach that statement. Thus, [Appellant] has failed to demonstrate that he exercised due diligence in obtaining the evidence of [David's] other statement upon which this fourth PCRA petition is based.

PCRA Court Opinion, 1/30/15, at 11. We discern no abuse of discretion or error of law in the PCRA court's finding that Appellant did not exhibit due diligence in obtaining David's statement about Jack. **See Williams**, **supra**. We emphasize that David had recanted his statement since Appellant's preliminary hearing and had been actively assisting Appellant in his post-conviction proceedings since at least 2003. Because of David's cooperation, we conclude that Appellant could have ascertained David's statement about Jack through the exercise of due diligence. Accordingly, Appellant cannot

- 17 -

J-S68038-15

meet the governmental interference exception to the PCRA time-bar. *See id.* Moreover, because Appellant's petition is untimely, we need not address the merits of the alleged *Brady* violation. *See id.* Therefore, we conclude Appellant's first two issues on appeal are meritless because his untimely PCRA petition failed to meet either the newly discovered fact or the governmental interference exception to the time-bar, and the PCRA court did not abuse its discretion or err as a matter of law in dismissing the petition as untimely. *See Fears*, *supra*.

In his third issue on appeal, Appellant argues that the PCRA court erred by denying him a hearing on his petition before dismissing it as untimely. Appellant's Brief at 32. We note that there is no absolute right to an evidentiary hearing in a post-conviction proceeding; instead, the trial court may forego a hearing when confronted with a frivolous claim. *Commonwealth v. Wah*, 42 A.3d 335, 338 (Pa. Super. 2012). We review a PCRA court's decision to dismiss without a hearing for an abuse of discretion. *Id.* Herein, the PCRA court explained that it dismissed Appellant's PCRA petition without a hearing because it found that Appellant's claims were without merit. PCRA Court Opinion, 1/30/15, at 13. We conclude the PCRA court's dismissal without a hearing was not an abuse of its discretion because Appellant's attempts to satisfy the time-bar exceptions were frivolous. *See Wah*, *supra*. Therefore, Appellant's third issue on appeal is meritless.

- 18 -

J-S68038-15

In his fourth issue, Appellant contends the PCRA court erred in rejecting his "independent claim of actual innocence." Appellant's Brief at 39. Appellant asserts that the PCRA court erred because his actual innocence claim is a freestanding claim, citing federal *habeas corpus* precedent. *Id.* at 39-40. Our Supreme Court, however, has specifically rejected this argument. *See Commonwealth v. Abu-Jamal*, 833 A.2d 719, 738 (Pa. 2003) (explaining that a claim of actual innocence is cognizable under the PCRA and subject to the time-bar), *cert. denied*, *Abu-Jamal v. Pennsylvania*, 541 U.S. 1048 (2004). As Appellant's claim is cognizable under the PCRA, and we have concluded Appellant's petition is untimely, we are without jurisdiction to reach the merits of his actual innocence claim. *See id.* Accordingly, Appellant's fourth issue on appeal does not warrant relief.

Based on the foregoing, we conclude that the PCRA court did not abuse its discretion or commit an error of law in finding Appellant's serial PCRA petition untimely and dismissing it without a hearing.[4] *See Fears*, *supra*. Accordingly, we affirm the PCRA court's November 13, 2014 order.

---

[4] While the Commonwealth's brief addresses the timeliness issue, we do not consider the brief. After we granted two extensions to the Commonwealth, its brief was due on or before August 26, 2015, with no further extensions granted. The Commonwealth, however, did not file its brief until September 29, 2015; thus, it was not timely filed. On October 16, 2015, Appellant objected to the untimeliness of the brief. Accordingly, we grant Appellant's motion to strike and disregard the Commonwealth's brief.

J-S68038-15

Order affirmed.

Judge Donohue joins the memorandum.

President Judge Emeritus Bender files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/18/2015</u>

# EXHIBIT AA

J-S68038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN MILLER, | |
| Appellant | No. 3563 EDA 2014 |

Appeal from the PCRA Order November 13, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-1010301-1997

BEFORE:  BENDER, P.J.E., DONOHUE, J., and MUNDY, J.

CONCURRING AND DISSENTING MEMORANDUM BY BENDER, P.J.E.:

**FILED December 18, 2015**

I cannot agree with the Majority when it concludes that Appellant cannot avail himself of either the "newly discovered fact" and/or "governmental interference" exceptions to overcome the time-bar enumerated in the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9545(b)(1), with regard to new evidence concerning David Williams' ("David") statement to police falsely implicating Jack Williams ("Jack") in an unrelated homicide, which occurred within hours of David's implicating Appellant in the murder of Anthony Mullen ("Mullen").  Accordingly, I respectfully dissent in part, and concur in part.

Appellant was convicted in 1998 of murdering Mullen in 1996, based on his purported confession to David, and information received from Michael

J-S68038-15

Arnold ("Arnold") concerning the alleged murder weapon.[1]   At Appellant's trial, David fully recanted his statement to police implicating Appellant. Arnold partially recanted his prior statement, testifying at trial that he did not know the caliber of the firearm in question, and that it was inoperable when it came into Appellant's possession.   Nevertheless, the jury disbelieved the recantations, and convicted Appellant of second-degree murder and related offenses.     Subsequently, David has repeatedly recanted the statement he initially made to police implicating Appellant; indeed, David maintains that he murdered Mullen, and had framed Appellant for the killing. Arnold has also now fully recanted.[2]   These recantations were the primary basis for Appellant's previous, unsuccessful PCRA petitions.   The impetus for Appellant's current PCRA petition, his fourth, is new information concerning David's statement to police falsely implicating Jack in an unrelated homicide,[3] and a new iteration of Arnold's previous recantations.   David's

---

[1] The murder weapon was never recovered by the police.  However, Arnold's initial statement to the police indicated that Appellant had come into possession of Arnold's weapon, possibly a 9mm pistol, when Arnold had abandoned that weapon when approached by police two months' prior to Mullen's murder.   The Commonwealth's evidence revealed that 9mm cartridge casings were found near Mullen's body.

[2] Arnold wrote a letter in 2011 claiming that he had lied at Appellant's trial. Arnold subsequently composed an affidavit corroborating his statements in that letter.

[3] Relatedly, Appellant also contends that "David later told Jack that he had made a false statement inculpating Jack in exchange for leniency in his robbery case." Majority Opinion, at 12 (citing Appellant's Brief, at 24).

- 2 -

J-S68038-15

statement regarding Jack was given to police on the same day that David implicated Appellant for the murder of Mullen and, thus, it tends to corroborate David's and Arnold's recantations.

Appellant believes, reasonably, that if the jury was aware that David has falsely implicated another person in an unrelated murder within hours of implicating Appellant, they would have been more inclined to believe David's recantation and disbelieve his initial statement to police.  He makes similar claims with regard to Arnold's new recantation.

As the Majority correctly acknowledges, Appellant's current PCRA petition, his fourth, is facially untimely.   Under the PCRA, all petitions seeking collateral relief must be filed within one year of the date the judgment of sentence becomes final.   ***Commonwealth v. Bennett***, 930 A.2d 1264, 1267 (Pa. 2007).   There are three statutory exceptions to this time-bar:

**(b) Time for filing petition.--**

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

J-S68038-15

>  (iii) the right asserted is a constitutional right that was
>  recognized by the Supreme Court of the United States or
>  the Supreme Court of Pennsylvania after the time period
>  provided in this section and has been held by that court to
>  apply retroactively.

42 Pa.C.S. § 9545(b). Additionally, any petition attempting to invoke one of these exceptions "shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

Appellant avers that his claim regarding David's false accusation implicating Jack meets both the "newly discovered fact" and "governmental interference" exceptions set forth in sections 9545(b)(1)(ii) and 9545(b)(1)(i), respectively. With regard to Arnold's new recantation evidence, Appellant invokes only the "newly discovered fact" exception. As to this latter issue, I concur with Majority that the PCRA court's dismissal of this claim without a hearing was free of legal error and supported by the record. Thus, my dissent is confined to the issues related to David's falsely accusing Jack of committing an unrelated homicide on the same day that David first implicated Appellant in Mullen's murder.

First, with respect to the "newly discovered fact" exception, the Majority echoes the ruling of the PCRA court, construing Appellant's "newly discovered fact" as merely a "new source of a previously known fact." Majority Opinion, at 13; *see Commonwealth v. Johnson*, 863 A.2d 423, 427 (Pa. 2004) ("The after-discovered evidence exception, however, focuses on newly discovered *facts*, not on a newly discovered or a newly willing source for previously known facts.") (emphasis in original), *abrogation on*

- 4 -

J-S68038-15

*different grounds recognized by **Commonwealth v. Bennett***, 930 A.2d 1264 (Pa. 2007). I disagree with the application of this principle to the facts before us. The Majority conflates or confuses a new fact—David's false accusation regarding Jack—with the defense theory that David falsely implicated Appellant in the murder of Mullen. Even if one construes that defense theory as a fact, it is patently not the same fact as David's false statement regarding a different person and a different murder.[4] Thus, I would not have affirmed the PCRA court's dismissal of this issue, and would have instead moved on to consider the due diligence prong of the "newly discovered fact" exception. As discussed below, I believe that resolution of that prong requires that we remand for a hearing.

Second, regarding the "government interference" exception, the Majority relies squarely on the PCRA's court's reasoning for denying

---

[4] The Majority apparently disregards this distinction by invoking the notion that the "ultimate fact" at issue is David's false accusation of Appellant, and that the new fact regarding David's false accusation of Jack merely serves to reinforce or corroborate that "ultimate fact." Majority Opinion, at 14 ("Appellant has known the ultimate fact that David falsely accused Appellant of Mullen's homicide since his preliminary hearing in October [of] 1997."). I believe, however, that this over-generalization puts our interpretation and application of the "newly discovered fact" exception on a slippery slope towards oblivion. One might also construe Appellant's 'non-guilt' as the "ultimate fact" and, thus, render any new evidence challenging that ultimate fact as merely 'new sources of a previously known fact.' Thus, while we should endeavor to not permit trivial modifications of previously known facts to trigger the "newly discovered fact" exception of the PCRA's time-bar, we must also avoid over-generalizing so as to effectively preclude any new evidence from meeting the exception. Instantly, I believe the Majority treads too deeply into the latter camp.

- 5 -

J-S68038-15

Appellant's claim without a hearing, which essentially posits that Appellant could have simply asked pertinent questions of David to discover his false accusation regarding Jack at an earlier time.   PCRA Court Opinion (PCO), 1/30/15, at 11.   The PCRA court apparently believes that such questioning should have or could have occurred earlier because Appellant "had known [David] since childhood and [David] had been actively cooperating with [Appellant's] efforts to exonerate himself since at least 2003." *Id.*

I view this as little more than speculation.   The PCRA court fails to explain how it could come to this fact-intensive conclusion without the benefit of a hearing.   Certainly, it may be that David and Appellant knew each other since childhood.   And it is apparent that David assisted in Appellant's previous attempts for PCRA relief, as he testified on Appellant's behalf at prior PCRA hearings.   However, Appellant believes that David murdered Mullen and then falsely accused him of that murder.   One might reasonably doubt that the nature of their relationship is amicable in the way intimated by the PCRA court, regardless of David's prior assistance.   Indeed, as Appellant argues: "[Appellant] is incarcerated.   He had no ability to speak to [David], let alone force him to come forward with information before [David] himself decided that he was ready."   Appellant's Brief, at 26.   These conflicting narratives should have been resolved at an evidentiary hearing.

Regardless of these factual discrepancies, I would reject the PCRA court's legal conclusion as it stands.   Due diligence analysis must be "fact-specific, to be determined case-by-case; it does not require perfect vigilance

- 6 -

J-S68038-15

and punctilious care, but merely a showing that the [party] has put forth a reasonable effort." ***Commonwealth v. Selenski***, 994 A.2d 1083, 1089 (Pa. 2010). I do not believe that the PCRA court's legal analysis or the factual record adequately supports a finding that Appellant failed to act with due diligence.

It is only through the clarity of hindsight that one can conceive of simple, pertinent questions which might have extracted the new fact from David at an earlier time. If one already knows the answer sought, then the appropriate question(s) to elicit that answer easily come to mind. However, when the fact—or even the nature of that fact—is not known beforehand, then the pertinent questions are not so "easily obtained." PCO, at 11.

Moreover, whether David would have answered honestly at a prior time is unknown. If one thing is clear from the long history of this case, David has not been the most truthful of witnesses. However, even had he been inclined to answer honestly in the past, it is not at all clear that, as the PCRA court speculates, 'simple' questions regarding his interactions with authorities would have spurred him to reveal his accusations regarding Jack. David might have thought that his false statement to police regarding a different person and a different crime were wholly unrelated to Appellant's case. While we might expect an attorney to recognize the relevance of that information, I am reluctant to presume it of a layperson. Again, perfect hindsight about the potential information available from David tends to inflate our perception of what was probable or likely to have been revealed

- 7 -

J-S68038-15

beforehand.  Indeed, for all we know, David may have failed to answer the most direct and on-point questions likely to elicit the pertinent information long before this newly discovered information ultimately came to light.

I believe the PCRA court's due diligence analysis is erroneous and not adequately supported by the record.  Accordingly, I would remand this matter for a hearing to determine if Appellant acted with due diligence for purposes of resolving whether he can satisfy either the "newly discovered fact" and/or "government interference" exception to the PCRA's time bar.

I respectfully dissent.

# EXHIBIT BB

## AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA          :
                                      :          ss
COUNTY OF PHILADELPHIA                 :

I, LEON WILLIAMS, being duly sworn according to law, state that:

1.  I am an adult individual maintaining a work address at 327 S. 13th Street, Philadelphia, PA 19107.

2.  My date of birth is August 7, 1948.

3.  I am an attorney licensed by the Commonwealth of Pennsylvania and in good standing.

4.  I represented John Miller in his criminal trial in September 1998 for the homicide of Anthony Mullen and related charges.

5.  At no time prior to or during Mr. Miller's trial was I ever aware of Mark Manigault's identity or that Philadelphia police officers or detectives questioned Mr. Manigault in connection with Mr. Mullen's murder, and at no time did I ever receive any information, documents or other materials regarding Mr. Manigault.

6.  If I had known Mr. Manigault's identity and that he was questioned in connection with Mr. Mullen's murder, I would have considered this information and documentation in formulating and implementing my defense of Mr. Miller prior to and during his trial.

7.   The facts set forth in this affidavit are true and correct to the best of my

knowledge, information and belief.

_____
Leon Williams

Sworn to and Subscribed
Before me this _26_ day of
October, 2011.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JOHN D. LIBERT, Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 7, 2014