**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN MILLER | : | CIVIL ACTION |
| Petitioner | | |
| | | |
| v. | : | |
| | | |
| JOHN KERESTES, et al. | : | NO. 12-00742 |
| Respondents | | |

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

R. SETH WILLIAMS, District Attorney of Philadelphia County, by his assistants, SUSAN E. AFFRONTI, Chief, Federal Litigation Unit, and MAX C. KAUFMAN, Assistant Chief, Federal Litigation Unit, on behalf of respondents, respectfully requests that the petition for a writ of habeas corpus be dismissed without a hearing and with prejudice, and in support thereof submits the following response.

### INTRODUCTION

More than two decades ago, petitioner shot and killed Anthony Mullen during a robbery. A jury convicted petitioner of second-degree murder and related offenses, and he was sentenced to a mandatory term of life imprisonment. In the many years since, petitioner's case has been the subject of a direct appeal, four separate rounds of state postconviction review, three state postconviction evidentiary hearings, and a prior round of federal habeas review. Every court to consider the case has denied relief, and for good reason. Petitioner had a fair trial free of constitutional error, and he is not actually innocent.

In his latest effort to undo his proper and exhaustively reviewed convictions, petitioner has filed a second petition for federal habeas relief raising four claims.

1

However, he has not satisfied the statutory requirements for filing a second habeas petition. In any case, his claims do not entitle him to relief. Two of the claims, his claim of error on state postconviction review and his freestanding claim of actual innocence, are not even cognizable on federal habeas review. His other two claims, alleging violations of Brady v. Maryland, 373 U.S. 83 (1963), are untimely under the federal habeas statute's one-year filing deadline, and are also procedurally defaulted because they were not timely raised under state law. Moreover, all four claims are devoid of merit. No relief is due.

## FACTS AND PROCEDURAL HISTORY

On October 8, 1996, at approximately 11:15 p.m., the victim, Anthony Mullen, arrived at his job as a parking attendant at the Five Star Parking lot at 30th Street Station in Philadelphia. The parking facility was a large, open-air lot with one cashier's booth. The victim would generally sit in his own van at the lot rather than in the cashier's booth. He would go to the booth only when someone was leaving the lot (N.T. 09/24/98, 26-28, 30, 42).

At approximately 11:37 p.m., Amtrak police received a report that the attendant at the parking lot appeared to be dead. The Amtrak police arrived at the lot three minutes later and observed the victim's dead body. He had a single gunshot wound to his chest. A bullet had entered the left side of his chest, pierced his heart, and then exited his body (N.T. 09/24/98, 40, 43, 180-181).

The victim's dead body was on the ground approximately twenty feet from his van. The driver's side door to the van was open. Underneath the victim's body was a .25 caliber handgun. The gun belonged to the victim, who started carrying it after being

robbed at the parking lot.  Three .25 caliber fired cartridge casings and one fired .25 caliber bullet were recovered from the parking lot (N.T. 09/24/98, 52, 54, 57-60, 64-65; N.T. 09/25/98, 66, 71-73, 84-86).

In addition, there was a 9 millimeter fired cartridge casing on the ground approximately three feet from the victim's van.  There was also a 9 millimeter fired bullet inside the van on the driver's side floor.  The condition of this fired 9 millimeter bullet showed that it had definitely struck something.  Neither the 9 millimeter fired cartridge casing nor the 9 millimeter bullet could have been fired from the victim's .25 caliber gun. (N.T. 09/24/98, 56-57, 68; N.T. 09/25/98, 55, 70-71, 74-75).

No money was missing from the cash register inside the cashier's booth at the parking lot.  There was also money in the victim's pocket (N.T. 09/24/98, 30, 138).

Two days after the murder, petitioner spoke with David Williams at the intersection of 56th Street and Beaumont Avenue in Philadelphia.  David Williams grew up with petitioner, lived in the same neighborhood he did, had known him his whole life, and was himself involved in criminal activity.  Petitioner confessed to David Williams that he murdered the victim (N.T. 09/24/98, 71-73, 123-127, 158-159).

After speaking with petitioner, David Williams spoke with Mike Arnold.  Arnold also lived in the same neighborhood as petitioner and David Williams, and had known both men for years.  Arnold told David Williams that he lent a 9 millimeter gun to petitioner for a stickup, that petitioner shot someone with it, and that petitioner told Arnold that he "got rid of the gun" (N.T. 09/24/98, 125-126, 158-159).

Almost five months later, on February 27, 1997, David Williams was arrested for a series of robberies.  Following his arrest, David Williams asked to speak with

3

Detective Michael Sharkey of the Philadelphia Police Department.  David Williams had previously interacted with the detective, and they had a good rapport.  David Williams told Detective Sharkey that petitioner had killed the parking lot attendant and provided the detective with information about the murder.  Detective Sharkey, who did not investigate homicides, told David Williams that he could not make him any promises with respect to Williams' own criminal cases, but would have him speak with Detective Jeffrey Piree of the Homicide Unit (N.T. 09/25/98, 4-7, 10, 13).

Before he met with David Williams, Detective Piree was not familiar with the ballistics evidence in this case.  He did not know that a 9 millimeter gun had been used in the murder.  The detective also did not know whether or not any money had been taken from the parking lot.  Indeed, Detective Piree was not even the detective assigned to the murder.  The assigned detective was Detective William Coogan.  The information that a 9 millimeter gun was used in the killing, that no money was taken, and that a van was involved in the killing, was never released to the public (N.T. 09/24/98, 130-131, 133; N.T. 09/25/98, 88, 92-93).

On March 4, 1997, Detective Piree took a statement from David Williams.  David Williams told the police that petitioner had confessed to him that he murdered Anthony Mullens.  According to Williams' statement, petitioner revealed numerous details of the murder to him, including that the killing took place at night, that it occurred at a parking lot, that the victim "wouldn't give up the money" and then petitioner shot him, that petitioner netted "just a few dollars" from the crime, that the murder weapon was a 9 millimeter gun, that he got the gun from Arnold, that he got rid of the gun by busting it up and throwing it away, and that he cut his finger during the incident when the victim

4

closed a door on his hand.  David Williams told the police that petitioner "showed me his cut finger" (N.T. 09/24/98, 117-129).

On June 3, 1997, the police took a statement from Arnold.  Arnold confirmed that petitioner acquired a gun from him.  Specifically, he told the police that in late August of 1996, there was a fight in his neighborhood, and he brought a gun outside from his house.  When the police arrived, Arnold put the gun on the ground.  Petitioner picked up the gun and said that he would "hold it."  Arnold described the gun as either a .380 caliber or 9 millimeter.  In addition, Arnold told the police that he saw petitioner on the day of the murder and asked him where his gun was.  Petitioner responded that he still had it (N.T. 09/24/98, 167-168; N.T. 09/25/98, 88, 91; Exhibit C-24).

Later on June 3, 1997, the police obtained an arrest warrant for petitioner, and took him into custody the next day.  Upon his arrest, the police observed a scar on the outside of petitioner's left hand and a cut on the outside of his right hand.  In addition, petitioner had three scars from gunshots on his body: one on his left shoulder, one on his left elbow, and one on the inside of his right leg (N.T. 09/22/98, 31-32; N.T. 09/25/98, 92; Police form 75-229 [attached hereto as Exhibit A]).

On October 30, 1997, petitioner's preliminary hearing took place in the Municipal Court of Philadelphia.  David Williams acknowledged that his March 4, 1997 statement to Detective Piree accurately reflected what he told police.  However, he claimed that he lied about petitioner confessing to the murder for two reasons.  First, the police threatened him.  Second, he and petitioner were not getting along because he had stolen a beeper from petitioner.  David Williams claimed to have no personal knowledge of how Anthony Mullen was shot (N.T. 10/30/97, 8-20).

Arnold, unlike David Williams, testified at the preliminary hearing largely consistently with his police statement.  As he had previously told the police, Arnold testified that in late August of 1996, there was a fight in his neighborhood, and he brought a gun outside, which he then discarded when the police responded to the scene.  Petitioner picked up the gun, and confirmed that he still had the weapon when Arnold asked him about it close to the time of the murder.  Arnold testified that he "may have" told the police that the gun was possibly a 9 millimeter (N.T. 10/30/97, 41-45, 50, 53).

On September 23, 1998, petitioner's jury trial began before the Honorable John J. Poserina of the Court of Common Pleas of Philadelphia County.  In his trial testimony, David Williams again disavowed his police statement.  However, in contrast to his preliminary hearing testimony conceding that he actually made the statements attributed to him in the interview, he now alleged that, apart from some basic biographical information concerning his name, nickname, age, race, etc., all of the statements in the interview credited to him were supplied by the police, not him (N.T. 09/24/98, 92-94).

In addition, David Williams testified at petitioner's trial that homicide detectives questioned him about Jack Williams before questioning him about petitioner:

> Q.  And did you say that to Jeff Piree, the guy who took your statement?
>
> A.  Yes, I told it to both of them.  I mean, I told Piree. They initially took me to 8th and Race –
>
> Q.  Right.
>
> A.  – for – they asked me questions about Jack Williams, that was the initial, and then from there they started asking me questions about other things.

(N.T. 09/24/98, 82).[1]

Arnold's trial testimony, like his preliminary hearing testimony, recounted that in the late summer of 1996, a gun he brought to a fight in his neighborhood, but then dropped to the ground when the police arrived, was subsequently picked up by petitioner. Arnold also repeated that he saw petitioner close in time to the murder, asked him if he still had the gun, and petitioner said that he did. However, contrary to his police statement that the gun he provided petitioner was either a .380 caliber or 9 millimeter, Arnold professed to not know the caliber of the weapon. In addition, he claimed for the first time that the gun did not work (N.T. 09/24/98, 159-162, 171).

On September 29, 1998, the jury convicted petitioner of second-degree murder, robbery, and possessing an instrument of crime. On December 15, 1998, the trial court sentenced him to a mandatory term of life imprisonment for second-degree murder. The court did not impose additional penalties for the other offenses. On December 29, 2000, the Pennsylvania Superior Court affirmed the judgment of sentence. Petitioner did not seek allowance of appeal to the Pennsylvania Supreme Court.

On May 15, 2001, petitioner filed a *pro se* petition for relief under Pennsylvania's Post Conviction Relief Act (PCRA). Counsel was appointed and filed an amended PCRA petition on January 28, 2002. Petitioner's amended petition alleged newly available exculpatory evidence in the form of unsworn statements from Terry Scruggs

---

[1] On May 29, 1998, a jury convicted Jack Williams of first-degree murder and related offenses for the killing of Paul Jones. "The evidence of guilt was overwhelming." Commonwealth v. Jack Williams, 2002 WL 34401582 (Jan 30, 2002) (opinion and order) (Greenspan, J.); id. ("the evidence at trial was substantial, including eyewitness identification, defendant's testimony that he harbored a raging grudge against the victim, his threat, and later admission that he was going to kill the victim").

and Clinton Bailey.  In their statements, Scruggs and Bailey each alleged that David Williams had come to his house, implicated himself in the murder, and asked for help in getting rid of the murder weapon.

Scruggs and Bailey testified at evidentiary hearings before Judge Poserina on August 5 and August 8, 2002.  Their testimony revealed that they were longstanding friends with petitioner and with one another.  Scruggs used the alias "Terry Shaw."  He also had a lengthy criminal record, including a juvenile adjudication for drug dealing, two adult convictions for dealing drugs, a burglary conviction, two pending charges of murder, and two pending charges of attempted murder.  He conferred with petitioner about the murder while both men were incarcerated in the same state prison.  Bailey was on parole.  Despite their longtime friendships with petitioner, both Scruggs and Bailey claimed to only become aware that he had been convicted of murder in 2001. Whereas Scruggs alleged that Williams was driven to his house by another person, who waited in the car for him while he spoke with Scruggs, Bailey insisted that Williams was alone when he went to Bailey's house, and that he asked Bailey to take him somewhere to stash his gun.  Neither Scruggs nor Bailey ever provided any sort of explanation as to why David Williams would have needed the assistance of either man, or anyone else for that matter, to simply discard a gun (N.T. 08/05/02, 6-9, 20, 22-25, 27; N.T. 08/08/02, 5-7, 11-13).

On October 29, 2002, Judge Poserina made a finding of fact that the testimony of Scruggs and Bailey was not credible, and accordingly dismissed petitioner's PCRA petition (N.T. 10/29/02, 10-14).  Petitioner appealed.

On May 16, 2003, while petitioner's appeal was still pending in the Superior Court, he filed an application for remand to the PCRA court for an additional evidentiary hearing. The basis for his remand motion was an undated letter purportedly sent by David Williams to petitioner's mother in which Williams claimed that he was the person who shot Mullen. The letter asserted that the shooting took place when David Williams went to collect a drug debt from Mullen. David Williams alleged that he "lied on [petitioner] because [he] was afraid at the time." On May 21, 2003, the Superior Court granted the application for remand.

On July 30, 2003, David Williams testified before the PCRA court. He alleged that he knew the victim for approximately two months before the killing, had approximately five or six prior contacts with him, and sold him drugs. According to Williams, two days before the shooting, the victim bought drugs from him on consignment. David Williams claimed that the victim told him where he worked and that he could come to his workplace to get payment for the drugs. Then, on the night of October 8, 1996, David Williams went to the Five Star parking facility to collect Mullen's unpaid drug debt. When David Williams asked the victim for the money, however, Mullen fired three gunshots at him, and David responded by firing once in self-defense. David Williams testified that he did not see anyone at the scene after the shots were fired (N.T. 07/30/03, 7-8, 33-35, 38-39, 41).

David Williams testified that he falsely implicated petitioner in the murder to help himself with his own robbery cases, and because of "little neighborhood tiffs" between petitioner and him. David Williams professed that he was "[n]ot really" concerned about fingering himself in the homicide. He claimed that he told the police that petitioner got

the murder weapon from Arnold because both he (Williams) and Arnold had supposedly bought guns from a man named Michael White at the same time. According to David, "I didn't know how forensics work, but I figured if they put it together that the guns were sold in the same lot, so that if they ever tracked it down, it was a believable story" (N.T. 07/30/03, 18-19, 22-23, 46-47).

There were glaring inconsistencies between David Williams' purported "confession" to the Mullen murder and the indisputable facts of the crime. See Miller v. Beard, No. 05-5285 at 3 (Jan. 30, 2007) (memorandum & order) (Kauffman, J.) ("Williams' 'confession' was fraught with numerous inconsistencies"); Miller v. Beard, No. 05-5285 at 13 n.3 (Jun. 15, 2006) (report and recommendation) (Smith, M.J.) ("Williams' 'confession' at the PCRA hearing was riddled with inconsistencies"). For instance, when asked to describe Mullen, whom David Williams claimed to have known for months and to have met on numerous occasions, Williams testified that the victim was Caucasian. In fact, the murder victim was African-American. In addition, Williams claimed that the decedent was wearing a green jacket when he was killed. He was actually wearing a red jacket. According to Williams' PCRA testimony, the victim was inside a "little office" when Williams shot him. However, the evidence at trial showed that the victim was in or near his van when he was murdered. The victim's dead body was on the ground near the van, the driver's side door to the van was open, there was a 9 millimeter fired cartridge casing on the ground near the van, and there was a 9 millimeter fired bullet inside the van on the driver's side floor (N.T. 09/24/98, 41, 52, 54, 68; N.T. 09/25/98, 26, 55; N.T. 07/30/03, 37-39, 49-50, 63-64).

At the conclusion of the remand hearing, the PCRA court made a finding of fact that David Williams' testimony claiming responsibility for the shooting was not credible:

> **THE COURT:** I think he's incredible also, so if you want me to make findings of fact and conclusions of law I'll testify right now that I believe he was lying under oath just now, and in my opinion he's not believable.

(N.T. 07/30/03, 65).

On July 31, 2003, David Williams was arrested for perjury based on his false testimony at the PCRA hearing. On February 26, 2004, Williams pleaded guilty to perjury, and was sentenced to one to three years imprisonment, followed by four years' probation (CP-51-CR-1010901-2003).

On October 22, 2004, the state Superior Court affirmed the denial of petitioner's PCRA petition. On April 19, 2005, the Pennsylvania Supreme Court denied allowance of appeal.

On October 6, 2005, petitioner filed his first petition for a writ of habeas corpus in federal court. The petition "alleg[ed] that the evidence presented at trial was insufficient to convict him of second degree murder, and that permitting the jury to consider David Williams' statement as substantive evidence violated Pennsylvania's corpus delicti rule" (Miller v. Beard, No. 05-5285 at 3 (Jan. 30, 2007) (memorandum & order) (Kauffman, J.). On January 30, 2007, the district court denied and dismissed the petition, and declined to issue a certificate of appealability. On July 12, 2007, the Third Circuit denied petitioner's request for a certificate of appealability.

On October 23, 2007, petitioner filed a second PCRA petition in state court. This petition alleged newly discovered exculpatory evidence in the form of an affidavit from Andre Monroe, a friend of petitioner's and a fellow prisoner. Monroe's affidavit alleged

11

that on August 24, 2007, he had a chance meeting with petitioner inside of prison and spoke with him about why he was incarcerated. Monroe claimed that he was actually an eyewitness to the murder of Mullen. He alleged that David Williams, with whom he had previously played basketball, committed the killing. He claimed that after the shots were fired, Williams "ran right by me." According to Monroe, he never told anyone about what he witnessed because he "was afraid and scared."

On October 17, 2008, the PCRA court dismissed petitioner's second petition as untimely. He did not appeal.

On April 19, 2011, petitioner filed a third PCRA petition in state court alleging yet more supposedly newly discovered exculpatory evidence. This time the purported new evidence consisted of three documents: (1) another letter from David Williams to petitioner's mother dated March 19, 2011; (2) an affidavit of petitioner's mother claiming to have received this letter; and (3) an affidavit from defense investigator Mary Wilt dated April 1, 2011, which alleged that Wilt talked to Arnold in the last week of February 2011, and that Arnold purportedly recanted his police statement and trial testimony. In David Williams' letter to petitioner's mother, he wrote that he was "sorry about what happened" at the PCRA hearing in 2003, and again claimed to have shot Mullen. He disavowed his PCRA testimony that he shot Mullen over a drug debt, and instead asserted that he was "trying to rob him." Williams vaguely claimed that he "lied on [Miller] because of several reasons."

On June 6, 2011, petitioner filed an amended PCRA petition that included an affidavit from Arnold dated May 24, 2011. Arnold's affidavit alleged that he "lied at John Miller's trial back in September 1998." He claimed that "[m]y reason for lying is because

John Miller and myself were old drug competitors and I, Michael Arnold wanted John Miller out [sic] the way." Arnold asserted that "my coming forward is because my conscious [sic] is bothering me."

On July 18, 2011, the PCRA court, per the Honorable Sheila Woods-Skipper, issued notice of intent to dismiss petitioner's PCRA petition pursuant to Pa.R.Crim.P. 907.

On August 4, 2011, petitioner filed objections to the dismissal notice. He attached to his objections a certification from David Williams dated July 18, 2011. In his certification, Williams claimed that he accused petitioner of the shooting because "we had a drug-selling rivalry and I wanted him off the block."

On October 4, 2011, present counsel entered their appearance on petitioner's behalf. On November 3, 2011, petitioner filed an amended PCRA petition. Included as an exhibit to this petition was a certification from Mark Manigault dated September 22, 2011. Manigault's certification alleged that he was incarcerated with David Williams in 1997, and that Williams told Manigault that he was going to "pin a homicide that he (David) had done on somebody else." Manigault contended that "[t]he police interrogated me for a while about the homicide but I didn't know anything about it because I was incarcerated when the homicide occurred" (Petitioner's Exhibit P).

On November 18, 2011, the PCRA court dismissed petitioner's third PCRA petition as untimely. On November 28, 2011, petitioner filed a motion for reconsideration of the dismissal, as well as another amended PCRA petition. On December 13, 2011, the PCRA court denied reconsideration. On December 15, 2011, petitioner appealed to the Superior Court.

13

On January 24, 2012, while petitioner's PCRA appeal was still pending in state court, he filed an application for leave to file a second or successive petition for a writ of habeas corpus in the Third Circuit. On February 8, 2012, the Third Circuit granted this application.

On February 13, 2012, petitioner filed his second petition for a writ of habeas corpus in federal court. This petition raised two claims: (1) that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963) by failing to disclose a police interview with Mark Manigault about the Mullen murder; and (2) that petitioner is actually innocent.

On March 9, 2012, petitioner filed an application for remand in the Pennsylvania Superior Court. The basis for the remand motion was a certification executed by defense investigator Shaina Tyler claiming to have interviewed Jack Williams on March 1, 2012.[2] According to the certification, in the March 1, 2012 interview, Jack Williams alleged that he was imprisoned on the same cell block with David Williams in June of 1997. According to Jack Williams, he confronted David Williams at that time about implicating him in a murder. David Williams responded that he "just agreed with what the police told him." In addition, Jack Williams claimed that David Williams told him that David had "pinned" a murder on petitioner that David himself had committed in order to "get less time for his robbery charges" (Exhibit B at 1-2).

---

[2] Petitioner represents that this certification is included in his federal filings as Exhibit W (Petitioner's Memorandum at 15). In fact, the certification he has included under this heading is a subsequent certification from Tyler purporting to recount the March 1, 2012 interview as well as a follow-up interview with Jack Williams on April 27, 2012. This later certification is also redundantly included as petitioner's Exhibit R. The Commonwealth has included the omitted first certification as Exhibit B to its response.

On March 18, 2012, Arnold executed a certification recanting his police statement and trial testimony.

On March 28, 2012, the state Superior Court denied petitioner's application for remand based on the alleged interview with Jack Williams.

On April 27, 2012, defense investigators conducted a second interview with Jack Williams.  In addition, defense investigators conducted an interview with David Williams, in which David purportedly alleged that he fabricated his police statement implicating Jack Williams in the murder of Paul Jones.

On July 24, 2012, the Superior Court affirmed the dismissal of petitioner's third PCRA petition.  He did not seek allowance of appeal to the Pennsylvania Supreme Court.

On September 20, 2012, petitioner filed a fourth PCRA petition in state court.

On February 21, 2013, while petitioner's fourth PCRA petition was still pending in state court, he filed a motion in federal court to amend his still-pending second petition for a writ of habeas corpus.  On March 20, 2013, the district court granted this motion and accepted petitioner's amended petition, which had been attached as an exhibit to his motion to amend.

Petitioner's amended habeas petition raised the same two claims he had raised in his habeas petition filed on February 13, 2012, i.e., that the Commonwealth violated Brady by withholding Manigault's police statement, and that he is actually innocent.  In addition, the amended filing raised a third claim: the Commonwealth supposedly violated Brady by failing to disclose David Williams' police statement implicating Jack Williams in the murder of Paul Jones.

On November 20, 2014, the state PCRA court, per the Honorable Genece Brinkley, dismissed petitioner's fourth PCRA petition as untimely. On December 18, 2015, the Superior Court affirmed the dismissal on the basis that the petition was not timely filed. The Superior Court ruled that "the PCRA court did not abuse its discretion or commit an error of law in finding [petitioner's] serial PCRA petition untimely and dismissing it without a hearing." Commonwealth v. John Miller, No. 3563 EDA 2014 at 19 (Dec. 18, 2015) (memorandum). Petitioner did not seek allowance of appeal to the Pennsylvania Supreme Court.

On March 2, 2016, petitioner filed in federal court a second motion for leave to amend his petition for a writ of habeas corpus. On March 21, 2016, the district court granted the motion to amend.

On March 23, 2016, petitioner filed yet another amended habeas petition ("Habeas Petition"). In addition, he filed a memorandum of law in support of the petition ("Petitioner's Memorandum").

## APPLICABLE LEGAL STANDARDS

"Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Harrington v. Richter, 131 S.Ct. 770, 787 (2011) (quoting Calderon v. Thompson, 523 U.S. 538, 555-556 (1998)). "It disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." Richter, 131 S.Ct. at 787 (quotation marks and citation omitted).

"In light of the profound societal costs that attend the exercise of habeas jurisdiction, [there are] significant limits on the discretion of federal courts to grant

16

habeas relief." Calderon, 523 U.S. at 554-555 (quotation marks and citation omitted). "Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court." Richter, 131 S.Ct. at 787. "If the state court rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions to the doctrine of [procedural default] applies." Id. "And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to [28 U.S.C.A.] § 2254(d) set out in §§ 2254(d)(1) and (2) applies." Id. Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). Further, "[t]he ability of a federal district court to hold an evidentiary hearing in habeas review is limited." Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006). These limits on federal habeas review and relief "ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." Richter, 131 S.Ct. at 787.

### A.    One year statute of limitations

"A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of: "(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on

17

which the constitutional right asserted was initially recognized by the Supreme Court, if

the right has been newly recognized by the Supreme Court and made retroactively

applicable to cases on collateral review; or (D) the date on which the factual predicate of

the claim or claims presented could have been discovered through the exercise of due

diligence." Id.

    "The time during which a properly filed application for State post-conviction or

other collateral review with respect to the pertinent judgment or claim is pending shall

not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2).  A petition that

is "untimely" under the PCRA is "not 'properly filed,' and . . . is not entitled to statutory

tolling under § 2244(d)(2)." Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005).

    In addition, "a petitioner is entitled to equitable tolling [of the statute of limitations]

. . . if he shows (1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way and prevented timely filing." Holland v.

Florida, 560 U.S. 631, 649 (2010).

    Also, "actual innocence, if proved, serves as a gateway through which a

petitioner may pass [where the impediment is] expiration of the statute of limitations."

McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013).  "28 U.S.C. § 2244(d)(1), like other

statute of limitations provisions, must be applied on a claim-by-claim basis." Fielder v.

Varner, 379 F.3d 113, 122 (3d Cir. 2004).

    **B.**    **Independent and adequate state ground doctrine**

    "A federal habeas court will not review a claim rejected by a state court if the

decision of [the state] court rests on a state law ground that is independent of the

federal question and adequate to support the judgment." Walker v. Martin, 131 S.Ct.

18

1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)).  "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."  Id.

A state procedural rule is "independent" if it does not "depend[ ] on a federal constitutional ruling."  Ake v. Oklahoma, 470 U.S. 68, 75 (1985).  "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"  Walker, 131 S.Ct. at 1127 (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)).  "[A] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review."  Kindler, 558 U.S. at 60.  "[A] discretionary rule can be 'firmly established' and 'regularly followed' – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  Id. at 60-61.

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, . . . or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."  Harris v. Reed, 489 U.S. 255, 262 (1989).

### C.     Exhaustion requirement

Generally, "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  See also 28 U.S.C.A. § 2254(b)(1).  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts."  Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam).  The fair presentation doctrine requires that "the substance of a federal habeas corpus claim must first be presented to the state

courts." <u>Picard v. Connor</u>, 404 U.S. 270, 278 (1971).  "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-163 (1996).  Thus, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> at 163.  Similarly, a "passing reference to the concept of a 'fair trial'" is "insufficient to give fair notice of a federal due process claim." <u>Keller v. Larkins</u>, 251 F.3d 408, 415 (3d Cir. 2001).  In addition, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982).  "[M]ere similarity of claims is insufficient to exhaust." <u>Duncan</u>, 513 U.S. at 366.

Fair presentation also requires a state prisoner to "invok[e] one complete round of the State's established appellate review process." <u>Carey v. Saffold</u>, 536 U.S. 214, 220 (2002); <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).  "In Pennsylvania, one complete round includes presenting the federal claim through the Superior Court on direct or collateral review." <u>Moore v. McCready</u>, 2012 WL 6853243 at *6 (E.D. Pa. 2012) (report and recommendation).  "The burden of establishing that . . . claims were fairly presented falls upon the petitioner." <u>Lines v. Larkin</u>, 208 F.3d 153, 159 (3d Cir. 2000).

"The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982).  "[I]t would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an

opportunity to the state courts to correct a constitutional violation." Id. (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)).

"[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. . . there is a procedural default for purposes of federal habeas." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)). When a claim is procedurally defaulted, federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

### D.    Cause and prejudice

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." Id. at 753 (emphasis omitted). Generally, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" Id. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

There is, however, a "narrow exception" to the general rule of Coleman: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez v. Ryan, 132 S.Ct. 1309, 1315 (2012). This "narrow exception" has four requirements: "(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel

21

during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding[,]'" or "makes it virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim on direct review." Trevino v. Thaler, 133 S.Ct. 1911, 1918 (2013) (quotation marks and citation omitted). "[T]he exhaustion doctrine . . . requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Murray, 477 U.S. at 488-489. Accord Edwards v. Carpenter, 529 U.S. 446, 451 (2000) ("ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is *itself* an independent constitutional claim.  And we held in Carrier that the principles of comity and federalism that underlie our longstanding exhaustion doctrine . . . require *that* constitutional claim, like others, to be first raised in state court") (emphasis in original).

### E.    Miscarriage of justice

The miscarriage of justice gateway to review of defaulted or untimely claims "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995)).  "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of

a barred claim." Id. at 316.  Evidence is not new under Schlup if the petitioner knew of the "vital facts underlying" the evidence "long before the filing of his habeas petition." Sistrunk v. Rozum, 674 F.3d 181, 189, 191 (3d Cir. 2012).  In addition, "[e]vidence is not new if it was available at trial, but a petitioner merely chose not to present it to the jury." Goldblum v. Klem, 510 F.3d 204, 226 n.14 (3d Cir. 2007) (quotation marks and citation omitted).

In addition, "[t]o show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime." Keller v. Larkins, 251 F.3d 408, 415-416 (3d Cir. 2001).  To demonstrate actual innocence, a petitioner must establish that in light of the new evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner].'" McQuiggin, 133 S.Ct. at 1933 (quoting Schlup, 513 U.S. at 329).  "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." McQuiggin, 133 S.Ct. at 1935.  In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousely v. United States, 523 U.S. 614, 623 (1998); United States v. Garth, 188 F.3d 99, 107 (3d Cir. 1999).  "[T]he Government is not limited to the existing record to rebut any showing that petitioner might make." Bousely, 523 U.S. at 624; Garth, 188 F.3d at 107.  See also Shoulders v. Eckard, 2016 WL 1237798 at *3 (W.D. Pa. Feb. 29, 2016) (report and recommendation) ("In order to successfully invoke the 'miscarriage of justice' exception, a petitioner must: satisfy a two-part test in order to obtain review of otherwise procedurally barred claims.  First, the petitioner's allegations of constitutional error must be supported with new reliable evidence not available at trial. . . . Second, the petitioner must establish that it is more likely than not that no

reasonable juror would have convicted him in light of the new evidence") (quotation marks and citation omitted).

The miscarriage of justice standard "is demanding and permits review only in the extraordinary case." House v. Bell, 547 U.S. 518, 538 (2006) (quotation marks and citations omitted). "[T]enable actual-innocence gateway pleas are rare." McQuiggin, 133 S.Ct. at 1928.

## ARGUMENT

## I.   PETITIONER HAS NOT SATISFIED THE REQUIREMENTS FOR A SECOND PETITION

Even where the Court of Appeals has preliminarily authorized the filing of a second petition for a writ of habeas corpus, this Court is required to conduct its own independent gatekeeping analysis of whether the statutory requirements for a second petition have been met. See 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section"); Goldblum v. Klem, 510 F.3d 204, 220 (3d Cir. 2007) ("if a court of appeals finds that a petitioner has made a prima facie showing, the district court is obligated to conduct an independent gatekeeping inquiry under section 2244(b)(4)"). The relevant statutory provision dictates that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and . . . the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for

constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2244(b)(2)(B).

Here, as detailed below, the factual predicates for petitioner's <u>Brady</u> claims could have been discovered through due diligence many years ago.  Moreover, the facts underlying petitioner's claims do not come close to establishing by clear and convincing evidence that no reasonable juror – not even one – would have voted to convict him. Petitioner has not satisfied the statutory requirements for merits review of a successive habeas petition, and for this reason alone, his petition should be dismissed.

## II.     THE CLAIM OF ERROR ON PCRA REVIEW IS NON-COGNIZABLE, DEFAULTED, AND BASELESS

Petitioner claims that he "was deprived of his Fourteenth Amendment right to demonstrate his innocence with newly discovered evidence as the process afforded to him was fundamentally inadequate" (Habeas Petition at 5).  This claim of error on state postconviction review is not cognizable on federal habeas, and is procedurally defaulted and meritless in any event.

### A.     This claim is not cognizable

Petitioner's first claim is not cognizable on federal habeas review because it alleges error during his PCRA proceedings.  The Third Circuit has expressly and repeatedly held that claims of error during PCRA proceedings or other state collateral proceedings are not cognizable on federal habeas review.  <u>See</u> <u>Abu-Jamal v. Horn</u>, 520 F.3d 272, 297 (3d Cir. 2008) ("alleged errors in collateral proceedings are not a proper basis for habeas relief"); <u>id.</u> at 297 n.25 ("error in state collateral proceedings cannot be grounds for federal habeas relief"); <u>Lambert v. Blackwell</u>, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum. . . to pursue claims of error

at the PCRA proceeding"); id. ("alleged errors in collateral proceedings . . . are not a proper basis for habeas relief from the original conviction.  It is the original trial that is the 'main event' for habeas purposes"); Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation").

Here, petitioner alleges error in his collateral, PCRA proceedings, not in the proceedings that actually led to his conviction (See, e.g., Habeas Petition at 5 ["The violation of Mr. Miller's Fourteenth Amendment rights did not arise until the Pennsylvania Superior Court denied his **PCRA petitions**"]; Petitioner's Memorandum at 32 ["the Pennsylvania Superior Court's interpretation of the **PCRA process** has barred Mr. Miller's access to his liberty interest in proving his innocence with newly-discovered evidence"] [emphasis added]).  Accordingly, this claim is not cognizable on federal habeas review.  This claim may not even be reviewed by this Court, much less provide a basis for relief.  See, e.g., Brooks v. Diguglielmo, 2010 WL 2218671 at *6 (E.D. Pa. 2010) (adopted report and recommendation) ("Petitioner's claims of error on PCRA appeal are not cognizable grounds for habeas review"); Villanueva v. Rozum, 2008 WL 268060 at *4 (E.D. Pa. 2008) (adopted report and recommendation) (finding claim that "the Pennsylvania Superior Court erred by failing to remand the PCRA petition to the trial court and to appoint new counsel" was "non-cognizable" because it was "based on errors during PCRA proceedings").

     **B.**     **This claim is defaulted**

This non-cognizable claim is also procedurally defaulted. Petitioner never presented this claim to the state courts. Rather, he raised this claim for the first time in federal court, in his amended habeas petition dated March 23, 2016. The state courts have never had the opportunity to address this issue.

Moreover, petitioner is procedurally barred from returning to state court to litigate this claim now. If petitioner were to return to state court to attempt to raise this claim, he would be required to do so via the PCRA. "[T]he PCRA . . . provides the exclusive vehicle for obtaining state collateral relief on claims which are cognizable under the PCRA." Commonwealth v. Robinson, 837 A.2d 1157, 1162 (Pa. 2003).

The PCRA mandates that all petitions for relief, including second and subsequent petitions, must generally be filed within one year of the date the judgment became final. 42 Pa.C.S. § 9545(b)(1). A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review. 42 Pa.C.S. § 9545(b)(3).

Here, the Superior Court affirmed petitioner's judgment of sentence on December 29, 2000, and he did not seek allowance of appeal to the state Supreme Court. Therefore, the judgment became final on January 29, 2001, upon expiration of the thirty-day deadline for seeking allowance of appeal. See Pa.R.A.P. 1113(a). The one-year statute of limitations for filing any PCRA petition expired one year later on January 29, 2002, more than fourteen years ago. Because petitioner did not present his claim of errors on PCRA appeal to the state courts, and state corrective process is no

longer available to him, this claim is procedurally defaulted.  See Coleman, 501 U.S. at 735 n.1.

## C.  The miscarriage of justice exception is inapplicable

Petitioner insists that "there can be no procedural default where [he] presents new facts supporting his actual innocence" (Petitioner's Memorandum at 29).  On the contrary, he has not come close to satisfying the "demanding" miscarriage of justice standard.  McQuiggin, 133 S.Ct. at 1928, 1936.  The evidence he proffers is neither new nor reliable.  Moreover, petitioner has not shown, as he must, that in light of the dubious evidence belated marshalled by him, it is more likely than not that no reasonable juror – not even one – would have convicted him.

### 1.  Petitioner's sufficiency argument is misguided

Petitioner contends that he "was convicted of murdering Mr. Mullen based solely on the now recanted statements David Williams and Mr. Arnold gave to detectives" (Petitioner's Memorandum at 29).  His attack on the sufficiency of the evidence supporting his convictions is misplaced.  As the Supreme Court and Third Circuit have held, "mere legal insufficiency" does not establish the miscarriage of justice gateway to review of defaulted claims.  Bousely, 523 U.S. at 623; Garth, 188 F.3d at 107.  Rather, petitioner must demonstrate his "factual innocence."  Bousely, 523 U.S. at 623; Garth, 188 F.3d at 107.  In other words, it is not enough for a petitioner to show that the Commonwealth's proof at trial was legally inadequate, he must adduce new evidence showing that he in fact "did not commit the crime."  Garth, 188 F.3d at 107 (quoting Johnson v. Hargett, 978 F.2d 855, 860 (5th Cir.1992)).

In any event, the evidence was sufficient.  Indeed, the Pennsylvania Superior Court specifically ruled that the evidence was sufficient on direct appeal. Commonwealth v. John Miller, No. 768 EDA 1999 at 8-9 (Dec. 29, 2000).  The federal district court likewise rejected petitioner's sufficiency challenge in his prior round of federal habeas review.  Miller v. Beard, No. 05-5285 at 9-11 (Jan. 30, 2007) (memorandum & order) (Kauffman, J.).

These rulings were clearly correct.  The case against petitioner was not "based solely" on the police statements of David Williams and Arnold (Petitioner's Memorandum at 29).  For instance, Arnold testified at trial that in the late summer of 1996 he took a gun from his house during a neighborhood fight, that he threw the gun on the ground when he saw the police coming, and that petitioner then picked up the gun.  Arnold also testified that he saw petitioner again in late September or early October of 1996, asked him if he still had the gun, and petitioner responded that he did (N.T. 09/24/98, 159-162).

In addition to Arnold's incriminating trial testimony, there was ample ballistics and physical evidence corroborating the police statements of David Williams and Arnold. For example, there was a 9 millimeter fired cartridge casing and a fired 9 millimeter bullet that had clearly struck something at the scene.  This ballistics evidence corroborated David Williams' statement that the murder weapon was a 9 millimeter gun, as well as Arnold's statement that it could have been a 9 millimeter (N.T. 09/24/98, 56-57, 68, 124, 168; N.T. 09/25/98, 55, 70-71, 74-75).  In addition, there was a .25 caliber handgun underneath the victim's body, and three .25 caliber fired cartridge casings and one fired .25 caliber fired bullet in the parking lot.  This evidence that the victim

possessed and fired his own weapon corroborated David Williams' statement that the victim "wouldn't give it up" (N.T. 09/24/98, 57-60, 123; N.T. 09/25/98, 66, 71-73). No money was missing from the cash register inside the cashier's booth at the parking lot. There was also money in the victim's pocket. The full allotment of money in the cash register and the money on the victim's person corroborated David Williams' police account that petitioner told him that he only got "a few dollars" from the robbery and murder (N.T. 09/24/98, 30, 123, 138). The driver's side door to the victim's van was open. This corroborated David Williams' statement that the victim closed his door on petitioner's hand (N.T. 09/24/98, 52, 124). According to David Williams' police statement, petitioner "got rid of the gun" used in the killing. He "busted it . . . up and threw it away." The murder weapon was in fact never recovered, as petitioner conceded at trial (N.T. 09/24/98, 19, 124, 126).

In any case, even if the Commonwealth's proof had been limited to the police statements of David Williams and Arnold, this evidence would have been sufficient to sustain the convictions. Indeed, petitioner's confession to Williams alone would have been legally sufficient, given the uncontested tangible evidence that the victim died. See Wong Sun v. United States, 371 U.S. 471, 489 n.15 (1963) ("an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. . . . There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it") (citation omitted).

### 2. David Williams' recantations

Petitioner additionally asserts that "David Williams recanted immediately, and has actually been confessing to the crime for more than a decade – providing new

information over the years" (Petitioner's Memorandum at 30).  The miscarriage of justice exception requires "new reliable evidence . . . of actual innocence." Schlup, 513 U.S. at 324.  David Williams' recantations are not new evidence for purposes of Schlup.  The vital "facts" underlying this evidence are that David Williams allegedly fabricated his police statement against petitioner, and that David himself committed the killing. Petitioner has known that David Williams falsified his police statement since David's recantation at petitioner's preliminary hearing in 1997 (N.T. 10/30/97, 8-20).  Petitioner has known that David Williams was the "actual murderer" since David's letter to petitioner's mother in 2003.  Because petitioner has known the vital facts underlying David Williams' recantations for many years, this evidence is not new under Schlup. See Sistrunk, 674 F.3d at 189, 191 (finding that letter from witness Gregory Anderson admitting to perjury at preliminary hearing and affidavit stating that Damon Rodriguez admitted to being shooter were not new under Schlup because "Sistrunk not only could have known, but actually *did* know of the vital facts underlying both the Anderson letter and Rodriguez affidavit – i.e., Damon Rodriguez was the real shooter and Gregory Anderson perjured himself – long before the filing of his habeas petition") (emphasis in original).  In addition, two of David's recantations – his preliminary hearing recantation and his trial recantation – were obviously actually available at trial. See Goldblum, 510 F.3d at 226 n.14.

Moreover, reliability is sorely lacking here.  "Affidavits of recantation do not fall into any type of reliable evidence – exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – identified in Schlup." Ajamu-Osagboro v. Patrick, 620 F.Supp.2d 701, 718 (E.D. Pa. 2009). Recantation evidence is

inherently unreliable.  See United States v. Williams, 70 Fed.Appx. 632, 634 (3d Cir.

2003) ("cases are legion that courts look upon recantations with great suspicion");

Landano v. Rafferty, 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed

recantation testimony with great suspicion"); Ajamu-Osagboro, 620 F.Supp.2d at 718

("Recantation testimony is inherently untrustworthy").  David Williams grew up with

petitioner, lived in the same neighborhood he did, and had known him his whole life

(N.T. 09/24/98, 71-72).  His personal connections to petitioner gave him an incentive to

lie on his behalf.  See United States v. Ringwalt, 213 F.Supp.2d 499, 511 (E.D. Pa.

2002) ("Courts have found bias in a wide variety of situations, including familial or

sexual relationships, employment or business relationships, friendships, common

organizational memberships, and situations in which the witness has a litigation claim

against another party or witness").  Williams was himself involved in criminal activity,

and at the time of his trial testimony was serving an eight-to-sixteen year prison term for

multiple robberies (N.T. 09/24/98, 73).  In the criminal world, and especially in prison,

retaliation against cooperating witnesses is common, and aiding enforcement can be

dangerous and even fatal.

David Williams' recantations are even less reliable than this dubious evidence is

normally.  When David Williams' claim that he in fact committed the murder was

subjected to the crucible of cross-examination at the PCRA hearing in 2003, he

repeatedly lied under oath.  He did not know crucial facts of the crime.  For instance,

when asked to describe Mullen, whom David Williams claimed to have known for

months and to have met on numerous occasions, Williams testified that the victim was

Caucasian.  In fact, the murder victim was African-American.  In addition, David claimed

that the decedent was wearing a green jacket when he was killed.  He was actually

wearing a red jacket.  According to David Williams' PCRA testimony, the victim was

inside a "little office" when Williams shot him.  However, the evidence at trial showed

that the victim was in or near his van when he was murdered.  The victim's dead body

was on the ground near the van, the driver's side door to the van was open, there was a

9 millimeter fired cartridge casing on the ground near the van, and there was a 9

millimeter fired bullet inside the van on the driver's side floor.  After hearing David

Williams' various transparent lies, the presiding PCRA judge found as a fact that he was

"lying under oath" and "not believable" (N.T. 09/24/98, 41, 52, 54, 68; N.T. 09/25/98, 26,

55; N.T. 07/30/03, 37-39, 49-50, 63-65).

 In addition to his blatant lies about the indisputable facts of the crime, David

Williams also made other incredible claims straining the credibility of his recantation

beyond the breaking point.  For example, he claimed to know that the murder had not

already been solved by the time he gave his police statement because he "was on the

streets" (N.T. 07/30/03, 18).  However, the details of the police investigation were never

released to the public (N.T. 09/24/98, 133; N.T. 09/25/98, 92-93).  David Williams also

implausibly professed to have no concern that volunteering detailed information

regarding a homicide that he himself supposedly committed would implicate him in the

killing (N.T. 07/30/03, 18-19).  He offered an all-too-convenient tale of self-defense in

which Mullen fired multiple shots at him first, and then he fired a single shot in response

to protect himself (N.T. 07/30/03, 7-8, 40-41).  This story conveniently exonerated

petitioner while simultaneously denying Williams' own criminal liability.  David Williams

also offered an utterly absurd explanation for how the information that Arnold provided

the murder weapon to petitioner found its way into his police statement.  According to Williams, he informed the police that the gun came from Arnold "[b]ecause when I purchased my gun from Michael White, Mike Arnold also purchased his gun at the same time, so I didn't know how forensics work, but I figured if they put it together that the guns were sold in the same lot, so that if they ever tracked it down, it was a believable story" (N.T. 07/30/03, 22-23).

David Williams subsequently pleaded guilty to perjury for his blatantly false testimony in the PCRA court (CP-51-CR-1010901-2003).  Thus, he voluntarily acknowledged what the numerous, blatant inconsistencies in his PCRA testimony readily showed: that his purported "confession" to the Mullen murder was an utter fabrication.  See DiJoseph v. Vuotto, 968 F. Supp. 244, 247 (E.D. Pa. 1997) ("A guilty plea is an acknowledgement by a defendant that he participated in the commission of certain acts with a criminal intent") (quoting Commonwealth v. Anthony, 475 A.2d 1303, 1307 (Pa. 1984)).

The inconsistencies between the various recantations offered by David Williams over the years further confirm the unreliability of these allegations.  See Commonwealth v. John Miller, 3269 EDA 2011 at 19 (July 24, 2012) ("Williams has never told the same story twice; each version of his story is different").  For instance, at the preliminary hearing, David Williams acknowledged that his police statement accurately reflected what he told the police, but claimed that he lied in the statement because the police threatened him, and he and petitioner were involved in a dispute over a stolen beeper (N.T. 10/30/97, 8-20).  At trial, however, Williams insisted that none of the comments in his police statement implicating petitioner in the murder were actually made by him, and

that these statements were simply made up by the police (N.T. 09/24/98, 92-94).  Then, in David Williams' first letter to petitioner's mother, he claimed for the first time that he was the person who shot Mullen.  According to this letter, Williams shot Mullen while trying to collect a drug debt, and he "lied on [petitioner] because [he] was afraid at the time."  At the subsequent PCRA hearing, David offered an entirely different explanation for why he supposedly falsely implicated petitioner in the murder that had nothing to do with him supposedly being "afraid at the time."  Now he claimed that he accused petitioner because he wanted to help himself with his own criminal cases, and because he had "neighborhood tiffs" with petitioner (N.T. 07/30/03, 46-47).  In Williams' second letter to petitioner's mother, he jettisoned his claim that he shot Mullen over a drug debt, and instead asserted that the shooting took place while he was "trying to rob him."  In the certification of Williams from July 2011, he claimed for the first time that he accused petitioner of the shooting because "we had a drug-selling rivalry and I wanted him off the block."  This was at least his fourth different explanation for why he supposedly falsely accused petitioner.  The ever-changing recantations of David Williams, a lifelong friend of petitioner, fellow criminal, fellow prisoner, repeated and obvious liar, and admitted and convicted perjurer, are not "reliable" evidence satisfying the demanding miscarriage of justice standard.

### 3.    Arnold's recantations

Petitioner argues that "Michael Arnold also eventually recanted" (Petitioner's Memorandum at 30).  This evidence is not new under Schlup.  The vital fact underlying Arnold's recantations – that Arnold supposedly perjured himself at petitioner's trial – has been known to petitioner since his 1998 trial.  See Sistrunk, 674 F.3d at 189, 191.

This evidence is not remotely reliable either.  Like the various and varying recantations offered by David Williams, Arnold's recantations "do not fall into any type of reliable evidence – exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – identified in Schlup."  Ajamu-Osagboro, 620 F.Supp.2d at 718.  Moreover, by mere virtue of being recanting evidence, they are "inherently untrustworthy."  Id.  Indeed, the recantations by Arnold involve an admission of perjury.  His affidavit from 2011 states in no uncertain terms, "I've [sic] lied at John Miller's trial back in September 1998" (Petitioner's Exhibit N).  Recantations involving the admission of perjury are "the least reliable form of proof."  Teagle v. Diguglielmo, 336 Fed.Appx. 209, 213 (3d Cir. 2009) (quoting Commonwealth v. Henry, 706 A.2d 313, 321 (Pa. 1997)).  Arnold, like Williams, was a longstanding friend of petitioner and hailed from the same neighborhood (N.T. 09/24/98, 158).  This implicates bias.  See Ringwalt, 213 F.Supp.2d at 511.

Arnold's inherently dubious recantations are not even consistent with one another.  His 2011 recantation insists that he lied at petitioner's trial because he and petitioner "were old drug competitors" and he wanted petitioner "out the way" (Petitioner's Exhibit N).  His 2012 recantation, on the other hand, claims that his allegedly false testimony at trial was because he "felt pressured to stick with [his] original story" (Petitioner's Exhibit T at 3).  His allegation that he felt obliged to adhere to his original story at trial, moreover, is demonstrably false.  In fact, Arnold changed his story at trial by claiming to not know the caliber of the gun he provided to petitioner, and alleging for the first time that the gun petitioner took from him was inoperable (N.T. 09/24/98, 161, 171).

Equally incredible is Arnold's purported explanation for the detailed account in his police statement of how petitioner took his gun during a fight in his neighborhood, which Arnold subsequently confirmed at the preliminary hearing and again at trial.  Arnold claims that "[a]ll I was trying to do was remove myself from the situation and distance myself from the gun" (Petitioner's Exhibit T at 2).  This makes no sense.  If Arnold were desperate to disclaim any connection to the Mullen murder and the gun used in the killing, he would not invent a detailed story explicitly **linking** him to the murder weapon.  Arnold's exceedingly dubious recantations admitting perjury are not reliable evidence demonstrating his actual innocence.

### 4.   Manigault's statements

Petitioner avers that "[a]dditional new evidence independent of th[e] recantations [of David Williams and Arnold], namely statements from both Mark Manigault and Jack Williams, seriously undermines any weight that a reasonable juror might have assigned to David Williams' initial statement to police" (Petitioner's Memorandum at 30).  The statements of Manigault are not new pursuant to Schlup.  As discussed, the vital facts underlying this evidence – that David Williams falsely implicated petitioner, and that David Williams was the actual killer – have been known to petitioner since at least 2003.  See Sistrunk, 674 F.3d at 189, 191.

The Manigault evidence is also not new because Manigault was readily available to the defense at trial.  See Goldblum, 510 F.3d at 226 n.14.  The fact that David Williams gave his statement incriminating petitioner upon his arrest for a series of robberies raised the possible relevance of the circumstances of that arrest (N.T. 09/25/98, 4).  As the PCRA court in this case observed, "[c]ertainly, the circumstances

under which a witness gives a statement while in police custody are commonly inquired into by defense counsel in order to determine a possible basis to impeach that statement" (PCRA court opinion, 01/30/15, at 11).  A routine check of publicly available information would have revealed that David Williams' co-defendant in the robberies, who was arrested along with him, was Mark Manigault (See Exhibit C).

  In any case, Manigault's statements are not "reliable" within the meaning of Schlup.  They are not "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."  Schlup, 513 U.S. at 324.  He is a convicted robber (CP-51-CR-0312682-1997), "a crime that reflects on an individual's veracity."  United States v. Golson, 2009 WL 89670 at *5 (E.D. Pa. 2009).  As Manigault himself admits, he was "incarcerated with" petitioner and spoke with him about the murder (Petitioner's Exhibit P at 1-2).  This admission raises the prospect of undue influence or coercion.  His purported recollections of what Williams supposedly said to him more than fourteen years earlier are rank hearsay.  See Herrera v. Collins, 506 U.S. 390, 417 (1993) ("Petitioner's affidavits are particularly suspect . . . because . . . they consist of hearsay").  Manigault allegedly told a defense investigator on September 7, 2011 that he "could not remember Mr. Williams' exact words" (Petitioner's Exhibit O at 5).  However, the certification he executed later that same month purports to quote Williams verbatim (Petitioner's Exhibit P at 1).  Manigault's certification also claims that "I think David told the police that I was there for the homicide so that I could help myself out too" (Id.).  In fact, David Williams' police statement contains no reference whatsoever to Manigault, much less an allegation that he was present for the murder (N.T. 09/24/98, 122-129).

Although quite brief, Manigault's certified statement manages to include two admissions that he lied.  He claims that "[t]he police interrogated me for a while about the homicide but I didn't know anything about it because I was incarcerated when the homicide occurred" (Petitioner's Exhibit P at 1).  He similarly claims that when he encountered petitioner in prison, "I said I didn't know anything" (Id. at 1-2).  Yet, according to Manigault, he **did** know something about the murder.  According to him, David Williams had told him that he (Williams) had committed the killing and was planning to pin it on someone else.  Thus, Manigault, by his own admission, lied to both the police and petitioner when he professed total ignorance regarding the Mullen slaying.

Moreover, by way of explaining his belated decision to make a statement, Manigault implausibly alleges that "I have agreed to make this statement because I spoke to David Williams and he gave me his permission" (Petitioner's Exhibit P at 2).  However, David Williams has been recanting his police statement since 1997, and claiming that he himself committed the Mullen murder since at least 2003.  Whatever Manigault's motivation may have been for finally coming forward many years after the fact, it was certainly not because David Williams had only recently indicated his willingness to publicly air his recantation.  In addition, Manigault's admitted interaction with David Williams suggests collusion between them.

### 5.   **Jack Williams' statements**

The statements of Jack Williams are likewise neither new nor reliable.  The vital underlying facts here are that David Williams falsely implicated petitioner, that David Williams committed the killing, and that David Williams accused Jack Williams of a

separate murder.  Again, petitioner has known the first fact since 1997, and the second

fact since 2003 at the latest.  He has known of the third fact since his trial in 1998, when

David Williams specifically testified that homicide detectives questioned him about Jack

Williams before they interviewed him about petitioner's murder of Mullen:

> Q.  And did you say that to [Homicide Detective] Jeff
> Piree, the guy who took your statement?
>
> A.  Yes, I told it to both of them.  I mean, I told Piree.
> They initially took me to 8th and Race.
>
> Q.  Right.
>
> A.  – for – **they asked me questions about Jack
> Williams, that was the initial**, and then from there they
> started asking me questions about other things.

(N.T. 09/24/98, 81-82 [emphasis added]).  Because petitioner has known the vital facts

underlying Jack Williams' statements for many years, this evidence is not new.  See

Sistrunk, 674 F.3d at 189, 191.

Moreover, because petitioner was expressly alerted to the potential relevance of

Jack Williams at trial, he could have readily pursued this evidence at that time.  Jack

Williams was eminently available as early as 1998.  For this reason too, his statements

may not be deemed new for Schlup purposes.  See Goldblum, 510 F.3d at 226 n.14.

The allegations by Jack Williams are also not reliable.  As with the other

evidence proffered by petitioner, the allegations of Jack Williams fall outside the ambit

of compelling evidence that may satisfy the difficult-to-meet miscarriage of justice

exception.  Jack Williams' accusations many years after the fact do not constitute

"exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence."  Schlup, 513 U.S. at 324.  Jack Williams is a convicted first-degree murderer

(CP-51-CR-0503781-1997).  While first-degree murder may not technically constitute a crimen falsi offense, it is certainly no great stretch to conclude that a man capable of the most serious crime known to state law would have no compunction about lying. Petitioner's evidence regarding Jack Williams substantially consists of hearsay upon hearsay: a defense investigator's accounts of what Jack Williams purportedly told her regarding what David Williams purportedly told him when they were incarcerated together more than fourteen years earlier.  See Herrera, 506 U.S. at 417 (noting that affidavits consisting of hearsay are "particularly suspect").

Moreover, Jack Williams offered no explanation for why his alleged prison conversation with David Williams in 1997 would have turned from a discussion of Jack Williams' own case to a discussion about the Mullen murder, a case in which Jack Williams had no personal interest.  Jack Williams also displayed an implausibly strong memory for the alleged details of the supposed discussion of the Mullen killing many years earlier.  For instance, he purported to recall that David Williams told him he "went to get high" and "look for women" after the shooting, that he sold the murder weapon to an individual named "Randolph Dwayne Wright," and that David Williams explained to him that he provided information on the Mullen murder to "get less time for his pending robbery" (Petitioner's Exhibit R at 4-5).

### 6.    Petitioner is not actually innocent

In addition to petitioner's failure to support his constitutional claims with new and reliable evidence not available at trial, the miscarriage of justice gateway is also unavailable to him for a second, independently sufficient reason: he has not demonstrated his actual innocence by establishing that in light of his supposedly new

evidence, it is more likely than not that not even a single reasonable juror would have voted to convict him.

Certainly, the inconsistent, ever-changing recantations of David Williams would have zero chance of convincing any juror of his innocence. After all, David Williams explicitly recanted his police statement at trial (N.T. 09/24/98, 93). Yet the jury readily saw through his transparent lie and unanimously voted to convict. To be sure, the jurors at petitioner's 1998 trial were not privy to his more recent recantations claiming that he himself murdered Mullen. However, these tales are even more outlandish than his discredited trial testimony. Indeed, he has pleaded guilty to perjury based on his demonstrably and admittedly false claim to have committed the killing (despite being unable to correctly identify the victim's race, his clothing, or the location of the murder). Presenting additional versions of David Williams' recantation that are even more palpably untrue than the one unanimously rejected at trial would not be remotely exonerating.

Arnold's recantations would likewise not be exculpatory. Arnold partially recanted at trial. In contrast to his statement to police that the gun he provided petitioner was either a .380 caliber or 9 millimeter, he claimed at trial to not know the caliber of the gun (N.T. 09/24/98, 171). In addition, he alleged for the first time at trial that the gun petitioner took from him did not work (Id. at 161). Thus, here, as with David Williams, it is not mere speculation that recantations by Arnold would not make a bit of difference at trial. Arnold **did** recant at trial, and the jury nonetheless voted to convict.

Furthermore, even if credited, Arnold's recantations hardly establish petitioner's innocence. Even assuming, as his recantations allege, that Arnold did not provide the

gun petitioner used to shoot and kill and Mullen, this would not mean petitioner could not have committed the murder. Rather, it would merely mean that petitioner "would have had to have obtained a gun from a source other than Arnold" (Petitioner's Exhibit 6 at 17).

With respect to the statements of Manigault, this publicly-identified co-defendant of David Williams has been available to petitioner since at least 1997. However, petitioner did not get around to introducing any evidence concerning Manigault to any court until 2011. His unexplained delay in presenting this evidence undermines its purported exculpatory value. See McQuiggin, 133 S.Ct. at 1935 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing").

Moreover, Manigault's vague, hearsay allegation that David Williams told him while they were imprisoned together in 1997 that David was going to "pin a homicide that he (David) had done on somebody else" does not explicitly reference the Mullen killing. And even if it did, it is beyond peradventure that David's claim to be responsible for the murder of Mullen is simply not true. At the 2003 PCRA hearing, David could not even get basic details like the victim's race and clothing or the location of the shooting correct, and he subsequently pleaded guilty to perjury based on his demonstrably false testimony. Hearing that, in addition to admittedly lying about killing Mullen at the PCRA hearing, David also allegedly told his co-defendant the same lie would not make it probable that not even one juror would convict petitioner. Simply because an obvious lie may be repeated does not make it any more credible.

There is likewise no exoneration to be found in Manigault's suggestion that David Williams told the police that Manigault was a witness to the murder. Manigault offers only an equivocation based on supposition. He merely claims that, "I think David told the police that I was there for the homicide" (Petitioner's Exhibit P at 1 [emphasis added]). Furthermore, Manigault's guesswork is refuted by David's police statement, which contains nary a single reference to Manigault (N.T. 09/24/98, 122-129). In any case, even assuming David did mention his co-defendant as a witness, this does not come anywhere close to demonstrating that petitioner did not commit the murder.

As for Jack Williams, there was, as with Manigault, an unjustified, many-years-long delay by petitioner in pursuing this witness. David Williams explicitly testified at petitioner's trial back in 1998 that he spoke to homicide detectives about Jack Williams before giving his statement in this case (N.T. 09/24/98, 81-82). However, petitioner did not present any evidence regarding Jack Williams to any court until 2012, more than fourteen years later. Petitioner's lengthy, unexplained delay in presenting the Jack Williams evidence seriously undermines its exculpatory force. See McQuiggin, 133 S.Ct. at 1935.

In addition, the double-hearsay allegation of defense investigator Tyler that Jack Williams purportedly told her that David Williams purportedly told him that he pinned the Mullen murder on petitioner is hardly persuasive evidence of innocence. Again, David Williams' claim to be responsible for the murder of Mullen is an obvious and admitted lie, as his demonstrably false testimony at the 2003 PCRA hearing and subsequent guilty plea to perjury conclusively show. Jack Williams' belated allegation that David

45

Williams also expressed this patent fabrication to him does not make it any more credible.

There is likewise nothing exculpatory about the double-hearsay allegation that David Williams purportedly told Jack Williams that David merely "agreed" with the police when they questioned him regarding Jack's separate murder case (Exhibit B at 1; Petitioner's Exhibit Q at 4). Agreeing with the police is not same thing as lying to them. In any case, any hypothetical recantation by David Williams of his police statement in Jack Williams' murder case would be no more credible than his various false recantations in this case. As the presiding trial judge in Jack Williams' case observed, "[t]he evidence of [his] guilt was overwhelming. . . . including eyewitness identification, defendant's testimony that he harbored a raging grudge against the victim, his threat, and later admission that he was going to kill the victim." Williams, 2002 WL 34401582. The mountain of evidence incriminating Jack Williams in the murder of Paul Jones reflects that it was David Williams' initial police statement likewise implicating Jack in the killing that was in fact credible, not any subsequent attempt to disavow this amply corroborated statement. Moreover, even if David had falsely accused Jack in that unrelated murder, this would not demonstrate that David falsely identified petitioner here. This is not one of the "extraordinary" and "rare" circumstances where the petitioner has raised a tenable claim of actual innocence. House, 547 U.S. at 538; McQuiggin, 133 S.Ct. at 1928.

The inadequacy of petitioner's proffers is especially clear in light of the strength of the evidence against him, which, in the context of a claim of actual innocence, is not limited to the evidence presented at trial. See Bousley, 523 U.S. at 624; Garth, 188

F.3d at 107. David Williams' police statement recounting petitioner's confession to the murder included numerous detailed facts about the killing. For instance, the statement noted that the murder weapon was a 9 millimeter gun (N.T. 09/24/98, 124). This was corroborated by the recovery at the scene of a 9 millimeter fired cartridge casing and a fired 9 millimeter bullet that had clearly struck something (N.T. 09/24/98, 56-57, 68, 124, 168; N.T. 09/25/98, 55, 70-71, 74-75). David's statement recounted that the victim "wouldn't give up the money" and "wouldn't give it up" – i.e., violently resisted petitioner's robbery attempt (N.T. 09/24/98, 123). A .25 caliber handgun was underneath the victim's body and three .25 caliber fired cartridge casings and one fired .25 caliber fired bullet were recovered from the parking lot, confirming that the victim fought back (N.T. 09/24/98, 57-60, 123; N.T. 09/25/98, 66, 71-73). David's statement indicated that petitioner netted only a "few dollars" from the crime (N.T. 09/24/98, 123). This was confirmed by the full allotment of money in the parking lot's cash register and the money in the victim's pocket (N.T. 09/24/98, 30, 123, 138). The statement reported that the victim closed a door on petitioner's hand (N.T. 09/24/98, 124). The driver's side door to the victim's van was in fact open (N.T. 09/24/98, 52, 124). According to David's statement, petitioner cut his finger during the crime (N.T. 09/24/98, 124). Indeed, when petitioner was arrested, he had scar on the outside of his left hand and a cut on the outside of his right hand (N.T. 09/22/98, 31-32; Exhibit A). David's statement provided that petitioner obtained the murder weapon from Mike Arnold (N.T. 09/24/98, 124). This was confirmed by Arnold's police statement, and partially corroborated by Arnold's trial testimony (N.T. 09/24/98, 167-168; 88, 91; Exhibit C-24). David said that petitioner told him that he had "gotten rid of of the gun" used in the murder. Petitioner

47

"busted it . . . up and threw it away" (N.T. 09/24/98, 124). The murder weapon was in fact never recovered (N.T. 09/24/98, 19, 124, 126).

These details of the murder were never shared with the public (N.T. 09/25/98, 92-93). Moreover, the detective who took David Williams' statement, Detective Piree, could not have supplied these specifics to David because the detective did not know them. Detective Piree was not the detective assigned to the Mullen murder, and did not know any details about the killing (N.T. 09/24/98, 130-131, 133; N.T. 09/25/98, 88). The claim that David Williams' knew this detailed information because he himself committed the murder has been thoroughly foreclosed by cross-examination in state court exposing this allegation as an utter fabrication, and David's subsequent guilty plea to perjury based on his false testimony under oath that he fabricated petitioner's confession to him. The only reasonable explanation for David Williams' knowledge of myriad intimate details of the murder is that petitioner in fact confessed the crime to him. Having provided a detailed confession to the murder of Anthony Mullen replete with numerous non-public facts of the killing, it is clear that petitioner is guilty of this slaying. The demanding miscarriage of justice exception is not established here.

**D.     This claim is baseless**

Petitioner's non-cognizable and defaulted claim of error during his state collateral review proceedings also fails on the merits.  Pennsylvania's postconviction relief procedures for raising claims of newly discovered evidence are not inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness.

48

"[D]ue process of law does not require a state court to consider newly discovered evidence proffered after trial if the trial itself was constitutionally adequate." McKinney v. Walsh, 2012 WL 706998 at *1 (E.D. Pa. Mar. 6, 2012) (order) (quotation marks and citation omitted). See also Herrera, 506 U.S. at 427-428 (Scalia, J., concurring) ("There is no basis in text, tradition, or even in contemporary practice (if that were enough) for finding in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction"). However, a "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 68 (2009). Because "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man[,] . . . [t]he State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." Id. at 69." "[W]hen a State chooses to offer help to those seeking relief from convictions, due process does not dictate[] the exact form such assistance must assume." Id. (quotation marks and citation omitted). "Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." Id. A state's postconviction relief procedures are "fundamentally inadequate" only if they are "inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness." Id. at 70 (quotation marks and citation omitted).

Here, Pennsylvania's PCRA statute provides that a petitioner may be eligible for relief if he pleads and proves by a preponderance of the evidence that his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence

49

that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). Claims of newly discovered evidence, like all claims under the PCRA, must generally be raised "within one year of the date the judgment becomes final." 42 Pa.C.S. § 9545(b)(1). However, there are "three exceptions to the time bar." Commonwealth v. Lark, 746 A.2d 585, 588 (Pa. 2000). A claim need not be raised within one year of the date the judgment became final if the petition alleges and the petitioner proves that:"(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States; (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. § 9545(b)(1)(i)-(iii). A petition invoking one of the exceptions to the PCRA time bar "shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

These procedures are not fundamentally inadequate. **The PCRA exceeds** constitutional mandates by establishing a state-law right to present newly available exculpatory evidence following conviction. The limits on this state-law right are reasonable. Certainly, the general one-year deadline for raising such claims is reasonable. As the Pennsylvania Supreme Court has observed, the PCRA's one-year time bar "strikes a reasonable balance between society's need for finality in criminal

50

cases and the convicted person's need to demonstrate that there has been an error in the proceedings that resulted in his conviction." *Commonwealth v. Peterkin*, 722 A.2d 638, 643 (Pa. 1998). Indeed, the federal habeas statute likewise mandates "[a] 1-year period of limitation" for the filing of habeas petitions by persons "in custody pursuant to the judgment of a State court." 28 U.S.C.A. § 2244(d)(1).

Moreover, the general one-year deadline is not without exceptions. If the newly-discovered evidence claim satisfies one of the three exceptions set forth in 42 Pa.C.S. § 9545(b)(1), and the claim is raised within sixty days of the date it could have been presented in accordance with 42 Pa.C.S. § 9545(b)(2), the one-year statute of limitations is inapplicable, and no time limit of any sort applies to the claim. *See Wyzykowski v. Department of Corrections*, 226 F.3d 1213, 1217 (11th Cir. 2000) ("In light of the . . . exceptions to the one-year limitations period, . . . we readily conclude that, as a general matter, the § 2244(d) limitation period does not render the collateral relief ineffective or inadequate to test the legality of detention").

The diligence requirement of 42 Pa.C.S. § 9545(b)(1)(ii) is eminently reasonable as well. Indeed, the comparable provision of the federal habeas statute includes an effectively identical requirement. *See* 28 U.S.C.A. § 2244(d)(1)(D) (providing that one-year federal statute of limitations may start from "the date on which the factual predicate of the claim or claims presented could have been discovered **through the exercise of due diligence**") (emphasis added). *See also Osborne*, 557 U.S. at 70 (state-law requirement that DNA evidence "must have been diligently pursued" in order for defendant to be entitled to access to evidence was "not inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness")

51

"[t]he requirement is facially reasonable" (Petitioner's Memorandum at 35). There is
nothing inadequate (let alone fundamentally inadequate) about Pennsylvania's
procedures for vindicating its state-created right to challenge a conviction with newly
available exculpatory evidence, which largely track those provided by federal law.

Petitioner's arguments to the contrary are misguided and unconvincing. He
contends that "[t]he Process afforded Mr. Miller has been and remains fundamentally
inadequate to vindicate his rights because of (1) the Pennsylvania Superior Court's
insistence that Mr. Miller present novel defense *theories* in order to obtain relief rather
than newly-discovered *evidence*, and (2) the Pennsylvania Superior Court's failure to
separate the benefit of hindsight from any possible diligence that Mr. Miller could have
reasonably employed to discover new evidence" (Petitioner's Memorandum at 33
[emphasis in original]). These are not allegations that Pennsylvania's postconviction
relief procedures are themselves fundamentally inadequate. Rather, petitioner is
arguing that the state Superior Court's **interpretations** of these state procedures in **his
specific case** were erroneous. However, it is axiomatic that any hypothetical error by
the state court in construing its own state law in this particular matter would not give rise
to a due process violation. See Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982) ("We
have long recognized that a mere error of state law is not a denial of due process. . . . If
the contrary were true, then every erroneous decision by a state court on state law
would come [to this Court] as a federal constitutional question") (quotation marks and
citations omitted).

In any case, petitioner mischaracterizes the Superior Court's decisions. The Superior Court never insisted that petitioner raise "novel defense theories" in order to invoke 42 Pa.C.S. § 9545(b)(1)(ii). Rather, the state court merely construed "the facts upon which the claim is predicated" language of this provision to mean the vital facts underlying the claim. See Commonwealth v. John Miller, 3269 EDA 2012 at 15-16 (July 24, 2012) ("the 'fact' that Williams falsely accused Miller of Mullen's murder was known to Miller long before Manigault 'came forward' with his claim that Williams confided in him in prison. . . . Moreover, to the extent that Manigault's statement implicates Williams in the crime, Williams began implicating himself in Mullen's murder as far back as 2002"); id. at 18-19 ("Although his most recent story contains some new details, the crux of the story – that Williams, and not Miller, killed Mullen – remains the same"); Commonwealth v. John Miller, 3563 EDA 2014 at 14 (Dec. 18, 2015) ("David's statement accusing Jack . . . is simply Appellant's latest means to discredit David's statement implicating him in Mullen's murder. Appellant has known the ultimate fact that David falsely accused Appellant of Mullen's homicide since his preliminary hearing in October 1997"); id. at 15 ("Appellant asserts that Arnold's latest, most detailed recantation is a newly discovered fact capable of overcoming the time-bar . . . Arnold, however, recanted his initial statement to police both at Appellant's trial and in a 2011 statement"). This was a perfectly reasonable construction of state law.

Indeed, the Third Circuit interprets effectively identical language in the federal analogue to 42 Pa.C.S. § 9545(b)(1)(ii) – 28 U.S.C. § 2244(d)(1)(D) – in exactly the same way. Section 2244(d)(1)(D) provides that the one year statute of limitations for federal habeas petitions may run from "the date on which the factual predicate of the

claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). The Third Circuit has held that "the factual predicate" of a petitioner's claims constitutes the 'vital facts' underlying those claims." McAleese v. Brennan, 483 F.3d 206, 214 (3d Cir. 2007). See also Champney v. Secretary, Dept. of Corrections, 469 Fed. Appx. 113, 116 (3d Cir. 2012) ("The requisite 'factual predicate' of a claim is the set of 'vital facts' underlying the claim"). The Pennsylvania Superior Court's interpretation of its own state postconviction relief procedures in accordance with how this Circuit interprets its corresponding federal postconviction procedures was not "inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness." Osborne, 557 U.S. at 68 at 70.

The Superior Court's assessments of petitioner's diligence were likewise not fundamentally inadequate. Contrary to petitioner's claims, the state court never imported hindsight into its diligence analysis. On appeal from the dismissal of petitioner's third PCRA petition, the Superior Court ruled that petitioner was not diligent in pursuing a purported police statement given by Manigault. The state court reasoned:

> Miller became aware of Manigault's status as a possible exculpatory witness on July 18, 2011, when Williams spoke to Project Innocence staff members and told them that he may have confessed to Manigault while imprisoned together for robbery. However, Williams has been known to Miller since prior to his trial – indeed, since childhood. Moreover, Williams has been actively cooperating with Miller's efforts to exonerate himself since at least 2003. Certainly, through the exercise of due diligence, Miller could have obtained information regarding Manigault from Williams prior to 2011.

Commonwealth v. John Miller, 3269 EDA 2012 at 21-22. Thus, the state court determined that petitioner was not diligent in seeking Manigault's statement prior to

2011 based on the circumstances confronting petitioner at the time: his longstanding

relationship with David Williams, and David's active involvement in petitioner's defense.

This is not a hindsight analysis.

Similarly, on PCRA appeal from the dismissal of petitioner's fourth petition, the

Superior Court determined that petitioner did not exhibit due diligence in obtaining David

Williams' police statement implicating Jack Williams in the separate murder of Paul

Jones:

> We emphasize that David had recanted his statement since
> Appellant's preliminary hearing and had been actively
> assisting Appellant in his post-conviction proceedings since
> at least 2003. Because of David's cooperation, we conclude
> that Appellant could have ascertained David's statement
> about Jack through the exercise of due diligence.

Commonwealth v. John Miller, 3563 EDA 2014 at 17. Here again, petitioner's diligence

was evaluated in light of contemporaneous factors – David's recantation at the

preliminary hearing, and his active assistance to the defense – rather than through the

lens of hindsight. The state court's reasonable due diligence determinations in light of

contemporaneous circumstances were hardly inconsistent with bedrock traditions, the

conscience of our people, or any recognized principle of fundamental fairness.

In fact, here, as with the factual predicate question, the Superior Court's analyses

accorded with federal law. The Third Circuit has held that "[w]hen a petitioner has

knowledge of his innocence and of witnesses who might testify to it, [m]ere excusable

neglect is not sufficient to show diligence." Sistrunk, 674 F.3d at 190 (quotation marks

and citation omitted). Pursuant to this law, petitioner neglecting for years to ever even

ask lifelong friend and recanting and defense-cooperating witness David Williams if

there was anyone else he may have confessed the murder to, and if he ever gave a

statement in any other case, was not due diligence.  The Superior Court's diligence holdings were not merely adequate.  They were exactly in line with what the Third Circuit would have ruled.  Petitioner's non-cognizable, defaulted, and baseless claim of error on state postconviction review does not entitle him to habeas relief in federal court.

### III.    THE JACK WILLIAMS BRADY CLAIM IS UNTIMELY, DEFAULTED, AND BASELESS

Petitioner claims that the Commonwealth violated Brady when it failed to disclose David Williams' police statement implicating Jack Williams in the separate and unrelated murder of Paul Jones ("Petitioner's Memorandum at 38, 41).  This claim is untimely, procedurally defaulted, and meritless.

### A.    This claim is untimely

The Pennsylvania Superior Court affirmed petitioner's judgment of sentence on December 29, 2000, and he did not seek allowance of appeal to the Pennsylvania Supreme Court.  Accordingly, his judgment became final on January 29, 2001, upon expiration of the thirty-day deadline for seeking allowance of appeal to the state Supreme Court.  See Pa.R.A.P. 1113(a).  The one-year statute of limitations for the filing of a federal habeas petition began to run on this date.  See 28 U.S.C.A. § 2244(d)(1).  One hundred and six days later, on May 15, 2001, petitioner filed his first, timely PCRA petition in state court.  This petition was pending in state court until April 19, 2005, when the Pennsylvania Supreme Court denied allowance of appeal from the Superior Court's affirmance of the dismissal of the petition.  The statute of limitations was tolled during the pendency of petitioner's properly-filed, first PCRA petition.  See 28

U.S.C.A. § 2244(d)(2). The statute of limitations then began to run again, and expired

two-hundred and fifty-nine days later, on January 3, 2006.[3]

As petitioner acknowledges, he did not raise his Brady claim concerning the

police statement about Jack Williams in federal court until February 21, 2013, when he

included this claim in an amendment to his second habeas petition (Petitioner's

Memorandum at 28). Thus, he raised this claim more than six years after the expiration

of the federal statute of limitations. This claim is untimely.

Petitioner maintains that this claim is timely pursuant to 28 U.S.C. §

2244(d)(1)(D) (Petitioner's Memorandum at 25). Specifically, he argues that "[u]ntil

March 1, 2012, [when his representatives purportedly interviewed Jack Williams],

despite continued and diligent efforts to establish his innocence for more than a decade,

Mr. Miller had no way of knowing that David Williams falsely implicated Jack Williams in

another, unrelated murder on the same day that he implicated Mr. Miller in the Mullen

murder" (Id. at 28). This argument is unpersuasive.

Section 2244(d)(1)(D) provides that the one-year limitations period may start on

"the date on which the factual predicate of the claim or claims presented could have

been discovered through the exercise of due diligence." "[T]he 'factual predicate' of a

petitioner's claims constitutes the 'vital facts' underlying those claims." McAleese, 483

F.3d at 214. Accord Champney, 469 Fed. Appx. at 116. The vital fact underlying

---

[3] Petitioner's second, third, and fourth PCRA petitions did not give rise to statutory
tolling for two reasons. First, these petitions were filed after the expiration of the federal
one-year statute of limitations: on October 23, 2007, April 19, 2011, and September 20,
2012, respectively. Second, these petitions were themselves untimely under the
PCRA's one-year time bar, and thus were not "properly filed" as required by 28 U.S.C. §
2244(d)(2). See Pace, 544 U.S. at 417.

petitioner's <u>Brady</u> claim – that David Williams gave a police statement implicating Jack Williams in a separate murder before providing his statement in this case – has been actually known by petitioner since his 1998 trial.

David Williams specifically testified at trial that homicide detectives questioned him about Jack Williams right before they interviewed him about petitioner's murder of Mullen:

> Q. And did you say that to [Homicide Detective] Jeff Piree, the guy who took your statement?
>
> A. Yes, I told it to both of them. I mean, I told Piree. They initially took me to 8th and Race.
>
> Q. Right.
>
> A. – for – **they asked me questions about Jack Williams, that was the initial,** and then from there they started asking me questions about other things.

(N.T. 09/24/98, 81-82 [emphasis added]). This trial testimony alerted petitioner that David Williams gave a statement accusing Jack Williams of a separate murder immediately before providing his statement against petitioner in this case. At the very minimum, the above-quoted testimony notified petitioner of the possibility of such a statement, which petitioner could have easily confirmed through even a modicum of diligence. Indeed, as petitioner himself recounts, when he finally got around to contacting Jack Williams many years later in 2012, Jack Williams readily reported that David Williams had given a statement against him, and readily provided petitioner with an actual copy of the statement (Petitioner's Memorandum at 15-17). David Williams' express testimony at trial all the way back in 1998 that homicide detectives asked him questions about Jack Williams immediately before questioning

58

him about this case obliterates petitioner's false assertion that he "had no way of knowing" about the Jack Williams statement before 2012.

In fact, even if the Court were to improperly ignore (as petitioner does) that David Williams explicitly testified about Jack Williams at trial, it would still be clear that the fact that David Williams provided a police statement accusing Jack Williams of murder was attainable through due diligence well before 2012. David Williams was a lifelong friend of petitioner who had been recanting his police statement since 1997 and actively participating in the defense since at least 2003. As the state PCRA court cogently explained, ascertaining that David Williams gave a police statement implicating Jack Williams in a separate murder was merely a matter of asking this friendly and cooperative witness the "simple question as to what occurred while he was in police custody on the day he gave the statement. Certainly, the circumstances under which a witness gives a statement while in police custody are commonly inquired into by defense counsel in order to determine a possible basis to impeach that statement" (PCRA court opinion, 01/30/15, at 11). This Brady claim raised for the first time in federal court more than fourteen years after it could have been presented is manifestly untimely.

**B.    This claim is defaulted**

The Pennsylvania Superior Court rejected this claim on the basis that it was not timely raised in accordance with the PCRA's statute of limitations (Commonwealth v. John Miller, 3563 EDA 2014 at 18 ["because Appellant's petition is untimely, we need not address the merits of the alleged Brady violation"]). This was an independent and adequate state law procedural ruling precluding federal habeas review. See, e.g.,

Peterson v. Brennan, 196 Fed.Appx. 135, 142 (3d Cir. 2006) ("the PCRA statute of

limitations is an adequate and independent state ground to deny habeas relief");

Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002) ("it is now clear that this one-year

limitation is a jurisdictional rule that precludes consideration of the merits of any

untimely PCRA petition, and it is strictly enforced in all cases, including death penalty

appeals"); Robinson v. Lamas, 2014 WL 1632213 at *8 (E.D. Pa. 2014) (adopted report

and recommendation) ("The Third Circuit has held that the PCRA statute of limitations is

an independent and adequate state rule ground that precludes federal habeas review");

Furman v. Sauers, 2013 WL 4547847 at *7 (E.D. Pa. 2013) (adopted report and

recommendation) ("The PCRA's statute of limitations has been found to be an

independent and adequate basis to support a procedural default"); Murphy v. Harlow,

2015 WL 8331699 at *3 (M.D. Pa. 2015) (memorandum) ("The one-year statute of

limitations applicable to state PCRA proceedings has been held to be . . . an

independent and adequate state procedural rule").

        As detailed above in section IIC, the miscarriage of justice exception does not

excuse the default.  Petitioner has not proffered new and reliable evidence of his actual

innocence, nor made the requisite showing that it is more likely than not that not even a

single reasonable juror would convict him in light of his proffers.  Notwithstanding

petitioner's unpersuasive invocation of the demanding miscarriage of justice exception,

this claim is procedurally defaulted, and is therefore necessarily beyond the reach of

federal habeas corpus review.

        **C.      This claim is baseless**

In addition to being time-barred and defaulted, this claim fails on the merits as well. Under Brady, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 132 S.Ct. 627, 630 (2012). Thus, "[t]o prove a Brady violation, a defendant must show the evidence at issue meets three critical elements." Dennis v. Secretary, Department of Corrections, 834 F.3d 263, 284 (3d Cir. 2016) (en banc). "First, the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching." Id. (quotation marks and citations omitted). "Second, it must have been suppressed by the State, either willfully or inadvertently." Id. at 284-285 (quotation marks and citation omitted). "Third, the evidence must have been material such that prejudice resulted from its suppression." Id. at 285 (citations omitted). The defendant "has the burden of establishing a Brady violation." United States v. Felix, 221 Fed. Appx. 176, 177 (3d Cir. 2007). Accord Carter v. Parker, 2014 WL 3964924 at *35 (E.D. Pa. 2014) (adopted report and recommendation) ("The burden is on the defendant to prove that the Commonwealth committed a Brady violation"). Here, petitioner has not carried his burden of demonstrating any of the three requirements of Brady.

**1.    The evidence is not favorable**

David Williams' police statement accusing Jack Williams of murdering Paul Jones is not evidence favorable to petitioner. On the contrary, this statement **corroborates** the credibility of David's police statement against petitioner here. "The evidence of [Jack Williams'] guilt was overwhelming . . . including eyewitness identification, defendant's testimony that he harbored a raging grudge against the

victim, his threat, and later admission that he was going to kill the victim.'" Williams, 2002 WL 3440182. The compelling other evidence demonstrating that Jack Williams murdered Paul Jones likewise indicates that David Williams' statement implicating Jack in the Jones killing is truthful. Evidence that David accurately and credibly identified the killer in another case substantiates, rather than undermines, the truthfulness of his statement about petitioner.

Petitioner argues that "[n]ow . . . David Williams admits that he fabricated" his statement against Jack Williams ("Petitioner's Memorandum at 40"). David's very belated claim to a defense investigator in 2012 that he supposedly made up his statement against Jack Williams is not remotely credible ("Petitioner's Exhibit Q"). His recantations of his statement against petitioner have been exposed as obvious lies, and have even given rise to a guilty plea to perjury. Moreover, the overwhelming evidence of Jack Williams' guilt confirms the reliability of David's initial statement against Jack. David Williams' purported recantation of his Jack Williams statement is no more believable than his blatantly fabricated and admittedly perjurious recantations of his statement against petitioner.

Petitioner alleges that "David Williams also now explains that the evidence he provided against Jack Williams could easily be disproven through prison telephone records" ("Petitioner's Memorandum at 40"). On the contrary, David Williams' police statement did not specify the date of the telephone call in which Jack Williams admitted to him that he killed Paul Jones. David's statement likewise did not specify that the call involved an official prison telephone subject to recording. In addition, the call was only one piece of the evidence against Jack Williams included in David Williams' statement.

For instance, David additionally told the police in his statement that four other people besides Jack Williams told him that Jack murdered Paul Jones: Jesse Booker, Keith Edwards, Eugene Patterson, and Dwayne Wright (Petitioner's Exhibit S at 2, 4). Mere prison telephone records would not "easily" disprove the entirety of David's statement against Jack. Indeed, it is telling that despite "the benefit of legal representation, years, . . . thousands upon thousands of dollars to chase down leads, . . . the services of a retired FBI agent[,] and questioning[] . . . by former federal prosecutors" ("Petitioner's Memorandum at 37), petitioner has never proffered any such records to any court.

Finally, petitioner contends that the fact "[t]hat the Commonwealth did not call [David Williams] as a witness in Jack Williams' murder trial further demonstrates that the police knew that his accusations against others were false" ("Petitioner's Memorandum at 40). This is silly. The Commonwealth did not present David Williams' testimony at Jack Williams' murder trial because the evidence was "overwhelming" without it. Williams, 2002 WL 34401582. Also, David Williams had shown himself at petitioner's 1997 preliminary hearing in petitioner's case, which predated the Jack Williams trial in 1998, to be an uncooperative witness. The Commonwealth reasonably declined to present David Williams as a witness at the murder trial for Jack Williams because David's testimony was redundant and unnecessary, and he was likely to be a "south" witness, not because it disbelieved his amply corroborated police statements.

**2.     The evidence was not suppressed**

"Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. Perdomo, 929 F.2d 967, 973 (3d Cir. 1991).

Accord United States v. Claxton, 766 F.3d 280, 304 (3d Cir. 2014). Here, petitioner knew of the essential fact that David Williams gave a police statement implicating Jack Williams in a separate murder by virtue of David's explicit testimony on direct examination at trial that homicide detectives "asked me questions about Jack Williams" before questioning him about petitioner (N.T. 09/24/98, 82). The fact of the Jack Williams statement was squarely at petitioner's disposal at trial to potentially impeach David Williams. Thus, the statement was not suppressed for Brady purposes.

Petitioner notes that "Mr. Leon Williams [his trial counsel] signed an affidavit stating at no time prior to or during Mr. Miller's trial was he ever aware that David Williams . . . gave a statement to police implicating Jack Williams in the Jones murder" (Petitioner's Memorandum at 43). This affidavit is not credible. It also claims that "at no time did I ever receive any information, documents or other materials regarding Jack Williams" (Petitioner's Exhibit V at 1). In light of David's express testimony at trial about being questioned about Jack Williams (N.T. 09/24/98, 82), this allegation is demonstrably false.

Moreover, to believe that counsel was unaware about the Jack Williams statement, one would have to presume that counsel was simply (and ineffectively) not paying attention when David Williams testified about the statement. The "strong presumption" in the law, however, is that counsel was competent. Strickland v. Washington, 466 U.S. 668, 689 (1984). Petitioner has not rebutted the strong presumption of competent representation.

In any case, irrespective of whether petitioner actually knew about the Jack Williams statement, given David Williams' trial testimony about the statement, he

64

certainly at least **should** have known about it. This alone would be sufficient to find that the statement was not suppressed. *See* Perdomo, 929 F.2d at 973 ("Evidence is not considered to be suppressed if the defendant either knew **or should have known** of

'the essential facts permitting him to take advantage of any exculpatory evidence'")

(emphasis added).

**3.    The evidence is not material**

The police statement accusing Jack Williams also flunks the material requirement of Brady. "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-470 (2009)). Thus, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-110 (1976).

Here, the jury actually heard from David Williams that he gave a statement to homicide detectives accusing Jack Williams (N.T. 09/24/98, 81-82), yet nonetheless voted to convict. The Jack Williams statement was powerfully corroborated by "overwhelming," independent evidence of Jack's guilt. Williams, 2002 WL 3440158 2. David's demonstrably credible statement about Jack strongly supported the credibility of David's statement against petitioner. David Williams' statement accusing petitioner was likewise corroborated by Arnold's trial testimony and a plethora of ballistics and physical evidence, as detailed above. Cumulative evidence further corroborating an already

amply substantiated police statement would not have created a reasonable probability of a different outcome at trial.

Petitioner claims that "David Williams' false police statement implicating Jack Williams in a murder casts reasonable doubt upon the validity of David Williams' statement against Mr. Miller" (Petitioner's Memorandum at 46). The assumption built into this argument – that David's statement implicating Jack Williams in the murder of Paul Jones was "false" – is itself false. Again, quite apart from David Williams' police statement, there was "overwhelming" evidence that Jack Williams murdered Jones. _Williams_, 2002 WL 3440582. A jury duly convicted Jack of the killing and related offenses, and these convictions have been affirmed on direct and collateral review. David's clearly credible statement against Jack does not impeach his statement against petitioner. On the contrary, it confirms the latter statement's truthfulness. No relief is due as to petitioner's untimely, defaulted, and baseless _Brady_ claim regarding David Williams' police statement credibly implicating Jack Williams in a separate murder.

### IV.    THE MANIGAULT _BRADY_ CLAIM IS UNTIMELY, DEFAULTED, AND BASELESS

Petitioner also claims that the Commonwealth violated _Brady_ by failing to disclose a police statement that Mark Manigault allegedly gave in this case (Petitioner's Memorandum at 38, 41). This claim too is untimely, procedurally defaulted, and substantively meritless.

#### A.    This claim is untimely

As detailed above in section IIIA, the one-year federal statute of limitations expired in petitioner's case on January 3, 2006. However, petitioner did not raise his

Manigault Brady claim until six years later, on February 13, 2012, as he concedes (Petitioner's Memorandum at 27-28). This was far too late.

Petitioner's effort to invoke a later start date for the statute of limitations under 28 U.S.C. § 2244(d)(1)(D) is unavailing. He contends that "[t]he earliest date on which Mr. Miller could have discovered Mr. Manigault's evidence was on July 18, 2011" when David Williams purportedly referenced Manigault during an interview with a defense investigator (Petitioner's Memorandum at 26). In fact, petitioner could have discovered the vital fact underlying his Brady claim — that Manigault purportedly gave a police statement in this case — through due diligence years before the summer of 2011. David Williams was a childhood friend of petitioner's who began recanting his police statement in 1997 and actively assisting the defense in 2003. Given David's affinity for petitioner and demonstrated willingness to help in his defense, discovering Manigault's alleged connection to the case was simply a matter of basic questioning of David. For instance, to learn of Manigault's purported link to the case, petitioner "need only have inquired of [David] Williams, 'Is there anyone else to whom you confessed to shooting Mullen?'" Commonwealth v. John Miller, 3269 EDA 2012 at 22 at n.10. Manigault's alleged connection to the case would likewise have been revealed by the "simple question as to what occurred while he was in police custody on the day he gave the statement" (PCRA court opinion, 01/30/15, at 11). Petitioner surely could have extracted the information about Manigault from a friendly and obliging David Williams well before 2011.

Alternately, petitioner could have readily come to Manigault on his own, without going through David Williams. David Williams gave his statement against petitioner

67

following David's arrest for a series of robberies (N.T. 09/25/98, 4). This raised the circumstances of David's arrest as a potentially fruitful line of defense investigation and inquiry (See PCRA court opinion, 01/30/15, at 11 ["Certainly, the circumstances under which a witness gives a statement while in police custody are commonly inquired into by defense counsel in order to determine a possible basis to impeach that statement"]). A routine check of publicly available documentation would have revealed that David Williams' co-defendant and co-arrestee in the robberies was Mark Manigault (See Exhibit C). Petitioner's Manigault Brady claim, like his Brady claim pertaining to the statement about Jack Williams, was not timely raised in federal court, and for this reason alone does not entitle him to habeas relief.

**B.    This claim is defaulted**

Petitioner's untimely claim regarding a purportedly undisclosed police statement from Manigault is also procedurally defaulted. The state Superior Court rejected this claim on the basis that it was not timely raised under the PCRA's jurisdictional, one-year filing deadline. Commonwealth v. John Miller, 3269 EDA 2012 at 22 & n.11. This was an independent and adequate state law procedural ruling giving rise to a procedural default. See, e.g., Peterson, 196 Fed. Appx. at 142; Whitney, 280 F.3d at 251; Robinson, 2014 WL 1632213 at *8; Furman, 2013 WL 4547847 at *7; Murphy, 2015 WL 833169 at *3. Moreover, as detailed supra in section IIC, the difficult-to-satisfy and rarely met miscarriage of exception has not been demonstrated here due to the absence of new and reliable evidence of actual innocence. Petitioner's unconvincing claim of actual innocence does not provide a gateway to substantive review.

**C.    This claim is baseless**

Petitioner has not satisfied any of three requirements for a successful Brady claim. He has not shown that the alleged police statement from Manigault is favorable to the defense, that the Commonwealth suppressed this purported statement, or that this evidence is material.

**1.     The evidence is not favorable**

According to Manigault, when the police supposedly questioned him about petitioner's murder of Mullen, he told them that he "didn't know anything about it because [he] was incarcerated when the homicide occurred" ("Petitioner's Exhibit P at 1). There is nothing exculpatory about any such statement. Manigault professing complete ignorance of the circumstances of the killing because he was imprisoned at the time hardly tends to establish petitioner's innocence. See Ramirez v. DiGuglielmo, 2014 WL 4473651 at *12 (E.D. Pa. 2014) (adopted report and recommendation) ("[E]xculpatory evidence is that which 'intrinsically tends to establish [the] defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is merely collateral or impeaching').

Petitioner insists that "the record of Mr. Manigault's interrogation . . . undermines the credibility of David Williams' entire statement against Mr. Miller" (Petitioner's Memorandum at 41). But a statement from Manigault that he did not know anything about the Mullen murder would only arguably undermine David Williams' police statement accusing petitioner if David had claimed in the statement that Manigault **did** know something about the killing. David's statement contains no such claim that Manigault had information about the murder of Mullen. Indeed, the statement contains

no reference of any kind to Manigault (N.T. 09/24/98, 117-129; Petitioner's Exhibit E).

The favorability prong of Brady is not met here.

**2.     The evidence was not suppressed**

Petitioner has likewise failed to carry his burden of demonstrating suppression.

Manigault did not claim that he was questioned by the police in this case until 2011, more than fourteen years after the fact. His very belated assertion is refuted by David Williams' police statement, which contains absolutely no reference to Manigault. In the absence of any mention by David, the police would have had no reason to believe Manigault had any information about the murder, and would not have interviewed him about it.

Moreover, Manigault merely claims that he was "interrogated" by the police, and that he told them that he "didn't know anything" (Petitioner's Exhibit P at 1). This bare allegation of questioning does not demonstrate that Manigault's answers were reduced to a statement, as petitioner simply assumes, particularly since Manigault had no meaningful information to provide (Petitioner's Memorandum at 43 ["Detectives would have likewise recorded a summary of Mr. Manigault's interrogation on an 'Investigation Interview Record'"]). Petitioner has not established, as he must, that a Manigault police statement even existed, much less that such a statement was withheld by the Commonwealth. See Martinelli v. Beard, 2012 WL 5928367 at *46 (M.D. Pa. 2012) ("it is axiomatic that a Brady claim cannot survive where a defendant fails to demonstrate that evidence allegedly withheld by the prosecution even existed in the first instance").

**3.     The evidence is not material**

Any hypothetical Manigault police statement is not material evidence. A statement from Manigault that he knows nothing about this murder does not exculpate petitioner. Nor does it impeach David Williams' police statement. Notwithstanding petitioner's misleading suggestions to the contrary, David's statement does not include a "claim that Mr. Manigault had information about Mr. Miller's role in the Mullen murder" (Petitioner's Memorandum at 46). In fact, his statement makes no mention of Manigault at all (N.T. 09/24/98, 117-129; Petitioner's Exhibit E).

Petitioner maintains that "if Mr. Miller had been given the information regarding Mr. Manigault, he could have interviewed Mr. Manigault and learned that David Williams admitted to Mr. Manigault that David Williams had falsely accused Mr. Miller to gain leniency for himself" (Petitioner's Memorandum at 45-46). It is nothing but pure speculation that Manigault would have agreed to cooperate with the defense at the time of petitioner's trial in 1998 (Petitioner's Exhibit P at 2 ["Now I have agreed to make this statement because I spoke to David Williams and he gave me his permission"]). As the Supreme Court has made clear, the "mere possibility" that evidence might help the defense "does not establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at 109-110. In any case, hearsay testimony from David Williams' co-robber merely repeating what the jury heard from David Williams himself – that David's police statement was fabricated – would not have created a reasonable probability of a different outcome at trial. Petitioner's untimely, defaulted, and meritless Brady claim based on a purported police statement by Manigault does not entitle him to habeas relief.

V.      THE FREESTANDING CLAIM OF ACTUAL INNOCENCE IS NOT COGNIZABLE AND BASELESS

70

Petitioner claims that "[t]he Commonwealth violated [his] state and federal constitutional rights to due process of law by incarcerating him, a person who is actually innocent of the crimes for which he was convicted" (Habeas Petition at 9). This freestanding claim of actual innocence is not cognizable on federal habeas review and is baseless in any event.

**A.     This claim is not cognizable**

The Third Circuit has held that a freestanding claim of actual innocence is not a cognizable claim for federal habeas relief in a non-capital case like this one. In Fielder v. Varner, 379 F.3d 113 (3d Cir. 2004), Fielder "sought a new trial based on newly discovered evidence." Id. at 114. Specifically, "Fielder's after-discovered evidence claim was based on the discovery of an alleged eyewitness to the shooting, . . . who stated that a man whom he knew by the name of Nike was the one who actually shot" the murder victim in the case. Id. at 115. The Third Circuit ruled that "this claim is not cognizable under the federal habeas statute because it rests on state, rather than federal, law. It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for federal habeas relief absent an independent constitutional violation.'" Id. at 122 (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)).

This Circuit is hardly alone in disallowing stand-alone actual innocence claims on habeas review in non-capital cases. Numerous other circuits have likewise so held. Indeed, at least one Circuit, the Fourth, has extended the bar to capital cases as well. See, e.g., In re Swearingen, 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review.");

71

Johnson v. Bett, 349 F.3d 1030, 1038 (7th Cir. 2003) ("For claims based on newly discovered evidence to state a ground for federal habeas relief, they must relate to a constitutional violation independent of any claim of innocence."); Rouse v. Lee, 339 F.3d 238, 255 (4th Cir. 2003) ("[C]laims of actual innocence are not grounds for habeas relief even in a capital case ..."); David v. Hall, 318 F.3d 343, 347–48 (1st Cir.2003) ("The actual innocence rubric ... has been firmly disallowed by the Supreme Court as an independent ground of habeas relief, save (possibly) in extraordinary circumstances in a capital case"); Burton v. Dormire, 295 F.3d 839, 848 (8th Cir. 2002) ("[W]e have squarely rejected the notion that a prisoner may receive a writ simply because he claims he is innocent."); LaFevers v. Gibson, 238 F.3d 1263, 1265 n. 4 (10th Cir. 2001) ("[A]n assertion of actual innocence, although operating as a potential pathway for reaching otherwise defaulted constitutional claims, does not, standing alone, support the granting of the writ of habeas corpus").

Pursuant to binding Third Circuit law, which enjoys much support around the country, petitioner's freestanding claim of actual innocence in his non-capital case is not cognizable, and thus cannot entitle him to relief. See, e.g., Whitacre v. Ferguson, 2016 WL 3749035 at *9 (W.D. Pa. 2016) (report and recommendation) ("A stand-alone claim of actual innocence is not cognizable in federal habeas") (citing Albrecht); Heard v. Kerestes, 2015 WL 10586890 at *14 (E.D. Pa. 2015) (report and recommendation) ("Petitioner's stand alone claim of actual innocence is not cognizable in this habeas proceeding and should be denied"); Cox v. Beard, 2014 WL 556236 at *6 (W.D. Pa. 2014) ("Bound, as we are by the holding of Fielder, we find that Petitioner's stand-alone claim of actual innocence is not cognizable); Rodriquez v. Pennsylvania, 2014 WL

3952901 at *10 (E.D. Pa. 2014) (adopted report and recommendation) ("Petitioner's

stand alone claim of actual innocence is not cognizable in this habeas proceeding and

does not warrant an evidentiary hearing"); Pirela v. Vaughn, 2014 WL 1199345 at *10

(E.D. Pa. 2014) ("Petitioner's non-capital freestanding actual innocence claim is

unreviewable by this Court"); Jones v. Bickell, 2014 WL 2547788 at *6 n.3 (E.D. Pa.

2014) ("petitioner's stand alone claim of actual innocence is not cognizable under the

federal habeas statute").

Petitioner concedes that "the Supreme Court has not yet explicitly recognized a

right against the wrongful incarceration of an innocent person," but insists that the High

Court has "hinted" that a freestanding claim of actual innocence may be cognizable on

federal habeas review (Petitioner's Memorandum at 48). In fact, the Supreme Court

has admonished that opening up habeas review to stand-alone actual innocence claims

would be tremendously disruptive to the federal system:

Claims of actual innocence based on newly
discovered evidence have never been held to state a ground
for federal habeas relief absent an independent
constitutional violation occurring in the underlying state
criminal proceeding. . . .

This rule is grounded in the principle that federal
habeas courts sit to ensure that individuals are not
imprisoned in violation of the Constitution–not to correct
errors of fact. See, e.g., Moore v. Dempsey, 261 U.S. 86,
87–88, 43 S.Ct. 265, 265, 67 L.Ed. 543 (1923) (Holmes, J.)
("[W]hat we have to deal with [on habeas review] is not the
petitioners' innocence or guilt but solely the question whether
their constitutional rights have been preserved"); Hyde v.
Shine, 199 U.S. 62, 84, 25 S.Ct. 760, 764, 50 L.Ed. 90
(1905) ("[I]t is well settled that upon habeas corpus the court
will not weigh the evidence") (emphasis in original); Ex parte
Terry, 128 U.S. 289, 305, 9 S.Ct. 77, 80, 32 L.Ed. 405
(1888) ("As the writ of habeas corpus does not perform the
office of a writ of error or an appeal, [the facts establishing

73

guilt] cannot be re-examined or reviewed in this collateral proceeding") (emphasis in original).

More recent authority construing federal habeas statutes speaks in a similar vein. "Federal courts are not forums in which to relitigate state trials." Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983). The guilt or innocence determination in state criminal trials is "a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). "Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." Ibid. **Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence.**

Herrera, 506 U.S. at 860-861 (bold emphasis added).

In any case, irrespective of whether the United States Supreme Court has "hinted" at permitting freestanding actual innocence claims in federal habeas, it has never actually held that such claims are cognizable on habeas, as petitioner concedes. In the admitted absence of a Supreme Court decision (or *en banc* Third Circuit decision) so holding, the Third Circuit's clear decision in Fielder that stand-alone actual innocence claims are **not** cognizable in non-capital cases like this one binds this Court. See Loftus v. Southeastern Pennsylvania Transp. Authority, 843 F. Supp. 981, 984 (E.D. Pa. 1994) ("this Court is obliged to follow Third Circuit precedent unless that precedent has been overruled by the court of appeals sitting in banc or by an opinion of the Supreme Court that overrules the precedent").

Petitioner alleges that "[a]bsent explicit guidance from the Supreme Court, the Third Circuit has recognized that a free standing claim of actual innocence may be possible" ("Petitioner's Memorandum at 51"). If petitioner means to suggest that the Third Circuit has overruled Fielder sub silentio, and has approved stand-alone actual

74

innocence claims in cases not involving the death penalty, he is mistaken.  None of the decisions he cites held that freestanding claims of actual innocence are cognizable on habeas review in non-capital matters.

In the unpublished decision in Wright v. Superintendent Somerset SCI, 601 Fed. Appx. 115 (3d Cir. 2015), the Third Circuit merely **assumed**, for the sake of argument, that a freestanding actual innocence claim was cognizable, and then concluded that the "extraordinarily high" hurdle to succeeding on such a claim had not been cleared.  See id. at 121 ("We conclude that, **even if** a freestanding claim of actual innocence is cognizable, the merits of Wright's actual innocence claim do not satisfy the Schlup gateway standard, much less the 'extraordinarily high' standard required by Herrera")
(emphasis added).

In Han Tak Lee v. Glunt, 667 F.3d 397 (3d Cir. 2012), the Third Circuit expressly **declined** to reach the cognizability question.  See id. at 400 ("The brief on behalf of Petitioner–Appellant Han Tak Lee has listed the following statement of issues: 1. Is petitioner-appellant Han Tak Lee incarcerated for a crime of which newly discovered scientific evidence persuasively shows he is probably innocent, in violation of his due process rights? a. Is an actual innocence claim based upon newly discovered evidence cognizable in a federal habeas corpus petition filed under 28 U.S.C. § 2254? b. Does AEDPA's deferential standard of review apply to the Pennsylvania Superior court's decision in this case? 2. Is petitioner-appellant Lee entitled at least to discovery and an evidentiary hearing? . . . Because we dispose of this matter on the final issue listed, **we will not reach the other provocative issues in Nos. 1 and 1 a above**") (emphasis added).

76

In Albrecht v. Horn, 485 F.3d 103 (3d Cir. 2007), Albrecht "was sentenced to

death for the murder of his wife." Id. at 109. The fact that it was a capital case was

essential to the Court's determination to reach the merits of Albrecht's claim of actual

innocence:

> In Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853,
> 122 L.Ed.2d 203 (1993), the Supreme Court observed that a
> claim of innocence based on newly discovered evidence has
> never been a basis for federal habeas relief absent an
> independent constitutional violation occurring in the state
> trial. Id. at 398–99, 113 S.Ct. 853. See also Fielder v.
> Varner, 379 F.3d 113, 122 (3d Cir. 2004). In her
> concurrence, however, Justice O'Connor noted that:
>
> > [n]owhere does the Court state that the
> > Constitution permits the **execution** of an
> > actually innocent person. Instead, the Court
> > assumes for the sake of argument that a truly
> > persuasive demonstration of actual innocence
> > would render any such execution
> > unconstitutional and that federal habeas relief
> > would be warranted if no state avenue were
> > open to process the claim.
>
> Herrera, 506 U.S. at 427, 113 S.Ct. 853 (O'Connor, J.,
> concurring).

Albrecht, 485 F.3d at 121 (emphasis added).  See also Pirela, 2014 WL 1199345 at *9

("In Albrecht v. Horn, 485 F.3d 103, 122 (3d Cir.2007), the Third Circuit addressed the

merits of Petitioner's freestanding actual innocence claim under Herrera's heightened

hypothetical standard.  The Albrecht court, however, only considered this standard

because it was a capital case").  The decision in Albrecht entertaining the merits of an

actual innocence claim in the context of a death penalty case did not overturn the

Fielder decision holding that stand-alone claims of innocence are not cognizable in non-

death penalty cases like this one.  Indeed, Albrecht cited Fielder with approval, as seen

in the above-quoted excerpt. *See* Albrecht, 485 F.3d at 121. Petitioner's freestanding claim of actual innocence in his non-capital case is simply not a cognizable claim for relief on federal habeas review, and for this reason alone relief must be denied.

**B.    This claim is baseless**

In any case, even assuming, *arguendo*, in the face of ample authority to the contrary, that petitioner's actual innocence claim is cognizable in this case not involving the death penalty, it certainly fails on the merits. "[T]he threshold for any hypothetical freestanding innocence claim [i]s extraordinarily high.'" House, 547 U.S. at 554. To succeed on stand-alone claim of factual innocence "requires more convincing proof of innocence than Schlup[,]" which is itself a "demanding" standard. Id. Accord Wright, 601 Fed. Appx. at 120 n.16.

Here, as detailed at length above in section II.C, petitioner has not satisfied the Schlup gateway standard. He has not proffered new and reliable evidence of his actual innocence, and he has not demonstrated that in light of his unpersuasive proffers, it is more likely than not that not even one reasonable juror would convict him. Because petitioner has failed to meet the Schlup gateway standard, he has necessarily also failed to satisfy the significantly more exacting standard for freestanding claims of actual innocence. *See Wright*, 601 Fed. Appx. at 121 ("the merits of Wright's actual innocence claim do not satisfy the Schlup gateway standard, much less the 'extraordinarily high' standard required by Herrera"); Albrecht, 485 F.3d at 126 (Albrecht "has not shown that he meets the Schlup gateway standard . . . It follows that neither has Albrecht met the heightened Herrera standard of proving actual innocence on a freestanding innocence claim"); Stewart v. Lawler, 2011 WL 5075493 at *9 (E.D. Pa. 2011) ("Because

petitioner has failed to meet the Schlup gateway standards, it follows necessarily that

petitioner's proffered evidence also falls short of the "extraordinarily high" threshold

implied in Herrera that recognizes freestanding actual innocence claims"). No relief is

due as to petitioner's non-cognizable and meritless allegation of actual innocence.

## CONCLUSION

For the foregoing reasons, respondents respectfully request that the petition for

writ of habeas corpus be dismissed without a hearing and with prejudice.

Respectfully submitted,

MAX C. KAUFMAN
Assistant Chief, Federal Litigation Unit
SUSAN E. AFFRONTI
Chief, Federal Litigation Unit

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN MILLER** | : | CIVIL ACTION |
| Petitioner | : | |
| v. | : | |
| **JOHN KERESTES, et al.,** | : | NO. 12-00742 |
| Respondents | : | |

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on November 14, 2016, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

Charlotte Whitmore, Esquire
The Pennsylvania Innocence Project
1719 N. Broad Street
Philadelphia, PA 19122
(215) 204-4255

Hannah Dowd McPhelin, Esquire
Pepper Hamilton LLP
100 Market Street
Suite 200
PO Box 1181
Harrisburg, PA 17108
(717) 255-1128

Thomas M. Gallagher, Esquire
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799
(215) 981-4000

Max C. Kaufman
Assistant Chief, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747