**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
JOHN MILLER,                            :        CIVIL ACTION
                          Petitioner,   :
                                        :
        v.                              :        NO. 12-0742
                                        :
THE DISTRICT ATTORNEY FOR THE           :
COUNTY OF PHILADELPHIA, et al.,         :
                          Respondents.  :
_____ :

Henry S. Perkin, M.J.                                    June 12, 2019

**REPORT AND RECOMMENDATION**

        Presently before the Court is a counseled second Petition for Writ of Habeas

Corpus filed by John Miller, III ("Petitioner"), pursuant to 28 U.S.C. § 2254. Petitioner is

currently incarcerated in the State Correctional Institution at Mahanoy in Frackville,

Pennsylvania.  We recommend that the Petitioner is entitled to a new trial based on _Brady_

violations and an inadequate remedy under state law.  Accordingly, we recommend that the

Petition should be conditionally granted subject to the right of the Commonwealth to retry

Petitioner.

**I.      FACTS AND PROCEDURAL HISTORY.**

        The Pennsylvania Superior Court related the facts and procedural history as

follows.

        On October 8, 1996, the decedent, Anthony Mullen ("Mullen") was shot
and killed in a parking lot adjacent to 30th Street Station [in Philadelphia]. The
police recovered a 9mm cartridge casing next to Mullen's body, as well as three
.25-caliber cartridge casings on the opposite side of Mullen's automobile.
Furthermore, the police recovered a .25-caliber firearm underneath Mullen's body,
with one round jammed in the chamber and four rounds in the magazine.  No
other firearm was recovered from the scene.
        On February 27, 1997, the police arrested David Williams ([David]) for

robbery.  On February 28, 1997, [David] was interviewed by Detective Michael Sharkey ("Sharkey").  During the interview, [David], a neighbor and lifelong acquaintance of [Appellant], told Sharkey that [Appellant] was responsible for Mullen's murder.  On March 4, 1997, [David] was interviewed by Detective Jeffrey Piree ("Piree") of the Homicide Unit.  During the interview, [David] stated that [Appellant] confessed to him that he killed Mullen during a robbery attempt. [David] further stated that [Appellant] told him he had obtained the murder weapon from a neighbor, Michael Arnold ("Arnold") and then threw the gun away after the murder. [David] stated that he then confirmed this information with Arnold and Arnold told him that [Appellant] confessed to him as well.

On June 23, 1997, Detective Richard Bova ("Bova") interviewed Arnold. During the interview, Arnold confirmed that [Appellant] had taken a gun from him in August 1996.  Arnold stated that he retrieved the gun from his home after a fight erupted on the street outside[.]  Arnold further stated that he then discarded the gun when the police arrived on the scene, and he saw [Appellant] pick the gun up.  Arnold stated that the gun was either a silver automatic .380-caliber pistol or a 9mm pistol.  Arnold further stated that he spoke with [Appellant] on October 8, 1996, and [Appellant] confirmed at that time that he still possessed the gun.

On June 25, 1997, [Appellant] was arrested and charged with murder, robbery and related offenses.  On October 30, 1997, during a preliminary hearing, [David] recanted the statement that he had given to police.[David] testified that, while the statement accurately reflected what he told police, he had lied to the police because he and [Appellant] were not getting along at the time.  From September 24, 1998 to September 29, 1998, a jury trial was held before the Honorable Judge John Poserina.  At trial, [David] again recanted the statement he had given to police. [David] testified that he did not give any information to the police and they had fabricated his statement.  During their testimony, Sharkey and Piree refuted [David's] recantation.  Furthermore, Arnold testified that [Appellant] had taken his gun, but stated that the gun did not work and he was unaware of its caliber.  On September 29, 1998, the jury found [Appellant] guilty of second-degree murder, robbery and possession of an instrument of crime (PIC). On December 15, 1998, [Appellant] was sentenced to life imprisonment on the murder charge.

[Appellant] appealed the judgment of sentence to the Superior Court, which affirmed the sentence on December 29, 2000. [*Commonwealth v. Miller*, 769 A.2d 1207 (Pa. Super. 2000)(unpublished memorandum). [Appellant] did not file a Petition for Allowance of Appeal with the Pennsylvania Supreme Court.  On May 15, 2001, [Appellant] filed his first PCRA petition, alleging after-discovered evidence on the basis of statements by Clinton Bailey ("Bailey") and Terry Scruggs ("Scruggs") which implicated [David] in Mullen's murder.  On August 5, 2002 and August 28, 2002, the PCRA court held an evidentiary hearing and received testimony from Bailey and Scruggs.  On October 29, 2002, the PCRA court dismissed [Appellant's] petition after concluding that the testimony of

Bailey and Scruggs was unbelievable.

On November 26, 2002, [Appellant] filed a Notice of Appeal to the Superior Court. On January 8, 2003, [Appellant] filed a Concise Statement of Errors pursuant to Pa. R.A.P. 1925(b) and attached to it a copy of a letter from [David] to [Appellant's] mother. In the letter, [David] claims that he killed Mullen and falsely implicated [Appellant]. On April 16, 2003, [Apellant] filed an Application for Remand with the Superior Court for an evidentiary hearing regarding the letter. On May 21, 2003, the Superior Court granted [Appellant's] request for an evidentiary hearing, which was held on July 30, 2003. [David] testified at the hearing that he shot and killed Mullen in self-defense. [David] further testified that he had known Mullen for several months prior to the murder, and had shot him while he was trying to recover money that he had loaned Mullen a few days prior to the shooting. [David] also testified that the police had accurately recorded what he told them in his statement, but that he had lied to them. However, [David] testified incorrectly that Mullen was a short white male who was wearing a green jacket on the night of the shooting, and incorrectly identified the location of the shooting as occurring inside the parking garage adjacent to the station. In reality, Mullen was a tall, heavy-set, African-American male who was wearing a red jacket on the night of the shooting, and the shooting occurred near Mullen's van in an open air parking lot farther away from the station. At the conclusion of the hearing, the PCRA court stated that it believed [David] was lying under oath. The PCRA court then referred the case back to [the] Superior Court. On that same day, [David] was arrested for perjury based on the testimony he gave at the hearing. On February 26, 2004, [David] pled guilty to perjury and was sentenced to 1 to 3 years['] incarceration plus 4 years['] probation. On October 22, 2004, the Superior Court affirmed the PCRA court's dismissal of [Appellant's] petition. [*Commonwealth v. Miller*, 864 A.2d 581 (Pa. Super. 2004), appeal denied, 582 Pa. 716, 872 A.2d 1198 (Pa. 2005).] On April 26, 2005, the Supreme Court of Pennsylvania denied [Appellant's] Petition for Allowance of Appeal. [Id.]

On October 6, 2005, [Appellant] filed a petition for habeas corpus in the United States District Court for the Eastern District of Pennsylvania. On January 30, 2007, the Honorable Bruce Kauffman dismissed [Appellant's] petition without a hearing and ruled that no Certificate of Appealability should issue. On February 20, 2007, [Appellant] filed a Notice of Appeal and Application for Certificate of Appealability to the United States Court of Appeals for the Third Circuit. On July 27, 2007, the Honorable Judge Morton Greenberg denied [Appellant's] request for a Certificate of Appealability. On October 23, 2007, [Appellant] filed a Petition for a Writ of Certiorari to the United States Supreme Court, which denied [Appellant's] petition on February 19, 2008. [*Miller v. Beard*, 552 U.S. 1205, 128 S.Ct. 1271, 170 L.Ed.2d 105 (2008).]

On October 23, 2007, [Appellant] filed his second petition for relief pursuant to the PCRA. [Appellant] submitted with his petition an affidavit from

fellow inmate Andre Monroe, who claimed to have witnessed [David] shoot and kill Mullen.  On October 17, 2008, the PCRA court dismissed [Appellant's] petition without a hearing as untimely.  [Appellant did not file a notice of appeal to the Superior Court.]

On April 11, 2011, [Appellant] filed a third petition for relief pursuant to the PCRA.  [Appellant] attached to his petition another letter from [David] to his mother, in which [David] again declared that he killed Mullen and claimed that he incorrectly identified Mullen as a white male due to panic while on the witness stand.  On June 6, 2011, [Appellant] amended his petition to include an affidavit from Arnold, in which Arnold recanted his pretrial statement to police and his testimony at trial.  On July 18, 2011,the PCRA court sent [Appellant] a [Pennsylvania Rule of Criminal Procedure] 907 notice, indicating that his petition would be dismissed as untimely.  On August 4, 2011, [Appellant] filed a response to the [Rule] 907 notice.

On August 5, 2011, new counsel entered their appearance on behalf of [Appellant].  On November 3, 2011, defense counsel filed an amended petition, alleging after-discovered evidence and governmental interference as exceptions to the time-bar.  Defense counsel attached to the amended petition a statement from Mark Manigault ("Manigault").  In the statement, Manigault claimed that he shared a cell with [David] in February 1997 and [David] told him that he was going to pin a murder that he committed on someone else in order to get out of jail.  Manigault further claimed that he was interviewed by police about Mullen's murder, but told the police that he knew nothing.  Defense counsel argued that the police failed to disclose this alleged evidence to [Appellant] prior to trial and that it would have changed the outcome of [Appellant's] trial.  On November 18, 2011, the PCRA court dismissed [Appellant's] petition as untimely.  On November 28, 2011, defense counsel filed a motion for reconsideration.  On December 13, 2011, the PCRA court denied [Appellant's] motion.  On December 15, 2011, [Appellant] filed a Notice of Appeal to the Superior Court.  On February 13, 2012, [Appellant] filed a second petition for habeas corpus in federal court. [That petition remains pending in the United States District Court for the Eastern District of Pennsylvania.] On March 9, 2012, [Appellant] filed an Application for Remand with the Superior Court for an evidentiary hearing regarding evidence which is now the subject of his current PCRA petition.  On March 28, 2012, the Superior Court denied [Appellant's] Application for Remand.  On July 24, 2012, the Superior Court affirmed the denial of [Appellant's] PCRA petition. [*Commonwealth v. Miller*, 55A.3d 145 (Pa. Super. 2012)(unpublished memorandum).  Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.]

On September 20, 2012, [Appellant] filed a fourth petition for relief pursuant to the PCRA, invoking the after-discovered evidence and governmental interference exceptions to the time-bar.  In the instant petition, [Appellant] alleges that, on the same day [David] gave his statement to the police implicating

[Appellant] in Mullen's murder, [David] also gave a statement to the police which implicated Jack Williams ("Jack") in an unrelated murder. [Appellant] claims that [David] fabricated this statement to the police as well, and later told Jack that he purposefully included false information in the statement. [Appellant] further claims that [David] fabricated the statement against [Appellant] as well as the statement against Jack in order to receive leniency on his own pending charges. Jack was subsequently found guilty of first-degree murder at trial.  Four witnesses testified for the Commonwealth at Jack's trial, although [David] was not called to testify. [Appellant] alleges that he first learned about this other statement [David] gave during a phone call between defense counsel and [David] on April 27, 2012. [Appellant] argues that the Commonwealth failed to disclose to the defense that [David] had given an allegedly false statement to the police concerning a separate homicide on the same day that he gave his statement to police implicating [Appellant] in Mullen's murder. [Appellant] further argues that, had the jury known about this second statement, the outcome at trial would have been different.  Furthermore, [Appellant] claims that Arnold again recanted the statement he gave to police and the testimony he gave at trial.

On September 4, 2013, the Commonwealth filed a motion to dismiss [Appellant's] PCRA petition.  On October 11, 2013, [Appellant] filed a response to the Commonwealth's motion to dismiss.  On October 17, 2014, [the PCRA court] sent [Appellant] a notice pursuant to Rule 907, indicating that his petition would be dismissed because the issues raised in the petition were without merit. [Appellant] did not file a response to the [Rule] 907 notice.  On November 13, 2014, after independent review of [Appellant's] *pro se* petition, defense counsel's amended petition, the Commonwealth's motion to dismiss, and [Appellant's] response to the Commonwealth's motion to dismiss, [the PCRA court] dismissed the petition based upon a lack of merit.  On November 21, 2014, [Appellant], through counsel, filed a Notice of Appeal to the Superior Court.

*Commonwealth v. Miller*, 2015 Pa. Super. Unpub. LEXIS 4611 (Dec. 18, 2015).

In Petitioner's first habeas Petition, he alleged that, except for the testimony of David Williams, the evidence presented at his trial established merely that a homicide occurred, not a robbery.  Absent proof of a robbery, Petitioner contended that Williams' statement was inadmissible evidence under the *corpus delicti* rule since there was not independent proof of a robbery and his conviction of second-degree murder should not stand because proof of the underlying felony was not provided without a reasonable doubt.  The Court addressed these

arguments as two separate claims: (1) the trial court's admission of Williams' statement; and (2) assuming that this statement was improperly admitted, the evidence was insufficient to support Petitioner's conviction.  Former United States Magistrate Judge Charles B. Smith found that the first claim was unexhausted and procedurally defaulted and Petitioner's claimed actual innocence was based only on a claim that, absent Williams' statement at trial, there would have been no evidence connecting him to the crime.  Judge Smith found that under *Schlup v. Delo*, 513 U.S. 298, 321 (1995), Petitioner offered no new reliable evidence which could establish his actual innocence which did not satisfy the fundamental miscarriage of justice requirement of proving Petitioner actually innocent of the crime, therefore the procedural default of this claim was not excused.  Former United States District Judge Bruce W. Kauffman agreed with Magistrate Judge Smith's finding that Petitioner provided no new credible evidence that could establish his actual innocence or that would lead the Court to believe that a miscarriage of justice occurred.  *See Miller v. Beard*, Civ. A. No. 05-5285, Dkt Nos. 16, 22.

Petitioner's second Petition for a writ of habeas corpus in this Court raised two claims: (1) that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a police interview with Mark Manigault about the Mullen murder; and (2) that Petitioner is actually innocent.  On February 21, 2013, while Petitioner's fourth PCRA petition was still pending in state court, he filed a motion in this Court to amend his still-pending second Petition for a writ of habeas corpus. On March 20, 2013, the District Court granted this motion and accepted Petitioner's Amended Petition, which was attached as an exhibit to the motion to amend.  The Amended Petition raised the same two claims in the Petition filed on February 13, 2012, i.e., that the Commonwealth violated *Brady* by withholding Manigault's police statement,

6

and that he is actually innocent.  The Amended Petition raised a third claim: the Commonwealth violated *Brady* by failing to disclose David Williams' police statement implicating Jack Williams in the murder of Paul Jones.

On December 18, 2015, the Superior Court affirmed the dismissal of Petitioner's fourth PCRA petition on the basis that the petition was not timely filed. The Superior Court held that "the PCRA court did not abuse its discretion or commit an error of law in finding [petitioner's] serial PCRA petition untimely and dismissing it without a hearing." *Commonwealth v. John Miller*, No. 3563 EDA 2014 at 19 (Dec. 18, 2015) (mem.). Petitioner did not seek allowance of appeal to the Pennsylvania Supreme Court.[1]

On March 2, 2016, Petitioner filed a second motion for leave to amend his Petition for a writ of habeas corpus.  On March 21, 2016, the District Court granted the motion to amend.  On March 23, 2016, Petitioner filed another amended habeas Petition and a memorandum of law in support of the Petition ("Pet'r's Mem.").  In the March 23, 2016 Petition, Petitioner contends that: (1) he was deprived of his Fourteenth Amendment right to demonstrate his innocence with newly discovered evidence as the process afforded to him was fundamentally inadequate; (2) his due process rights were violated when the Commonwealth withheld exculpatory evidence in violation of *Brady*; and (3) the Commonwealth violated Petitioner's state and federal constitutional rights to due process of law by incarcerating him, a person who is

---

[1]When conducting an AEDPA review, where a state's highest court does not issue a merits determination of a claim that was adjudicated by a lower court, we "look through" to the last reasoned state court opinion, which is the Superior Court's opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 597 (3d Cir. 2015) (reviewing *Strickland* prejudice "through AEDPA's lens" because PCRA court adjudicated that prong on the merits even through Pennsylvania Supreme Court did not).

actually innocent of the crimes for which he was convicted.  The Commonwealth's Response

was filed on November 14, 2016 and Petitioner's Reply to the Commonwealth's Response was

filed on December 21, 2016.  *See* Dkt. Nos. 48, 51.

## II.   LEGAL STANDARDS.

### A.   Exhaustion

Federal habeas relief may not be granted unless a petitioner "has exhausted the

remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). For a claim to be

exhausted, "[b]oth the legal theory and facts underpinning the federal claim must have been

presented to the state courts, and the same method of legal analysis must be available to the state

court as will be employed in the federal court." *Evans v. Court of Common Pleas, De. County,*

*Pa.*, 959 F.2d 1227, 1231 (3d Cir. 1992). A state prisoner must "fairly present" his federal claims

to the state courts before seeking federal habeas relief by invoking "one complete round of the

State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999);

*see Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004) (quoting *McCandless v. Vaughn*, 172

F.3d 255, 261 (3d Cir. 1999) ("'Fair presentation' of a claim means that the petitioner 'must

present a federal claim's factual and legal substance to the state courts in a manner that puts them

on notice that a federal claim is being asserted.'")). The habeas petitioner bears the burden of

proving exhaustion of all state remedies. *Boyd v. Waymart*, 579 F.3d 330, 367 (3d Cir. 2009)

(quoting *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997)).

If the state courts have declined to review the merits of a petitioner's claim based

on his failure to comply with a state rule of procedure, the claim is procedurally defaulted. *Gray*

*v. Netherland*, 518 U.S. 152, 161-62 (1996); *Harris v. Reed*, 489 U.S. 255, 261-62 (1989) (state

court's rejection of federal claim is generally unreviewable if it rests on independent and adequate state law grounds such as failure to comply with state's rules for presentation of claims and arguments). Although "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion[, as] there are no state remedies any longer 'available' to him," *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), procedurally defaulted claims cannot be reviewed unless "the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. To demonstrate cause, the petitioner must show some objective factor external to the defense that impeded counsel's efforts to comply with some state procedural rule. *Slutzker v. Johnson*, 393 F.3d 373, 381 (3d Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To demonstrate a fundamental miscarriage of justice, a habeas petitioner must typically demonstrate actual innocence. *Schlup v. Delo*, 513 U.S. 298, 324-26 (1995).

"Exhaustion is not a jurisdictional requirement, but rather a rule of comity, and a federal court may in certain circumstances decide the merits of a claim despite non-exhaustion." *Evans*, 959 F.2d at 1231. Also, a federal court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Id.* (quoting *Granberry v. Greer*, 481 U.S. 129, 135 (1987). The doctrine of procedural default is also grounded in principles of comity and federalism. As the Supreme Court has explained:

> In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state

9

ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

The Supreme Court has held that the ineffectiveness of counsel on collateral review also may constitute "cause" to excuse a petitioner's default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* recognized a "narrow exception" to the general rule that attorney errors in collateral proceedings do not establish cause to excuse a procedural default, holding, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. To successfully invoke the *Martinez* exception, a petitioner must satisfy three conditions: (a) the default was caused by ineffective assistance of post-conviction counsel or the absence of counsel (b) in the initial-review collateral proceeding . . . and (c) the underlying claim of trial counsel ineffectiveness is 'substantial,' meaning 'the claim has some merit[.]'" *Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014) (quoting *Martinez*, 566 U.S. at 14); *see also Glenn v. Wynder*, 743 F.3d 402, 410 (3d Cir. 2014).

### B.     Merits Review.

Under the federal habeas statute, review is limited in nature and may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Factual issues determined by a state court are

presumed to be correct, rebuttable only by clear and convincing evidence. *Werts v. Vaughn*, 228

F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

        The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal

habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached

by [the Supreme] Court on a question of law or if the state court decides a case differently than

[the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529

U.S. 362, 412-13 (2000). With respect to "the 'unreasonable application' clause, a federal habeas

court may grant the writ if the state court identifies the correct governing legal principle from

[the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* at 413. The "unreasonable application" inquiry requires the habeas court to

"ask whether the state court's application of clearly established federal law was objectively

unreasonable." *Id.* at 409. As the Third Circuit has noted, "an unreasonable application of federal

law is different from an incorrect application of such law and a federal habeas court may not

grant relief unless that court determines that a state court's incorrect or erroneous application of

clearly established federal law was also unreasonable." *Werts*, 228 F.3d at 196 (citing *Williams*,

529 U.S. at 411).

## III.   <u>DISCUSSION</u>.

        Petitioner raises *Brady* claims on the following articles of exculpatory evidence

that were allegedly suppressed by the Commonwealth: (1) a police statement given by David

Williams about Jack Williams which falsely implicated Jack Williams in another, unrelated

murder on the same day that David Williams gave a statement to police implicating Petitioner in

the Mullen murder; (2) police interrogation (but no statement produced) of Mark Manigault

regarding the 1997 Mullen murder.  Following Manigault's and David Williams' unrelated arrest

for a robbery and placement together in a holding cell at 55th and Pine, Williams said that he was

going to do "whatever it took" to get out of custody and was going to "pin a homicide that he

(David Williams) had done on somebody else," and Williams told police that Manigault also had

information regarding the Mullen murder.  Manigault told police that he did not know anything

about Mullen's murder because he was incarcerated when Mullen was killed and no police

statement recording this interrogation was ever produced by the Commonwealth; and (3) the

recantation by Mike Arnold of the statement that he gave to police in 1997.

### A.    Whether this Second Petition Satisfies the AEDPA Requirements.

Respondents correctly note that even where the Court of Appeals has

preliminarily authorized the filing of a second petition for a writ of habeas corpus, this Court is

required to conduct its own independent analysis of whether the statutory requirements for a

second petition have been met.  *See* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any

claim presented in a second or successive application that the court of appeals has authorized to

be filed unless the applicant shows that the claim satisfies the requirements of this section");

*Goldblum v. Klem*, 510 F.3d 204, 220 (3d Cir. 2007) ("if a court of appeals finds that a petitioner

has made a *prima facie* showing, the district court is obligated to conduct an independent

gatekeeping inquiry under section 2244(b)(4)").  The relevant statutory provision dictates that

"[a] claim presented in a second or successive habeas corpus application under section 2254 that

was not presented in a prior application shall be dismissed unless . . . the factual predicate for the

claim could not have been discovered previously through the exercise of due diligence; and . . .

the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be

12

sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B).

Petitioner's previous habeas Petition was filed on October 6, 2005.  Thus, we must determine whether the factual predicates for Petitioner's *Brady* claims could have been discovered before October 6, 2005 through due diligence and whether the facts underlying Petitioner's claims, viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable juror would have found Petitioner guilty of Mullen's death.

1.    Whether the Factual Predicate of David Williams' Statement Implicating Jack Williams Could Have Been Discovered Previously Through Due Diligence.

Petitioner acknowledges that he did not raise his *Brady* claim in this Court concerning the police statement given by David Williams about Jack Williams until February 21, 2013, when he included this claim in an amendment to his second habeas petition. (Pet'r's Mem., p. 28.)  Petitioner contends that "[u]ntil March 1, 2012, [when his representatives interviewed Jack Williams], despite continued and diligent efforts to establish his innocence for more than a decade, [Petitioner] had no way of knowing that David Williams falsely implicated Jack Williams in another, unrelated murder on the same day that he implicated [Petitioner] in the Mullen murder." (*Id.* at 28.)  Defendant argues that the vital fact underlying Petitioner's *Brady* claim that David Williams gave a police statement implicating Jack Williams in the murder of Jack Jones on the same day prior to providing his statement in this case has been actually known by Petitioner since his 1998 trial.   At trial, David Williams testified that homicide detectives

13

questioned him about Jack Williams right before they interviewed him about Petitioner's

involvement in Mullen's murder:

> Q. And did you say that to [Homicide Detective] Jeff Piree, the guy who took your statement?
>
> A. Yes, I told it to both of them. I mean, I told Piree. They initially took me to 9th and Race.
>
> Q. Right.
>
> A. - for - they asked me questions about Jack Williams, that was the initial, and then from there they started asking me questions about other things.

(N.T. 09/24/98, pp. 81-82.) This trial testimony should have alerted Petitioner that David

Williams gave a statement accusing Jack Williams of a separate murder immediately before

providing his statement against Petitioner in this case.  At the very minimum, the above-quoted

testimony notified Petitioner of the possibility of such a statement, which Petitioner could have

confirmed through . . . . even a modicum of diligence.  Petitioner recounts that when he finally

contacted Jack Williams many years later in 2012, Jack Williams readily reported that David

Williams had given a statement against him, and readily provided Petitioner with a copy of the

statement.  (Pet'r's Mem. at 15-17.)  David Williams' 1998 trial testimony that homicide

detectives asked him questions about Jack Williams immediately before questioning him about

this case contradicts Petitioner's assertion that he "had no way of knowing" about the Jack

Williams statement before 2012.

Even if this Court ignores David Williams' testimony about Jack Williams at trial,

the fact that David Williams provided a police statement accusing Jack Williams of murder was

attainable before 2012.  David Williams was a lifelong neighborhood friend of Petitioner who

had been recanting his police statement since 1997 and actively participating in the defense since

at least 2003. As the PCRA court explained, ascertaining that David Williams gave a police

statement implicating Jack Williams in a separate murder required only asking David Williams

the

> simple question as to what occurred while he was in police custody on the day he
> gave the statement. Certainly, the circumstances under which a witness gives a
> statement while in police custody are commonly inquired into by defense counsel
> in order to determine a possible basis to impeach that statement.

(PCRA Ct. Op., 01/30/15, at 11.)  The factual predicate of Petitioner's *Brady* claim related to

David Williams could have been discovered after 2003 when David Williams participated in

Petitioner's defense, but before October 6, 2005, the filing of his first habeas Petition, through

due diligence.

>        2.    Whether the Factual Predicate of Mark Manigault's Statement Could Have
>              Been Discovered Previously Through Due Diligence.

Mark Manigault was David Williams' robbery co-defendant in Williams'

robberies, and Williams' criminal docket shows that Manigault was arrested with Williams.

Resp., Ex. C.  Manigault executed a statement dated September 22, 2011 stating:

> When David Williams and I got locked up for robbing a bar in 1997 we were in a
> holding cell together at 55th and Pine.  David said that he was going to do
> "whatever it took" to get out of there.  He said he was going to "pin a homicide
> that he (David) had done on somebody else."  I think David told the police that I
> was there for the homicide so that I could help myself out too.  The police
> interrogated me for a while about the homicide but I didn't know anything about it
> because I was incarcerated when the homicide occurred.  I think the cops said that
> a gas station attendant or something like that was killed at 30th Street Station.  I
> was recently incarcerated with John Miller at Mahanoy and he asked me if I knew
> anything about this but I said I didn't know anything.  Now I have agreed to make
> this statement because I spoke to David Williams and he gave me his permission.
> No one threatened me or promised me anything to get me to make this statement.

(Pet'r's Mem., Ex. P.)  Until 2011, Manigault did not claim that he was questioned by the police

in 1997 regarding Mullen's murder.  Petitioner contends that the record of Manigault's

interrogation and a statement from Manigault that he did not know anything about Mullen's

murder undermines David Williams' police statement accusing Petitioner of Mullen's murder if

David Williams claimed in the police statement that Manigault knew something about Mullen's

murder.  (Pet'r's Mem. at 41.)  David Williams' statement contains no reference to Manigault

and contains no claim that Manigault had information about Mullen's murder.  (N.T. 09/24/98,

117-129; Pet'r's Mem., Ex. E.)

   The PCRA court found that the factual predicate of this *Brady* claim could have

been discovered before 2011 through due diligence if Petitioner had questioned David Williams,

who had been cooperating with Petitioner since 2003.  Following this reasoning, the factual

predicate of this *Brady* claim could have been discovered before October 6, 2005 through due

diligence.

    3. <u>Whether the Factual Predicate of Mike Arnold's Recantations Could Have Been Discovered Previously Through Due Diligence</u>.

   Petitioner contends that prior to February 22, 2011, he did not know how police

detectives secured Mike Arnold's allegedly false statement and could not establish that Arnold

was lying when he told police that Petitioner confessed to committing Mullen's murder with a

gun Petitioner received from Arnold.  On February 22, 2011, Arnold stated to Mary Wilt, a

defense investigator, that his previous statement and testimony against Petitioner were false and

that he never gave Petitioner a gun.  Prior to that date, Arnold allegedly withheld this information

to avoid perjury charges.  Arnold executed a three-page certified statement on March 18, 2012,

16

stating:

I met John "Little" Miller and David "Baby James" Williams when I was in fifth grade and they were in junior high school. We were neighborhood friends but we were never really close friends. If we were outside together we would do things like ride bikes, play football and play basketball but we didn't have a lot in common. Miller didn't hang in our neighborhood too often. Rather, he hung out with a group about three blocks away. Williams was never around. Little and Baby James were older than me. They would hang out to make money while most of my friends and I were still in school. Baby James would always get in trouble. He could barely take care of himself. I hung out with his brother, Monte.

I have been arrested two times. The first time I was arrested was when I was a sophomore in Bartram High School when I was stopped with drugs in my pocket. After my arrest on drug possession charges I was sent to Flourtown on some sort of diversion program where I spent my junior year of high school. I was at Flourtown in June 1997 when the police came to interview me about the Mullen murder. I was arrested once more right after I got out of high school. On that occasion, I was driving a car with two passengers. I was pulled over and one of the passengers had marijuana in his jacket on the back seat. The cops found the marijuana but let two of the passengers go home. One was a young kid who was released and the other was a relative of a cop from the neighborhood. Only my friend and I were arrested. The charges for that arrest were pending during the Miller trial. I don't remember what happened to these charges but I think they were dismissed.

I do not remember if I was offered a deal if I cooperated with police in the Miller case but the charges just disappeared. I do remember, however, that I went to go visit a public defender, named Schwartz, who may have told me that he could see from my record that I cooperated with the police.

The police came to interview me about the Mullen murder in June 1997. I did not know anything about the case before the cops came. My school counselor, Oscar Page, was supposed to be there to help me but he was not very helpful. The cops came to my school and told me they were investigating Miller in a murder. They showed me a statement from Williams. I read over the statement about the case and how Williams said Miller confessed to committing the crime. At the end of Williams' statement I saw that Miller apparently told Williams that he got the gun from me. The cops told me that Williams was willing to testify against me if I didn't cooperate.

I made up the story about the gun and the fight on Florence Avenue because I wanted to do whatever I could do to get the police and Williams off my back and I thought it would be funny to send the cops on a "dead lead." I told them there was a fight and that I threw the gun in the bushes and that I later heard that Miller had picked up the gun. I never said Miller told me he had the gun. Unless you know how we thought, you wouldn't understand why I said what I

said.  I wanted to send the police on a wild goose chase.  People got killed all the time in our neighborhood.  Baby James put me in the mix of a murder investigation and I had to get myself out of it.  All I was trying to do was remove myself from the situation and distance myself from the gun.  If Miller did it then he did it but he didn't get it from me.  I didn't care about the connection to the gun.  All I cared about was that I wasn't the one who put it in his hands.  I did not give Miller or Williams a gun.  I didn't think my story would go anywhere because the cops wouldn't be able to verify it because I made it up.

I never thought the police were going to make me sign the statement.  I asked Oscar Page if I had to sign it and he told me that he would sign it as well.  I signed it but I didn't read through it.  Some of the information in the statement is inaccurate.  I never said the gun was a 9mm.  Rather, I said it was a .380.  I didn't know I was going to have to testify at Miller's trial.  About a year later, the cops took me out of my classroom and told me I had to testify the next day.  Before I was set to testify, I was in a room with two cops who told me Williams said I threatened him for snitching on me.  I never threatened Williams.  The only time I spoke to Williams after his arrest was when I was hanging out at Williams' grandmother's house with his brother Monte.  Williams called the house and I picked up the phone.  On the phone Williams laughed and said, "Your boy Little is up here."  I didn't say anything to Williams on the phone about Miller and gave the phone to Monte.  I never threatened David Williams and I never talked to anyone about Miller's case.

Before the hearing, the cops showed me my statement from the interview in June 1997.  I didn't want to get in trouble for lying so I repeated the same story under oath and mostly confirmed what I said to the police in 1997.  I felt pressured to stick with my original story.  After the trial, I consulted with attorneys who advised me not to come forward with the truth because I could be faced with potential perjury charges.  I'm coming forward now to set the record straight about my previous statements and the fact that I was not involved in the Mullen murder in any way.  I did not make this statement earlier because I was advised by lawyers not to and was worried about being involved at all and possible perjury charges.

(Pet'r's Mem., Ex. T.)  The vital fact underlying Arnold's recantations was that Arnold perjured himself at Petitioner's 1998 trial.  This has been known to Petitioner since his 1998 trial.  The predicate facts of Arnold's recantations were therefore known before 2005, when Petitioner filed his first habeas Petition.

        4.       <u>Whether the Facts Underlying Petitioner's Claims, Viewed in Light of the Evidence as a Whole, Would Be Sufficient to Establish By Clear and</u>

<u>Convincing Evidence That No Reasonable Juror Would Have Found
Petitioner Guilty of Mullen's Death</u>.

Finally, this Court must make an initial determination whether Petitioner's claims,

viewed in the light of the evidence as a whole, would be sufficient to establish by clear and

convincing evidence, that no reasonable juror would have found Petitioner guilty of Mullen's

death.   It is unclear to this Court whether no reasonable juror would have found Petitioner guilty

of Mullen's death based upon the Manigault statement, Arnold's recantations and David

Williams' statements.  28 U.S.C. § 2244(b)(2)(B).  Thus, we will review the merits of

Petitioner's claims presented in the instant successive Petition.

**B.     Whether Petitioner's State and Federal Due Process Rights Were Violated by
His Incarceration When Petitioner Claims Actual Innocence.**

Petitioner makes a free-standing claim that he is actually innocent, but this claim

does not provide a ground of relief in federal habeas proceedings because "[a] stand-alone claim

of actual innocence is not cognizable in federal habeas proceedings in a non-capital case."

*McMullen v. Bush*, No. CV 15-686, 2017 WL 4863125, at *4-5 (W.D. Pa. Oct. 5, 2017), *report

and recommendation adopted*, No. CV 15-686, 2017 WL 4842566 (W.D. Pa. Oct. 26, 2017)

(citing *Albrecht v. Horn*, 485 F.3d 103, 121-22 (3d Cir. 2007) (citing *Herrera v. Collins*, 506

U.S. 390 (1993)) and Federal Habeas Manual § 1:60).

In non-capital cases, the United States Court of Appeals for the Third Circuit has

held, based upon the *Herrera* decision, that: "It has long been recognized that '[c]laims of actual

innocence based on newly discovered evidence' are never grounds for 'federal habeas relief

absent an independent constitutional violation.' " *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir.

2004) (quoting *Herrera*, 506 U.S. at 400); *Albrecht*, 485 F.3d at 121-22. Thus, to the extent that

Petitioner is making a stand-alone claim of actual innocence, such claim is not cognizable under the federal habeas corpus statute.

C.      **Whether Petitioner Was Denied His Fourteenth Amendment Right to Demonstrate His Innocence with Newly Discovered Evidence Due to an Allegedly Fundamentally Inadequate State Court Process.**

Petitioner claims that he "was deprived of his Fourteenth Amendment right to demonstrate his innocence with newly discovered evidence [on post-conviction review] as the process afforded to him was fundamentally inadequate." Pet., p. 5. Petitioner asks this Court to review this case without deference to the state courts' rulings because the Pennsylvania courts failed to address his claim that his due process rights articulated in *Brady* were violated. Pet'r's Mem., pp. 37-38. Petitioner presented his *Brady* claims to the state court in his third and fourth PCRA petitions. In the Superior Court's July 24, 2012 decision, the court stated "we do not reach the question of whether Manigault's police interview was exculpatory in nature and, thus, *Brady* material." Pet'r's Mem., Ex. X; *Commonwealth v. Miller*, No. 3269 EDA 2011, at 22 n.1.) In affirming the denial of Petitioner's fifth PCRA petition as untimely filed, the Superior Court stated "we need not address the merits of the alleged *Brady* violation" referring to Petitioner's claim that the Commonwealth failed to disclose that David Williams gave a police statement falsely implicating Jack Williams in a separate murder at the same time that David Williams falsely accused Petitioner of Mullen's murder. Pet'r's Mem., p. 38.

Respondents contend that this claim of error on state post-conviction review is not cognizable on federal habeas review. *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum. . .to pursue claims of error at the PCRA proceeding"); *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) ("the federal role

20

in reviewing an application for habeas corpus is limited to evaluating what occurred in the state

or federal proceedings that actually led to the petitioner's conviction; what occurred in the

petitioner's collateral proceeding does not enter into the habeas calculation").

       Alternatively, Respondents contend that this claim is also procedurally defaulted

because Petitioner never presented this claim to the state courts.  Rather, he raised this claim for

the first time in federal court, in his March 23, 2016 Amended Petition.  If Petitioner were to

return to state court to attempt to raise this claim, he would be required to do so via the PCRA.

"[T]he PCRA . . . provides the exclusive vehicle for obtaining state collateral relief on claims

which are cognizable under the PCRA." *Commonwealth v . Robinson*, 837 A.2d 1157, 1162 (Pa.

2003).  However, the PCRA mandates that all petitions for relief, including second and

subsequent petitions, must generally be filed within one year of the date the judgment became

final.  42 Pa.C.S. § 9545(b)(1). A judgment becomes final at the conclusion of direct review,

including discretionary review in the Supreme Court of the United States and the Supreme Court

of Pennsylvania, or at the expiration of time for seeking the review. 42 Pa.C.S. § 9545(b)(3).

       The Superior Court affirmed Petitioner's judgment of sentence on December 29,

2000, and he did not seek allowance of appeal to the Pennsylvania Supreme Court. Therefore,

Petitioner's judgment of sentence became final on January 29, 2001, upon expiration of the

thirty-day deadline for seeking allowance of appeal.  *See* Pa.R.A.P. 1113(a). The one-year PCRA

statute of limitations expired one year later on January 29, 2002.  Because Petitioner did not

present his claim of errors on PCRA appeal to the state courts, and state corrective process is no

longer available to him, this claim is procedurally defaulted.  *See Coleman*, 501 U.S. at 735 n.1.

       Petitioner contends that "there can be no procedural default where [he] presents

new facts supporting his actual innocence." (Pet'r's Mem. at 29.)  Respondents contend that

Petitioner does not satisfy the miscarriage of justice standard because the evidence he proffers is

neither new nor reliable under *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928, 1936 (2013), and he

has not shown that in light of the evidence, it is more likely than not that no reasonable juror

would have convicted him.

Under *McQuiggan*, petitioners who assert a plausible actual innocence claim may

invoke the miscarriage of justice exception to overcome the federal habeas corpus statute of

limitations. *Id.* at 1928.   To establish the requisite probability of actual innocence, Petitioner

must "support his allegations of constitutional error with new reliable evidence - whether it be

exculpatory scientific evidence, trustworthy witness accounts, or critical physical evidence - that

was not presented at trial." *Schlup*, 513 U.S. at 316.  Petitioner argues that he is entitled to the

miscarriage of justice exception to AEDPA's procedural default and statute of limitations

requirements.  The exception may overcome procedural default rules such as the timing

requirements of 28 U.S.C. § 2244(d)(1). *See McQuiggin*, 133 S.Ct. at 1928 ("[A]ctual innocence,

if proved, serves as a gateway through which a petitioner may pass whether the impediment is a

procedural bar . . . or . . . expiration of the statute of limitations.").

However, "[t]he fundamental miscarriage of justice exception is narrow."

*Coleman v. Greene*, 845 F.3d 73, 76 (3d Cir. 2017). The Supreme Court has applied it to a

limited category: "a petitioner must 'persuade[ ] the district court that, in light of the new

evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

doubt.'" *McQuiggin*, 133 S.Ct. at 1928 (alteration in original) (quoting *Schlup*, 513 U.S. at 329).

Put differently, the exception is only available when a petitioner presents "evidence of innocence

22

so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 1936 (quoting *Schlup*, 513 U.S. at 316). We review Petitioner's evidence proffered to support his actual innocence claims.

Petitioner claims that his due process rights were violated when the Commonwealth allegedly withheld exculpatory evidence in violation of *Brady*. This Court must employ a three part test to determine whether a *Brady* violation has occurred: (1) the evidence at issue must be favorable to the defendant, either because it is exculpatory or impeaching in nature; (2) the evidence must have been suppressed by the state either wilfully or inadvertently; and (3) prejudice must result from this suppression. *Dennis v. Sec'y Dept. of Corr.,* 834 F.3d 263, 284-85 (3d Cir. 2016)(en banc); *Banks v. Dretke*, 540 U.S. 668, 691 (2004)(citations omitted). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different[.]" *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)(quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). A conviction would only be reversed if there is "a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 870 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Courts are required to conduct two inquiries to determine whether a *Brady* violation has occurred. *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000). First, a court must ask "whether the prosecution must disclose the evidence, i.e., whether the evidence is *Brady* material." *Id.* Second, the court must ask "whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes

23

a *Brady* violation." *Id.*  A cognizable *Brady* violation exists only where both of these elements are present.

Petitioner contends that the Commonwealth violated *Brady* when it failed to disclose two statements, one made by David Williams to police implicating Jack Williams in the separate and unrelated murder of Paul Jones; and a police statement that Mark Manigault allegedly gave in this case.  These statements formed the basis of Petitioner's fourth PCRA petition filed on September 20, 2012, in which Petitioner invoked the after-discovered and governmental interference exceptions to the PCRA time-bar.  Judge Genece Brinkley, who was assigned petitioner's PCRA cases after the retirement of Judge Poserina, related that:

> In the instant petition, Defendant alleges that, on the same day he gave his statement to the police implicating Defendant in Mullen's murder, Williams also gave a statement to the police which implicated Jack Williams ("Jack") in an unrelated murder.  Defendant claims that Williams fabricated this statement to the police as well, and later told Jack that he purposefully included false information in the statement.  Defendant further claims that Williams fabricated the statement against him as well as the statement against Jack in order to receive leniency on his own pending charges.  Jack was subsequently found guilty of first-degree murder at trial.  Four witnesses testified for the Commonwealth at Jack's trial, although Williams was not called to testify.  Defendant alleges that he first learned about this other statement Williams gave during a phone call between defense counsel and Williams on April 27, 2012.  Defendant argues that the Commonwealth failed to disclose to the defense that Williams had given an allegedly false statement to the police concerning a separate homicide on the same day that he gave his statement to police implicating Defendant in Mullen's murder.  Defendant further argues that, had the jury known about this second statement, the outcome at trial would have been different.  Furthermore, Defendant claims that Arnold again recanted the statement he gave to police and the testimony he gave at trial.
> On September 4, 2013, the Commonwealth filed a motion to dismiss Defendant's PCRA petition.  On October 11, 2013, Defendant filed a response to the Commonwealth's motion to dismiss.  On October 17, 2014, this Court sent Defendant a notice pursuant to Rule 907, indicating that his petition would be dismissed because the issues raised in the petition were without merit.  Defendant did not file a response to the Rule 907 notice.  On November 13, 2014, after

independent review of Defendant's *pro se* petition, defense counsel's amended petition, the Commonwealth's motion to dismiss, and Defendant's response to the Commonwealth's motion to dismiss, this Court dismissed the petition based upon lack of merit.  On November 21, 2014, Defendant, through counsel, filed a Notice of Appeal to the Superior Court.

*Commonwealth v. Miller*, PCRA Ct. Op., Nov. 13, 2014.  The Pennsylvania Superior Court affirmed the dismissal of the fourth PCRA petition. These statements are reviewed separately.

　　　　　　　1. The David Williams Statement Implicating Jack Williams.

Petitioner claims that the Commonwealth violated *Brady* when it failed to disclose David Williams' police statement implicating Jack Williams in the separate and unrelated murder of Paul Jones.  (Pet'r's Mem. at 38, 41.) David Williams gave a police statement implicating Jack Williams in the murder of Paul Jones ninety minutes before he made a very similar statement implicating Petitioner in the Mullen murder.  Detectives recorded a summary of the statement on an "Investigation Interview Record," a standard form used by the Philadelphia Police Department Homicide Division. (Pet'r's Mem., Ex. S, Selected Pages of Materials received from J. Williams on June 1, 2012, Investigation Interview Record of David Williams, Mar. 4, 1997.)  Petitioner's attorneys obtained this Record from Jack Williams on June 1, 2012 as part of the discovery materials related to Jack Williams' conviction for the Jones murder.

The Commonwealth possessed the Investigation Interview Record and did not disclose it to Petitioner which, according to Petitioner, constitutes a *Brady* violation. Respondents contend that this *Brady* claim is untimely, procedurally defaulted, and meritless.

The Pennsylvania Superior Court affirmed Petitioner's judgment of sentence on December 29, 2000, and he did not seek allowance of appeal to the Pennsylvania Supreme Court.

25

Petitioner's judgment of sentence became final on January 29, 2001, upon expiration of the

thirty-day deadline for seeking allowance of appeal to the state Supreme Court. *See* Pa. R.A.P.

1113(a). The one-year statute of limitations for filing a federal habeas petition began to run on

this date. *See* 28 U.S.C.A. § 2244(d)(1). Petitioner's first, timely filed PCRA petition was filed

one hundred and six days later, on May 15, 2001, and remained pending in state court until April

19, 2005, when the Pennsylvania Supreme Court denied allowance of appeal from the Superior

Court's affirmance of the dismissal of the PCRA petition. The statute of limitations was tolled

during the pendency of Petitioner's properly-filed, first PCRA petition. *See* 28 U.S.C.A. §

2244(d)(2). The statute of limitations then began to run again, and expired on January 3, 2006.

Petitioner acknowledges that he did not raise his *Brady* claim concerning the

police statement about Jack Williams in federal court until February 21, 2013, when he included

this claim in an amendment to his second habeas Petition. (Pet'r's Mem. at 28.) Thus, Petitioner

raised this claim more than six years after the expiration of the federal statute of limitations.

Petitioner maintains, however, that this claim is timely pursuant to 28 U.S.C. §

2244(d)(1)(D). (Pet'r's Mem. at 25.) Specifically, he argues that "[u]ntil March 1, 2012, [when

his representatives purportedly interviewed Jack Williams], despite continued and diligent efforts

to establish his innocence for more than a decade, [Petitioner] had no way of knowing that David

Williams falsely implicated Jack Williams in another, unrelated murder on the same day that he

implicated [Petitioner] in the Mullen murder." (*Id.* at 28.) Section 2244(d)(1)(D) provides that

the one·year limitations period may start on "the date on which the factual predicate of the claim

or claims presented could have been discovered through the exercise of due diligence." "[T]he

'factual predicate' of a petitioner's claims constitutes the 'vital facts' underlying those claims."

*McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007); *accord Champney v. Sec'y, Pa. Dep't Corr.*, 469 F. App'x 113, 116 (3d Cir. 2012). Respondents argue that the vital fact underlying Petitioner's *Brady* claim - that David Williams gave a police statement implicating Jack Williams in a separate murder before providing his statement in this case - has been known by Petitioner since his 1998 trial.

Petitioner's second, third, and fourth PCRA petitions did not give rise to statutory tolling because these petitions were filed after the expiration of the federal one-year statute of limitations: on October 23, 2007, April 19, 2011, and September 20, 2012, respectively. As found by the state courts, these petitions were untimely under the PCRA's one-year time bar, and thus were not "properly filed" as required by 28 U.S.C. § 2244(d)(2). *See Pace*, 544 U.S. at 417.

David Williams specifically testified at Petitioner's trial that homicide detectives questioned him about Jack Williams right before they interviewed him about Petitioner's involvement in the murder of Mullen. *See* N.T. 09/24/98, 81-82. This trial testimony arguably alerted Petitioner that David Williams gave a statement accusing Jack Williams of a separate murder immediately before providing his statement against Petitioner in the Mullen case.

The Commonwealth argues that the evidence was not suppressed because "the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991). *Accord United States v. Claxton*, 766 F.3d 280, 304 (3d Cir. 2014). Petitioner arguably knew of the essential fact that David Williams gave a police statement implicating Jack Williams in a separate murder by virtue of David Williams' testimony on direct examination at trial that homicide detectives "asked me questions about Jack Williams" before questioning him about

27

Petitioner.  *See* N.T. 09/24/98, 82.  Respondents thus argue that Petitioner was on notice at trial of the fact that the Jack Williams statement existed and that fact was available to Petitioner at trial to potentially impeach David Williams, therefore the statement was not suppressed for *Brady* purposes.

Petitioner's trial counsel, Leon Williams, Esquire, who, at sentencing, described Petitioner as his nephew whose case he took to try to help him, signed an affidavit in support of the instant Petition stating at no time prior to or during Petitioner's trial was he ever aware that "David Williams . . . gave a statement to police implicating Jack Williams in the Jones murder." *See* N.T. 12/15/1998, p. 2; Pet'r's Mem. at 43.  Respondents argue that to believe that counsel was unaware about the Jack Williams statement, it would have to be presumed that counsel was not paying attention when David Williams testified about the statement but the "strong presumption" in the law is that counsel was competent, citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  Given David Williams' trial testimony about the statement, they contend that trial counsel should have known about the statement and this is sufficient to find that the statement was not suppressed. *See Perdomo*, 929 F.2d at 973 ("Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence").

Petitioner notes, however, that the Commonwealth does not argue that it ever disclosed this evidence, thus the Commonwealth's argument that its alleged Constitutional violations should be excused because he knew or should have known about the evidence regarding Jack Williams is unavailing and contrary to binding precedent in this Circuit. Petitioner cites *Dennis*, 834 F.3d at 290, in which the Third Circuit noted that "[t]he United

States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady* as this would clearly be."  Pl.'s Reply Br., p. 5 (citing *Dennis*, 834 F.3d at 290).

In addition to contending that this claim is time-barred and defaulted, Respondents also contend that this claim fails on its merits.  Under *Brady*, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S.Ct. 627, 630 (2012).  The defendant "has the burden of establishing a *Brady* violation." *United States v. Felix*, 221 F. App'x 176, 177 (3d Cir. 2007). *Accord Carter v. Parker*, 2014 WL 3964924 at *35 (E.D. Pa. 2014) (adopted report and recommendation) ("The burden is on the defendant to prove that the Commonwealth committed a *Brady* violation").  Respondents contend that Petitioner has not carried his burden of demonstrating any of the three requirements of *Brady*. We recommend that this argument should be rejected.

David Williams' police statement accusing Jack Williams of murdering Paul Jones corroborates the credibility of David's police statement against Petitioner.  Respondents cite the state court opinion in the Paul Jones case which states "[t]he evidence of [Jack Williams'] guilt was overwhelming . . . including eyewitness identification, defendant's testimony that he harbored a raging grudge against the victim, his threat, and later admission that he was going to kill the victim." *Commonwealth v. Jack Williams*, 2002 WL 34401582. According to Respondents, this evidence demonstrating that Jack Williams murdered Paul Jones strongly indicates that David Williams' statement implicating Jack Williams in the Jones killing is more likely than not truthful. Thus, Respondents argue that evidence that David Williams

accurately and credibly identified the killer in another case substantiates, rather than undermines, the truthfulness of his statement about Petitioner's guilt in the Mullen case.

Petitioner argues that "[n]ow . . . David Williams admits that he fabricated" his statement against Jack Williams.  (Pet'r's Mem. at 40.)  However, the history of David Williams' recantations of his statement against Petitioner shows that the recantations have been obvious lies and have even led to David Williams' guilty plea to perjury, thereby undermining the credibility of David Williams' claim in 2012 to a defense investigator that he supposedly made up his statement against Jack Williams.  (Pet'r's Mem., Ex. Q.)  The evidence of Jack Williams' guilt confirms the reliability of David Williams' initial statement against Jack Williams.  David Williams' recantation in 2012 of his Jack Williams statement is not more believable than his admittedly perjurious recantations of his statement against Petitioner.  Petitioner alleges that "David Williams also now explains that the evidence he provided against Jack Williams could easily be disproven through prison telephone records."  (Pet'r's Mem. at 40.)  Respondents contend, in return, that David Williams' police statement did not specify the date of the telephone call in which Jack Williams admitted that he killed Paul Jones and the statement did not specify that the call involved an official prison telephone subject to recording. In addition, David Williams told the police in his statement that he was told by four people besides Jack Williams that Jack murdered Paul Jones: Jesse Booker, Keith Edwards, Eugene Patterson, and Dwayne Wright.  (Pet'r's Mem., Ex. S, pp. 2, 4.)  Thus, prison telephone records would not disprove the entirety of David Williams' statement against Jack Williams.

Petitioner also contends "[t]hat the Commonwealth did not call [David Williams] as a witness in Jack Williams' murder trial further demonstrates that the police knew that his

accusations against others were false." (Pet'r's Mem. at 40.)  Contrary to Petitioner's argument,

David Williams was an uncooperative witness at Petitioner's 1997 preliminary hearing, which

predated Jack Williams' 1998 trial.  It was reasonable for the prosecution to not call David

Williams as a witness in the Jack Williams trial if his testimony was redundant of other witnesses

and if it could lead to David Williams turning into a hostile witness, not because the prosecution

disbelieved his corroborated police statements.

      "To demonstrate prejudice excusing the procedural default of a *Brady* claim, a

habeas petitioner must show that the undisclosed evidence is material."  *Johnson v. Folino*, 705

F.3d 117, 128 (3d Cir. 2013).  The Third Circuit reviewed how this Court must evaluate the

materiality of Brady:

> "The materiality of *Brady* material depends almost entirely on the value of the
> evidence relative to the other evidence mustered by the state."  *Rocha v. Thaler*,
> 619 F.3d 387, 396 (5th Cir. 2010)(internal quotation marks and citation omitted).
> Suppressed evidence that would be cumulative of other evidence or would be used
> to impeach testimony of a witness whose account is strongly corroborated is
> generally not considered material for *Brady* purposes.  *Id.* at 396-97.  Conversely,
> however, **undisclosed evidence that would seriously undermine the testimony
> of a key witness may be considered material when it relates to an essential
> issue if the testimony lacks strong corroboration**.  *Id.* at 397.
>    A court must "evaluate the tendency and force of the undisclosed evidence
> item by item" to determine whether the evidence is material.  *Kyles*, 514 U.S. 436
> n.10, 115 S.Ct. 1555.  In addition, a court must "evaluate its cumulative effect for
> purposes of materiality separately."  *Id.* Individual items of suppressed evidence
> may not be material on their own, but may, in the aggregate, "undermine[]
> confidence in the outcome of the trial."  *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375.

*Id.* at 129 (emphasis added).

      Respondents argue that David Williams' statement accusing Petitioner of

Mullen's murder was corroborated by Mike Arnold's trial testimony and ballistics and physical

evidence, and cumulative evidence corroborating an already substantiated police statement would

not have created a reasonable probability of a different outcome at trial.  Thus, Respondents contend that David Williams' statement against Jack Williams does not impeach David Williams' statement against Petitioner, but rather confirms the latter statement's truthfulness.

The suppressed Jack Williams evidence is favorable to Petitioner. The only direct evidence presented against him at trial was David Williams' statement to detectives on March 4, 1997, following his arrest for robbery, that Petitioner confessed to David Williams that he killed Mullen. The only other evidence presented at trial implicating Petitioner in Mullen's murder was testimony from Mike Arnold that he observed Petitioner pick up an inoperable gun from the street approximately two months before the shooting. Within hours on the same day that David Williams gave the statement to detectives implicating Petitioner, David Williams also gave a very similar statement implicating Jack Williams in a different murder.  David Williams now admits that he fabricated both statements in hopes of getting a lenient sentence for the robbery charges he faced.  David Williams' statement became the prosecution's key piece of evidence in Petitioner's trial because it was the only evidence that connected Petitioner to Mullen's murder. At the time of Petitioner's trial, David Williams had already recanted his statement to police implicating Petitioner.

Nevertheless, the Commonwealth's case against Petitioner depended on the jury believing David Williams' original statement implicating Petitioner over his recantations at the preliminary hearing and at trial. Evidence that David Williams gave the police irrefutably false information about Jack Williams and Mark Manigault (which directly related to his accusation against Petitioner) on the same day he gave the original statement against Petitioner would have provided a forceful method of impeaching David Williams' statement.  As Petitioner notes, this

new information reveals that David Williams was willing to say just about anything, including

demonstrably and incontestably false information, in an attempt to reduce his sentence.

As Judge Bender wrote in his opinion concurring and dissenting with the majority

of the Superior Court denying Petitioner's appeal of his Fourth PCRA Petition:

> David's [Williams] statement regarding Jack [Williams] was given to the police
> on the same day that David implicated Appellant for the murder of Mullen and,
> thus, it tends to corroborate David's and Arnold's recantations.
>
> Appellant believes, reasonably, that if the jury was aware that David has falsely
> implicated another person in an unrelated murder within hours of implicating
> Appellant, they would have been more inclined to believe David's recantation and
> disbelieve his initial statement to police.

(Pet., Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 2-3 (dissenting)(emphasis

added)).

If the Commonwealth had not suppressed the record of David Williams' false

statement against Jack Williams which undermines the credibility of David Williams' statement

against Petitioner, that statement could have been used to further cross-examine and impeach

David Williams at Petitioner's trial, providing the jury a fuller understanding of the veracity, or

lack thereof, of David Williams' statement to police implicating Petitioner in Mullen's murder.

Accordingly, it is recommended that the Commonwealth committed a *Brady* violation in not

disclosing David Williams' police statement implicating Jack Williams in a separate murder to

Petitioner.

2.   The Mark Manigault *Brady* Claim.

Petitioner claims that the Commonwealth violated *Brady* by failing to disclose a

police statement given by Mark Manigault in this case. (Pet'r's Mem. at 38, 41.) Manigault did

33

not claim until 2011 that he was questioned by the police in this case in 1997.  The alleged

statement given by Manigault was one of the subjects of Petitioner's third amended PCRA

petition filed on November 3, 2011.  Judge Sheila Woods-Skipper, sitting as the PCRA court,

discussed this statement as follows:

> Petitioner attempts to invoke the newly-discovered evidence exception to the
> PCRA timeliness requirement, specifically citing to . . . an affidavit by Mark
> Manigault.[fn]
>
>> [fn] In addition, Petitioner claims interference by governmental
>> officials with the presentation of the claim exception because at the
>> time of trial the prosecution and police investigators failed to
>> provide information on Mark Manigault being questioned in
>> relation to the Mullen murder. Due to Petitioner not presenting any
>> evidence of government interference in bringing his present PCRA
>> claim, and merely a trial issue, this claim will be reviewed under
>> the newly-discovered evidence exception only.
>
> The Petitioner also claims the affidavit of Mark Manigault as newly-discovered
> evidence.  The Petitioner does not explain why this could not have been obtained
> through the exercise of due diligence.  Nor does Petitioner allege the specific date
> that he became aware of Mr. Manigault's evidence in order to satisfy the sixty day
> filing requirement.[fn]  The existence of Mr. Manigault was known by Mr.
> Williams, who has given multiple affidavits since trial, and no explanation is
> given for why this information was not found through due diligence by Petitioner
> through Mr. Williams.  For these reasons, Petitioner has failed to properly satisfy
> the requirements for newly-discovered evidence with regards to the affidavit of
> Mr. Manigault.
>
>> [fn] 42 Pa. C.S. § 9545(b)(2).
>
> . . . .
>
> This petition is an example of a repetitive or serial petition that should not be
> entertained given the facts and circumstances of this case.  The petition
> "evidences the problems that can arise if we permit post-conviction relief to
> destroy any concept of finality in our decisional process in the area of criminal
> law."[fn] Similar to *Lawson*, the petitioner here has repeatedly filed petitions on the
> same issue, albeit "after-discovered evidence" as opposed to ineffective assistance
> of counsel, but the same principle should hold true in this case that the mere

assertion of newly discovered evidence is not sufficient to override the
"previously litigated" provisions in § 9544(b)."

> ᶠⁿ *Commonwealth v. Lawson*, 549 A.2d 107, 110 (1988).

*Commonwealth v. Miller*, CP-51-CR-1010301-1997, pp. 3, 4, 5 (PCRA Ct. Op., 11/18/11).  On

appellate review of Petitioner's third PCRA petition by the Superior Court, that court stated:

> [O]n November 3, 2011 *pro bono* counsel filed a "Third Amended Petition for
> Post-Conviction Relief."  In this petition, Miller asserts newly-discovered
> evidence in the form of a statement from Mark Manigault, who claimed that,
> while sharing a cell with Williams, he was told by Williams that Williams "was
> going to do 'whatever it took' to get out of [jail]" and intended to "pin a homicide
> that [Williams] had done on somebody else."  Certification of Mark Manigault,
> 9/22/11.  Manigault also told Miller that Williams had told police that Manigault
> had been present for Mullen's murder so that Manigault could use that
> "information" as leverage to help himself in his own then-pending criminal case.
> Miller also alleged that, during their initial investigation of Mullen's murder,
> police had questioned Manigault, but Manigault had told them he did not know
> anything about the murder because he had been incarcerated at the time.  Miller
> claims that the police were required to disclose to him this "exculpatory evidence"
> prior to trial.  He claims that, had he been aware of Manigault at the time, he
> would have discovered that Williams had lied to the police about Manigault being
> at the scene of Mullen's murder and, consequently, he would have been able to
> argue that other parts of Williams' story were also false.  Miller claims this would
> have changed the outcome of his trial.

> On November 18, 2011, the PCRA court issued a Memorandum and Order
> dismissing Miller's petition.ᶠⁿ In its memorandum, the court found that: (1) the
> letter from David Williams recanting his prior incriminating statements is not
> "newly-discovered evidence," as Williams' recantation was previously litigated;
> (2) Miller did not demonstrate due diligence in obtaining the affidavit from Mark
> Manigault, nor did he show that he presented the evidence within 60 days of
> discovering it; and (3) Mike Arnold's recantation is not "newly-discovered"
> because he had previously recanted in similar fashion at Miller's preliminary
> hearing.  Accordingly, the court entered an order denying Miller relief.

> > ᶠⁿThe PRCA court acknowledged that Miller had filed his original
> > petition on April 19, 2011, but had amended it on June 6, 2011 and
> > again on November 3, 2011.  The court also acknowledged
> > Miller's "objections to dismissal notice," which he filed on August
> > 4, 2011.

. . . .

Here, Miller's judgment of sentence became final on January 29, 2001, thirty days after it was affirmed by this Court and the time to file a petition for allowance of appeal expired. *See* 42 Pa.C.S.A. § 9545(b)(3). Accordingly, Miller had one year from that date, or until January 29, 2002, to file a timely PCRA petition. Miller filed the first in the instant series of petitions and amendments on April 19, 2011, nearly ten years after his judgment of sentence became final. As such, his petition is untimely unless he pleads and proves one of the exceptions to the time bar under section 9545(b).

Here, Miller first claims that the PCRA court erred in dismissing his petition as untimely, having found that he failed to prove any of the exceptions to the time bar. Miller had presented numerous pieces of evidence which he claims satisfy the "after-discovered evidence" and/or "governmental interference" exceptions to the time bar. We will address each piece of evidence in turn.

. . . .

Next, Miller claims that the trial court erred in not addressing the merits of his claim that the Commonwealth failed to inform him of the existence of allegedly exculpatory evidence, in the form of a statement given to police by Manigault, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *U.S. v. Bagley*, 473 U.,S. 667 (1985). Specifically, Miller claims that during an interview with police during the course of the original murder investigation, Manigault denied knowing anything about Mullen's murder. Miller claims Manigault's denial

> directly contradicted the statement Williams apparently gave [that Manigault was at the scene of the crime] and should have alerted detectives that Williams was lying about [Miller's] involvement in the homicide. The [r]ecord of Manigault's interrogation is either exculpatory evidence or evidence that could have been used to cross-examine Williams and to corroborate his testimony at trial that he fabricated [Miller's] alleged confession.

Third Amended Petition for Post-Conviction Relief, 11/3/11, at ¶ 89.

*Brady* requires disclosure by the prosecution of evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Subsequently, in *Bagley*, the Supreme Court held that the rule in *Brady* also applies to impeachment evidence, where the reliability of a given witness may be determinative of guilt or innocence. *See also Commonwealth v.*

36

*Mitchell*, 839 A.2d 202, 216 (Pa. 2003)("A violation of *Brady* occurs when the Commonwealth suppresses material evidence favorable to the accused, and there is a reasonable probability [that] if the evidence had been disclosed the outcome of the trial would have been different.")

"Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove that the failure to previously raise these claims was the result of interference by government officials, and that the information could not have been obtained earlier with the exercise of due diligence." *Commonwealth v. Hawkins*, 953 A.2d 1248, 1253 (Pa. 2008). Here, Miller became aware of Manigault's status as a possible exculpatory witness on July 18, 2011, when Williams spoke to Project Innocence staff members and told them that he may have confessed to Manigault while imprisoned together for robbery. However, Williams has been known to Miller since prior to his trial - indeed, since childhood. Moreover, Williams has been actively cooperating with Miller's efforts to exonerate himself since at least 2003. Certainly, through the exercise of due diligence, Miller could have obtained information regarding Manigault from Williams prior to 2011.[fn] As Miller failed to demonstrate due diligence in obtaining Manigault's statement, *see id.*, his governmental interference claim must fail. Moreover, because this claim is meritless, Miller suffered no prejudice as a result of the PCRA court's failure to address it in its opinion.[fn]

> [fn]Miller or his counsel need only have inquired of Williams: "Is there anyone else to whom you confessed to shooting Mullen?"

> [fn]Because Miller did not demonstrate due diligence, we do not reach the question of whether Manigault's police interview was exculpatory in nature and, thus, *Brady* material.

*Commonwealth v. Miller*, No. 3269 EDA 2011, Pa. Super. Ct. Op., July 24, 2012, pp. 6-8, 11, 20-22.

The one-year federal statute of limitations expired in Petitioner's case on January 3, 2006 but Petitioner did not raise this Manigault *Brady* claim until six years later, on February 13, 2012, as he concedes. (Pet'r's Mem. at 27-28.) Petitioner invokes a later start date for the statute of limitations under 28 U.S.C. § 2244(d)(1)(D) and contends that "[t]he earliest date on which [Petitioner] could have discovered Mr. Manigault's evidence was on July 18, 2011" when

David Williams purportedly referenced Manigault during an interview with a defense investigator.  (Pet'r's Mem. at 26.)

Respondents contend that Petitioner could have discovered the vital fact underlying his *Brady* claim, that Manigault purportedly gave a police statement in this case, through due diligence years before the summer of 2011 by questioning David Williams, as noted by the PCRA court.  They also argue that Manigault's alleged connection to the case would have been revealed by the "simple question as to what occurred while he was in police custody on the day he gave the statement." (PCRA Ct. Op., 01/30/15, at 11.)  They further contend that Petitioner could have extracted the information about Manigault from David Williams well before 2011, or Petitioner could have gone to Manigault on his own, without going through David Williams since Williams gave his statement against Petitioner following his arrest for a series of robberies.  (N.T. 09/25/98, p. 4.) This raised the circumstances of David Williams' arrest as a potentially fruitful line of defense investigation and inquiry.  *See* PCRA Ct. Op., 01/30/15, at 11 ("Certainly, the circumstances under which a witness gives a statement while in police custody are commonly inquired into by defense counsel in order to determine a possible basis to impeach that statement").  Publicly available documentation would have revealed that David Williams' co-defendant and co-arrestee in the robberies was Mark Manigault.

Respondents also argue that this claim is also procedurally defaulted. The Superior Court rejected this claim on the basis that it was not timely raised under the PCRA's jurisdictional, one-year filing deadline. *Commonwealth v. John Miller*, 3269 EDA 2012 at 22 & n.11. Again, Respondents contend that this was an independent and adequate state law procedural ruling giving rise to a procedural default.

Assuming, *arguendo*, that Petitioner's claim of actual innocence provides a gateway for this Court to consider this claim on its merits, despite a supposed untimeliness of and procedural default of this claim, this Court disagrees with Respondents that Petitioner has not satisfied any of three requirements for a successful *Brady* claim: that the alleged police statement from Manigault is favorable to the defense, that the Commonwealth suppressed this purported statement, or that this evidence is material.

A statement from Manigault that he did not know anything about the Mullen murder would undermine David Williams' police statement accusing Petitioner of Mullen's murder if David Williams claimed in the police statement that Manigault knew something about Mullen's murder. However, David Williams' police statement contains no reference to Manigault nor claim that Manigault had information about Mullen's murder.  (N.T. 09/24/98, 117-129; Pet'r's Ex. E.)  Manigault's professing complete ignorance of the circumstances of Mullen's killing because he was imprisoned at the time does not establish Petitioner's innocence. *See Ramirez v. DiGuglielmo*, 2014 WL 4473651 at *12 (E.D. Pa. 2014) (adopted report and recommendation) ("[E]xculpatory evidence is that which 'intrinsically tends to establish [the] defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is merely collateral or impeaching'").

Although Petitioner insists that "the record of Mr. Manigault's interrogation . . . undermines the credibility of David Williams' entire statement against [him]," the favorability prong of *Brady* is not met.  (Pet'r's Mem. at 41.)  Petitioner cannot demonstrate that this statement was suppressed.  Manigault did not claim that he was questioned by the police in this case until 2011, more than fourteen years after the alleged questioning.  This belated assertion is

refuted by David Williams' police statement, which contains no reference to Manigault. In the absence of any mention of Manigault by David Williams, the police in the Mullen case would have no reason to believe Manigault had any information about the Mullen murder.

Additionally, Petitioner has not established, as he must, that a Manigault police statement even existed.  Manigault claims that he was "interrogated" by police and he told them that he "didn't know anything."  (Pet'r's Mem., Ex. P at 1.) This statement does not demonstrate that Manigault's answers were reduced to a statement, especially since Manigault had no meaningful information to provide.  (Pet'r's Mem. at 43.)  Petitioner has not established that a Manigault police statement even existed, much less that such a statement was withheld by the prosecution. *See Marinelli v. Beard*, 2012 WL 5928367 at *46 (M.D. Pa. 2012) ("it is axiomatic that a *Brady* claim cannot survive where a defendant fails to demonstrate that evidence allegedly withheld by the prosecution even existed in the first instance").

Respondents contend that any hypothetical Manigault police statement that Manigault knows nothing about the Mullen murder is not material evidence because it neither exculpates Petitioner nor impeaches David Williams' police statement. This Court disagrees. David Williams' statement does not include a "claim that Mr. Manigault had information about [Petitioner's] role in the Mullen murder." (Pet'r's Mem. at 46.)  His statement does not mention Manigault.  (N.T. 09/24/98, pp. 117-129; Pet'r's Ex. E.)  Petitioner maintains, however, that "if [Petitioner] had been given the information regarding Mr. Manigault, he could have interviewed Mr. Manigault and learned that David Williams admitted to Mr. Manigault that David Williams had falsely accused [Petitioner] to gain leniency for himself." (Pet'r's Mem. at 45-46.)  This is speculative, however, and the "mere possibility" that evidence might help the defense "does not

40

establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110

(1976).  However, Detectives would have recorded a summary of Mr. Manigault's interrogation

on an "Investigation Interview Record," but the Commonwealth never told Petitioner or his trial

counsel about the interrogation or any record thereof.  (Pet., Ex. BB, Aff. of Leon Williams,

October 26, 2011, 5.) (stating that he was never told of Manigault's identity or that Philadelphia

police officers or detectives had questioned Manigault in connection with Mullen's murder).

Because prosecutors failed to do so, all information, documents, or other materials regarding Mr.

Manigault were withheld.

       Hearsay testimony from David Williams' co-robber repeating what the jury heard

from David Williams himself, that David Williams' police statement was fabricated, may not

have alone created a reasonable probability of a different outcome at trial, but it would be a

statement affecting David Williams' credibility.  *Brady* requires such statements to be turned

over to a defendant.  *See Wilson v. Beard*, 589 F.3d 651, 659, 666-67 (3d Cir. 2009).

       This Court must also consider the impact of the withheld evidence on pre-trial

decisions by defense counsel while preparing for trial, in addition to decisions made at trial.

*United States v. Bagley*, 473 U.S. 667, 683 (1985).  The defense in a criminal case is entitled to

disclosure of information that would call into question the thoroughness or good faith of the

police investigation, or police knowledge of information that contradicts their selected witnesses

or theory of guilt. *See Kyles*, 514 U.S. at 446.  If Petitioner had been given the information

regarding Manigault, he could have interviewed Manigault and learned that David Williams

admitted to Manigault that he falsely implicated Petitioner to gain leniency for himself, serving

as an independent piece of evidence from a third party corroborating David Williams' recantation

and undermining his initial statement to police.

Considering the totality of the evidence as required by *Kyles*, if David Williams' withheld statement against Jack Williams and Manigault's withheld statement disproving David Williams' statement had both been presented to the jury, "[d]isclosure. . .would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Id.* at 441 (noting the District Court's statement that "'the essence of the State's case' was the testimony of eyewitnesses").

Petitioner notes that the only member of the Pennsylvania Superior Court to ever address the merits of his *Brady* claims concluded that the withheld evidence would have "reasonably" caused the jury to reach a contrary conclusion as to the credibility of David Williams' original statement. (Pet., Ex. AA, *Commonwealth v. Miller*, No. 3563 EDA 2014, at 2-3 (Bender, J., dissenting)(emphasis added)) ("Appellant believes, reasonably, that if the jury was aware that David has falsely implicated another person in an unrelated murder within hours of implicating Appellant, they would have been more inclined to believe David's recantation and disbelieve his initial statement to police." (emphasis added).)  The key evidence against Petitioner was a police statement made by David Williams implicating Petitioner, given while David Williams was trying to secure a lighter sentence for himself.  David Williams' statement against Petitioner was one in a series of statements David Williams made against various people in an attempt to convince police to give him a lesser sentence.  David Williams recanted his statement even before Petitioner's preliminary hearing, and he has been confessing to Mullen's murder for more than a decade. David Williams' statement against Petitioner could have been impeached with evidence of his similarly untrue statements about Jack Williams and Mark

42

Manigault.

   The evidence was favorable to Petitioner, withheld by the prosecution, and material.  The Commonwealth's failure to disclose it prejudiced Petitioner.  This Court must ask "[i]n light of this newly disclosed evidence, and the relative paucity of other evidence connecting [petitioner] to the [Mullen] murder . . ., could confidence in the verdict be undermined?" *Bridges v. Beard*, 941 F. Supp.2d 584, 609 (E.D. Pa. 2013)(citing *Johnson*, 705 F.3d at 132). These violations of *Brady* undermine confidence in Petitioner's verdict.  He is entitled to habeas relief and a new trial.

**V.  CERTIFICATE OF APPEALABILITY.**

   Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district court judge is required to make a determination as to whether a certificate of appealability ("COA") should issue. A COA should not issue unless the petitioner demonstrates that jurists of reason would find it to be debatable whether the petition states a valid claim for the denial of a constitutional right.

   For the reasons set forth above, we believe that reasonable jurists could debate the Court's conclusion that Petitioner is entitled to a new trial based on *Brady* violations and an inadequate remedy under state law. On this basis, it is recommended that a COA should be granted on these claims.

   Therefore, I make the following:

## RECOMMENDATION

AND NOW, this   12th    day of June, 2019, it is respectfully RECOMMENDED

that the Petition for a writ of habeas corpus should be CONDITIONALLY GRANTED; and that

the Petitioner should be discharged from all custody resulting from his conviction and sentence

in the Philadelphia Court of Common Pleas in Criminal Number CP-51-CR-1010301-1997

UNLESS, within 180 days from the date of final determination of this matter, the

Commonwealth of Pennsylvania retries the charges against Petitioner.  It is further

RECOMMENDED that there is probable cause to issue a certificate of appealability limited to

the issue of *Brady* violations and an inadequate remedy under state law.

Any party may file objections to this Report and Recommendation.  *See* Local

Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.


BY THE COURT:



   */s/ Henry S. Perkin*
HENRY S. PERKIN
UNITED STATES MAGISTRATE JUDGE